**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

HEALTHY GULF
100 Common Street
Suite 902
New Orleans, LA 70112,

BAYOU CITY WATERKEEPER
2010 N Loop West
Suite 103
Houston, TX 77018,

FRIENDS OF THE EARTH
1101 15th Street, NW
11th Floor
Washington, DC 20005,

CENTER FOR BIOLOGICAL DIVERSITY
378 N Main Avenue
Tucson, AZ 85701,

NATURAL RESOURCES DEFENSE COUNCIL
40 West 20th Street
11th floor
New York, NY 10011,

and

SIERRA CLUB
2101 Webster Street
Suite 1300
Oakland, CA 94612,

                         *Plaintiffs*,

        v.

DEBRA A. HAALAND, in her official capacity as
SECRETARY OF THE INTERIOR
1849 C Street NW
Washington, DC 20240,

Civil Action No.   23-cv-00604

LAURA DANIEL-DAVIS, in her official capacity
as PRINCIPAL DEPUTY ASSISTANT
SECRETARY OF THE INTERIOR FOR LAND
AND MINERALS MANAGEMENT
1849 C Street NW
Washington, DC 20240,

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240,

and

BUREAU OF OCEAN ENERGY MANAGEMENT
1849 C Street NW
Washington, DC 20240,

*Defendants*.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      Plaintiffs Healthy Gulf, Bayou City Waterkeeper, Friends of the Earth, Center for Biological Diversity, Natural Resources Defense Council, and Sierra Club (collectively, "Plaintiffs") challenge the unlawful decision by Secretary of the Interior Debra Haaland, acting through her delegated authority to Laura Daniel-Davis, the Principal Deputy Assistant Secretary of the Interior for Land and Minerals Management, the Department of the Interior, and the Bureau of Ocean Energy Management ("the Bureau") (collectively, "Defendants"), to hold Gulf of Mexico Oil and Gas Lease Sale 259 based on insufficient and arbitrary environmental analyses, in violation of the National Environmental Policy Act (NEPA) and the Administrative Procedure Act (APA).

2.      The Gulf of Mexico is one of the most productive and biodiverse ecosystems in the United States, providing a home to thousands of species ranging from simple invertebrates to highly evolved marine mammals including dolphins and whales. The Gulf includes habitat for five of the world's seven species of sea turtles and is the exclusive home of the critically endangered Rice's whale, a species that scientists estimate has fewer than 100 individuals remaining, with recent surveys estimating 50 individuals or less. Oil and gas operations have already caused grave harm to the Gulf ecosystem as a result of seismic activities, ship strikes, and accidents, including the massive *Deepwater Horizon* spill in 2010. Studies estimate that the Rice's whale suffered a 22 percent population loss as a result of the 2010 disaster with over half of the spill's footprint overlapping with the species' habitat. Gulf Coast communities have also suffered from the pollution impacts of oil and gas activities and infrastructure. In addition, the climate impacts from fossil fuel development and use have significantly harmed the Gulf ecosystem and communities through sea level rise, coastal erosion, and increased storms.

3.      President Biden's administration has recognized that climate change presents an existential threat to the nation and the world, and that bold, immediate actions are needed to achieve emission reductions and curb the climate emergency facing the planet. Despite this, Defendants are now offering over 73 million acres of public waters to the oil and gas industry, one of the largest offshore lease sales in U.S. history. Lease Sale 259 will result in the production of up to 1.12 billion barrels of oil and 4.4 trillion cubic feet of natural gas over the next 50 years, thus contributing substantially to greenhouse gas pollution that will exacerbate the climate crisis worldwide, undermine national and international efforts to transition to clean energy, and increase harms to Gulf communities.

4.      On January 10, 2023, the Bureau released its Final Supplemental Environmental Impact Statement ("Final SEIS") that was intended to assess the environmental effects of its leasing decision. However, the Final SEIS failed to take the required "hard look" at the significant impacts of this massive lease sale. For example, the Final SEIS failed to properly disclose and consider the significant harm from ship strikes, pollution, and oil spills on endangered species such as the Rice's whale, finding instead that such impacts would be "negligible." The Bureau also failed to consider the latest data from the National Marine Fisheries Service (NMFS) on Rice's whale habitat and its overlap with proposed leasing areas. The Bureau did not rationally evaluate the impacts of greenhouse gas emissions, relying instead on problematic modeling and assumptions to conclude that this massive lease sale will result in only "slightly higher domestic emissions" than not leasing at all, and further failed to consider the impacts of such fossil fuel development on climate goals and commitments. With regard to environmental justice, the Final SEIS arbitrarily dismissed the impacts of onshore oil and gas infrastructure—refineries, petrochemical plants, and other industrial sources that process fossil

fuels and related products from Lease Sale 259—on Gulf communities. The Final SEIS also ignored the latest air quality data from the Bureau's own air pollutant emissions inventory and from the Environmental Protection Agency (EPA). Moreover, the Final SEIS presented an incomplete and misleading picture of oil spill impacts and risks based on flawed modeling that failed to properly consider reasonably foreseeable accidents. Finally, the Bureau failed to fully account for the many other industrialized activities in the Gulf of Mexico in its cumulative impacts analysis.

5.    The Bureau further violated NEPA by failing to consider reasonable scaled-back alternatives to its proposed action, instead evaluating only the leasing of almost all available areas of the Western, Central, and Eastern Gulf OCS planning areas. The Bureau incorrectly determined that the four alternatives it considered would barely differ in terms of their impacts, denying Plaintiffs the meaningful comparison of alternatives that NEPA requires, and the Bureau the distinctions it needed to make an informed decision. In addition, the Bureau rejected reasonable alternatives identified during the comment process that would have significantly reduced environmental impacts while still meeting the purpose and need for the action as well as the Bureau's legal obligations.

6.    Finally, in its rush to complete the Final SEIS, the Bureau failed to adequately respond to Plaintiffs' comments on the draft SEIS, offering only boilerplate responses and failing to grapple with and respond to substantive technical and legal critiques of the draft SEIS.

7.    On February 24, 2023, the Bureau released a Record of Decision to hold Lease Sale 259. 88 Fed. Reg. 12,413 (Feb. 27, 2023). In the Record of Decision, the Bureau decided to offer for lease a subset of the blocks analyzed as Alternative D in the Final SEIS, encompassing approximately 13,600 OCS blocks and 73.3 million acres, although it did not change its estimate

of oil and gas production that would result from the lease sale or the environmental impacts from the sale. The Record of Decision noted that, although the Bureau was required by the Inflation Reduction Act of 2022 to hold Lease Sale 259 by March 30, 2023, that law did not disturb the Bureau's normal leasing procedures or ability to determine the size, location, or terms of the lease sale.

8.      On February 27, 2023, the Bureau issued its Final Notice of Sale for Lease Sale 259, providing that the lease sale will be held on March 29, 2023. 88 Fed. Reg. 12,404 (Feb. 27, 2023).

9.      The Bureau's arbitrary and capricious decision to hold Lease Sale 259 violated NEPA and resulted in Defendants making this lease sale decision without an adequate consideration or understanding of its environmental effects or a proper consideration of alternatives.

10.     Plaintiffs ask this Court to declare that Defendants' decision to hold Lease Sale 259 violates NEPA and the APA, to vacate the unlawful decision to hold Lease Sale 259, and to vacate or enjoin any leases issued or actions taken pursuant to the unlawful Lease Sale 259 unless and until Defendants comply with the law.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§ 702–706 (APA).

12.     Venue is appropriate under 28 U.S.C. § 1391(e)(1) because the U.S. Department of the Interior and the Bureau's headquarters are located in this District, a plaintiff resides in this District, and a substantial part of the events and omissions which gave rise to this action occurred in this District.

13.     This Court has authority to grant the requested relief in this case pursuant to the

APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

**PARTIES**

14.     Plaintiff HEALTHY GULF is a network of community, conservation,

environmental, and fishing groups and individuals committed to empowering people to protect

and restore the natural resources of the Gulf of Mexico. Healthy Gulf's purpose is to collaborate

with and serve communities who love the Gulf of Mexico by providing research,

communications, and coalition-building tools needed to reverse the long-pattern of over-

exploitation of the Gulf's natural resources. Healthy Gulf has been actively involved in efforts to

strengthen oversight of the offshore oil and gas industry and end new oil and gas leasing in this

region. Healthy Gulf is headquartered in New Orleans, Louisiana, with offices in Pensacola,

Florida and Madison, Mississippi. Healthy Gulf's members live in the five Gulf states of Texas,

Louisiana, Mississippi, Alabama, and Florida, and nationwide. For example, a member of

Healthy Gulf is a small business owner of a Ship Island excursion company, which offers cruises

to Ship Island, offshore from Mississippi, as well as dolphin watching cruises in the Gulf. The

business has been in his family for generations. He relies on a healthy environment, clean waters,

and healthy marine life to continue the family business which has already been adversely

impacted by oil and gas development activities in the Gulf, as well as resulting climate change.

Healthy Gulf brings this action for itself and as representative of its members.

15.     Plaintiff BAYOU CITY WATERKEEPER is a nonprofit, membership-based

organization based in Houston, Texas, with approximately 2,600 members and supporters.

Bayou City Waterkeeper's mission and purpose is to address environmental injustices caused by

water pollution and infrastructure and promote equity and climate resilience in decisions

affecting the waters and people across the Lower Galveston Bay watershed, which stretches from Lake Livingston and the Katy Prairie south to the Brazos River and out to Galveston Bay and encompasses the entire greater Houston region. As part of this work, Bayou City Waterkeeper monitors major sources of water pollution, wetland destruction, and climate risks across the Lower Galveston Bay watershed. Offshore oil and gas drilling, including from Lease Sale 259, affects Bayou City Waterkeeper's interests in at least two ways: (1) by increasing greenhouse gas emissions, which in turn intensifies the major storms the region already faces, decreasing communities' ability to prevent flooding and undermining local efforts to create flood protections, of which Bayou City Waterkeeper is a part, and (2) by increasing onshore fossil fuel infrastructure development along the Texas coast and inland waterways, which results in destruction of wetlands and other habitats, creates new pollution and health risks for neighboring communities, and affects the organization's recreational and aesthetic interests in wetlands and waterways. Bayou City Waterkeeper's members' interests will be affected in a manner consistent with these concerns. Bayou City Waterkeeper's members include individuals advocating for flood protection policies, the effectiveness of which depends on the reduction of greenhouse gas emissions. Bayou City Waterkeeper's members also include individuals advocating for wetlands protection, living near facilities supporting offshore oil and gas development, and/or using wetlands and waterways for recreation or other aesthetic interests. Bayou City Waterkeeper brings this action for itself and as representative of its members.

16.     Plaintiff FRIENDS OF THE EARTH ("FoE") is a 501(c)(3) nonprofit, membership-based organization headquartered in Washington, D.C. FoE currently has over 1.5 million activists and over 140,000 members, located across all 50 states and the District of Columbia. FoE's primary mission is to defend the environment and champion a more healthy

and just world by collectively ensuring environmental and social justice, human dignity, and respect for human rights and peoples' rights. FoE and its members are dedicated to fighting to reduce greenhouse gas emissions and domestic reliance on fossil fuels and support a temporary pause on oil and gas leasing on federal public lands and water. Specifically, FoE's Climate & Energy and Oceans & Vessels programs directly engage in administrative and legal advocacy to protect the environment and society from climate change, pollution, and industrialization associated with fossil fuel development and greenhouse gas emissions. FoE's members recreate and enjoy the waters and wildlife in the Gulf. For example, a Friends of the Earth member, who is also a member of Sierra Club, visits the Gulf of Mexico regularly with his family to fish and recreate, and hopes to continue doing so in the future. He enjoys fishing, surfing, viewing the wildlife habitats, and visiting rescued turtles on South Padre Island. His enjoyment depends on a healthy environment and abundant marine wildlife protected from oil and gas impacts. Friends of the Earth brings this action for themselves and as representatives of its members.

17.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit corporation that maintains offices across the United States and Baja California Sur, Mexico. The Center advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law. The Center's mission also includes protecting air quality, water quality, and public health. The Center's Oceans Program focuses specifically on conserving marine ecosystems, and seeks to ensure that imperiled species such as marine mammals, corals, and sea turtles are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from the air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the Gulf of Mexico from the harmful impacts of

offshore oil and gas drilling. The Center has more than 89,000 members, including members who live and recreate throughout the Gulf of Mexico region. These members appreciate and benefit from wildlife in the Gulf of Mexico, such as Rice's whales, sperm whales, loggerhead sea turtles, Kemp's ridley sea turtles, leatherback sea turtles, and corals threatened by noise pollution, vessel traffic, oil spills, and/or climate pollution caused by oil and gas activity. For example, the Center has a member who regularly visits the Gulf of Mexico to enjoy marine wildlife. They go to the Gulf of Mexico to observe whales, sea turtles, and other marine mammals. This member works to advocate for wildlife protections from threats such as oil and gas development, pollution, and habitat destruction. Additionally, the Center's member has a strong interest in conserving sea turtles, regularly visiting Gulf sea turtle habitat and nesting beaches to view and enjoy observing turtles there. The Center brings this action for itself and as representative of its members.

18.    Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a nationwide not-for-profit, tax-exempt membership organization organized under New York law. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC has over 365,000 members nationwide, more than 30,000 of them in the Gulf of Mexico region. NRDC is working to solve the most pressing environmental issues we face today, including environmental injustice, air pollution, and climate change. NRDC's advocacy to protect ocean and coastal ecosystems and wildlife, including the Gulf of Mexico and its marine life, from the harms of oil production dates back decades. NRDC members have economic, recreational, aesthetic, and other interests in areas and animals threatened by the lease sale. For example, one NRDC member lives on the coast in Texas—he makes art from beach sand and enjoys sailing, swimming, and observing ocean wildlife. Another

NRDC member lives in Texas and visits the Gulf Coast regularly to birdwatch and view other wildlife. A third NRDC members lives on a barrier island on the Gulf Coast in Texas and goes to local beaches and wetlands regularly to observe wildlife and create art depicting the natural environment. Continued oil and gas development would injure their interests.

19.     Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club is one of the oldest and largest conservation groups in the country, with more than 800,000 members nationally in over 60 chapters in all of the 50 states, the District of Columbia, and Puerto Rico, including over 38,000 members in its Gulf chapters. Sierra Club members use the public lands and waters throughout the Gulf, including those that would be affected by oil and gas activities, for quiet recreation, aesthetic pursuits, and spiritual renewal. Sierra Club members further observe and enjoy wildlife found in the Gulf that may be harmed by oil and gas activities. Sierra Club brings this action for itself and as representative of its members.

20.     Plaintiffs and Plaintiffs' members and staff regularly use, enjoy, and benefit from the marine and coastal environments of the Gulf of Mexico, including waters within and adjacent to the five Gulf states, and plan to continue doing so in the future. Plaintiffs and Plaintiffs' members and staff regularly enjoy and benefit from the presence of healthy marine and avian life within those environments for recreational, aesthetic, commercial, scientific, and environmental purposes, including whale watching, bird watching, scientific study, boat touring, underwater diving, fishing, photography, sculpture, and beach bathing.

21.     Lease Sale 259 will directly and irreparably injure these interests. Lease Sale 259 will, for example, increase vessel traffic and noise pollution and increase the risk of oil spills and other accidents. Lease Sale 259 will also contribute to environmental pollution from associated onshore oil and gas infrastructure located in Gulf communities. Further, Lease Sale 259 will increase global greenhouse gas emissions and result in additional climate impacts. The abilities of Plaintiffs and Plaintiffs' members and staff to pursue these interests hinge on the health of the marine, coastal, and estuarine ecosystems (with clean water and oil-free beaches) and the well-being of the species that live, migrate, feed, and breed in areas affected by oil and gas activities. Defendants are authorizing oil and gas development without a full and accurate analysis of its impacts or reasoned consideration of how to avoid or mitigate those impacts. As a result, Defendants are enabling new oil and gas development to negatively impact the environment in which Plaintiffs and Plaintiffs' members and staff have an interest. The interests of Plaintiffs and Plaintiffs' members and staff have been, are being, and will be adversely affected by Defendants' violations of federal law, as described herein. These harms can be remedied only if Defendants are forced to comply with the requirements of NEPA and the APA. Were Defendants directed to complete the required NEPA analysis, it could require additional environmental mitigation of the lease sale's impacts or the adoption of alternatives that would minimize or avoid such impacts in the first place. Plaintiffs have no other adequate remedy at law.

22.     Defendants' failure to comply with NEPA by relying on flawed analysis also deprives Plaintiffs and their members of procedural rights and information guaranteed by NEPA. Plaintiffs and their members have advocated and will continue to advocate for the protection of the Gulf and in opposition to oil and gas leasing and its environmental impacts; seek to discuss the issue with relevant decisionmakers to encourage consideration of alternatives that would

avoid, minimize, or mitigate environmental harm; and seek to provide information to the public and the media regarding the lease sale and its impacts on the sensitive environmental resources of the Gulf of Mexico. If Defendants had complied with NEPA, the process would have generated additional information on the lease sale's impacts to the species, climate, and other environmental resources in which Plaintiffs and their members have an interest. Plaintiffs and their members would have access to this information and be better informed about the program and its impacts, improving their ability to participate in decisionmaking and to suggest potential mitigation or alternatives. Defendants' failure deprives them of this information and the ability to comment on a draft NEPA analysis. If Defendants are required to redo their NEPA analysis and/or prepare a supplemental environmental impact statement, these informational and procedural injuries would be redressed.

23.     Defendant DEBRA A. HAALAND is sued in her official capacity as the Secretary of the Interior. She is the chief officer of the Department of the Interior charged with overseeing the proper administration and implementation of the Outer Continental Shelf Lands Act (OCSLA). OSCLA vests authority in the Secretary of the Interior to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Secretary of the Interior is required to comply with NEPA when taking any action affecting the environment.

24.     Defendant LAURA DANIEL-DAVIS is sued in her official capacity as the Principal Deputy Assistant Secretary of the Interior for Land and Minerals Management. The Principal Deputy Assistant Secretary for Land and Minerals Management is the official to whom the Secretary has delegated authority to sign records of decision to hold lease sales under OCSLA. The Principal Deputy Assistant Secretary for Land and Minerals Management is required to comply with NEPA when taking any action affecting the environment.

25. Defendant U.S. DEPARTMENT OF THE INTERIOR is the federal department with authority, through the Secretary, under OCSLA to hold oil and gas lease sales on the OCS and to issue leases. The Department of the Interior is required to comply with NEPA when taking any action affecting the environment.

26. Defendant BUREAU OF OCEAN ENERGY MANAGEMENT is the federal agency within the Department of the Interior to which the Secretary has delegated authority under OCSLA to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Bureau is required to comply with NEPA when taking any action affecting the environment.

## STATUTORY BACKGROUND

27. To hold Lease Sale 259, Defendants must comply with several federal statutes, including NEPA, OCSLA, and the APA, among others.

I. NATIONAL ENVIRONMENTAL POLICY ACT

28. NEPA is this country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1 (2019)[1]; *see* 42 U.S.C. § 4321 *et seq.* Its purpose is to "promote efforts which will prevent or eliminate damage to the environment." 42 U.S.C. § 4321. The Council on Environmental Quality has promulgated regulations implementing NEPA, which are "binding on all federal agencies." 40 C.F.R. § 1500.3; *see id.* §§ 1500.1–1508.28. The Department of the Interior also has its own NEPA implementing regulations. *See* 43 C.F.R. §§ 46.10, 46.20.

29. Congress enacted NEPA to ensure that federal agencies incorporate

---

[1] The Council on Environmental Quality revised its regulations implementing NEPA in mid-2020, which became effective on September 14, 2020. 85 Fed. Reg 43,304 (July 16, 2020). Those new regulations do not apply to and are not referenced in the NEPA analyses at issue here, which began in August 2016, 81 Fed. Reg. 55,480 (Aug. 19, 2016). *See* 85 Fed. Reg. at 43,372, 43,340 (stating new regulations only "apply to any NEPA process begun after September 14, 2020"). Unless otherwise noted, this complaint only references the regulations in effect prior to September 14, 2020.

environmental concerns into the decisionmaking process. 42 U.S.C. § 4331(a)–(b). To that end, NEPA has two principal purposes: (1) to ensure agencies evaluate prospectively the environmental impacts of proposed actions that they carry out, fund, or authorize; and (2) to give the public a meaningful opportunity to participate in the decision-making process. NEPA ensures that detailed information concerning significant environmental impacts "will be made available to the larger [public] audience that may [] play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

30.    NEPA requires all agencies of the federal government to prepare a "detailed statement" evaluating all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an Environmental Impact Statement (EIS), must analyze and describe: (1) the "environmental impact of the proposed action"; (2) any "adverse environmental effects which cannot be avoided should the proposal be implemented"; (3) "alternatives to the proposed action"; (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity"; and (5) any "irreversible or irretrievable commitment of resources which would be involved in the proposed action should it be implemented." *Id.*; *see also* 40 C.F.R. § 1502.1.

31.    Major federal actions requiring preparation of an EIS include those "with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. § 1508.18.

32.    The decision to hold Lease Sale 259 is a major federal action subject to the requirements of NEPA.

33.    The Bureau is required to ensure it complies with the requirements of NEPA

before holding the lease sale.

34.     Under NEPA, "agencies must 'take a "hard look" at [the] environmental consequences' of their actions, and 'provide for broad dissemination of relevant environmental information.'" *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1082 (D.C. Cir. 2016) (alteration in original) (quoting *Robertson*, 490 U.S. at 350). The EIS must fully consider and disclose the potential environmental impacts of proposed actions and alternatives to that action to take the "hard look" NEPA requires. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1501.4, 1502.1, 1502.5.

35.     NEPA requires agencies to use high quality, accurate scientific information and to ensure the scientific integrity of their analyses. 40 C.F.R. §§ 1500.1(b), 1502.24.

36.     An EIS must analyze the direct, indirect, and cumulative effects of the proposed action and any identified alternatives thereto. 40 C.F.R. § 1508.25. Direct effects are those effects "which are caused by the action and occur at the same time and place." *Id.* § 1508.8(a). Indirect effects are those effects "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." *Id.* § 1508.8(b). Cumulative effects are those that "result [] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id.* § 1508.7. "Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic, social, or health, whether direct, indirect, or cumulative." *Id.* § 1508.8.

37.     Downstream greenhouse gas emissions, which are those that result from reasonably foreseeable transportation, processing, and especially combustion of fossil fuels, are

effects that the agency must quantify and analyze. *See, e.g.*, *Sierra Club v. Fed. Energy Regul. Comm'n*, 867 F.3d 1357, 1373–74 (D.C. Cir. 2017).

38.     In an EIS, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action. 40 C.F.R. § 1502.14(a). The alternatives analysis is the "heart of the environmental impact statement," *id.*, and serves NEPA's twin purposes of fostering informed decisionmaking and informed public participation.

39.     Agencies must address submitted comments in final EISs. 40 C.F.R. § 1503.4(a); *see id.* § 1502.9(b); 43 C.F.R. § 46.435. In response to comments, the agency may modify its analysis, such as by changing alternatives, adding new alternatives, supplementing its analysis, or correcting facts. 40 C.F.R. § 1503.4(a).

40.     NEPA requires that an agency incorporate its environmental analysis into its decision-making process. "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action." *Id.* § 1500.1(c); *see also id.* ("Ultimately . . . it is not better documents but better decisions that count."); *id.* § 1502.1 ("primary purpose" of an EIS is to "serve as an action-forcing device to insure that the policies and goals defined in the Act are infused into the ongoing programs and actions of the Federal Government. . . . An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.").

41.     The NEPA data and analyses supporting an agency's decision must be presented in the EIS. *See id.* § 1502.1. An agency may not rely on its Record of Decision to alter or augment its analyses or cure deficiencies in an EIS.

II.     OUTER CONTINENTAL SHELF LANDS ACT

42.     OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq.* The Outer Continental Shelf extends

from the outer boundary of state waters—typically three nautical miles from shore—to the outer

boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.*

§§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10,605 (Mar. 14, 1983).

43.     In 1978, Congress amended OCSLA to provide, in part, for the development of

resources on the Outer Continental Shelf "subject to environmental safeguards." Pub. L. No. 95-

372, § 202, 92 Stat. 629, 634–35 (1978) (codified as amended at 43 U.S.C. § 1332(3)).

44.     OCSLA charges the Secretary of the Interior with managing oil and gas activities

on the Outer Continental Shelf. 43 U.S.C. §§ 1334(a), 1344(a). Management of the OCS "shall

be conducted in a manner which considers economic, social, and environmental values of the

renewable and nonrenewable resources contained in the [OCS]," as well as "the potential impact

of oil and gas exploration on other resource values of the outer Continental Shelf and the marine,

coastal, and human environments." *Id*. § 1344(a)(1).

45.     OCSLA prescribes four, tiered stages for the Secretary to sell and allow

development of offshore oil and gas deposits: (1) five-year leasing programs; (2) lease sales;

(3) exploration plans; and (4) development and production plans. *Id.* §§ 1337, 1340, 1344, 1351.

46.     NEPA review is required at each stage, although Defendants may "tier" a later

analysis to earlier reviews to eliminate repetitive discussions of the same issues and focus on the

actual issues ripe for decision. *See* 40 C.F.R. § 1502.20.

47.     At the five-year program stage, the Secretary develops a schedule of proposed

lease sales indicating "the size, timing, and location of leasing activity" in identified regions over

an upcoming five-year period. 43 U.S.C. § 1344(a).

48.     At the lease sale stage, the Secretary decides whether and under what conditions

to offer for sale leases that "entitle the lessee to explore, develop, and produce the oil and gas

contained within the lease area," subject to certain approvals. *Id.* § 1337. The Secretary retains broad discretion to accept or reject bids that are made on such lease sales. *Id*.; *see* 30 C.F.R. § 556.516(b) ("BOEM reserves the right to reject any and all bids received, regardless of the amount offered"). Once a lease is issued, a lessee may conduct ancillary activities on its lease without any further federal approval under OCSLA. 30 C.F.R. §§ 550.105, .207–.209. These activities include geological and geophysical exploration, such as seismic reflection and refraction to detect the presence of oil or gas, and other surveys that are needed to determine how to explore or develop a lease. *Id.* §§ 550.105, .207.

49.     The third stage of OCS planning involves exploration plans submitted to Interior by lessees, which should provide a schedule of anticipated exploration activities to be undertaken, a description of equipment to be used for such activities, and the general location of each well to be drilled. 43 U.S.C. § 1340.

50.     The fourth and final stage is the submission of development and production plans, which describe facilities and operations proposed by the lessee that will be constructed or utilized in the development and production of oil or gas from the lease area, as well as environmental and safety safeguards to be implemented. 43 U.S.C. § 1351.

51.     The Department of the Interior's manual and regulations provide categorical exclusions from NEPA for exploration plans and development and production plans in the Western and Central Gulf of Mexico. 516 Department Manual § 15.4(A); 30 C.F.R. § 550.269(a). For that reason, review at the lease sale stage is particularly important in addressing NEPA's requirements.

52.     The Bureau is the federal agency within the Department of the Interior to which the Secretary has delegated authority to manage leasing, exploration, development, and

production of oil and gas resources on the Outer Continental Shelf under OCSLA. 30 C.F.R.

§ 550.101.

III.     ADMINISTRATIVE PROCEDURE ACT

53.     The APA confers a right of judicial review on any person who is adversely

affected by agency action. 5 U.S.C. § 702.

54.     The APA provides that the reviewing court "shall . . . hold unlawful and set aside

agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A).

55.     Under the APA, a court shall also "hold unlawful and set aside" any agency

action that was promulgated "without observance of procedure required by law." *Id*. § 706(2)(D).

56.     The adequacy of an agency's NEPA analysis and its compliance with NEPA's

requirements are reviewed for arbitrary and capricious action under the APA's standard.

IV.     INFLATION REDUCTION ACT

57.     Enacted on August 16, 2022, the Inflation Reduction Act (IRA) establishes

various measures to invest in clean energy, cut U.S. greenhouse gas emissions, and reduce the

national deficit to curb inflation. Pub. L. No. 117-169, 136 Stat. 1818 (2022).

58.      The IRA directs the Secretary of the Interior to take steps regarding four oil and

gas lease sales—Lease Sales 257, 258, 259, and 261—that had been proposed under the 2017–

2022 Outer Continental Shelf Leasing Program. *Id*. § 50264.

59.     The Secretary is required to "conduct Lease Sale 259" no later than March 31,

2023, in accordance with the record of decision adopting the 2017–2022 five-year program. *Id*.

§ 50264(d). The IRA does not provide any further conditions on the Secretary regarding how to

conduct Lease Sale 259, or dictate the size or location of the lease sale.

60.     According to the Bureau, "the IRA does not impact the bulk of BOEM's normal

leasing process, including the resolution of particular questions going to the scope of the sales and the terms of the resulting leases." 88 Fed. Reg. 2,371, 2,371 (Jan. 13, 2023). The IRA also provides that "[e]xcept as expressly provided in paragraphs (1) and (2) of subsection (b), nothing in this section supersedes, amends, or modifies existing law." IRA § 50265(c).

61.     For the ten-year period following its enactment, the IRA links offshore wind leasing to offshore oil and gas lease sales. During this time, the Bureau may issue leases for offshore wind development on the Outer Continental Shelf only if, during the prior twelve-month period, at least one "offshore [oil] lease sale" has been held and not less than 60,000,000 acres have been offered in "offshore [oil] lease sales." Pub. L. No. 117-169, § 50256(b)(2). The IRA defines "offshore lease sale" as an oil and gas lease sale held in accordance with OCSLA and "that, if any acceptable bids have been received for any tract offered in the lease sale, results in the issuance of a lease." *Id*. § 50265(a)(2).

## STATEMENT OF FACTS

I.     THE RICH ECOSYSTEM OF THE GULF OF MEXICO

62.     The Gulf of Mexico is an extraordinary aesthetic, economic, and environmental resource to the five Gulf Coast states and the nation, supporting some of the most productive and biodiverse tropical and temperate ecosystems in the United States.

63.     The Gulf is home to thousands of marine species, ranging from simple invertebrates, such as conchs and sponges, to complex and highly evolved fish and marine mammals. In addition, five of the world's seven species of sea turtles, as well as hundreds of shore and coastal bird species, reside in or migrate through the Gulf of Mexico. Over 300 species of coral, as well as other hard-bottom communities, wetlands, seagrass beds, mangroves, and soft bottom communities, provide the habitats necessary to support this rich assemblage of marine life.

64.     Over two dozen marine and coastal species living in the Gulf of Mexico are listed as endangered or threatened under the Endangered Species Act. Among them is the Rice's whale—one of the most endangered whales on the planet, with perhaps as few as 50 individuals remaining.

65.     The Gulf of Mexico's environmental beauty and productivity also support a robust economy. The region produces more than one-third of the nation's domestic seafood supply. The Gulf's commercial fisheries and coastal tourism generate more than $40 billion annually in economic activity in the five Gulf Coast states.

II.     CLIMATE CHANGE IN THE GULF OF MEXICO

66.     The world has warmed substantially over the last 150 years, with remarkable acceleration in recent decades, resulting in changes in surface, atmospheric, and oceanic temperatures, melting glaciers, reduced snow cover, shrinking sea ice, rising sea levels, ocean acidification, and changes in precipitation patterns, among other effects. Human activities, especially emissions of greenhouse gases, are primarily responsible. This warming is expected to continue, and its effects will accelerate and intensify.

67.     Climate change will undoubtedly affect the habitat, behavior, abundance, and distribution of all species present in the Gulf of Mexico. It will bring increased storms, flooding, rising seas, and other severe harms to the region. In fact, the effects of climate warming are already being acutely felt by vulnerable Gulf communities.

68.     Storms are becoming increasingly severe in the Gulf region in the face of climate change. For example, Hurricane Harvey was a Category 4 storm when it hit the coast of Texas in 2017 and dumped 60.5 inches of rain during the multi-day onslaught, killed at least 63 people, affected millions of others in several states, and caused $125 billion in damage. In 2022, Hurricane Ian became the deadliest storm to strike the southwest coast of Florida since 1935,

22

resulting in at least 148 deaths and $50 billion in damage. Scientists have concluded that climate change made these hurricanes more powerful and increased their deadly flooding.

69.     These strong storms also frequently cause damage to infrastructure such as oil pipelines and offshore platforms. For example, Hurricane Ivan in 2004 caused a massive seafloor shift that toppled a production platform and resulted in the longest recorded spill in U.S. history. Hurricane Ike in 2008 caused 24 spills (18 from platforms and 6 from pipelines) totaling over 5,000 barrels of oil released into the environment.

70.     Flooding has become a common occurrence in Louisiana as a result of climate warming, bringing damage and destruction to the state. For example, in 2020, Hurricane Laura caused damage to industrial facilities that led to elevated toxic emissions along the Louisiana Coast.

71.     Sea level rise and coastal erosion is an acute threat in the Gulf Region. The Fourth National Climate Assessment issued in 2018 predicts that Texas alone will see as much as $21 billion in flooded coastal property by 2030.[2] Communities in Gulf states, such as the tribal community of Isle de Jean Charles in Louisiana, are being relocated because of severe land loss, sea level rise, and coastal flooding.

72.     Carbon dioxide emissions account for over 80 percent of U.S. greenhouse gas emissions. The exploration, development, and production of oil and gas in the Gulf will release greenhouse gases from the use of combustion engines, construction, drilling, and through the deliberate or accidental release of methane.

73.     The main human activity that emits carbon dioxide is the combustion of fossil

---

[2] U.S. Global Change Research Program, *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II* (2018), https://nca2018.globalchange.gov/.

fuels—including oil and gas—for energy and transportation. In addition to direct emissions, oil and gas production will result in downstream emissions of greenhouse gases from the processing and transportation of oil and gas products.

74. Extensive research demonstrates the urgent need to reduce greenhouse gas emissions to levels that will maintain global average temperatures to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels.

75. In 2018, the Intergovernmental Panel on Climate Change (IPCC) issued a special report that estimated the global carbon budget—the amount of carbon dioxide equivalent that can be emitted without exceeding the Paris Agreement limit of 1.5°C of warming above pre-industrial levels. At the current rate of global emissions, the entire global carbon budget will be spent in the next decade. When that carbon budget is apportioned across countries, most estimates of the remaining U.S. carbon budget are negative or near zero.

76. To limit warming to 1.5°C, or even 2°C, above pre-industrial levels will require substantial reductions in net global carbon dioxide emissions prior to 2030 and net carbon dioxide emissions of at least zero by mid-century. A 2016 analysis found that carbon emissions from developed reserves in currently operating oil and gas fields and coal mines would already lead to global temperature rise beyond 2°C.[3] To stay well below 2°C, the study recommends that "[n]o new fossil fuel extraction or transportation infrastructure should be built, and governments should grant no new permits for them" and that some fossil fuel fields "—primarily in rich countries—should be closed before fully exploiting their resources." Similarly, the International

---

[3] Greg Muttitt, *The Sky's Limit: Why the Paris Climate Goals Require a Managed Decline of Fossil Fuel Production* 5, Oil Change Int'l (Sept. 2016), http://priceofoil.org/content/uploads/2016/09/OCI_the_skys_limit_2016_FINAL_2.pdf.

Energy Agency recently issued a report finding that in order to get to net zero from the energy sector by 2050, there can be no new oil and gas fields approved for development beyond the projects already committed to as of 2021.[4]

77.     President Biden's administration has recognized the existential threat from climate warming. Executive Order 14008, "Tackling the Climate Crisis at Home and Abroad" emphasizes the significant greenhouse gas emissions that result from oil and gas development and sets out a policy of aligning federal management of public waters with the need to support robust climate action. 86 Fed. Reg. 7,619 (Feb. 1, 2021). The administration directed agencies to make significant reductions in greenhouse gas emissions; to build resilience against the impacts of climate change; to address actions that conflict with these objectives; and to "combat the climate crisis" by implementing a government-wide approach that reduces climate pollution in every sector of the economy.

78.     The United States has formally committed to climate change targets that require the nation to rapidly decrease greenhouse gas emissions. Under the Paris Agreement, which the United States rejoined on January 20, 2021, the nation committed to holding the long-term global average temperature "to well below 2°C above pre-industrial levels and to pursue efforts to limit the temperature increase to 1.5°C above pre-industrial levels." The Agreement requires a "well below 2°C" climate target because 2°C of warming is no longer considered a safe guardrail for avoiding catastrophic climate impacts and runaway climate change. Under the Agreement, the U.S. Nationally Determined Contribution is to reduce net greenhouse gas emissions by 26–28 percent below 2005 levels by 2025 and by 50–52 percent below 2005 levels by 2030. The Biden

---

[4] International Energy Agency, *Net Zero by 2050: A Roadmap for the Global Energy Sector* (2021), https://www.iea.org/reports/net-zero-by-2050.

Administration has also pledged to reach a 100 percent carbon pollution-free power sector by 2035 and a net-zero economy by 2050. As the Bureau noted in the Final SEIS, "[t]o meet these targets and to reduce reliance on and demand for oil and gas, the U.S. would have to drastically change the way it consumes and supplies energy."

79.     On January 6, 2023, over a month prior to the decision challenged in this case, the Council on Environmental Quality (CEQ) released interim guidance to assist agencies in analyzing greenhouse gas (GHG) and climate change effects of their proposed actions under NEPA. 88 Fed. Reg. 1,196 (Jan. 9, 2023). CEQ stated that it was issuing the guidance "so that agencies may make use of it immediately," recognizing that the "United States faces a profound climate crisis and there is little time left to avoid a dangerous—potentially catastrophic—climate trajectory." *Id*. at 1,196–97.

80.     When analyzing a proposed action's climate change effects under NEPA, CEQ recommends that agencies should disclose and consider such emissions "in the context of relevant climate action goals and commitments." *Id*. at 1,201. Moreover, in evaluating the impacts of fossil fuel projects, CEQ has found that "[a]gencies should not simply assume that if the federal action does not take place, another action will perfectly substitute for it and generate identical emissions, such that the action's net emissions relative to the baseline are zero." *Id*. at 1,205. When evaluating the effects of a proposed action, CEQ further directs agencies to "consider how climate change can make a resource, ecosystem, human community, or structure more vulnerable to many types of effects," particularly with regard to environmental justice communities that can be disproportionately and adversely affected by climate change-related hazards such as storm surges, heat waves, drought, flooding, and sea level rise. *Id*. at 1,208–09.

III.   THE BUREAU'S ARBITRARY AND CAPRICIOUS ANALYSES OF THE
       ENVIRONMENTAL EFFECTS OF LEASE SALE 259

81.     Despite the serious harms from oil and gas production, the Bureau included Lease

Sale 259 among the proposed lease sales in its 2017–2022 National Outer Continental Shelf Oil

and Gas Leasing Program. The Bureau did not hold Lease Sale 259 prior to the expiration of the

five-year program in June 2022.

82.     However, following the passage of the IRA, Defendants announced on October 6,

2022, the next steps that they would take to move forward with Lease Sale 259 and the other

lease sales subject to that Act. These steps included the release of a draft SEIS for Lease Sales

259 and 261, with a 45-day public comment period that closed on November 21, 2022. Plaintiffs

and others submitted hundreds of pages of detailed technical and legal comments, including

technical reports and appendices, critiquing the draft SEIS and calling for significant changes in

order to comply with NEPA.

83.     Even so, the Bureau released the Final SEIS for Lease Sale 259 about six weeks

later, on January 10, 2023. The Final SEIS made few, if any, substantive changes from the draft,

and either ignored or offered boilerplate non-responses to Plaintiffs' detailed technical criticisms.

84.     The Final SEIS tiered to three earlier NEPA reviews that were prepared during

the multi-stage process leading up to Lease Sale 259: (1) a programmatic EIS on the nationwide

2017–2022 Program finalized in November 2016; (2) a programmatic EIS on the Gulf of Mexico

lease sales under the Program issued in March 2017; and (3) a supplemental EIS on the effects of

a proposed lease sale issued in December 2017.

85.     As discussed below, the Bureau's decision to hold Lease Sale 259 relied on

flawed and outdated environmental analyses which fail to properly consider the environmental

effects of holding this massive oil and gas lease sale.

### 1.    *Programmatic EIS for the 2017–2022 Program*

86.     In March 2016, the Bureau announced its proposed program for the 2017–2022

Outer Continental Shelf Oil and Gas Leasing Program (2017–2022 Program), which consisted of

ten region-wide lease sales in the Gulf of Mexico—Lease Sales 249, 250, 251, 252, 253, 254,

256, 257, 259, and 261. *See* 81 Fed. Reg. 14,881 (Mar. 18, 2016). The Bureau also released a

draft programmatic EIS, the stated purpose of which was to assess at a general level the effects

of activities that could occur under leases issued pursuant to the 2017–2022 Program, including

exploration, development, and production activities. *Id*. at 14,885.

87.     The Bureau finalized the programmatic EIS for the 2017–2022 Program (the "5-

Year Program EIS") in late 2016. *See* 81 Fed. Reg. 83,870 (Nov. 22, 2016). The 5-Year Program

EIS noted that "[i]f a decision is made to move forward with any of the proposed lease sales in

the Five-Year Program, additional environmental reviews would take place that would be more

site-specific and analyze impacts on ESA-listed and non-listed species in greater detail." In

addition, the Bureau stated that the proposed lease sales may be "scaled back," "reduce[d],"

"limit[ed]," or "cancelled." On January 17, 2017, the Bureau issued its Record of Decision and

approval for the 2017–2022 Program as described in the 5-Year Program EIS. *See* 82 Fed. Reg.

6,643 (Jan. 19, 2017).

### 2.    *2017 Lease Sale EIS*

88.     On April 22, 2016, the Bureau provided notice of availability of a draft

programmatic EIS purporting to evaluate the environmental effects of a single lease sale in the

Gulf of Mexico under the 2017–2022 Program. 81 Fed. Reg. 23,747 (Apr. 22, 2016). The EIS

did not assess the combined effects of all ten proposed lease sales.

89.     On March 10, 2017, the Bureau published notice of availability of the final

programmatic EIS on the environmental effects of a single lease sale planned for the Gulf of

Mexico in 2017–2022 (the "2017 Lease Sale EIS"). 82 Fed. Reg. 13,363 (Mar. 10, 2017).

90.    The 2017 Lease Sale EIS stated that the Bureau planned to supplement the 2017

Lease Sale EIS "on a regular basis to provide for more consistency and for planning purposes."

The Bureau expected "to issue a Supplemental EIS once a calendar year."

### 3.    2018 Lease Sale SEIS

91.    On March 31, 2017, the Bureau published a notice of availability of a draft

supplemental EIS. 82 Fed. Reg. 16,060 (Mar. 31, 2017). The draft supplemental EIS stated that it

analyzed the effects of a single region-wide lease sale under the 2017–2022 Program and was

intended to tier from and update the 5-Year Program EIS and 2017 Lease Sale EIS. The stated

purpose of the draft supplemental EIS was to assess the effects of activities likely to occur on

leases executed in a single given lease sale, including broadly the effects of exploration,

development, and production activities.

92.    The Bureau accepted public comments on the draft supplemental EIS through

May 15, 2017.

93.    On December 15, 2017, the Bureau announced the availability of the final

supplemental EIS (the "2018 Lease Sale SEIS"). 82 Fed. Reg. 59,644 (Dec. 15, 2017).

94.    The 2018 Lease Sale SEIS intended to apply the analysis to inform later

regionwide lease sales, but also indicated that it would be supplemented as necessary to inform

later sales. At the time that the Bureau published the 2018 Lease Sale SEIS, it stated that

"[s]upplemental NEPA reviews, including opportunities for public involvement are currently

planned to be conducted annually for the remaining proposed lease sales."

95.    The Bureau relied upon the 2018 Lease Sale SEIS, as well as the 5-Year Program

EIS and 2017 Lease Sale EIS, when it issued a Record of Decision ("ROD") for Lease Sale 257

in August 2021. In *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113 (D.D.C. 2022), which

challenged the Lease Sale 257 ROD,  the court found that the Bureau had violated NEPA in these analyses by improperly excluding foreign oil consumption from the model used to estimate net greenhouse gas emissions from the lease sale, and by erroneously assuming that foreign production would substitute for domestic production—resulting in higher emissions—under the no action alternative. As a result, the court vacated the Record of Decision and action taken based on that decision, including Lease Sale 257.

### 4.    *2023 Final SEIS for Lease Sales 259 and 261*

96.     On October 6, 2022, the Bureau announced that it had prepared a draft SEIS for Lease Sales 259 and 261, which was available for public comment until November 21, 2022.

97.     On October 24, 2022, the Bureau officially announced the availability of the Proposed Notice of Sale for Lease Sale 259. 87 Fed. Reg. 64,246 (Oct. 24, 2022). The notice proposed a regionwide sale, which would offer for lease nearly all remaining unleased areas in the Western and Central Gulf of Mexico, as well as additional areas in the Eastern Gulf that are not subject to Congressional moratorium. In fact, at more than 70 million acres, Lease Sale 259 is one of the largest offshore oil and gas lease sales in U.S. history. The Bureau predicts that Lease Sale 259 would result in the production of up to 1.12 billion barrels of oil and 4.4 trillion cubic feet of natural gas on the leases sold over the next fifty years, resulting in the emission of 381,517 tons of $CO_2$ equivalent over the life of the project.

98.     Plaintiffs submitted hundreds of pages of detailed technical and legal comments on this draft SEIS on November 21, 2022, raising numerous issues with the Bureau's failure to take a hard look at the project's significant environmental impacts or properly consider alternatives, among other issues. In particular, Plaintiffs raised concerns regarding the Bureau's failure to fully analyze the lease sales' impacts to protected species such as the Rice's whale, contributions to climate change, air quality impacts, oil spill harms, effects related to abandoned,

orphaned, and decommissioned wells and other infrastructure, environmental justice impacts, and cumulative impacts. Plaintiffs also detailed that the Bureau had failed to consider a reasonable range of alternatives or accurately assess the alternatives' impacts, and identified other alternatives that would limit the scope of development activities, reduce impacts to critically endangered species, limit conflicts with potential wind leasing, and minimize harm to the environment.

99.     For example, the Bureau failed to properly consider the impacts of Lease Sale 259 on the Rice's whale, a species that lives exclusively in the Gulf and for which scientists believe less than a hundred individuals remain. Some recently published studies state that the species is more imperiled than previously thought, estimating a population abundance of fifty individuals or less. Moreover, those studies show that the Rice's whale inhabits areas of active oil and gas leasing and development in the Central and Western Gulf, which were previously not considered part of the species' habitat range. Despite evidence of significant impacts to this species and other imperiled marine mammals from seismic activities, ship strikes, pollution, and oil spills, including in the Western and Central Gulf, the Bureau concluded that such impacts from this massive lease sale would be negligible. In doing so, the Bureau ignored the recent data from NMFS on the habitat and population of the Rice's whale.

100.    On climate change, the Bureau concluded that development of over a billion barrels of crude oil in federal waters would only result in "slightly higher" greenhouse gas emissions compared to not leasing at all. This analysis relied on problematic modeling and assumptions that both underestimated the emissions resulting from Lease Sale 259 and overestimated emissions from the no leasing alternative. The Bureau failed to provide a meaningful analysis of the emissions' significance in the context of the climate crisis by ignoring

relevant climate action goals and commitments, including the impact of Lease Sale 259 on the remaining carbon budget. The Bureau also ignored recent data showing significant declines in petroleum demand due to transportation, electrification, and energy efficiency policies; and failed to analyze the implications of the IRA on greenhouse gas emissions. The Bureau also failed to fully disclose the costs and benefits of greenhouse gas emissions under different scenarios.

101.    Offshore oil and gas development generates air pollution directly, from activities including drilling, vessels used to maintain infrastructure, flaring, and venting, as well as indirectly, from refining, transportation, and combustion of fossil fuels. The Bureau failed to use its own updated emissions inventory and the EPA's most recent data on air pollutants emitted in the region as part of its analysis of the impacts from Lease Sale 259.

102.    The Bureau arbitrarily dismissed the significant impacts that associated oil and gas infrastructure—including refineries, gas processors, and petrochemical plants—has on Gulf communities by claiming that "these low-income and minority communities are located onshore and distant from Federal OCS oil- and gas-related activities." BOEM ignored the fact that the oil and gas produced over the next several decades from Lease Sale 259 will result in the continued operation of this onshore fossil fuel infrastructure. Refineries and petrochemical plants that rely on oil and gas produced in the region are more likely to be in low-income and communities of color.[5] African Americans are 75 percent more likely to live near toxic pollution than the rest of Americans and are exposed to 38 percent more air pollution than white people.[6] The Bureau also

---

[5] Jill Johnston & Lara Cushing, *Chemical Exposures, Health, and Environmental Justice in Communities Living on the Fenceline of Industry*, 7 Current Env't Health Reps. 48 (2020).
[6] Lesley Fleischman & Marcus Franklin, *Fumes Across the Fence-Line: The Health Impacts of Air Pollution from Oil and Gas Facilities on African American Communities*, NAACP & Clean Air Task Force (Nov. 2017).

claimed that it lacks regulatory authority over such operations, but this statement provides no basis for refusing to consider the full scope of Lease Sale 259 impacts on Gulf communities or arbitrarily concluding that they will not occur.

103.    The Bureau further failed to consider the impacts of a changing climate on Gulf communities, both from Lease Sale 259 as well as the cumulative climate impacts of other Gulf oil and gas leasing and reasonably foreseeable oil and gas infrastructure projects. Such climate impacts include sea level rise, flooding, and increased storms that are significantly impacting these communities. Moreover, hurricane disasters have highlighted the vulnerabilities of communities of color to the oil industry. Severe storms—exacerbated by climate change and land loss from offshore oil activities—have destroyed homes, displaced families, and triggered toxic spills.[7]

104.    Carefully analyzing the impacts on affected communities is particularly important in light of the Executive Order 13985, Advancing Racial Equity and Support for Underserved Communities Through the Federal Government, which mandates that "agencies shall consult with members of communities that have been historically underrepresented in the Federal Government and underserved by, or subject to discrimination in, Federal policies and programs," 86 Fed. Reg. 7,009 (Jan. 25, 2021), as well as earlier directives requiring that Defendants "make achieving environmental justice part of its mission by identifying and addressing . . . disproportionately high and adverse human health or environmental effects of [its] . . . activities on minority populations and low-income populations," 59 Fed. Reg. 7,629 (Feb. 16, 1994). Remarkably, the Final SEIS and ROD do not so much as mention Executive Order 13985,

---

[7] Aaron B. Flores et al., *Petrochemical releases disproportionately affected socially vulnerable populations along the Texas Gulf Coast after Hurricane Harvey*, 42 Population & Env't 279 (2020).

despite detailed and persistent requests to the Bureau that it consider the Order's mandates when evaluating the impacts of Lease Sale 259.

105.    Furthermore, the Bureau failed to adequately consider the potentially devastating effects of oil spills resulting from Lease Sale 259. In particular, the Bureau's methodology for assessing oil spill risks arbitrarily excluded spills greater than 10,000 barrels ("bbl") from its analysis. The methodology also relied on spill data only up to the year 2010 to calculate the risk of future spills. The Bureau arbitrarily determined that catastrophic spills such as Deepwater Horizon are "not reasonably foreseeable" and dismissed the impacts of that spill as "difficult or impossible to discern from other factors." Catastrophic events like oil spills that have in fact occurred are, by definition, reasonably foreseeable, and scientists have made determinations about the disaster-level impacts. The Rice's whale, for example, experienced a 22 percent population loss as a result of the 2010 Deepwater Horizon disaster, and it has not and may not ever recover. Based on its imperiled state and the ongoing threats it confronts, scientists posit that the loss of one more individual could lead to the species' extinction. Although the Bureau incorporated by reference its *Gulf of Mexico Catastrophic Spill Event Analysis* report, this report provides only a "general overview" of impacts, fails to accurately analyze the impacts of a catastrophic spill on specific resources like the Rice's whale, and gives no estimate of the likelihood of a catastrophic spill. The Bureau also failed to analyze the additional risks from extracting oil from deeper waters—production wells are sited in increasingly deeper waters, which carry additional risks of blowouts and other disasters.

106.    Furthermore, the Bureau failed to consider a reasonable range of alternatives for Lease Sale 259, evaluating only the leasing of almost all available areas of the Western, Central, and Eastern Gulf planning areas. In particular, the four action alternatives evaluated by the

Bureau were: (1) Alternative A: leasing all areas of the Western, Central, and Eastern Gulf not under Presidential withdrawal; (2) Alternative B: leasing all areas of the Central and Eastern Gulf not under Presidential withdrawal; (3) Alternative C: leasing all areas of the Western Gulf not under Presidential withdrawal; and (4) Alternative D: leasing under Alternative A, B, or C with three potential lease stipulations ((a) Topographic Features; (b) Live Bottom (Pinnacle Trend); and (c) Blocks South of Baldwin County, Alabama). As required by NEPA, the Bureau also included Alternative E, the No Action Alternative that would result in cancellation of Lease Sale 259.

107.    The Bureau assumed the four action alternatives would barely differ in terms of their impacts, despite offering vastly different amounts of acreage for lease in different regions of the Gulf, each with unique habitats and wildlife assemblages. As a result, the analysis failed to provide the meaningful comparison of alternatives that NEPA requires.

108.    In addition, the Bureau failed to properly consider alternatives suggested by Plaintiffs and others that would have significantly reduced environmental impacts while still meeting the purpose and need of the action and the Bureau's legal obligations under OCSLA and the IRA. These alternatives included excluding blocks from leasing in Rice's whale habitat in De Soto Canyon and in the 100–400m isobath (i.e., a contour line connecting points of equal water depths) in the Western and Central Gulf to protect this critically endangered species.

109.    On January 10, 2023, the Bureau released its Final SEIS for Lease Sale 259. The Final SEIS included an Appendix C entitled, "Responses to Public Comments on the Draft Supplemental EIS," which provided only boilerplate responses to the concerns raised by Plaintiffs, rather than any substantive changes to the Draft SEIS itself, and failed to provide an explanation for rejecting reasonable alternatives proposed by Plaintiffs and other commenters.

110.    On February 24, 2023, the Bureau issued the Record of Decision for Lease Sale 259.  In the Record of Decision, the Bureau decided to offer for lease a subset of the blocks analyzed as Alternative D in the Final SEIS. In particular, the Bureau included additional exclusions to cover (1) draft identified Wind Energy Areas and final Wind Energy Areas; (2) Depth-restricted, segregated block portions; and (3) BOEM-designated Significant Sediment Resource Area Blocks. These additional restrictions reduced the total acreage estimated to be available for lease from 78.54 million acres (in the Final SEIS) to 73.3 million acres. The Bureau did not alter its estimate of the projected oil and gas production from the lease sale.

## CLAIMS FOR RELIEF

### First Cause of Action

**Violation of NEPA and APA: Failure to Take a Hard Look at the Effects of Lease Sale 259**

111.    The allegations made in paragraphs 1–110 are realleged and incorporated by this reference.

112.    The Record of Decision for Lease Sale 259 is final agency action for which there is no other adequate remedy in a court. *See* 5 U.S.C. § 704.

113.    NEPA requires that the Bureau take a "hard look" at the environmental consequences of its actions in its EIS before action is taken. NEPA and its implementing regulations require the Bureau to assess in its EIS the environmental impacts of the proposed action, including direct, indirect, and cumulative effects, which are reasonably foreseeable. 42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.1, 1508.7, 1508.8. NEPA and its implementing regulations further require the Bureau to use high quality, accurate scientific information in its EIS and to ensure the scientific integrity of this analysis. 40 C.F.R. § 1500.1(b); *see also* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.24.

114.    In reaching its decision to hold Lease Sale 259, the Bureau relied on the Final

SEIS, which in turn tiered to the 5-Year Program EIS, the 2017 Lease Sale EIS, and the 2018 Lease Sale SEIS.

115.    In its NEPA analyses, the Bureau failed to take a hard look at the significant environmental impacts of its decision to hold Lease Sale 259. This failure included its consideration of impacts related to the Rice's whale, greenhouse gas emissions, air quality, oil spill harms and risks, environmental justice impacts, air quality impacts, the impacts of deepwater and ultra-deepwater drilling, and cumulative impacts.

116.    The Bureau also failed to rationally consider impacts relative to the different areas leased under each action alternative, instead irrationally concluding that impacts are equivalent regardless of the amount of leasing, the geographic location, or the habitat or species affected.

117.    For example, the Bureau failed to properly consider the impacts of Lease Sale 259 on the Rice's whale, despite evidence of significant impacts to this critically endangered species from seismic activities, ship strikes, pollution, and oil spills, including impacts in the Western and Central Gulf, and recent data from NMFS showing that the whale's habitat overlaps with areas open for bidding in Lease Sale 259.

118.    The Bureau also failed to analyze the impacts of Lease Sale 259 on deepwater and ultra-deep waters. For example, the Bureau did not adequately analyze the deepwater impacts of the Lease Sale on marine environments, such as deepwater fishes, corals, and canyon habitats. The Bureau also did not sufficiently analyze the increased risk associated with drilling at greater depths.

119.    With regard to climate change, the Bureau relied upon problematic modeling and assumptions, including from the flawed MarketSim greenhouse gas emissions model, and failed to provide a meaningful analysis of the emissions' significance in the context of the climate

crisis by considering relevant climate action goals and commitments.

120.    On environmental justice, the Bureau arbitrarily ignored the significant impacts that oil and gas infrastructure serving, and supported by, Lease Sale 259 has on Gulf communities, and failed to consider the climate impacts from Lease Sale 259 and other oil and gas activities in the Gulf on these communities, including the effects of sea level rise, flooding, and increased storms. The Bureau's environmental justice determination is premised on the irrational and unjustified assumption that environmental justice communities will not experience impacts due to their location on shore and distance from oil and gas development. As a result of this flawed assumption, the Bureau further neglected to consider the ways in which Lease Sale 259 will aggravate existing health, socioeconomic, or cultural vulnerabilities within environmental justice communities. When analyzing air quality impacts, the Bureau arbitrarily relied on outdated air quality data from EPA, despite the availability of more recent emissions data from EPA, and an outdated version of the Bureau's own air pollutant emissions inventory.

121.    The Bureau also failed to adequately analyze the potentially devastating effects of oil spills resulting from Lease Sale 259 by arbitrarily excluding spills greater than 10,000 bbl from its analysis, basing its coastal spill analysis on historical trends without justification, determining that catastrophic spills such as Deepwater Horizon are "not reasonably foreseeable," and addressing catastrophic spills only in an outside report incorporated by reference, which itself failed to provide resource-specific impacts analysis or any estimate of catastrophic spill likelihood. It also ignored the risks posed by oil and gas development in deeper waters.

122.    The Bureau failed to take a hard look at the impacts related to abandoned, orphaned, or decommissioned wells, pipelines, and other infrastructure, including the potential for long-term leaks of oil and methane, that can both pollute the environment and create use

conflicts for future development of offshore wind or other infrastructure in the region.

123.    Finally, the Bureau failed to properly consider the significant cumulative impacts that Lease Sale 259 will have when added to other industrial uses of the Gulf, including aquaculture, offshore wind, and carbon capture and sequestration projects, deepwater oil and gas export facilities, as well as additional oil and gas infrastructure.

124.    In sum, the Bureau's failure to take a hard look at the environmental impacts from Lease Sale 259 prior to issuing its Record of Decision was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

125.    These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

<u>Second Cause of Action</u>

**Violation of NEPA and APA: Failure to Consider a Reasonable Range of Alternatives**

126.    The allegations made in paragraphs 1–125 are realleged and incorporated by this reference.

127.    NEPA requires agencies to study a reasonable range of alternatives to their proposed actions. 42 U.S.C. §§ 4332(2)(C)(iii), 4332(2)(E); *see also* 40 C.F.R. § 1502.14. The description of alternatives is considered "the heart" of an EIS. 40 C.F.R. § 1502.14.

128.    An agency's consideration of alternatives serves the twin purposes of fostering informed decisionmaking and informed public participation.

129.    In an EIS, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives." *Id.* The range must, to the fullest extent possible, include "reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon

the quality of the human environment." 40 C.F.R. § 1500.2(e). The existence of reasonable but unexamined alternatives renders an EIS inadequate.

130.    Here, the Bureau did not consider a reasonable range of alternatives for Lease Sale 259 in its Final SEIS or Record of Decision.

131.    Instead, the Bureau only considered four action alternatives that offered for lease essentially all available areas for leasing in the Gulf in different combinations of the three planning areas—Western, Central, and Eastern Gulf of Mexico—and for which the Bureau arbitrarily and incorrectly assumed had identical or similar impacts, regardless of the size or location of the leases offered for sale.

132.    Plaintiffs and other commenters proposed several alternatives that would have reduced the affected area and/or the amount of oil and gas activity and limited the harmful effects of the lease sale, while still being consistent with the IRA and other laws. For example, Plaintiffs suggested an alternative that would exclude leasing in Rice's whale habitat in De Soto Canyon and within the 100–400m isobath in the Western and Central Gulf. Alternatives that would have reduced the areas open for leasing and/or resulted in less oil and gas activity in the Gulf are reasonable given that they would still meet the Bureau's legal obligations and the purpose and need for this project. However, the Bureau did not examine these alternatives, nor did it provide any reasons for not considering these alternatives.

133.    By failing to consider a reasonable range of alternatives for Lease Sale 259 prior to issuing its Record of Decision, including alternatives that would have resulted in avoidance or minimization of adverse effects, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its implementing regulations, and the

APA, 5 U.S.C. §§ 701–706.

134.    These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

**Third Cause of Action**

**Violation of NEPA and APA: Failure to Adequately Respond to Comments**

135.    The allegations made in paragraphs 1–134 are realleged and incorporated by this reference.

136.    Informed public participation is a cornerstone of the NEPA process. "The informational role of an EIS is to give the public assurance that the agency has indeed considered environmental concerns in its decisionmaking process and, perhaps more significantly, provide a springboard for public comment in the agency decisionmaking process itself. The purpose here is to ensure that the larger audience can provide input as necessary to the agency making the relevant decisions." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (cleaned up). NEPA thus requires Defendants to solicit and respond to substantive comments on their work. *See* 40 C.F.R. §§ 1502.9(a)–(c), 1503.4; 43 C.F.R. § 46.435.

137.    In their comments on the draft SEIS, Plaintiffs raised numerous concerns regarding the Bureau's failure to properly consider the significant environmental impacts of its decision, including impacts related to the critically endangered Rice's whale, greenhouse gas emissions, oil spill harms and risks, the impacts of deepwater and ultra-deepwater drilling, air quality impacts, environmental justice impacts, and cumulative impacts. Plaintiffs also commented that the Bureau had failed to consider reasonable alternatives to the proposed action and failed to accurately assess the alternatives' impacts, and proposed several alternatives that would have reduced the affected area and/or the amount of oil and gas activity and would have limited the harmful effects of the lease sale.

138. However, the Bureau failed to properly respond to Plaintiffs' comments on the draft SEIS, either ignoring comments altogether or offering only boilerplate responses and failing to make substantive changes to the document. For example, the Bureau failed to consider significant new information in the Final SEIS regarding the Rice's whale; nor did it properly explain why it could not consider an alternative that would prohibit oil and gas production in Rice's whale habitat, even where such an alternative would be fully consistent with the Bureau's legal obligations. The Bureau also failed to respond to Plaintiffs' comments about the Bureau's reliance on outdated air quality and oil spill data.

139. By failing to reasonably respond to significant comments prior to issuing its Record of Decision for Lease Sale 259, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedures required by law, in violation of NEPA, 42 U.S.C. § 4332, its implementing regulations, and the APA, 5 U.S.C. §§ 701–706.

140. These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1. Declare that the Bureau's Record of Decision to hold Lease Sale 259 violates NEPA and its implementing regulations, and is arbitrary and capricious and not in accordance with law in violation of the APA;

2. Declare that the Final SEIS issued by the Bureau in connection with holding Lease Sale 259 is unlawful, in violation of NEPA and its implementing regulations, and the APA;

3.     Declare that any bids received by the Bureau in connection with holding Lease Sale 259 are not acceptable given the Bureau's violations of NEPA and its implementing regulations, and the APA;

4.     Vacate the Record of Decision to hold Lease Sale 259 and the Final SEIS;

5.     Vacate or enjoin any leases executed pursuant to that Record of Decision, and any activity on leases executed pursuant to Lease Sale 259;

6.     Enter any other appropriate declaratory or injunctive relief to ensure that Defendants comply with NEPA and the APA, and to prevent irreparable harm to Plaintiffs and to the environment until such compliance occurs;

7.     Award Plaintiffs their costs, reasonable attorneys' fees, and other expenses pursuant to 28 U.S.C. § 2412; and

8.     Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 6th day of March 2023.

 /s/ Jan Hasselman
Jan Hasselman (DC Bar No. WA0029)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
206-343-1526 Fax
jhasselman@earthjustice.org

George Torgun (*pro hac vice* forthcoming)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
gtorgun@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Bayou City Waterkeeper, Friends of the Earth, and Center for Biological Diversity*

43

*/s/ Kristen Monsell*
Kristen Monsell (DC Bar No. CA00060)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94612
(510) 844-7137 Telephone
(510) 844-7150 Fax
kmonsell@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological
Diversity*

*/s/ Thomas Zimpleman*
Thomas Zimpleman (DC Bar No. 1049141)
Irene Gutierrez (*pro hac vice* forthcoming)
Julia K. Forgie (*pro hac vice* forthcoming)
Francis W. Sturges, Jr. (*pro hac vice* forthcoming)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St., Suite 300
Washington, DC 20005
202-513-6244 Telephone
tzimpleman@nrdc.org
igutierrez@nrdc.org
jforgie@nrdc.org
fsturges@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense
Council*

*/s/ Devorah Ancel*
Devorah Ancel (*pro hac vice* forthcoming)
SIERRA CLUB
PO Box 4998
Austin, TX 78765
415-845-7847 Telephone
303-449-6520 Fax
devorah.ancel@sierraclub.org

*Attorney for Plaintiff Sierra Club*