# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

HEALTHY GULF, et al.,

        *Plaintiffs,*

    v.

DEBRA A. HAALAND, et al.,

        *Defendants.*

Case No. 1:23-cv-00604-APM

# MEMORANDUM IN SUPPORT OF PLAINTIFFS'
# MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ..............................................................................................................1

STATUTORY BACKGROUND .........................................................................................2

    I.     NATIONAL ENVIRONMENTAL POLICY ACT ..................................................2

    II.    OUTER CONTINENTAL SHELF LANDS ACT ...............................................3

FACTUAL BACKGROUND ..............................................................................................4

    I.     THE GULF OF MEXICO AND IMPACTS OF OIL AND GAS
         LEASING ..........................................................................................................4

         A.     Overview ...............................................................................................4

         B.     Impacts of Oil Spills, Including *Deepwater Horizon* .................................5

         C.     Impacts of Oil and Gas Development on Rice's Whale .............................6

         D.     Impacts of Oil and Gas Development on Gulf Communities ....................8

    II.    THE CLIMATE CRISIS AND THE NATION'S POLICY RESPONSE...............9

    III.   LEASE SALE 259 AND NEPA PROCESS...........................................................11

         A.     2017–2022 leasing program........................................................................11

         B.     The Inflation Reduction Act .......................................................................12

         C.     Supplemental NEPA Process for Lease Sale 259 ......................................13

STANDARD OF REVIEW ..............................................................................................16

ARGUMENT ...................................................................................................................17

    I.     THE BUREAU FAILED TO TAKE A HARD LOOK AT IMPACTS ON
         RICE'S WHALE ................................................................................................18

    II.    THE BUREAU'S CLIMATE ANALYSIS FAILS TO SATISFY NEPA ...........22

         A.     The Bureau's analysis relied on outdated and misleading data and
              arbitrarily ignored declining U.S. oil consumption trends........................24

B.    The GHG analysis failed to contextualize lease sale GHG emissions with federal climate policies and international climate commitments ................................................................................................ 30

1.    NEPA documents must explain how actions will achieve or conflict with other environmental laws and standards .................. 30

2.    The Bureau never adequately addressed Lease Sale 259's GHG emissions in the context of climate policies and commitments ................................................................................ 32

III.    THE BUREAU FAILED TO TAKE A HARD LOOK AT ENVIRONMENTAL JUSTICE IMPACTS ON GULF COMMUNITIES ......... 35

A.    The Bureau improperly dismissed environmental justice impacts as "onshore and distant" ............................................................... 36

B.    The Bureau cannot dismiss impacts based on an alleged lack of "regulatory authority" ................................................................... 38

IV.    THE BUREAU FAILED TO TAKE A HARD LOOK AT OIL SPILL RISKS ........................................................................................ 39

V.    THE BUREAU FAILED TO CONSIDER REASONABLE ALTERNATIVES ............................................................................ 43

CONCLUSION ................................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**                                                                                         **Page(s)**

*\*350 Montana v. Haaland,*
   50 F.4th 1254 (9th Cir. 2022) ...............................................................................23, 33, 34, 35

*Am. Oceans Campaign v. Daley,*
   183 F.Supp.2d 1 (D.D.C. 2000) .........................................................................................43

*Balt. Gas & Elec. Co. v. NRDC,*
   462 U.S. 87 (1983) ............................................................................................................29

*Bauer v. DeVos,*
   325 F.Supp.3d 74 (D.D.C. 2018) .......................................................................................22

*California v. Bernhardt,*
   472 F.Supp.3d 573 (N.D. Cal. 2020) ............................................................................19, 22

*Carik v. U.S. Dep't of Health & Human Servs.,*
   4 F.Supp.3d 41 (D.D.C. 2013) .............................................................................................5

*Ctr. for Biological Diversity v. Bernhardt,*
   982 F.3d 723 (9th Cir. 2020) .............................................................................................24

*Ctr. for Biological Diversity v. U.S. Dep't of Interior,*
   623 F.3d 633 (9th Cir. 2010) .............................................................................................43

*Custer Cnty. Action Ass'n v. Garvey,*
   256 F.3d 1024 (10th Cir. 2001) .........................................................................................19

*Diné Citizens Against Ruining Our Env't v. Haaland,*
   59 F.4th 1016 (10th Cir. 2023) .....................................................................................11, 34

*Dist. Hosp. Partners, L.P. v. Burwell,*
   786 F.3d 46 (D.C. Cir. 2015) .............................................................................................41

*EarthReports, Inc. v. FERC,*
   828 F.3d 949 (D.C. Cir. 2016) ...........................................................................................37

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) .....................................................................................................19, 20

*Food & Water Watch v. FERC,*
   28 F.4th 277 (D.C. Cir. 2022) .......................................................................................28, 43

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.,*
   528 U.S. 167 (2000) ..........................................................................................................18

*Friends of the Earth v. Haaland,*
   583 F.Supp.3d 113 (D.D.C. 2022) .................................................................... *passim*

*Friends of the Earth v. U.S. Army Corps of Eng'rs,*
   109 F.Supp.2d 30 (D.D.C. 2000) ............................................................................ 38

*Fund for Animals v. Babbitt,*
   903 F.Supp. 96 (D.D.C. 1995) ............................................................................... 17

*Gov't of Manitoba v. Norton,*
   398 F.Supp.2d 41 (D.D.C. 2005) ........................................................................... 40

*Greater Yellowstone Coal. v. Flowers,*
   359 F.3d 1257 (10th Cir. 2004) ............................................................................. 45

*Greater Yellowstone Coal. v. Kempthorne,*
   577 F.Supp.2d 183 (D.D.C. 2008) ......................................................................... 44

*Gulf Restoration Network v. Haaland,*
   47 F.4th 795 (D.C. Cir. 2022) ........................................................................ 28, 33

*Hunt v. Wash. State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) .............................................................................................. 18

*California ex rel. Imperial Cnty. Air Pollution Control Dist. v. Dep't of the
   Interior,*
   767 F.3d 781 (9th Cir. 2014) ................................................................................ 31

*Lewis v. Sec'y of Navy,*
   195 F.Supp.3d 277 (D.D.C. 2016) ........................................................................ 16

*Louisiana v. Biden,*
   Case No. 2:21-CV-00778, 2022 WL 3570933 (W.D. La. Aug. 18, 2022) ............. 10

*Mont. Wilderness Ass'n v. McAllister,*
   658 F.Supp.2d 1249 (D. Mont. 2009) ................................................................... 31

*\*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ................................................................................ 17, 22, 24

*Nat. Res. Def. Council, Inc. v. Daley,*
   209 F.3d 747 (D.C. Cir. 2000) .............................................................................. 17

*Nat. Res. Def. Council v. EPA,*
   489 F.3d 1364 (D.C. Cir. 2007) ............................................................................ 18

*Nat'l Parks Conservation Ass'n v. Manson,*
   414 F.3d 1 (D.C. Cir. 2005) ................................................................................. 18

*Native Vill. of Point Hope v. Jewell,*
  740 F.3d 489 (9th Cir. 2014) ...........................................................17

*New York v. Nuclear Regul. Comm'n,*
  681 F.3d 471 (D.C. Cir. 2012) ..........................................................40

*Ocean Advocates v. U.S. Army Corps of Eng'rs,*
  402 F.3d 846 (9th Cir. 2005) ...........................................................41

*Robertson v. Methow Valley Citizens Council,*
  490 U.S. 332 (1989).................................................................3, 40

*\*Sierra Club v. FERC,*
  867 F.3d 1357 (D.C. Cir. 2017) ...................................................*passim*

*Sierra Club v. Mainella,*
  459 F.Supp.2d 76 (D.D.C. 2006) .........................................................39

*Sierra Club v. U.S. Dep't of Energy,*
  867 F.3d 189 (D.C. Cir. 2017) ......................................................23, 29

*Sierra Club v. Watkins,*
  808 F.Supp. 852 (D.D.C. 1991) ..........................................................41

*Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.,*
  555 F.Supp.3d 739 (D. Alaska 2021) .....................................................25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  255 F.Supp.3d 101 (D.D.C. 2017) ........................................................36

*\*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  440 F.Supp.3d 1 (D.D.C. 2020) ......................................................17, 36

*\*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  985 F.3d 1032 (D.C. Cir. 2021) .....................................................29, 33

*\*Vecinos para el Bienestar de la Comunidad Costera v. FERC,*
  6 F.4th 1321 (D.C. Cir. 2021) ....................................................*passim*

*Western Watersheds Project v. Abbey,*
  719 F.3d 1035 (9th Cir. 2013) ..........................................................44

*WildEarth Guardians v. U.S. Bureau of Land Mgmt.,*
  870 F.3d 1222 (10th Cir. 2017) .........................................................23

*WildEarth Guardians v. Zinke,*
  368 F.Supp.3d 41 (D.D.C. 2019).....................................................23, 29

*Authorities upon which we chiefly rely are marked with an asterisk*

**Statutes**

5 U.S.C. § 706 ......................................................................................................... 17

42 U.S.C. § 4321 ....................................................................................................... 2

42 U.S.C. § 4332 ................................................................................................ *passim*

43 U.S.C. § 1301 ....................................................................................................... 3

43 U.S.C. § 1331 ....................................................................................................... 3

43 U.S.C. § 1332 ....................................................................................................... 3

43 U.S.C. § 1334 ....................................................................................................... 3

43 U.S.C. § 1337 .................................................................................................... 3, 4

43 U.S.C. § 1340 ....................................................................................................... 4

43 U.S.C. § 1344 ....................................................................................................... 3

43 U.S.C. § 1351 ....................................................................................................... 4

Pub. L. No. 117-169, 136 Stat. 1818 (2022) ...................................................... 12, 13

**Regulations**

30 C.F.R. § 550.101 .................................................................................................. 3

30 C.F.R. § 550.105 .................................................................................................. 4

30 C.F.R. § 550.207 .................................................................................................. 4

30 C.F.R. § 550.208 .................................................................................................. 4

30 C.F.R. § 550.209 .................................................................................................. 4

30 C.F.R. § 550.269 .................................................................................................. 4

30 C.F.R. § 556.516 .................................................................................................. 4

40 C.F.R. § 1500.1 ............................................................................................. *passim*

40 C.F.R. § 1500.2 .................................................................................................. 43

40 C.F.R. § 1500.3 ................................................................................................2

40 C.F.R. § 1502.1 ................................................................................................3

40 C.F.R. § 1502.2 ..........................................................................................31, 33

40 C.F.R. § 1502.14 ........................................................................................3, 43

40 C.F.R. § 1502.16 ..................................................................................22, 29, 34

40 C.F.R. § 1502.20 ..............................................................................................4

40 C.F.R. § 1502.22 ............................................................................................40

40 C.F.R. § 1502.24 .......................................................................................passim

40 C.F.R. § 1508.7 ..............................................................................................36

40 C.F.R. § 1508.8 ....................................................................................22, 29, 36

40 C.F.R. § 1508.25 ..............................................................................................2

40 C.F.R. § 1508.27 ........................................................................................17, 31

**Federal Register Notices**

48 Fed. Reg. 10,605 (Mar. 10, 1983) ....................................................................3

59 Fed. Reg. 7629 (Feb. 11, 1994) ................................................................35, 36

74 Fed. Reg. 66,496 (Dec. 15, 2009) ....................................................................9

77 Fed. Reg. 40,080 (July 6, 2012) ......................................................................11

81 Fed. Reg. 14,881 (Mar. 18, 2016) ..............................................................2, 11

81 Fed. Reg. 51,866 (Aug. 8, 2016) ................................................................22, 31

81 Fed. Reg. 83,870 (Nov. 22, 2016) ..................................................................11

82 Fed. Reg. 13,363 (Mar. 10, 2017) ..................................................................11

82 Fed. Reg. 59,644 (Dec. 15, 2017) ..................................................................12

85 Fed. Reg. 43,304 (July 16, 2020) ....................................................................2

86 Fed. Reg. 7619 (Jan. 25, 2021) ................................................................10, 32

87 Fed. Reg. 64,246 (Oct. 24, 2022) ............................................................................. 13

88 Fed. Reg. 916 (Jan. 5, 2023) ................................................................................... 7, 8

88 Fed. Reg. 12,413 (Feb. 27, 2023) .............................................................................. 15

88 Fed. Reg. 1196 (Jan. 9, 2023) ........................................................................... *passim*

88 Fed. Reg. 2371 (Jan. 13, 2023) .......................................................................... 13, 14

## INTRODUCTION

On February 24, 2023, the Bureau of Ocean Energy Management ("Bureau") finalized its decision to hold Gulf of Mexico Lease Sale 259, one of the largest offshore oil and gas lease sales in U.S. history. This massive sale will result in the production of up to 1.12 billion barrels of oil and 4.4 trillion cubic feet of natural gas over the next 50 years, contributing substantially to greenhouse gas pollution that will exacerbate the climate crisis and causing significant harm to Gulf ecosystems and communities already suffering from the disproportionate impacts of oil and gas development. Although the Inflation Reduction Act of 2022 ("IRA") directed the Bureau to hold a lease sale of some kind, that Act did not require the Bureau to offer more than 73 million acres of the Gulf—approximately the size of Italy—to oil and gas interests, nor did it excuse the agency from analyzing the significant impacts of the sale, as required by the National Environmental Policy Act ("NEPA").

The Bureau's environmental review of this sale presented a distorted and myopic view of its impacts, ignored or dismissed evidence of harm to Gulf ecosystems and communities, and failed to contextualize the harm or consider less damaging options. This arbitrarily narrow analysis violated NEPA in two important ways. First, the Bureau failed to take the required "hard look" at the impacts of this lease sale by: (i) failing to properly consider harm to Rice's whale, a critically endangered species whose approximately 50 remaining individuals reside only in the Gulf; (ii) improperly determining that the climate impacts of this action would be essentially the same as not leasing; (iii) arbitrarily dismissing the harm from oil and gas operations on environmental justice communities; and (iv) presenting an incomplete and misleading picture of oil spill risks and impacts. Second, by considering only four action alternatives with nominally differing impacts, the Bureau failed to meaningfully compare alternatives and rejected reasonable alternatives that would substantially reduce Lease Sale 259's significant impacts.

1

Plaintiffs therefore ask this Court to declare that the Bureau's decision to hold Lease Sale 259 violates NEPA and the Administrative Procedure Act ("APA").[1]

## STATUTORY BACKGROUND

### I.    National Environmental Policy Act

NEPA is this country's "basic national charter for protection of the environment." 40 C.F.R. § 1500.1 (2019);[2] *see* 42 U.S.C. § 4321 *et seq*. Its purposes include "promot[ing] efforts which will prevent or eliminate damage to the environment," 42 U.S.C. § 4321, and ensuring that federal agencies incorporate environmental concerns into the decisionmaking process, *see id.* § 4331(a)–(b). The Council on Environmental Quality ("CEQ") has promulgated regulations implementing NEPA, which are "binding on all Federal agencies." 40 C.F.R. § 1500.3(a); *see generally id*. § 1500.1 *et seq.*

NEPA requires federal agencies to prepare a "detailed statement" evaluating all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This Environmental Impact Statement ("EIS") must analyze the direct, indirect, and cumulative effects of the proposed action, 40 C.F.R. § 1508.25(c), and the agency must perform this duty using high-quality, accurate scientific information and must ensure the scientific integrity of its analyses. *Id*. §§ 1500.1(b), 1502.24. An EIS "forces the agency to take a 'hard look' at the environmental consequences of its actions, including alternatives to its

---

[1] Pursuant to the Order Granting Briefing Schedule, Dkt. No. 46, "[i]f the Court rules in favor of Plaintiffs on any of their claims on summary judgment, the Parties will submit a proposed schedule for remedy briefing within seven days of the Court's summary judgment ruling."
[2] CEQ revised its regulations implementing NEPA in mid-2020, which became effective on September 14, 2020. 85 Fed. Reg. 43,304 (July 16, 2020). Those new regulations do not apply to and are not referenced in the NEPA analyses at issue here, which began in March 2016, 81 Fed. Reg. 14,881 (Mar. 18, 2016). *See* 85 Fed. Reg. at 43,372, 43,340 (stating new regulations only "apply to any NEPA process begun after September 14, 2020"). Unless otherwise noted, this brief only references the regulations in effect prior to September 14, 2020.

proposed course," and "ensures that these environmental consequences, and the agency's consideration of them, are disclosed to the public." *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (citations omitted); *see* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.1.

In an EIS, an agency must "[r]igorously explore and objectively evaluate all reasonable alternatives" to a proposed action. 40 C.F.R. § 1502.14(a). This analysis is the "heart of the [EIS]," *id.*, and serves NEPA's twin purposes of fostering informed decision-making and public participation. *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

## II.    <u>Outer Continental Shelf Lands Act</u>

The Outer Continental Shelf Lands Act ("OCSLA") governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf ("OCS"). *See* 43 U.S.C. § 1331 *et seq.* The OCS extends from the outer boundary of state waters—typically 3 nautical miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10,605 (Mar. 10, 1983). OCSLA requires that the development of resources on the OCS be "subject to environmental safeguards." 43 U.S.C. § 1332(3).

The Secretary of the Interior manages oil and gas activities on the OCS. *Id.* §§ 1334(a), 1344(a).[3] This management "shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the [OCS]," and "the potential impact of oil and gas exploration on other resource values of the [OCS] and the marine, coastal, and human environments." *Id.* § 1344(a)(1).

OCSLA prescribes four, tiered stages for the development of offshore oil and gas deposits: (1) five-year leasing programs, *id.* § 1344; (2) lease sales, *id.* § 1337; (3) exploration

---

[3] The Secretary has delegated authority to the Bureau to manage leasing, exploration, development, and production of oil and gas resources on the OCS. 30 C.F.R. § 550.101.

plans, *id*. § 1340; and (4) development and production plans, *id*. § 1351. NEPA applies at each stage, although the Secretary may "tier" later analyses to earlier reviews. *See* 40 C.F.R. § 1502.20.

At the lease sale stage, the Secretary decides whether and under what conditions to offer leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area." 43 U.S.C. § 1337(b)(4). The Secretary retains broad discretion to accept or reject bids made for leases. *See id*.; 30 C.F.R. § 556.516(b). Once a lease is issued, a lessee may conduct geological and geophysical exploration, such as seismic surveys, without further approval under OCSLA. 30 C.F.R. §§ 550.105, .207–.209.[4]

## FACTUAL BACKGROUND

### I.    The Gulf of Mexico and Impacts of Oil and Gas Leasing

#### A.    Overview

The Gulf of Mexico is home to some of the nation's most productive and biodiverse tropical and subtropical ecosystems, a range of habitats, and thousands of species. *See* BOEM01750–52; *Friends of the Earth*, 583 F.Supp.3d at 124. Over two dozen marine and coastal species living in the Gulf are listed as endangered or threatened under the Endangered Species Act ("ESA"). *See* BOEM00198–99, 00558–59. The Gulf produces more than one-third of the nation's domestic seafood supply, *Friends of the Earth*, 583 F.Supp.3d at 124, and coastal tourism and recreation generate over $11 billion annually in economic activity in the five Gulf Coast states. BOEM01744.

---

[4] Interior's manual and regulations implementing NEPA provide categorical exclusions for exploration plans and development and production plans in the western and central Gulf. 516 Department Manual § 15.4(C)(10); 30 C.F.R. § 550.269(a). Thus, the lease sale stage is the last point at which an EIS is definitively required and is particularly important in addressing NEPA's requirements. *See Friends of the Earth v. Haaland*, 583 F.Supp.3d 113, 133–34 (D.D.C. 2022), *vacated as moot*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023).

The Gulf is the nation's primary offshore source of oil and gas, generating about 97% of all U.S. offshore oil and gas production.[5] As of May 1, 2023, there are over 2,000 active leases in the Gulf that cover about 11 million acres.[6] Vast networks of oil and gas pipelines crisscross the seafloor and numerous transport vessels, storage facilities, and onshore terminals support operating platforms in these leased areas. BOEM19527–28.

The Bureau has recognized that offshore oil and gas operations harm the environment in numerous ways, including through oil spills; bottom habitat destruction; marine debris; water pollution; and noise from vessels, seismic surveys, construction, and general operations. *See, e.g.*, BOEM19544. Oil and gas activities also cause air pollution, erode coastal wetlands, impair commercial and recreational fishing opportunities, degrade recreational and aesthetic experiences, and contribute significantly to climate change. *Id*.

## B.    Impacts of Oil Spills, Including *Deepwater Horizon*

Oil spills have caused significant and lasting environmental, public health, and economic damage in the Gulf. Exposure to spilled crude oil causes severe harm to coral reefs, marine plants, marine mammals, sea turtles, oysters, and fish. BOEM07541–46. Oil spills also damage shorelines, subsistence activities, commercial and recreational fishing, tourism, and the health of onshore communities. BOEM07546–48, 18607, 26163–64. Racial and ethnic minority groups living and working on the Gulf Coast are disproportionately exposed to oil- and gas-related hazards, including oil spills. BOEM25266–67.

---

[5] *Oil and Gas - Gulf of Mexico*, BOEM, https://www.boem.gov/regions/gulf-mexico-ocs-region/oil-and-gas-gulf-mexico (last visited June 16, 2023). *See Carik v. U.S. Dep't of Health & Human Servs*., 4 F.Supp.3d 41, 48 n.4, (D.D.C. 2013) (pursuant to Fed. R. Evid. 201(b)(2), court may take judicial notice of information available on government website).
[6] *Combined Leasing Report*, BOEM (May 1, 2023), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/Lease%20stats%205-1-23.pdf.

Large-scale oil spills magnify these harms, causing catastrophic damage to communities and ecosystems. Spills of greater than 1,000 barrels are responsible for nearly 80% of total volume spilled. BOEM07535. The Gulf has endured multiple spills greater than 10,000 barrels, which continue to cause devastating impacts. *See* BOEM20040–42.

For instance, the Gulf has yet to recover from the effects of the 2010 *Deepwater Horizon* disaster, which leaked over 130 million gallons of oil, killing and injuring countless marine species, as well as contaminating thousands of miles of ocean and coastal habitat. BOEM07543–45, 46226. Many ESA-listed species were profoundly affected—endangered sperm whales suffered a 7% decline in population, and the endangered Rice's whale population diminished by about 20%. BOEM46912. *Deepwater Horizon* also took a severe human toll. The rig explosion killed eleven workers and injured seventeen others. BOEM07541. Workers involved with cleanup efforts continue to suffer from decreased liver, blood, heart, and respiratory functions. BOEM58299. Spill contamination caused fishery closures that led to an estimated $247 million loss for the Gulf's commercial fishing industry. BOEM57833.

Greater reliance on riskier deepwater and ultra-deepwater drilling, BOEM17301, 19127, and more frequent and intense storms in the Gulf, BOEM51314–1616, increase the probability of future oil spills and the likelihood that these spills could be catastrophic.

C.    **Impacts of Oil and Gas Development on Rice's Whale**

Rice's whale, also known as the Gulf of Mexico whale (and formerly as Bryde's whale), is the only baleen whale species whose entire known range is limited to waters off the United States, and specifically the Gulf. BOEM74377. With a remaining population of only about 50 individuals, BOEM33666, 74378, Rice's whale is one of the most endangered marine mammals in existence. BOEM21821. The continued survival of this species is precarious—"[s]mall-scale

incremental impacts over time or a single catastrophic event" could result in extinction. BOEM73134.

Oil and gas activities in the Gulf pose a serious threat to the continued survival of Rice's whales. *Id.*; *see also* BOEM58203, 73174–75, 73187–89. Energy exploration and development is one of the most significant anthropogenic threats to the whale's recovery, likely to "eliminate or seriously degrade" the population. BOEM73229. These activities degrade the whale's habitat and behavior and cause illness, injury, and death. For example, noise from high-energy seismic surveys used in oil and gas exploration causes behavioral disturbance and physical injury, including permanent hearing impairment. BOEM58203, 73188–89. Rice's whales are also particularly susceptible to serious injury or death resulting from vessel strikes because they spend most of their time near the water's surface. BOEM58201. In addition, oil spills can cause physical injury, behavioral changes, or death, depending on the size and duration of the spill. BOEM73174–75. As noted above, the *Deepwater Horizon* spill devastated Rice's whale, killing approximately 20% of its population. BOEM46912.

Although once considered to exclusively inhabit the northeastern Gulf centered in De Soto Canyon, significant new evidence demonstrates that the whale persistently occurs in the western and central Gulf, where oil and gas development occurs. *See, e.g.*, BOEM21821. These recent studies show that Rice's whale habitat extends into the central and western Gulf, in water depths between 100 and 400 meters, which is believed to be conducive to its feeding. *See id.*; BOEM73164; *see also* BOEM73289. More than 40% of the population occurs in these shelf-break waters, outside the northeastern Gulf core habitat area. *See* 88 Fed. Reg. 916, 944 (Jan. 5, 2023) (stating "core habitat area contains approximately 57% of predicted Rice's whale abundance").



BOEM07551.

### D. Impacts of Oil and Gas Development on Gulf Communities

Gulf communities, including Black, Indigenous, and other communities of color, have been disproportionately impacted by pollution from oil and gas activities and the extensive infrastructure system that supports it. *See* BOEM03712–15. Over 47% of total U.S. petroleum refining capacity and 51% of total U.S. natural gas processing plant capacity is located along the Gulf Coast. BOEM17830 (citing *Gulf of Mexico Fact Sheet*, U.S. Energy Information Administration, https://www.eia.gov/special/gulf_of_mexico/). Most of the United States' basic chemical production takes place there as well, making use of the raw materials, such as ethylene, propylene, and benzene, that are developed by the area's refiners and processors. *Id.* (citing *Chemicals Industry Profile, Advanced Manufacturing*, U.S. Department of Energy, https://www.energy.gov/eere/amo/chemicals-industry-profile). Of the top 10 chemical

production complexes in the world, five are located in Texas and one is in Louisiana. BOEM03667.

This concentration of fossil fuel-related industrial activity has resulted in long-standing health and quality-of-life impacts on local residents, and disproportionate impacts on communities of color. For example, refineries and petrochemical plants in Gulf states are more likely to be in low-income and communities of color. BOEM17830–31. African Americans are 75% more likely to live near toxic air pollution from oil and gas facilities than the rest of Americans, and the counties with the highest percentages of African Americans living near oil refineries are located in the Gulf states. BOEM11103, 11118–19. Several areas of the Gulf are already failing to meet federal standards for ozone, sulfur dioxide, and lead, BOEM03263, resulting in respiratory and health impacts such as asthma attacks and elevated cancer risks, BOEM11111–15.

## II.    The Climate Crisis and the Nation's Policy Response

Lease Sale 259 arises at a time of rapid change in federal policy addressing fossil fuels, greenhouse gases ("GHG"), and the climate crisis. In 2009, the federal government declared that elevated concentrations of GHGs were likely to "endanger the public health and welfare of current and future generations." 74 Fed. Reg. 66,496, 66,523 (Dec. 15, 2009). In the 2017 Fourth National Climate Assessment, the federal government concluded unequivocally that current temperatures were "now the warmest in the history of modern civilization" due to GHG emissions, and documented a range of serious consequences including melting glaciers, diminishing snow cover, shrinking sea ice, rising sea levels, ocean acidification, and increases in "extreme events" like storms and rainfall. BOEM75798.

The nation has enacted policies that seek to address this crisis. Two years ago, President Biden issued Executive Order 14008, *Tackling the Climate Crisis at Home and Abroad*, formally

declaring the nation to be in a "climate crisis" that called for an all-of-government response. 86 Fed. Reg. 7619 (Jan. 25, 2021).[7] In 2021, the Biden Administration articulated pathways to its goal of net-zero GHG emissions by 2050. BOEM78522 ("Long-Term Strategy"). Noting that transportation is the largest source of GHG emissions in the United States, the Administration called for a dramatic shift away from fossil fuel use in this sector. BOEM78532, 78547. Earlier this year, the Administration emphasized anew that the United States "faces a profound climate crisis and there is little time left to avoid a dangerous—potentially catastrophic—climate trajectory." *National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions and Climate Change*, 88 Fed. Reg. 1196, 1197 (Jan. 9, 2023) ("2023 GHG Guidance"). Internationally, as a signatory to the Paris climate agreement, the nation committed to cutting U.S. GHG emissions by over half by 2030 in order to hold global average temperature increases to 2.0 degrees Celsius and "pursue efforts" to hold them to 1.5 degrees. BOEM07609. And last year, Congress enacted the IRA, which President Biden described as "one of the most significant laws in our history" and "the most aggressive action ever . . . in confronting the climate crisis." Remarks By President Biden At Signing of H.R. 5376, the Inflation Reduction Act of 2022, 2022 WL 3367985 (Aug. 16, 2022); *see* BOEM19521–22.

Meeting these policy commitments will require an aggressive phase-out of the production and consumption of fossil fuels, starting immediately. As the record reveals, there are *already* more than enough fossil fuels in development to overshoot the nation's climate policy goals and international commitments to limit emissions, even without any new development. BOEM07602–03 (citing studies that U.S. must *end* oil production by 2031 to preserve a 67%

---

[7] One section of this Executive Order, which paused federal leasing, was enjoined by a district court but is not salient here. *Louisiana v. Biden*, Case No. 2:21-CV-00778, 2022 WL 3570933 (W.D. La. Aug. 18, 2022).

chance of meeting Paris targets),[8] BOEM29933. A U.N.-authored report found that plans to continue production of fossil fuels were "dangerously out of sync" with international commitments to reduce GHGs. BOEM73517–18, 73538 (stating that "countries are planning on producing around 110% more fossil fuels (or more than double the amount) in 2030 than would be consistent with the median 1.5°C-warming pathway").

### III.     Lease Sale 259 and NEPA Process

#### A.     2017–2022 leasing program

In March 2016, the Bureau announced its proposed 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program ("2017–2022 Program"), which consisted of ten region-wide[9] lease sales encompassing most areas of the Gulf available for leasing. *See* 81 Fed. Reg. 14,881 (Mar. 18, 2016). The Bureau finalized a programmatic EIS for this program in November 2016 (the "5-Year Program EIS"). *See* 81 Fed. Reg. 83,870 (Nov. 22, 2016). The 5-Year Program EIS noted that "[a]dditional environmental reviews would take place that would be more site-specific and analyze impacts on ESA-listed and non-listed species in greater detail" if the Bureau moved forward with lease sales. BOEM02032.

In March 2017, the Bureau issued a final EIS purporting to evaluate the effects of a single lease sale in the Gulf under the 2017–2022 Program (the "2017 Lease Sale EIS"). 82 Fed. Reg. 13,363 (Mar. 10, 2017). The Bureau planned to supplement that review "on a regular basis to

---

[8] "The carbon budget is a finite amount of total GHGs that may be emitted worldwide, without exceeding acceptable levels of global warming." *Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1043 (10th Cir. 2023). The concept has been recognized in this Circuit as a "generally accepted method for estimating the impact of greenhouse gas emissions." *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329–30 (D.C. Cir. 2021).
[9] Prior OCS leasing programs had offered different portions of the three Gulf planning areas for leasing. *See, e.g.*, 77 Fed. Reg. 40,080 (July 6, 2012).

provide for more consistency and for planning purposes," and expected "to issue a Supplemental EIS once a calendar year." BOEM02927.

In December 2017, the Bureau finalized a supplemental EIS to further analyze the effects of a single regionwide lease sale (the "2018 Lease Sale SEIS"). 82 Fed. Reg. 59,644 (Dec. 15, 2017). The 2018 Lease Sale SEIS indicated that supplemental reviews would be conducted "annually for the remaining proposed lease sales." BOEM04703.

Rather than supplement the 2018 Lease Sale SEIS, however, the Bureau simply relied on its prior NEPA reviews when it approved a Record of Decision ("ROD") for Lease Sale 257 in August 2021. In *Friends of the Earth*, which challenged Lease Sale 257, the district court found that the Bureau's prior NEPA reviews improperly excluded foreign oil consumption from the model used to estimate the sale's net GHG emissions, and erroneously assumed that, under the no action alternative, foreign production would substitute for domestic production—resulting in higher emissions. 583 F.Supp.3d at 139–46. The court vacated the ROD and actions taken based on that decision. *Id*. at 162.

Lease Sale 259 was also included in the 2017–2022 Program. However, it was not held prior to the Program's expiration in June 2022.

**B.    The Inflation Reduction Act**

On August 16, 2022, the IRA was signed into law. Pub. L. No. 117-169, 136 Stat. 1818 (2022). The IRA establishes various measures to invest in clean energy, cut U.S. greenhouse gas emissions, and reduce the national deficit to curb inflation. However, the IRA also directs the Secretary of the Interior to take steps to further four lease sales (257, 258, 259, and 261) that had been proposed under the 2017–2022 Program. *Id*. § 50264.

In particular, the Secretary was required to "conduct Lease Sale 259" in accordance with the ROD for the 2017–2022 Program and no later than March 31, 2023. *Id.* § 50264(d). The IRA

12

did not provide any further conditions regarding how to conduct Lease Sale 259 or dictate the size or location of the sale. As the Bureau has conceded with regard to Lease Sale 259, "the IRA does not impact the bulk of [the Bureau's] normal leasing process, including the resolution of particular questions going to the scope of the sales and the terms of the resulting leases." 88 Fed. Reg. 2371 (Jan. 13, 2023).[10]

### C.   Supplemental NEPA Process for Lease Sale 259

On October 6, 2022, the Bureau announced that it had prepared a draft supplemental EIS ("draft SEIS") for Lease Sales 259 and 261, which was available for public comment until November 21, 2022. BOEM06025. The Bureau also released an addendum to the draft SEIS to estimate the GHG emissions resulting from a "typical" Gulf lease sale. BOEM21649. On October 24, 2022, the Bureau proposed a regionwide sale for Lease Sale 259, offering nearly all remaining unleased areas in the western and central Gulf, as well as additional areas in the eastern Gulf not subject to congressional moratorium. 87 Fed. Reg. 64,246 (Oct. 24, 2022). The Bureau predicted that Lease Sale 259 would result in up to 1,750 new exploration and development wells, 280 new production structures, over 2,000 km of new pipelines, and about 550,000 service vessel round trips. BOEM06109. Production from the lease sale would include up to 1.12 billion barrels of oil and 4.4 trillion cubic feet of natural gas over the next fifty years. BOEM06089.

Plaintiffs and many others submitted hundreds of pages of detailed technical comments highlighting flaws in the draft SEIS on November 21, 2022. With regard to Rice's whale,

---

[10] With regard to Lease Sale 257, Section 50264(b)(1) of the IRA mandated that the Bureau, within 30 days of the Act's enactment, "accept the highest valid bid for each tract or bidding . . . for which a valid bid was received," and then "promptly issue to the high bidder a fully executed lease . . . ." Because of this language, the D.C. Circuit found that the Bureau had a nondiscretionary duty to issue leases for Lease Sale 257 and held that the IRA had rendered challenges to that lease sale moot. *Friends of the Earth*, 2023 WL 3144203 at *1–2.

Plaintiffs highlighted recent evidence of the species' habitat in the central and western Gulf and pointed out that the Bureau previously excluded the same habitat areas from wind energy leasing. BOEM07549–51, 07649–50, 17829–30, 19990–94. Plaintiffs and federal agencies also criticized the Bureau's methods and conclusions with respect to GHG emissions, highlighting the Bureau's use of a faulty model with outdated and grossly inaccurate assumptions regarding future oil demand, and the need to contextualize GHG impacts in light of the nation's policies addressing the climate emergency. *See, e.g.*, BOEM07509–26, 17808–09. Plaintiffs also explained the Bureau's failure to analyze the impacts to environmental justice communities and oil spill risks, among other issues, as well as its failure to properly consider alternatives to the proposed action. *See, e.g.*, BOEM07552–58, 07568–71, 7630–36.

The Bureau released the Final SEIS ("FSEIS") for Lease Sale 259 a mere six weeks later. 88 Fed. Reg. 2371 (Jan. 13, 2023). The FSEIS made few, if any, substantive changes from the draft, and either ignored or offered boilerplate responses that failed to consider or meaningfully address Plaintiffs' detailed technical criticisms. *See, generally*, BOEM19868–20085. Dismissing the recent information about Rice's whale habitat in the central and western Gulf, the FSEIS concluded that impacts to marine mammals would be negligible to moderate at the regional, population-level scale, while the incremental contribution of one lease sale to cumulative impacts on marine mammals would be negligible. BOEM19444, 19597, 19600, 19990. On climate change, the Bureau concluded that development of over a billion barrels of crude oil and four trillion cubic feet of natural gas would result in only "slightly higher" GHG emissions compared to not leasing at all and dismissed relevant climate action goals and commitments as "beyond the scope of th[e] analysis" of climate impacts. BOEM19548–50, 19889. The Bureau dismissed the significant environmental justice impacts of oil and gas leasing and related

14

infrastructure on Gulf communities by claiming that "these low-income and minority communities are located onshore and distant from Federal OCS oil- and gas-related activities," and that it has "no regulatory authority" over such infrastructure. BOEM19645. And with respect to oil spill risks, the Bureau excluded large, high-consequence spills from its analysis as "not reasonably foreseeable," and did not evaluate the increased risks of developing in deeper waters. BOEM19489, 19645.

Furthermore, the FSEIS evaluated only four action alternatives: (1) Alternative A: leasing all available areas of the western, central, and eastern Gulf; (2) Alternative B: leasing all available areas of the central and eastern Gulf; (3) Alternative C: leasing all available areas of the western Gulf; and (4) Alternative D: leasing under Alternative A, B, or C with three potential lease stipulations that would remove small areas from leases due to their ecological importance and sensitivity to oil- and gas-related activities, or to mitigate visual impacts. BOEM19495–501. As required by NEPA, the Bureau also included Alternative E, the No Action Alternative. BOEM19502. Without explanation, the Bureau assumed impacts would hardly differ across the four action alternatives. *See* BOEM19513–14. The Bureau declined to consider reasonable alternatives suggested by Plaintiffs and others that would have significantly reduced impacts.

On February 24, 2023, the Bureau released its ROD for Lease Sale 259. 88 Fed. Reg. 12,413 (Feb. 27, 2023). In the ROD, the Bureau decided to offer for lease a subset of the blocks analyzed as Alternative D. BOEM20100. The Bureau included additional exclusions to cover (1) draft identified Wind Energy Areas and final Wind Energy Areas; (2) Depth-restricted, segregated block portions; and (3) Bureau-designated Significant Sediment Resource Area Blocks. These additional restrictions reduced the total acreage estimated to be available for lease from 78.54 million acres (in the FSEIS) to 73.3 million acres. BOEM20101. The Bureau did not

alter its estimates regarding the amount of development or projected oil and gas production from the lease sale.

Along with the ROD, the Bureau released an "Errata Sheet" for the FSEIS and an updated GHG Report with corrections. *See* BOEM05852, 20089. Among other unexplained changes, the Errata Sheet altered the conclusions regarding GHG emissions by (1) changing the finding that the no leasing alternative (Alternative E) would result in "slightly higher" emissions than Alternative A, to "Alternative A results in slightly higher domestic emissions" than the no leasing alternative; (2) recalculating the increase in global GHG emissions from Alternative A, as compared to the no leasing alternative, from 46.8 million metric tons to 66.8 million metric tons, and (3) reversing its conclusion that leasing has a "smaller impact on the domestic GHG budget," compared to no leasing, to a "larger" impact. BOEM20089–92. The Errata Sheet also updated the anticipated total GHG emissions from the Lease Sale from 243 to 360 million tons.[11] BOEM20089–90.

## STANDARD OF REVIEW

A party is entitled to summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Challenges to final agency action under NEPA are reviewed under the APA. *Sierra Club*, 867 F.3d at 1367. "In the APA context, summary judgment is the mechanism for deciding whether as a matter of law an agency action is supported by the administrative record and is otherwise consistent with the APA standard of review." *Lewis v. Sec'y of Navy*, 195 F.Supp.3d 277, 283 (D.D.C. 2016).

---

[11] In this brief, tons of GHG emissions mean tons of carbon dioxide equivalent ($CO_2e$) emissions, a measurement that incorporates the different climate-forcing impacts of different gasses, e.g., methane has a warming impact 80 times as potent as carbon dioxide over a 20-year scale or 30 times more potent on a 100-year time scale. BOEM07613.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In doing so, a court must determine whether the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). Courts "do not hear cases merely to rubber stamp agency actions," *Nat. Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 755 (D.C. Cir. 2000), but instead consider "whether the agency has explained its decision, whether the facts on which the agency purports to have relied have some basis in the record, and whether the agency considered the relevant factors." *Fund for Animals v. Babbitt*, 903 F.Supp. 96, 105 (D.D.C. 1995) (citations omitted); *accord State Farm*, 463 U.S. at 43.

## ARGUMENT

NEPA mandates that the Bureau prepare an EIS that takes a "hard look" at the environmental consequences of its decision to hold Lease Sale 259, including an evaluation of a reasonable range of alternatives to its proposed course of action. *Sierra Club*, 867 F.3d at 1367 (citing 42 U.S.C. § 4332(2)(C)(iii)). This hard look requires a detailed consideration of impacts on imperiled species, potentially catastrophic events such as oil spills, and impacts on environmental justice communities. *See* 40 C.F.R. § 1508.27(b); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 440 F.Supp.3d 1, 7 (D.D.C. 2020); *Vecinos*, 6 F.4th at 1330. Moreover, "[i]t is only at the lease sale stage that the agency can adequately consider cumulative effects of the lease sale on the environment, including . . . the effects of the sale on climate change." *Native Vill. of Point Hope v. Jewell*, 740 F.3d 489, 504 (9th Cir. 2014).

17

Here, the Bureau violated these requirements in several ways. It failed to properly consider harm to Rice's whale, a critically endangered species whose approximately 50 remaining individuals reside only in the Gulf. It improperly found that the climate impacts of a massive oil and gas lease sale would be essentially the same as not leasing by relying on outdated and arbitrary information, and failed to consider these impacts in light of federal climate policies and commitments. It arbitrarily dismissed harm to environmental justice communities based on their distance from offshore leasing and the Bureau's claim to have "no regulatory authority" over onshore oil and gas activities. It failed to take a hard look at oil spill risks by ignoring catastrophic spills and impacts as not reasonably foreseeable and failing to consider the increased risks posed by current operations. And the Bureau failed to meaningfully consider a reasonable range of alternatives and arbitrarily rejected other reasonable alternatives that would have substantially reduced Lease Sale 259's significant impacts. The Bureau's failure to take a hard look at the significant impacts of Lease Sale 259 or consider reasonable alternatives violated NEPA and was arbitrary and capricious in violation of the APA.[12]

## I.    <u>The Bureau Failed to Take a Hard Look at Impacts on Rice's Whale</u>

The Bureau concluded that impacts from Lease Sale 259 on Rice's whale—a critically endangered species with only 50 individual whales remaining—would be "negligible."

---

[12] Plaintiffs have standing to bring this action on behalf of their members, as demonstrated by the declarations attached to this Motion. Declarations of Scott Eustis, Louis Skrmetta, Kenneth Saxon, John Jacob, Hallie Templeton, William L. Foster II, Peter Galvin, Robert Wiygul, Marilyn Cook, Michael Guckian, and Joni Shereda (discussing the concrete interests of Plaintiffs' members, including recreational, aesthetic, informational, commercial, and scientific interests); *see Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *accord Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000); *Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007). Because Plaintiffs assert "archetypal procedural injur[ies]," the case law "relieves [them] of the need to demonstrate that (1) the agency action would have been different but for the procedural violation, and (2) that court-ordered compliance with the procedure would alter the final result." *Nat'l Parks Conservation Ass'n v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005).

BOEM19597, 19602. In reaching that conclusion, the Bureau ignored record evidence documenting the whale's habitat in the western and central Gulf, and instead examined only the "primary core habitat of Rice's whale . . . in the northeastern [Gulf], centered in De Soto Canyon in water depths between approximately 100 and 400 m." *See* BOEM19600. The Bureau also ignored the recommendations of federal wildlife agencies to avoid leasing in that extended habitat and, remarkably, its own prior decision to "completely avoid[]" that habitat in siting wind activities in the Gulf. BOEM17718. As a result, the Bureau's conclusion is arbitrary and unsupported by the record.

NEPA and its implementing regulations require the Bureau to use high quality, accurate scientific information in its FSEIS and to ensure the scientific integrity of its analysis. 40 C.F.R. § 1500.1(b); *see also* 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.24. Where more recent scientific information is available in the record, the agency may not simply dismiss it and instead rely on outdated data. *See Custer Cnty. Action Ass'n v. Garvey*, 256 F.3d 1024, 1034 (10th Cir. 2001) (noting "agencies must take a hard look at the environmental consequences of proposed actions utilizing the best available scientific information" (cleaned up)); *California v. Bernhardt*, 472 F.Supp.3d 573, 624 (N.D. Cal. 2020) ("NEPA mandates that an agency use state of the art science to make sound scientific decisions."). Nor may an agency ignore, without explanation, its own prior contrary findings. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009). But here, the Bureau relied on outdated data and ignored its own prior contrary conclusions regarding "one of the most endangered whales in the world." BOEM62061.

First, in analyzing impacts to Rice's whale, the Bureau ignored a body of evidence—all in the record before the agency—that confirms Rice's whale distribution in the western and central Gulf, where these highly endangered whales face heightened risks. Specifically, as part of

a comprehensive, five-year NMFS assessment of Rice's whale habitat and distribution, Soldevilla et al. (2022) repeatedly detected Rice's whale vocalizations at three sites in the northwestern Gulf of Mexico in every month of the year, providing "evidence for the persistent occurrence of some Rice's whales over a broader distribution in the [Gulf of Mexico] than previously understood." BOEM21835, 21838. These findings corroborated previous Rice's whale sightings in the western Gulf. *See* BOEM21835 (citing Soldevilla et al. 2017; Rosel et al. 2021). In September 2022, NMFS biologists recognized this study was part of a "growing body of evidence supporting the importance of the extended habitat" in the western and central Gulf. BOEM10959; *see also* BOEM17718.

The record also demonstrates that Rice's whales face increased dangers to their survival in the western and central Gulf. *See* BOEM21838. In contrast to the eastern Gulf, "the western [Gulf] has high levels of shipping traffic, . . . oil and gas exploration (including seismic airgun surveys), and oil and gas production activity." *Id.* Seismic activities, noise, service-vessel strikes, pollution, and oil spills stemming from this fossil fuel development all pose serious risks to Rice's whales. *See* BOEM58203; *see also* BOEM17718. Traffic from service vessels, for instance, poses a heightened risk of ship strikes because Rice's whales spend a significant portion of each day near the surface. BOEM58201 (documenting tagged Rice's whale spent "70% of its time within 15 m of the surface, making it vulnerable to ship strikes"). These risks are all the more consequential because the Rice's whale population is so precarious that the loss of just one individual could "drive the species to extinction." BOEM10959; *see also* BOEM17718.

The Bureau arbitrarily dismissed this record evidence and failed to consider impacts to Rice's whale throughout its distribution in the western and central Gulf. That the Bureau

mentioned the Soldevilla et al. (2022) study does not excuse these analytical shortcomings. The Bureau brushed aside the study's findings as merely indicating it is "plausible that the Rice's whale's distribution is broader" than its core habitat, and then asserted that "not enough information is available at this time to confirm [Rice's whale] distribution or any seasonal movements outside of the core area." BOEM19990. But that assertion is belied by the record and, as noted below, by the Bureau's own contrary finding in siting offshore wind leasing areas.

The record shows that federal wildlife agencies recognized the significance of these studies and advised the Bureau to completely avoid development activities in the known distribution of Rice's whales in the western and central Gulf. Early in 2022, NMFS recommended that "*no offshore wind leasing and/or development occur within the boundaries of the currently known distribution of Rice's whales in the western and central [Gulf]*." BOEM17718 (emphasis in original). More recently, the Marine Mammal Commission made similar recommendations for future oil and gas leasing in the Gulf. The Commission cited the Soldevilla et al. (2022) study, noted the species' "precarious conservation status" and its "*confirmed* presence in the western Gulf," and recommended that the Bureau therefore "exclude areas with 100 to 400 m depths from proposed lease sales in the [Gulf]." BOEM09038 (emphasis added). But the Bureau ignored these recommendations, without explanation, in considering the impacts of Lease Sale 259. That neither "demonstrates reasoned decisionmaking" nor satisfies NEPA's hard look requirement. *Sierra Club*, 867 F.3d at 1368 (cleaned up).

Remarkably, the Bureau itself has conceded the risks of ocean energy development throughout Rice's whale's extended distribution. In July 2022, consistent with NMFS' recommendation, the Bureau decided to eliminate blocks in Rice's whale habitat in the western and central Gulf from offshore wind leasing. BOEM18450 (examining entire western and central

Gulf planning areas), BOEM18459 (assigning Rice's whale habitat a suitability store of zero), BOEM18480, 18490. In doing so, the Bureau determined that Rice's whale habitat in the western and central Gulf is "completely unsuitable" for development activity. BOEM18458–59, 18480.

Having determined that Rice's whale's critically-endangered status and distribution in the western and central Gulf made those areas unsuitable for wind leasing, the Bureau cannot rest on an FSEIS that does not even address Rice's whale occurrence in those areas selected for oil and gas development. *Cf. Bauer v. DeVos*, 325 F.Supp.3d 74, 109 (D.D.C. 2018) (finding that "an unacknowledged and unexplained inconsistency is the hallmark of arbitrary and capricious decision-making"). The Bureau's failure to consider such information and impacts here renders its analysis inadequate and its conclusion arbitrary. *State Farm*, 463 U.S. at 43 (agency acts arbitrarily when it offers "an explanation for its decision that runs counter to the evidence before the agency"); *California v. Bernhardt*, 472 F.Supp.3d at 624 (explaining agencies "cannot ignore the science").

## II.    **The Bureau's Climate Analysis Fails to Satisfy NEPA**

NEPA requires agencies to adequately consider the reasonably foreseeable indirect effects of their actions, including the lifecycle GHG emissions of projects they authorize. 40 C.F.R. §§ 1502.16(b), 1508.8(b); *Sierra Club*, 867 F.3d at 1371–75. CEQ first issued guidance on considering GHGs in 2016. 81 Fed. Reg. 51,866 (Aug. 8, 2016) ("2016 GHG Guidance"). CEQ recently issued updated GHG guidance, finding that "[c]limate change analysis is a critical component of environmental reviews and integral to Federal agencies managing and addressing climate change." 88 Fed. Reg. 1196, 1198 (Jan. 9, 2023).[13] Like all information in an EIS, a

---

[13] The 2023 GHG Guidance was released shortly before the FSEIS in this case, and months before the ROD.

GHG analysis must be of "high quality" and represent "accurate scientific analysis." 40 C.F.R. §§ 1500.1, 1502.24. When assessing GHG emissions, agencies "must engage in 'reasonable forecasting and speculation,' with *reasonable* being the operative word." *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 198 (D.C. Cir. 2017) (emphasis in original, citations omitted). Courts in this Circuit have consistently struck down agency NEPA findings for fossil fuel-related decisions that inadequately addressed GHG emissions. *See Vecinos*, 6 F.4th at 1329 ("we agree with Petitioners that the Commission failed to adequately analyze the impact of the projects' [GHG] emissions"); *Sierra Club*, 867 F.3d at 1371–75 (invalidating EIS for gas pipeline because it failed to consider impacts of burning transported gas in power plants); *WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41, 67–71 (D.D.C. 2019) (finding agency violated NEPA by failing to quantify GHG emissions from oil and gas development).[14]

Here, the Bureau estimated lifecycle domestic GHG emissions from Lease Sale 259 to be a staggering 360 million tons. BOEM20090 (tbl.4-1).[15] The Bureau further assumed that if the sale did not occur, "demand for oil and gas would not disappear" but "would be fulfilled from alternative sources." BOEM21655. It compared the sale's GHG emissions to hypothetical emissions that would arise without it if oil and gas production elsewhere filled the same demand. *Id.* Based on this comparative analysis, the Bureau concluded GHG emissions were negligible

---

[14] The same is true in other circuits. *See, e.g.*, *350 Montana v. Haaland*, 50 F.4th 1254, 1266 (9th Cir. 2022) (finding GHG disclosures for coal mine invalid where agency failed to cite "scientific evidence" to support conclusions); *WildEarth Guardians v. U.S. Bureau of Land Mgmt.*, 870 F.3d 1222, 1236–38 (10th Cir. 2017) (rejecting NEPA analysis of GHG emissions for coal mine).

[15] For context, EPA estimates that total U.S. GHG emissions in 2021 were 6,340 million tons. *See EPA, Inventory of U.S. Greenhouse Gas Emissions and Sinks* (April 19, 2023), https://www.epa.gov/ghgemissions/inventory-us-greenhouse-gas-emissions-and-sinks.

because they were "only slightly higher than, but largely similar" to, the no action alternative. BOEM20104.

This analysis violated NEPA for two reasons. First, the Bureau used outdated and misleading data about future oil demand in its model, ignoring extensive record evidence that domestic policies and other factors will significantly and rapidly decrease the nation's oil consumption in the decades ahead. The result is a grave overestimate of GHG emissions in the no action alternative and, hence, an underestimate of the lease sale's comparative emissions. Second, the Bureau failed to disclose the fundamental conflict between national climate commitments and the decades of new oil production that would result from the sale. Either flaw is a sufficient basis to set aside the FSEIS.

A.    **The Bureau's analysis relied on outdated and misleading data and arbitrarily ignored declining U.S. oil consumption trends**

First, the Bureau's GHG analysis relied on flawed and outdated data that failed to adequately consider how policy and technology will dramatically drive down fossil fuel use in the years ahead. Despite a wealth of evidence in the record, the Bureau either ignored this issue completely or arbitrarily dismissed these factors without explanation. The Bureau's blinkered analysis is at odds with governing regulations, frustrates NEPA's objectives of full disclosure and informed decisionmaking, and is arbitrary and capricious. 40 C.F.R. §§ 1500.1(b)–(c), 1502.24; *State Farm*, 463 U.S. at 43 (finding agency cannot reach conclusion that "runs counter to the evidence").

To analyze Lease Sale 259's GHG emissions, the Bureau used MarketSim—an economic model that courts have repeatedly criticized for producing inaccurate GHG analyses. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 737–39 (9th Cir. 2020) (Bureau uses "simplistic" model that assumes "near constant oil and gas demand over the next 40 to 70

24

years"); *Friends of the Earth*, 583 F.Supp.3d at 137–38, 140–42; *see also Sovereign Iñupiat for a Living Arctic v. Bureau of Land Mgmt.*, 555 F.Supp.3d 739, 762–64 (D. Alaska 2021) (rejecting agency reliance on MarketSim model results). MarketSim uses data about current and projected oil demand to model energy production, consumption, and prices. *See* BOEM21657–59. Critically, the Bureau used a version of MarketSim that relied on the "reference case" set out in the U.S. Energy Information Administration's ("EIA") Annual Energy Outlook for 2020 ("AEO2020 reference case"). BOEM21658. The AEO2020 reference case makes projections of future U.S. energy production, consumption, and prices based on regulations and laws only as implemented as of 2019.[16] BOEM56323; *see also* BOEM56370.

Relying on energy-related requirements frozen in place as of 2019 fundamentally skews the results of the analysis in two ways. First, as discussed further below, it fails to account for the hugely consequential energy conservation policies (including but not limited to the IRA) that have been adopted, as well as technological progress made, in the intervening three-and-a-half years. *See* BOEM62234 ("new laws or regulations (effective after we published an AEO) can . . . lead to significant differences between projections and realized outcomes"). Second, even if BOEM had updated its model to incorporate conservation measures in place in 2023 rather than in 2019, the agency still erroneously assumed that the status quo would remain frozen in place through 2050, with no additional conservation actions or progress. This means the Bureau assumed no future reductions in crude oil demand or consumption, including as a result of mandates to be implemented pursuant to existing laws like the IRA, U.S. commitments to meet international agreement obligations, and the near certainty that increasing social and economic

---

[16] Perplexingly, the Bureau's FSEIS failed even to use the most up-to-date EIA Annual Energy Outlook—AEO2022—available prior to release of the draft SEIS. *See* BOEM05863–64.

pressure to address the climate crisis will continue to drive down fossil fuel consumption. BOEM05863, 05865, 05879 ("MarketSim makes no assumptions about future technology or policy changes other than those reflected in the [AEO 2020 reference case] forecast"; model used inputs "based on current policies," which would "change under a net-zero emissions future"). Indeed, the AEO2020 reference case projects just a 0.6% decline in gasoline consumption and just a 0.1% decline in CO2 emissions between 2019 and 2050, estimates that are wildly misaligned with government policies, commitments, and the evidence in the record. BOEM56402–03.[17] Because of BOEM's reliance on the AEO2020 reference case in this way, its analysis significantly underestimates the comparative GHG emissions from leasing. BOEM13617, 13621 (Rhodium study finding that "climate effects of [leasing] are far greater than [the Bureau] projects," noting only a 5% probability that global emissions would follow the EIA's approach).

The record is replete with evidence that the Bureau's model assumptions about future U.S. oil consumption are implausible, outdated, and misleading. BOEM13615 (Bureau's model is "outdated, in tension with the published literature, and suffers from severe data limitations"), BOEM12735 (projecting declining oil demand as the world moves into alignment with climate goals and pledges), BOEM07608. Significant clean energy improvements were underway even *before* the passage of the IRA, particularly in the transportation sector. For example, the record confirms that electric vehicle sales will grow sharply in the years ahead, displacing cars powered by fossil fuels. BOEM07610. This is due in significant part to post-2019 federal fuel economy standards for cars and light trucks, which are expected to reduce oil demand. *See* BOEM07515,

---

[17] EIA Annual Energy Outlook 2020, Tbl. 2 is also available at: https://www.eia.gov/outlooks/aeo/data/browser/#/?id=2-AEO2020&cases=ref2020&sourcekey=0.

58110–11. Since 2019, zero-emission light-duty vehicle programs were also put in place in 17 states, and zero-emission medium-duty vehicle programs were put in place in New York and California. BOEM57962–63. And post-2019 federal policy sets a target that half of all new light-duty cars sold in 2030 will be zero-emission. BOEM78532, 78547 (fig.8) (showing use of fossil fuels for transportation dropping drastically by 2050). But the Bureau's projections reflect none of these policies and trends.

The IRA will only accelerate the downward trend in domestic oil and gas consumption, something multiple commenters, including EPA, discussed in their comments. BOEM17808, 07516, 13615. One study estimated that, with IRA implementation, national transportation emissions would fall 18–26% from 2005 levels by 2030. BOEM07516, 16902. Another study found that the IRA, in conjunction with other emission-reducing policies, will drive down domestic natural gas demand by 18–27%. *See* BOEM07517. The record shows that IRA implementation is projected to trigger substantial shifts toward renewables, resulting in a steep drop in oil demand. BOEM07527, 13615, 16904–05; *see also* BOEM07608 ("the federal government projects that US GHG emissions will decline by . . . [about] 40 percent by 2030 under current law and policy, including the effects of the [IRA]").

The Bureau's use of such misleading assumptions about future oil demand also collides with guidance from both the nation's NEPA expert agency, CEQ, and the nation's GHG expert agency, EPA. CEQ explicitly advises that a project's emissions should be compared not to business as usual, but against scenarios that incorporate policies aimed at reducing GHG emissions. 88 Fed. Reg. at 1205 (stating that comparison should be "against scenarios or energy use trends that are consistent with achieving science-based GHG reduction goals, such as those pursued in the *Long-Term Strategy of the United States*"). Similarly, EPA recommended that the

Bureau compare Lease Sale 259 emissions to "current trajectories (consistent with Paris 2030 and net-zero 2050 goals) for energy production and demand" rather than outdated assumptions that the status quo would remain in place for decades. BOEM17808–09.[18] Commenters echoed this demand, urging the Bureau to use reference scenarios "that account for the effects of current U.S. law and policy . . . ." *See, e.g.*, BOEM07609.

Despite these extensive critiques, the Bureau failed to meaningfully engage with this issue. *See Friends of the Earth*, 583 F.Supp.3d at 144 (rejecting GHG analysis where agency "never grappled with Plaintiffs' core contention"). Rather than explaining its reasoning for ignoring GHG-reduction policies and projections, the Bureau dismissed the concerns on the basis that climate policies driving falling demand are "beyond the scope of this analysis." BOEM19889. But the Bureau cannot embed a critical assumption about future oil demand—one that is determinative of the entire analysis—and then sidestep evidence that it is fundamentally wrong by declaring that evidence "beyond the scope" of the analysis. *See Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803 (D.C. Cir. 2022) (invalidating lease sale EIS because it ignored evidence that undermined a core assumption as "beyond the scope" of analysis); *Food & Water Watch v. FERC*, 28 F.4th 277, 288–89 (D.C. Cir. 2022) (finding agency's unexplained dismissal of request to consider gas combustion in GHG analysis unlawful).

With respect to the IRA, the Bureau mostly just repeated that the law directed this sale to occur. BOEM19939–40. But this is irrelevant to the point that the IRA will drive declining oil and gas demand in the years ahead. The Bureau considered the climate mitigation effects of the IRA only to the extent of noting—and misconstruing—one study, BOEM19486 (citing Larsen et

---

[18] In fact, EPA took the unusual step of offering a second critique after the FSEIS. It repeated its previous criticisms that "it is not appropriate to assume that in the absence of the proposed action, a comparable amount of production will be substituted." BOEM20097.

al. 2022), which proclaimed the IRA to be a "game changer for US decarbonization," including by incentivizing electric vehicles, BOEM21795, 21801. The study projected that the IRA will result in a less than 1% decline specifically in the *industrial sector's* petroleum consumption. BOEM21801. The Bureau misattributed this percentage figure to the nation's entire petroleum consumption, BOEM19486, most of which is actually in the *transportation* sector, BOEM21801 (discussing IRA's impacts on transportation sector in different section of the report). And the FSEIS says nothing at all about the many other data points in the record predicting that the IRA will result in significant declines in oil consumption in the decades ahead.

NEPA does not allow the Bureau to rely on fundamentally misleading assumptions, as it did here. 40 C.F.R. §§ 1502.16(b), 1508.8(b); *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 105 (1983) (finding assumptions in NEPA document must reflect "reasoned decisionmaking" and "consider[] the relevant factors"). It cannot engage in "forecasting" that is fundamentally unreasonable. *Sierra Club*, 867 F.3d at 198. The Bureau's use of outdated and misleading data and its decision to ignore GHG-reducing policies in its analysis also frustrates NEPA's chief purpose: to ensure that its decision was made with both the full disclosure and full consideration of its climate impacts. 40 C.F.R. § 1500.1(b)–(c). This is precisely the kind of arbitrary and capricious GHG analysis that must be set aside. *Vecinos*, 6 F.4th at 1329 (agency "failed to respond to significant opposing viewpoints concerning the adequacy of its analyses" of GHGs, rendering it "deficient under NEPA and the APA"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1049 (D.C. Cir. 2021) (agency cannot fail to explain NEPA decision in light of conflicting information in the record); *WildEarth Guardians*, 368 F.Supp.3d at 67–69 (finding agency violated NEPA by failing to address GHG emissions when record "replete with information" on how to assess GHGs).

**B.     The GHG analysis failed to contextualize lease sale GHG emissions with federal climate policies and international climate commitments**

The FSEIS and accompanying analysis also failed to live up to NEPA's "hard look" requirement, and are arbitrary and capricious, because they never put the sale's GHG emissions in the appropriate context. The urgency of addressing the climate crisis by reducing GHG emissions is now a central pillar of U.S. domestic and international policy. *See supra* Factual Background Section II. But the FSEIS said virtually nothing about this context. Instead, the Bureau waved away a 67-million-ton increase in emissions as "slightly higher than, but largely similar" to the emissions that would occur without the sale. BOEM20104. However, a 67-million-ton *increase* in GHGs over several decades is extraordinarily consequential when domestic and international policy call for urgent and drastic *reductions* in GHGs, starting now. The failure to disclose the collision between the sale's GHG emissions and the nation's climate policy goals violates key regulations, ignores evidence in the record, and leaves decisionmakers and the public both uninformed about the sale's true climate impact and hamstrung in meaningfully considering alternatives and mitigation.

1.     NEPA documents must explain how actions will achieve or conflict with other environmental laws and standards

A key purpose of NEPA is to disclose the extent to which any given action will advance, or conflict with, NEPA's overarching goals of environmental protection as well as other environmental policies, standards, and laws. Specifically, an EIS "*shall* state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of NEPA as interpreted in the regulations in this subchapter *and other*

*environmental laws and policies.*" 40 C.F.R. § 1502.2(d) (emphasis added);[19] *California ex rel.*

*Imperial Cnty. Air Pollution Control Dist. v. Dep't of the Interior*, 767 F.3d 781, 798 (9th Cir.

2014) ("An EIS must discuss a project's interaction with 'other environmental laws and

policies'" (quoting 40 C.F.R. § 1502.2(d))); *Mont. Wilderness Ass'n v. McAllister*, 658

F.Supp.2d 1249, 1252–53 (D. Mont. 2009) (finding EIS for travel plan that increased motorized

activity invalid because it did not explain how it would comply with Wilderness Study Act). In

fact, "[w]hether an action threatens a violation of Federal, State, or local law or requirements

imposed for the protection of the environment" is a threshold question that can determine

whether an EIS is required in the first place. *See* 40 C.F.R. § 1508.27(10).

 CEQ guidance drives this point home. The 2016 GHG Guidance directed agencies to

discuss GHG policies and plans, and make clear whether a proposal was consistent with such

plans. 81 Fed. Reg. at 51,866. The 2023 GHG Guidance similarly directs that GHG emissions be

placed "in the context of relevant climate action goals and commitments." 88 Fed. Reg. at 1200–

01, 1203 ("placing those emissions in appropriate context are important components of analyzing

a proposed action's reasonably foreseeable climate change effects"). "[A]gencies should explain

how the proposed action and alternatives would help meet or detract from achieving relevant

climate action goals and commitments, including Federal goals, international agreements . . . or

others as appropriate." *Id*. at 1203. Without this context, reporting out raw numbers of GHGs

gives the public and decisionmakers little useful information. *Id.* at 1201–02.

---

[19] Section 101 of NEPA is a sweeping recognition by the U.S. federal government of "the critical importance of restoring and maintaining environmental quality to the overall welfare and development" of people, and a call to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations," among other things. 42 U.S.C. § 4331(a), (b)(1). In Section 102, Congress directed that the "policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies" of NEPA. 42 U.S.C. § 4332(1).

2.    <u>The Bureau never adequately addressed Lease Sale 259's GHG emissions
in the context of climate policies and commitments</u>

As discussed above, the United States has adopted multiple policies in response to the

climate crisis. *See supra* Factual Background Section II. In Executive Order 14008, President

Biden directed the Administration "to organize and deploy the full capacity of its agencies to

combat the climate crisis to implement a Government-wide approach *that reduces climate

pollution in every sector of the economy*." 86 Fed. Reg. at 7622 (emphasis added). The United

States has also committed to deep decarbonization via the Paris Agreement and in the *Long-Term

Strategy,* which calls for a dramatic shift away from fossil fuels. *See supra* Factual Background

Section II.

Multiple commenters urged the Bureau to discuss Lease Sale 259's GHG emissions in

the context of these policies and commitments. "Simply stating the emissions are 'slight' fails to

acknowledge that they are incompatible with national climate policies and meeting the country's

GHG reduction goals." BOEM17821–22. EPA itself urged the Bureau to review its findings in

light of "Paris 2030 and net-zero 2050 goals." BOEM17808–09; *see also* BOEM07526 (EIS

"fails to account for the clean energy goals articulated in various recent Executive Orders issued

by President Biden and enshrined in the Paris Agreement"), BOEM13617 (Bureau model is

"largely incompatible with international commitments"). That contextualization is important

because oil and gas production would have to end within a decade to have even a partial chance

of meeting Paris Agreement targets. BOEM07603.

Despite this chorus of concern, the FSEIS is either silent or dismissive as to these policies

and goals. While the FSEIS provides a boilerplate recitation of the scientific consensus on the

impact of GHGs generally, neither the FSEIS nor the GHG Report says a word about Executive

Order 14008 and the President's demand for an "all of government" response to the climate

crisis. Nor do they say a word about the *Long-Term Strategy*. Instead, in response to comments, the Bureau summarily waved away this key issue as "beyond the scope of this analysis." BOEM19889.

The failure to either address this evidence or engage with these comments is arbitrary and capricious and violates NEPA. An EIS "shall" discuss how alternatives advance the goals of NEPA and other laws and policies—such as the nation's climate policies and international commitments. 40 C.F.R. § 1502.2(d). These issues are not "beyond the scope" of the EIS— assessing conflicts between a proposed action and other goals is *a central purpose* of the EIS. *Id.* Moreover, the Bureau's failure to address repeated comments in the record—including from EPA, an agency with extensive NEPA implementation expertise—is the essence of arbitrary and capricious agency decisionmaking. *See Standing Rock*, 985 F.3d at 1047 (finding agency violated NEPA and APA where it "made no effort" to explain its decision in light of conflicting evidence and expert criticism). "To engage in reasoned decisionmaking, an agency must respond to objections that on their face seem legitimate." *Gulf Restoration Network*, 47 F.4th at 803 (cleaned up); *Vecinos*, 6 F.4th at 1329 ("Because the Commission failed to respond to significant opposing viewpoints concerning the adequacy of its analyses of the projects' [GHG] emissions, we find its analyses deficient under NEPA and the APA."); *350 Montana*, 50 F.4th at 1270 (opaque GHG disclosures "hid the ball and frustrated NEPA's purpose").

In contrast to domestic climate policies, as to which it is silent, the GHG Report at least mentions the Paris Agreement. BOEM05870–71. But the only context it offers is to present the sale's estimated GHG emissions as a percentage of total national emissions that would comply with the Paris targets. BOEM05871. Not surprisingly, it is not a big percentage—around 0.45% of the total national 2030 emissions that are theoretically available under a Paris-compliant GHG

trajectory. The GHG Report nowhere acknowledges that there is enough oil and gas *already* in production to overshoot Paris climate targets, and that existing leases and permits will have to be curtailed to satisfy these goals even before new ones are issued. The authorization of new emissions here means that even more emissions would have to be removed elsewhere. This truncated discussion does little to inform decisionmakers or the public about the climate implications of over a billion barrels of new crude oil and four trillion tons of natural gas.

The Bureau's portrayal of project emissions as a small percentage of total emissions is contrary to NEPA. 40 C.F.R. § 1502.16(b) (requiring agencies to analyze "indirect effects *and their significance*") (emphasis added); 88 Fed. Reg. at 1201 ("NEPA requires more than a statement that emissions from a proposed Federal action or its alternatives represent only a small fraction of global or domestic emissions."). As the Tenth Circuit noted in a similar situation, "[s]imply stating what percentage the emissions will make up of regional, national, and global emissions does not meaningfully inform the public or decisionmakers about the impact of the emissions. . . . [A]ll agency actions causing an increase in GHG emissions will appear de minimis when compared to the regional, national, and global numbers." *Diné Citizens*, 59 F.4th at 1043–44; *see also 350 Montana*, 50 F.4th at 1265–70 (rejecting similar "opaque comparison"; agency "did not cite any scientific evidence supporting the characterization of the project's emissions as 'minor' compared to global emissions"). This Court explicitly rejected the very same approach in *Friends of the Earth*, noting that "the fact that the sale would have a relatively small marginal impact on global oil consumption, and thus greenhouse gases, on its own says nothing about the adequacy of the conclusions" in an EIS. 583 F.Supp.3d at 146. It is puzzling to see the error repeated here.

In sum, the Bureau failed to contextualize the climate impacts of over a billion barrels of additional oil and gas and four trillion tons of natural gas on the global market with governing regulations and international commitments that require sharp reductions in fossil fuel use. The Bureau's analysis is also arbitrary and capricious because it failed to grapple with extensive record evidence and explicit agency guidance that such contextualization is critical to fulfilling NEPA's goals. *See 350 Montana*, 50 F.4th at 1266 (without scientific rationale or "articulated criteria," finding that mine's GHG emissions are "minor" is "deeply troubling").

III.    **The Bureau Failed to Take a Hard Look at Environmental Justice Impacts on Gulf Communities**

The Bureau arbitrarily disregarded the reasonably foreseeable, significant environmental justice impacts that Lease Sale 259 will have on Gulf communities. In the FSEIS, the Bureau acknowledged that OCS oil and gas operations "are supported by an expansive onshore network of coastal infrastructure," the potential impacts of which "could range from negligible to moderate, depending on the location, scale, and type of activity." BOEM19637; *see also* BOEM20014–32. However, the Bureau's "Environmental Justice Determination" summarily concluded that impacts on environmental justice communities "would be immeasurably small" because such communities "are located onshore and distant from Federal OCS oil- and gas-related activities," and because the Bureau "has no regulatory authority" over onshore infrastructure. BOEM19645. The Bureau also appeared to limit its consideration to an estimate of "0-1 new gas processing plant and 0-1 new pipeline landfall over the 50-year life of" the lease sale. *Id*. However, none of these rationales provides a valid basis for the Bureau's findings.

Pursuant to Executive Order 12898, federal agencies are required to identify and address "disproportionately high and adverse human health or environmental effects" of their actions on environmental justice communities. Executive Order 12898, 59 Fed. Reg. 7629, 7629 (Feb. 11,

1994); *see also, e.g.*, *Standing Rock Sioux*, 440 F.Supp.3d at 9 ("[I]n this Circuit, NEPA creates, through the [APA], a right of action deriving from Executive Order 12,898"). For fossil fuel-related projects, this includes effects associated with "the processing, refining, transporting, and end-use of the fossil fuel being extracted," 88 Fed. Reg. at 1204, regardless of whether such processes are "within the control or subject to the discretion of the agency proposing the action."[20] The Bureau's ill-considered conclusions regarding environmental justice impacts do not comply with these requirements and fail to provide the hard look required by NEPA. *Vecinos*, 6 F.4th at 1330 (agency's determination of environmental justice area affected by a project must be "reasonable and adequately explained"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 255 F.Supp.3d 101, 140 (D.D.C. 2017) (agency failed to take a hard look at project's environmental justice implications by offering only "a bare-bones conclusion that [tribe] would not be disproportionately harmed" by oil spill).

A.    **The Bureau improperly dismissed environmental justice impacts as "onshore and distant"**

First, the Bureau's dismissal of environmental justice impacts as "immeasurably small" because Gulf communities are "onshore and distant" from oil and gas development is contrary to NEPA. An EIS must include not only the direct effects of a proposed action, but also the indirect and cumulative impacts. "Indirect effects" are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable." 40 C.F.R. § 1508.8(b). "Cumulative impacts" are those resulting from the "incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." *Id*. § 1508.7. Effects are

---

[20] CEQ, *Environmental Justice, Guidance Under the National Environmental Policy Act* 9 (Dec. 10, 1997), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

"reasonably foreseeable" if they are "sufficiently likely to occur that a person of ordinary prudence would take [them] into account in reaching a decision." *EarthReports, Inc. v. FERC*, 828 F.3d 949, 955 (D.C. Cir. 2016) (citation omitted).

Here, Gulf communities will suffer from reasonably foreseeable indirect and cumulative effects of onshore oil and gas infrastructure that must be considered. The Bureau has projected that over 90% of oil produced from Lease Sale 259 would be brought ashore via pipelines to storage facilities and eventually transferred via pipeline or barge to Gulf coastal refineries. BOEM19533. In fact, the medium-to-heavy sour crude oil produced in the Gulf is mainly processed in Gulf refineries, which are primarily equipped for those types of crudes rather than the light, sweet crude being produced onshore. BOEM01730. Several new infrastructure projects, including export terminals, natural gas liquefaction plants, and pipelines, have been proposed in response to the increasing amount of fossil fuel exports since the U.S. export ban was lifted in 2015. BOEM19638–39. As the Bureau has previously observed, even a single proposed lease sale would "help to maintain what decades of economic development have built, the complex Gulf of Mexico region that exists today." BOEM03709.

Yet nowhere in the FSEIS or other NEPA documents did the Bureau provide any detail as to the effects of the onshore pollution from oil and gas infrastructure on the Gulf's most vulnerable residents. The closest the Bureau came to any acknowledgement of environmental justice impacts were the thumbnail descriptions of studies in the FSEIS's "New Information" section that addressed pollution exposure and climate change on Gulf communities. *See* BOEM19646–52. However, without any analysis of the impacts of Lease Sale 259 or other reasonably foreseeable indirect and cumulative effects, the Bureau simply concluded that there is "[n]o new information" that would change its findings on this issue. *See* BOEM19652. This lack

of analysis violates NEPA. *See Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109

F.Supp.2d 30, 42 (D.D.C. 2000) (noting that agency "dedicated nine or ten pages" to cumulative

impacts but "[t]here is no actual analysis," and agency "merely recite[s] the history of

development . . . and then conclude[s] that the cumulative direct impacts 'have been minimal'").

As CEQ recently stated, "where the proposed action involves fossil fuel extraction," the

"reasonably foreseeable indirect effects of such an action likely would include effects associated

with the processing, refining, transporting, and end-use of the fossil fuel being extracted,

including combustion of the resources to produce energy." 88 Fed. Reg. at 1204. EPA also

specifically recommended that the Bureau evaluate "all potential direct, indirect, and cumulative

impacts in accordance with the CEQ guidance," including "those from pipelines, oil and gas

receiving shore infrastructure, ports, servicing operations, initial construction and deployment,

exploration, connected actions, and other activities." *See* BOEM17809–10, 20014. The Bureau

refused to change its analysis in response. *See* BOEM20014–16.

In sum, the impacts of oil and gas infrastructure connected to Lease Sale 259 must be

evaluated as both an indirect and a cumulative effect. The Bureau's refusal to do so was arbitrary

and capricious and failed to provide the hard look required by NEPA.

**B.    The Bureau cannot dismiss impacts based on an alleged lack of "regulatory authority"**

Relatedly, there is no merit to the Bureau's attempt to dismiss environmental justice

impacts because it has "no regulatory authority" over onshore infrastructure. BOEM19645.

CEQ's guidance directly addresses this scenario:

> [D]ata may suggest there are disproportionately high and adverse
> human health or environmental effects on a minority population,
> low-income population, or Indian tribe from the agency action.
> Agencies should consider these multiple, or cumulative effects, *even*

> *if certain effects are not within the control or subject to the discretion of the agency proposing the action.*[21]

Courts have also rejected attempts by agencies to escape their legal obligations by claiming to lack regulatory authority over certain impacts. *See, e.g.*, *Sierra Club v. Mainella*, 459 F.Supp.2d 76, 103–05 (D.D.C. 2006). In *Mainella*, plaintiffs challenged the National Park Service's failure to evaluate the impacts of oil and gas drilling operations that occurred outside of park boundaries. *Id*. at 79. The Park Service claimed that NEPA did not require consideration of such impacts because the agency "has no authority to regulate surface operations outside park boundaries or otherwise prevent their impacts." *Id*. at 103. The district court rejected this argument, finding a "reasonably close causal relationship" between the drilling authorized by the agency and the surface operations, which could not occur until the Park Service authorized the drilling. *Id*. at 105.

Here, the Bureau has authority over offshore oil and gas lease sales, and the operations authorized by Lease Sale 259 will directly and indirectly impact onshore communities when those fossil fuels are processed onshore. Given that the Bureau had authority to consider such impacts and to take action that could have reduced these impacts, such as reducing the amount of authorized leasing, its failure to evaluate these reasonably foreseeable impacts violates NEPA.

## IV.    <u>The Bureau Failed to Take a Hard Look at Oil Spill Risks</u>

The Bureau also failed to properly consider oil spill risks and the potentially devastating impacts of oil spills from Lease Sale 259. In particular, the Bureau arbitrarily excluded spills greater than 10,000 barrels from its analysis, including catastrophic spills such as *Deepwater Horizon*, and claimed that such spills are "not reasonably foreseeable." The Bureau also failed to

---

[21] CEQ, *supra* note 20, at 9 (emphasis added).

consider the risks posed by offshore oil and gas development in deeper waters and other aspects of current operations that increase the chances of a spill.

First, there was no basis for the Bureau to exclude from its analysis spills greater than 10,000 barrels, including devastating spills like *Deepwater Horizon*, as "not reasonably foreseeable" and "not part of the Proposed Action." BOEM19489, 19531–33, 19645, 20039–41; *see also* BOEM03537. In fact, CEQ's NEPA regulations specifically define the term "reasonably foreseeable" to include "impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason." 40 C.F.R. § 1502.22(b)(4); *see* BOEM17810 (EPA recommendation that the Bureau evaluate catastrophic spill impacts).

The Bureau claimed that it was not required to consider *Deepwater Horizon* and other large spills because CEQ's regulations "removed the requirement to analyze worst-case scenarios." BOEM20039–41. However, that 1986 regulatory amendment retained agencies' duty to take a "hard look" at reasonably foreseeable impacts, which continue to be defined to include low-probability, catastrophic impacts. *See Robertson*, 490 U.S. at 354–56. With respect to accidents such as oil spills, "an agency must look at both the probabilities of potentially harmful events *and* the consequences if those events come to pass," and may only dispense with analyzing the consequences if "the harm in question is so remote and speculative as to reduce the effective probability of its occurrence to zero." *New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 478, 482 (D.C. Cir. 2012) (emphasis added) (cleaned up). Courts have routinely held that agencies have violated NEPA by failing to consider oil spills and other relatively low-likelihood, potentially catastrophic accidents. *See, e.g.*, *Gov't of Manitoba v. Norton*, 398 F.Supp.2d 41, 63–

65 (D.D.C. 2005) (rejecting EA for drinking water pipeline for not considering low-probability leakage); *Sierra Club v. Watkins*, 808 F.Supp. 852, 867–68 (D.D.C. 1991) (rejecting EA for failing to consider severe accidents that are "possible" even if "extremely unlikely"); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 868–69, 871 (9th Cir. 2005) (finding agency violated NEPA in approving oil dock expansion without considering increased risk of oil spills resulting from tanker traffic).

Here, the Bureau's own analysis indicates an up to 29% chance of a spill of 10,000 barrels or more as a result of a single regionwide lease sale, and a 99.5% chance when considering cumulative Gulf lease sales. BOEM19533 (tbl.3-7). Even if the number of forecasted catastrophic oil spills is low, the consequences of such an event can be significant and must be considered. The 2010 *Deepwater Horizon* disaster, for instance, spilled over 4 million barrels of oil, and Gulf ecosystems have yet to fully recover. *See supra* Factual Background Section I.B. Moreover, *Deepwater Horizon* is not the only large oil spill that has occurred in recent years. Other incidents include a 16,152-barrel spill in 2017 caused by damage to a pipeline segment, and the Taylor Energy well platform spill that has released over 119,000 barrels of oil into the Gulf since the platform was struck by Hurricane Ivan in 2004. *See* BOEM20041–42. These incidents further demonstrate that such events are, in fact, reasonably foreseeable. It was arbitrary for the Bureau to ignore the full data set in determining oil spill risks of Lease Sale 259. *See Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 56–57 (D.C. Cir. 2015) ("[A]gencies do *not* have free rein to use inaccurate data."); 42 U.S.C. § 4332(2)(D)–(E); 40 C.F.R. §§ 1500.1(b), 1502.24.

Second, the Bureau failed to consider that oil spill risks in the Gulf will likely increase. According to the Bureau, "[s]pill rates were calculated based on the assumption that spills occur

in direct proportion to the volume of oil handled and are expressed as the number of spills per billion barrels of oil handled (spills/BBO)." BOEM19531. This assumption ignores factors that are increasing the probability of future oil spills, such as increased hurricane severity and frequency due to climate change, increased high-risk deepwater and ultra-deepwater drilling, and aging oil and gas infrastructure. *See supra* Factual Background Section I.B; BOEM17301, 19127. For example, since the number of pipeline-miles required to transport oil is growing due to increased deepwater drilling, the risk calculation based only on oil volume—and not on distance from shore—underestimates the risk of an oil spill. BOEM19069.

The Bureau failed to consider that an increasing amount of exploration and development activity occurs in deeper waters, where spill risks are greater. For example, between 2000 and 2009 (the Bureau relied on spill data through 2010), 15% of Gulf oil production came from ultra-deep operations (waters deeper than 1500 meters). BOEM17301. By 2017, however, 52% of Gulf oil production came from such operations. *Id.*[22]

Oil and gas activities at these deeper depths pose unique risks. Various factors—including increased reservoir pressure and temperature and unstable rock and sediment—can increase the risk of blowouts in deepwater drilling environments. BOEM59409–10. Unsurprisingly, researchers have found that "deep water platforms have a much higher probability of an incident (such as a spill, accident, or injury) reported." BOEM19123. For an average platform, "each 100 feet of added depth increases the probability of . . . [an] incident by

---

[22] The Bureau's own well permit data further illuminate this trend—in 2022, for instance, the Bureau approved 7 new well permits and 29 revised new well permits in shallow water (less than 500 feet deep), compared to 46 new well permits and 374 revised new well permits in deep water (more than 500 feet deep). *See Status of Gulf of Mexico Permits*, BOEM, https://www.bsee.gov/stats-facts/offshore-information/status-of-gulf-of-mexico-well-permits (last visited Mar. 21, 2023).

8.5%." BOEM19127. Furthermore, as drilling occurs farther from shore, oil must travel longer

distances to reach the shore, and spill response becomes more difficult, as *Deepwater Horizon*

highlighted all too well. *See* BOEM58890–91, 59078. The Bureau's analysis failed to account

for these circumstances and thereby underestimated spill risks.

## V.    The Bureau Failed to Consider Reasonable Alternatives

The Bureau further violated NEPA by failing to consider a reasonable range of

alternatives to its Proposed Action. 42 U.S.C. § 4332(2)(C)(iii), (2)(F); *see also* 40 C.F.R. §

1502.14. When preparing an EIS, an agency must "[r]igorously explore and objectively evaluate

all reasonable alternatives." 40 C.F.R. § 1502.14; *Food & Water Watch*, 28 F.4th at 282 (agency

must evaluate "reasonable alternatives to a contemplated action") (citation omitted). The range

must, to the fullest extent possible, include "reasonable alternatives to proposed actions that will

avoid or minimize adverse effects of these actions upon the quality of the human environment."

40 C.F.R. § 1500.2(e). "The existence of reasonable but unexamined alternatives renders an EIS

inadequate." *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 623 F.3d 633, 642 (9th Cir.

2010) (citation omitted). Here, the Bureau's alternatives analysis suffers from three major

defects.

First, the Bureau considered four action alternatives that offered for leasing most

available areas of the Gulf's three different planning areas (western, central, and eastern), but

concluded that each alternative had identical or nearly identical impacts. *See* BOEM19552–53.

The Bureau did not adequately explain why each alternative would result in similar impacts

notwithstanding their differing locations, scope, and conditions. *See Am. Oceans Campaign v.

Daley*, 183 F.Supp.2d 1, 20 (D.D.C. 2000) (agency violated NEPA by failing to "fully explain

the environmental impact of the proposed action and alternatives"). For example, although the

Bureau acknowledged that "a smaller leased area resulting in less projected OCS oil- and gas-

related activity could decrease the likelihood of OCS oil- and gas-related activities impacting marine mammal populations, such as the Rice's whale," it found that there was "not enough conclusive data on the density, general distributions, and possible migratory behaviors of marine mammal populations" and summarily concluded that "the level of impacts would be the same for Alternatives A-D." BOEM19453. However such data do in fact exist for Rice's whale, and the particular location and conditions of Lease Sale 259 will be essential in preventing significant harm to this critically endangered species. *See supra* Factual Background Section I.C, Argument Section I. There is no reasonable basis for the Bureau's failure to even attempt to evaluate the impacts of its various alternatives using this highly relevant evidence.

Second, setting aside the Bureau's illogical determination that each alternative would result in largely the same "negligible," "minor," or "moderate" impacts for affected resources, its selection of such an unreasonably narrow range of alternatives prevented the decisionmaker and the public "from meaningfully evaluating the difference between the alternatives." *Greater Yellowstone Coal. v. Kempthorne*, 577 F.Supp.2d 183, 204–05 (D.D.C. 2008) (alternatives that resulted in the same determination of "negligible to moderate" impacts prevented meaningful evaluation of differences); *Western Watersheds Project v. Abbey*, 719 F.3d 1035, 1050–51 (9th Cir. 2013) (alternatives that only differed in "terms and conditions" the agency would impose to minimize impacts violated NEPA).

Third, the Bureau failed to consider reasonable alternatives that would have significantly reduced the harmful effects of Lease Sale 259 on affected resources, while still being consistent with its legal mandates. For example, Plaintiffs suggested an alternative that would exclude leasing in Rice's whale habitat in De Soto Canyon and within water depths between 100 and 400 meters in the western and central Gulf. BOEM17818, 19899. Plaintiffs also suggested reduced

leasing alternatives which would have been more consistent with U.S. climate commitments and OCSLA's environmental mandates. BOEM07599–607, 07615–18, 17817–19. However, the Bureau did not examine these alternatives or provide any valid basis for failing to do so.

Regarding Rice's whale in particular, the Bureau claimed that it had "not identified any new significant information" regarding alternatives and offered no explanation for rejecting this proposal other than to note that "critical habitat has not been identified for the Rice's whale." BOEM19494–95, 19899–900, 19987–88. However, the Bureau has been presented with significant new information regarding the importance of Rice's whale habitat in the western and central Gulf, which led it to exclude such areas from offshore wind leasing—a *less* harmful action than oil and gas development. *See supra* Argument Section I. Moreover, simply because an area has not yet been designated as critical habitat for a critically endangered species does not mean that impacts to such habitat should not be considered significant for purposes of NEPA. *See Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1275 (10th Cir. 2004) (finding "the record clearly establishes that this stretch of the Snake River has long been an important and productive bald eagle nesting territory" even if not "critical habitat," and noting "difficulties" with critical habitat designation process). The Bureau's failure to consider this and other reasonable alternatives in the FSEIS, without adequate explanation, violated NEPA.

## CONCLUSION

For the foregoing reasons, the Court should declare that the Bureau's decision to hold Lease Sale 259 violated NEPA and the APA.

Respectfully submitted this 20th day of June, 2023.

/s/ George Torgun
George Torgun (*pro hac vice*)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
gtorgun@earthjustice.org

Jan E. Hasselman (DC Bar No. WA0029)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
415-217-2040 Fax
jhasselman@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Bayou City Waterkeeper, Friends of the Earth, and Center for Biological Diversity*

/s/ Kristen Monsell
Kristen Monsell (DC Bar No. CA00060)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94612
510-844-7137 Telephone
510-844-7150 Fax
kmonsell@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity*

/s/ Thomas Zimpleman
Thomas Zimpleman (DC Bar No. 1049141)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St., Suite 300
Washington, DC 20005
202-513-6244 Telephone
tzimpleman@nrdc.org

Julia K. Forgie (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL

1314 Second St.
Santa Monica, CA 90401
310-434-2351 Telephone
jforgie@nrdc.org

Irene Gutierrez (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter St., 21st Floor
San Francisco, CA 94104
415-875-6187 Telephone
igutierrez@nrdc.org

Melanie D. Calero (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
40 W. 20 Street
New York, NY 10011
212-727-4546 Telephone
mcalero@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*

*/s/ Devorah Ancel*
Devorah Ancel (*pro hac vice*)
SIERRA CLUB
PO Box 4998
Austin, TX 78765
415-845-7847 Telephone
303-449-6520 Fax
devorah.ancel@sierraclub.org

*Attorney for Plaintiff Sierra Club*