# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HEALTHY GULF, et al.

　　　　　　　　　　　　*Plaintiffs*,

　　v.

DEBRA A. HAALAND, et al.

　　　　　　　　　　　　*Defendants,*

and

CHEVRON USA;
AMERICAN PETROLEUM INST.,

　　　　　　　　　　　　*Defendant-*
　　　　　　　　　　　　*Intervenors.*

Civil Action No. 23-cv-00604-APM

# FEDERAL DEFENDANTS' COMBINED CROSS-MOTION
# FOR SUMMARY JUDGMENT AND OPPOSITION TO PLAINTIFFS'
# MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL BACKGROUND ................................................................................................... 2

    I.      Outer Continental Shelf Lands Act ........................................................... 2

    II.     National Environmental Policy Act ........................................................... 3

FACTUAL BACKGROUND ............................................................................................. 5

    I.      BOEM's 2017-2022 Five Year Oil and Gas Leasing Program ............................ 5

    II.     Enactment of the Inflation Reduction Act ................................................. 6

    III.    BOEM's Supplemental EIS for Lease Sale 259 ....................................... 7

    IV.    BOEM's Approval of Lease Sale 259 ....................................................... 9

STANDARD OF REVIEW ................................................................................................ 9

ARGUMENT ....................................................................................................................... 10

    I.      BOEM's Analysis of Greenhouse Gas Emissions Complied with NEPA............ 10

          A.     Analysis of Greenhouse Gas Emissions Under NEPA ............................ 10

          B.     BOEM Reasonably Analyzed the Greenhouse Gas Emissions Resulting from  Lease Sale 259 ................................................................. 13

          C.     Plaintiffs' Critiques of BOEM's Analysis Fail to Demonstrate a Violation of  NEPA.......................................................................... 17

                1.     BOEM's Reliance on Available Data from the Energy Information Administration Complied with NEPA ...................... 18

                2.     BOEM Appropriately and Adequately Contextualized its Disclosure of GHG Emissions, Including By Analyzing Those Emissions in the Context of Relevant Environmental Laws and Policies ........................................................................ 24

    II.     BOEM's Analysis of Impacts to the Rice's Whale Complied with NEPA .......... 28

    III.    BOEM'S Analyzed a Reasonable Range of Alternatives....................................... 35

i

IV.    BOEM Reasonably Analyzed the Potential Impacts of Oil Spills........................ 38

V.     BOEM Included Environmental Justice Communities in its Process, and Properly  Analyzed Environmental Justice Impacts ............................................. 41

CONCLUSION...................................................................................................................... 44

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexandria v. Slater,*
198 F.3d 862 (D.C. Cir. 1999) ............................................................................ 35

*American Oceans Campaign v. Daley,*
183 F. Supp. 2d 1 (D.D.C. 2000) ........................................................................ 36

*Balt. Gas & Elec. Co. v. NRDC,*
462 U.S. 87 (1983) .......................................................................................... 5, 42

*Bay Neighborhood Council, Inc. v. Karlen,*
444 U.S. 223 (1980) ............................................................................................ 34

*Bienestar de la Comunidad Costera v. FERC,*
6 F.4th 1321 (D.C. Cir. 2021) ............................................................... 23, 24, 44

*California v. Watt,*
668 F.2d 1290 (D.C. Cir. 1981) ............................................................................ 3

*Center for Biological Diversity v. Bernhardt,*
982 F.3d 723 (9th Cir. 2020) .............................................................................. 12

*Citizens Against Burlington, Inc. v. Busey,*
938 F.2d 190 (D.C. Cir. 1991) ............................................................................ 35

*Communities Against Runaway Expansion v. F.A.A.,*
355 F.3d 678 (D.C. Cir. 2004) ..................................................................... 42, 43

*Ctr. for Biological Diversity v. FERC,*
67 F.4th 1176 (D.C. Cir. 2023) ........................................................................... 17

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
563 F.3d 466 (D.C. Cir. 2009) ......................................................................... 3, 4

*Dep't of Transp. v. Pub. Citizen,*
541 U.S. 752 (2004) ........................................................................................ 5, 23

*Dine Citizens Against Ruining Our Env't v. Haaland,*
59 F.4th 1016 (10th Cir. 2023) ........................................................................... 27

*Friends of the Earth v. Haaland,*
583 F. Supp. 3d 113 (D.D.C. 2022) .............................. 8, 11, 12, 17, 20, 27, 28, 29

*Greater Yellowstone Coal v. Kempthorne,*
577 F. Supp. 2d 183 (D.D.C. 2008) .................................................................... 36

*Greater Yellowstone Coalition v. Flowers,*
    359 F.3d 1257 (10th Cir. 2004) ..................................................................... 37

*Gulf Restoration Network v. Haaland,*
    47 F.4th 795 (D.C. Cir. 2022) ................................................................... 27, 28

*Izaak Walton League of America v. Marsh,*
    655 F.2d 346 (D.C. Cir. 1981) ..................................................................... 35

*Keating v. FERC,*
    569 F.3d 427 (D.C. Cir. 2009) ..................................................................... 10

*Kleppe v. Sierra Club,*
    427 U.S. 390 (1976) ..................................................................................... 33

*Marsh v. Or. Nat. Res. Council,*
    490 U.S. 360 (1989) ................................................................................. 5, 33

*Montana v. Haaland,*
    50 F.4th 1254 (9th Cir. 2022) ..................................................................... 27

*Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins.,*
    463 U.S. 29 (1983) .................................................................................. 9, 10

*Nat'l Com. for the New River v. FERC,*
    373 F.3d 1323 (D.C. Cir. 2004) ................................................................... 44

*Oceana v. BOEM,*
    37 F. Supp. 3d 147 (D.D.C. 2014) ............................................. 20, 21, 22, 39, 40

*Red Lake Band of Chippewa Indians v. United States Army Corps of Engineers,*
    No. 20-3817 (CKK), 2022 U.S. Dist. WL 5434208 (D.D.C. Oct. 7, 2022) ............ 42

*Robertson v. Methow Valley Citizens Council,*
    490 U.S. 332 (1989) ................................................................................... 3, 4

*Secretary of the Interior v. California,*
    464 U.S. 312 (1984) ..................................................................................... 2

*Sierra Club v. Adams,*
    578 F.2d 389 (D.C. Cir. 1978) ..................................................................... 35

*Sierra Club v. FERC,*
    867 F.3d 1357 (D.C. Cir. 2017) ........................................................... 9, 11, 42

*Sierra Club v. Mainella,*
    459 F. Supp. 2d 76 (D.D.C. 2006) ............................................................... 44

*Sierra Club v. U.S. Dep't of Energy,*
    867 F.3d 189 (D.C. Cir. 2017) ....................................... 5, 11, 17, 21, 34

*Slope Borough v. Andrus,*
    642 F.2d 589 (D.C. Cir. 1980) ..................................................................... 4

*Sovereign Inupiat for a Living Arctic v. U.S. Bureau of Land Mgmt.*,
  555 F. Supp. 3d 739 2021 WL 3667986 (D. Alaska Aug. 18, 2021) ...................................... 12

*Standing Rock Sioux Tribe v. U.S. Army Corp. of Engineers*,
  985 F.3d 1032 (D.C. Cir. 2021)......................................................................................... 25

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
  255 F. Supp. 3d 101 (D.D.C. 2017)................................................................................... 41

*Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*,
  282 F.Supp.3d 91 (D.D.C. 2017)....................................................................................... 44

*Tacoma, Washington v. FERC*,
  460 F.3d 53 (D.C. Cir. 2006)...................................................................................... 31, 32

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010)................................................................................ 4, 20, 21

*Theodore Roosevelt P'ship v. Salazar*,
  661 F.3d 66 (D.C. Cir. 2011)............................................................................................ 31

*U.S. Ecology, Inc. v. U.S. Dept. of the Interior*,
  231 F.3d 20 (D.C. Cir. 2000)....................................................................................... 5, 18

*U.S. Sugar Corp. v. EPA*,
  830 F.3d 579 (D.C. Cir. 2016).......................................................................................... 10

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council. Inc.*,
  435 U.S. 519 (1978)......................................................................................................... 35

*Western Watersheds Project v. Abbey*,
  719 F.3d 1035 (9th Cir. 2013).......................................................................................... 37

*WildEarth Guardians v. Jewell*,
  738 F.3d 298 (D.C. Cir. 2013)............................................................................ 10, 11, 17, 21

*WildEarth Guardians v. Zinke*,
  368 F. Supp. 3d 41 (D.D.C. 2019).............................................................................. 11, 23

**Statutes**

16 U.S.C. § 1536(a)(2)........................................................................................................ 31

42 U.S.C. § 4332(2)(C).......................................................................................................... 4

42 U.S.C. §§ 4321-4370f........................................................................................................ 3

43 U.S.C. § 1332(3)............................................................................................................... 2

43 U.S.C. § 1334.................................................................................................................... 3

43 U.S.C. § 1337.................................................................................................................... 3

43 U.S.C. § 1337(a)............................................................................................................... 3

43 U.S.C. § 1337(a)(1) .......................................................................................... 3

43 U.S.C. § 1337(a)(8) .......................................................................................... 9

43 U.S.C. § 1337(l) .............................................................................................. 23

43 U.S.C. § 1340(c) ............................................................................................... 3

43 U.S.C. § 1344 ................................................................................................... 3

43 U.S.C. § 1345(a)-(b) ....................................................................................... 23

43 U.S.C. § 1351 ................................................................................................... 3

43 U.S.C. §§ 1301-1356 ....................................................................................... 2

5 U.S.C. § 702 ...................................................................................................... 9

5 U.S.C. § 706(2)(A) ............................................................................................. 9

Pub. L. No. 109-432, 120 Stat. 2922 (Dec. 20, 2006) ...................................... 29

Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022) ........................................ 6

**Regulations**

15 C.F.R. § 930.36(b) .......................................................................................... 23

30 C.F.R. § 550.207 ............................................................................................... 3

40 C.F.R. § 1502.14(a) ................................................................................... 35, 38

40 C.F.R. § 1502.16(b) (2018) ............................................................................. 26

40 C.F.R. § 1502.2(d) .......................................................................................... 24

40 C.F.R. § 1502.22 ............................................................................................. 22

40 C.F.R. § 1502.22(b) ................................................................................... 22, 39

40 C.F.R. § 1505.2 ................................................................................................. 5

40 C.F.R. § 1508.7 (2019) ................................................................................... 10

40 C.F.R. §§ 1508.28 ............................................................................................. 4

40 C.F.R. pt. 1502 ................................................................................................. 4

43 Fed. Reg. 55,978 (Nov. 29, 1978) ..................................................................... 4

51 Fed. Reg. 15,618, (Apr. 25, 1986) ..................................................................... 4

51 Fed. Reg. 15,618, (Apr. 25, 1986) ................................................................... 22

81 Fed. Reg. 14,881 (Mar. 18, 2016) ...................................................................... 5

81 Fed. Reg. 51,866 (Aug. 5, 2016) ...................................................................... 12

81 Fed. Reg. 83,870 (Nov. 22, 2016) ...................................................................... 5

82 Fed. Reg. 6643 (Jan. 19, 2017) ............................................................................... 7

84 Fed. Reg. 15,446 (Apr. 15, 2019) ........................................................................... 28

85 Fed. Reg. 43,304, (July 16, 2020) ............................................................................ 4

86 Fed. Reg. 47,022 (Aug. 23, 2021) .......................................................................... 29

86 Fed. Reg. 5,322, (Jan. 19, 2021) ............................................................................ 29

86 Fed. Reg. 7,037, (Jan. 20, 2021) ............................................................................ 24

87 Fed. Reg. 64,246 (Oct. 24, 2022) ............................................................................. 8

88 Fed. Reg. 1196 (Jan. 9, 2023) ................................................................................ 12

88 Fed. Reg. 2371 (Jan. 13, 2023) ................................................................................ 8

88 Fed. Reg. 25,251, (Apr. 21, 2023) .......................................................................... 42

88 Fed. Reg. 47,453 (July 24, 2023) ...................................................................... 30, 33

**Other Authorities**

Executive Order 12,898 ............................................................................................... 42

Executive Order 14,008 ......................................................................................... 25, 42

Executive Order 14,096 ............................................................................................... 42

Executive Order 13,990 ............................................................................................... 24

**INTRODUCTION**

The Bureau of Ocean Energy Management ("BOEM") complied with the National

Environmental Policy Act ("NEPA") in issuing a record of decision regarding the challenged

offshore oil and gas lease sale known as Lease Sale 259.  Lease Sale 259 was unique because

Congress expressly mandated that BOEM proceed with the sale in the Inflation Reduction Act

("IRA").  Moreover, the IRA specified that if the Department of the Interior wishes to offer areas

for offshore wind leasing, it must offer at least sixty million acres for offshore oil and gas leasing

within the year preceding issuance of the wind energy lease(s).  Holding Lease Sale 259 permits

the administration to move forward with offshore wind leasing, thus promoting the

administration's objective to promote renewable energy.  While Plaintiffs are clearly dissatisfied

with the fact that Congress required this sale to be held, they fail to demonstrate that BOEM

violated NEPA in approving the sale.

First, and contrary to Plaintiffs' contentions, BOEM appropriately analyzed greenhouse

gas ("GHG") emissions related to the sale by quantifying those emissions and contextualizing

their effects in various ways, including by calculating their social cost, comparing them to the

administration's national emissions targets, and discussing their impact on the United States'

commitments under the Paris Agreement.  While Plaintiffs would have preferred more depth of

analysis in certain respects, BOEM's efforts more than satisfy NEPA's hard look requirement.

Second, BOEM reasonably analyzed the potential environmental impacts on the endangered

Rice's whale.  Further, BOEM reasonably relied on the measures established by the National

Marine Fisheries Service ("NMFS") to avoid harm to the Rice's whale from oil and gas

development, and Plaintiffs have failed to demonstrate that such reliance was arbitrary or

capricious.  Third, BOEM considered a reasonable range of alternatives by analyzing several

1

leasing options.  Fourth, BOEM reasonably analyzed oil spill risks, including through its analysis of a wide range of spill mitigation measures, infrastructure, and a history of past spills, large and small.  Fifth, BOEM took the requisite hard look at environmental justice impacts.  BOEM consulted with over a dozen native tribes through its process, and analyzed upstream, downstream, indirect, and cumulative impacts on vulnerable communities.  Because the administrative record amply demonstrates that BOEM took a hard look at the environmental impacts of LS 259, summary judgment on Plaintiffs' NEPA claims should be granted in favor of Defendants.

## LEGAL BACKGROUND

### I.     Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act ("OCSLA") of 1953, 43 U.S.C. §§ 1301-1356c, was enacted to establish a regime for offshore oil and gas leasing.  It was later amended in 1978 to further, among other policies, a national policy of making the Outer Continental Shelf "available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs."  43 U.S.C. § 1332(3).  OCSLA prescribes a multi-stage process for development of offshore oil and gas resources, with environmental review at each stage.  *Sec'y of the Interior v. California*, 464 U.S. 312, 337-40 (1984).  "[T]he leasing program's four-stage process is pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent."  *Ctr. for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 472-73 (D.C. Cir. 2009) (internal quotation marks omitted) (quoting *California v. Watt*, 668 F.2d 1290, 1297 (D.C. Cir. 1981)).

The first stage is the "five-year program," involving the development and publication of a schedule of proposed Outer Continental Shelf ("OCS") oil and gas lease sales over a five-year period to best meet the nation's energy needs.  *See* 43 U.S.C. § 1344.  The second stage, at issue in this case, is the lease sale itself.  *See generally* 43 U.S.C. §§ 1334, 1337.  The decisions made at this stage include whether and when to hold a sale, which lease blocks to offer in the sale, and the terms of the sale.  43 U.S.C. § 1337(a).  The sale itself is accomplished through a competitive sealed-bid auction.  43 U.S.C. § 1337(a)(1).  The qualified bidders submitting the highest bids may obtain leases, which entitle them to conduct limited preliminary activities, *i.e.*, ancillary activities, such as lower-impact geophysical surveys.  *See* 30 C.F.R. § 550.207.  The third stage includes the lessee's filing and BOEM's review of an exploration plan pursuant to 43 U.S.C. § 1340(c) to explore for oil and gas deposits.  The fourth and final stage, which is contingent upon discovery of paying quantities of oil or gas, is the lessee's filing and BOEM's review of a development and production plan for the purposes of actually producing oil and gas from the leaseholds.  43 U.S.C. § 1351; *see also Ctr. for Biological Diversity*, 563 F.3d at 473.

## II.    National Environmental Policy Act

The National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321-4370m-11 ("NEPA"), serves the dual purposes of, first, informing agency decision-makers of the environmental effects of proposed major federal actions and, second, ensuring that relevant information is made available to the public.  *See Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).  To meet these dual purposes, NEPA requires an agency to prepare an Environmental Impact Statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  While this mandate identifies the procedures agencies must follow to consider the environmental impacts of their actions, it does

not dictate substantive results.  *See Robertson*, 490 U.S. at 350.  The Council on Environmental

Quality ("CEQ") regulations implementing NEPA provide guidance as to the nature and content

of an EIS.  *See* 40 C.F.R. pt. 1502.[1]  An agency may tier to a prior NEPA analysis prepared at an

earlier stage of a planning process.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616

F.3d 497, 511-12 (D.C. Cir. 2010); *see also* 40 C.F.R. § 1508.28.

In carrying out its NEPA and OCSLA duties, BOEM typically prepares a programmatic

NEPA analysis for the five-year program and then prepares additional NEPA analysis at each

OCSLA stage requiring federal action, including prior to lease sales.  *See Ctr. for Biological*

*Diversity*, 563 F.3d at 473; *see also N. Slope Borough v. Andrus*, 642 F.2d 589, 593-94 (D.C.

Cir. 1980).  Typically, in the Gulf of Mexico Region, BOEM prepares an EIS analyzing a

representative lease sale that can be used to support decisions for each of the Gulf of Mexico

sales proposed in the five-year program (referred to as a multisale EIS).  After preparing that

initial multisale EIS, BOEM decides on the first sale covered in the document, and then conducts

additional NEPA analyses, as necessary, for later lease sales.  The NEPA process for each sale

concludes with the issuance of a record of decision choosing among alternatives and, if the

decision is to hold the sale, deciding on the lease sale area, the terms for the sale, and the date on

---

[1] CEQ initially promulgated regulations implementing NEPA in 1978, 43 Fed. Reg. 55,978 (Nov. 29, 1978) (codified at 40 C.F.R. pts. 1500-1508), and a substantive amendment to those regulations in 1986, *see* NEPA Regulations, 51 Fed. Reg. 15,618 (Apr. 25, 1986) (codified at 40 C.F.R. pt. 1502).  In 2020, CEQ substantially revised the regulations and noted that agency NEPA actions begun before the effective date of the revised regulation (September 14, 2020) could continue under the pre-existing regulations.  *See* Update to Regulations, 85 Fed. Reg. 43,304, 43,339 (July 16, 2020).  Because scoping and the related EIS and prior SEIS tiered were begun before the 2020 regulation changes, BOEM continued under the pre-2020 CEQ regulations.  Unless otherwise noted, we cite the pre-2020 version of CEQ's regulations, which is attached as Ex. 1.

which the lease sale will be held.  *See* 40 C.F.R. § 1505.2; *U.S. Ecology, Inc. v. U.S. Dept. of the Interior*, 231 F.3d 20, 22 (D.C. Cir. 2000).

In reviewing agency action for NEPA compliance, courts ensure that agencies have taken a "hard look" at the environmental consequences of their decisions.  *Sierra Club v. U.S. Dept. of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017) ("*Sierra Club I*").  Judicial review of agency NEPA compliance is deferential, particularly as to an agency's technical and scientific determinations.  *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989).  The "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97-98 (1983); *see also Dept. of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) ("[I]nherent in NEPA . . . is a 'rule of reason.'") (citation and quotation marks omitted).

## FACTUAL BACKGROUND

## I.    BOEM's 2017-2022 Five Year Oil and Gas Leasing Program

Lease Sale 259 is the tenth in a series of offshore oil and gas lease sales originally proposed by BOEM as part of the 2017-2022 Five-Year Outer Continental Shelf Leasing Program (the "2017-2022 Five-Year Program").  *See* Notice of Availability, 81 Fed. Reg. 14,881 (Mar. 18, 2016).  In order to help inform the Secretary's decision at the Five-Year Program stage, BOEM prepared the Outer Continental Shelf Oil and Gas Leasing Program: 2017-2022 Final Programmatic EIS (the "Programmatic EIS") in 2016.  *See* Final Programmatic EIS, 81 Fed. Reg. 83,870 (Nov. 22, 2016); BOEM01900.  Subsequently, to inform individual Gulf of Mexico lease sale decisions conducted under the 2017-2022 Five-Year Program, BOEM prepared a multi-sale EIS, known as the Gulf of Mexico OCS Oil and Gas Lease Sales: 2017-

2022 Gulf of Mexico Lease Sales 249, 250, 251, 252, 253, 254, 256, 257, 259, and 261 Final

Multisale EIS (the "Multisale EIS"), BOEM02841.  The Multisale EIS analyzed the potential

impact of the decision to hold a single lease sale that would be representative of each of the ten

region-wide sales tentatively scheduled for the Gulf of Mexico.  BOEM02926.  The Multisale

EIS also stated that BOEM would conduct further NEPA reviews for later sales, as necessary.

BOEM02927 ("An additional NEPA review (e.g., a Determination of NEPA Adequacy, an

[Environmental Assessment] or, if necessary, a Supplemental EIS) will be conducted prior to the

decision on an individual proposed [Gulf of Mexico] lease sale to address any relevant new

information.").  Following that, BOEM completed a supplemental EIS (known as the Gulf of

Mexico OCS Lease Sale Final Supplemental Environmental Impact Statement 2018 (the "2018

Supplemental EIS") to update information in the Multisale EIS and to inform subsequent leasing

decisions.  BOEM04699.

The 2017-2022 Five-Year Program expired at the end of June 2022, and the last sale held

under that Program was Lease Sale 257.  BOEM21886.  Nevertheless, as discussed below, the

Inflation Reduction Act 2022 ("IRA"), Pub. L. No. 117-169, 136 Stat. 1818, directed BOEM to

proceed with Lease Sale 259 in accordance with the Secretary's record of decision approving the

2017-2022 Five-Year Program, regardless of the expiration of the Program, and to do so by

March 31, 2023.  *See* IRA § 50264(d), 136 Stat. at 2060.

## II.    Enactment of the Inflation Reduction Act

Congress enacted the IRA on August 16, 2022.  *See* IRA, Pub L. No. 117-169, 136 Stat.

1818.  In the IRA, Congress reinstated Lease Sale 257—which a district court had previously

vacated—and mandated that BOEM issue the leases to the highest bidders at the lease sale.  IRA

*Id.* § 50264(b); 136 Stat. at 2059-60.  The IRA also mandated that the Department of the Interior

proceed with three other sales that were part of the 2017-2022 Five-Year Program but not held before the program expired in June 2022.  IRA § 50264(c)-(e), 136 Stat. at 2060.  Relevant here, the act states:

> Notwithstanding the expiration of the 2017–2022 leasing program, not later than March 31, 2023, the Secretary shall conduct Lease Sale 259 in accordance with the Record of Decision approved by the Secretary on January 17, 2017, described in the notice of availability entitled "Record of Decision for the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program Final Programmatic Environmental Impact Statement; MMAA104000" issued on January 17, 2017 (82 Fed. Reg. 6643 (January 19, 2017)).

IRA § 50264(d); 136 Stat. at 2060.

Finally, the IRA incentivized Interior to offer a certain volume of land in its offshore lease sales by tying the issuance of offshore wind leases to oil and gas lease sales.  Specifically, the IRA provides that the Secretary cannot issue a lease for offshore wind development on the OCS unless the following conditions are met:

> (A) an offshore [oil and gas] lease sale has been held during the 1-year period ending on the date of the issuance of the lease for offshore wind development; and

> (B) the sum total of acres offered for lease in offshore lease sales during the 1-year period ending on the date of the issuance of the lease for offshore wind development is not less than 60,000,000 acres.

IRA § 50265(b)(2); 136 Stat. at 2061.

### III.    BOEM's Supplemental EIS for Lease Sale 259

Following the enactment of the IRA, BOEM moved quickly to comply with other applicable statutory requirements to the maximum extent practicable and meet Congress's deadline to hold Lease Sale 259 no later than March 31, 2023, just a little over seven months later.  On October 6, 2022, BOEM published a Draft Supplemental EIS ("Draft SEIS") for Lease Sales 259 and 261 and circulated the draft for a forty-five-day public comment period ending on November 21, 2022.  BOEM06025; BOEM06027-28.  On October 24, 2022, BOEM published a

Proposed Notice of Sale.  Notice of Availability, 87 Fed. Reg. 64,246 (Oct. 24, 2022).  After

considering the public comments on the Draft SEIS, BOEM issued the Final SEIS on January 9,

2023 (referred to as "SEIS" or "2023 SEIS").  BOEM19431; *see also* Final SEIS, 88 Fed. Reg.

2371 (Jan. 13, 2023).  The SEIS analyzes new information available since the preparation of the

2018 SEIS to determine whether any such information indicates that individual decisions on

Lease Sales 259 and 261 would result in significant impacts not already analyzed in the prior

NEPA documents.  BOEM19436-40.  The topics analyzed in the SEIS include the potential

environmental impacts of the sales on coastal habitats, benthic communities, fish and

invertebrate species, marine mammals, and commercial fisheries.  BOEM19443-45.

 The SEIS also contains an expanded analysis of GHG emissions, BOEM19445-47,

including an addendum entitled the Gulf of Mexico OCS Oil and Gas Leasing Greenhouse Gas

Emissions and Social Cost Analysis ("GHG Addendum").  BOEM19446; BOEM21649-80.[2]

The GHG Addendum is significant because it corrects the errors in the NEPA analyses for Lease

Sale 257 identified by the district court in *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113

(D.D.C. 2022), *vacated and remanded*, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28,

2023), where the court ruled that NEPA required BOEM to quantify the potential impact of

Lease Sale 257 on foreign GHG emissions.  *See id.* at 136-47.  In response to this direction,

BOEM's GHG analysis now allows BOEM to forecast how foreign oil consumption and

associated GHG emissions would shift in response to BOEM's decision to approve (or not)

Lease Sale 259.  BOEM19446-47; BOEM19547-51.

---

[2] After initially issuing the GHG Addendum in October 2022, BOEM issued a corrected version, updating some of the emissions calculations, in February 2023.  BOEM05852-83.  BOEM also issued an erratum explaining the changes in the Corrected GHG Addendum and making corresponding corrections to the SEIS.  BOEM20088-92.

IV.     **BOEM's Approval of Lease Sale 259**

On February 22, 2023, BOEM issued a record of decision ("ROD") authorizing Lease

Sale 259 to proceed on March 29, 2023 – i.e., two days prior to Congress's March 31 deadline.

BOEM20099-113; IRA § 50264(d), 136 Stat. at 2060.  Contemporaneously with the issuance of

the ROD, BOEM published the Final Notice of Sale on February 24, 2022, which OCSLA

requires BOEM to do at least thirty days prior to the sale.  43 U.S.C. § 1337(a)(8).  BOEM's

decision authorized the sale of lease blocks in the Western, Central, and Eastern Planning areas,

subject to several exclusions.  BOEM20100.  The areas excluded are areas subject to a

September 2020 Presidential withdrawal, areas within the Flower Garden Banks National Marine

Sanctuary, areas that were previously subject to specific leasing stipulations (*e.g.,* topographic

features and live bottom stipulations), areas proposed for wind energy development, and depth-

restricted areas.  BOEM20100-01; *see also* BOEM19499-501.  BOEM's decision authorized the

sale of parcels totaling 73.3 million acres.  BOEM20101.  This figure was significant for

purposes of the IRA because it exceeded the 60-million-acre threshold for offshore oil and gas

leases offered, which is a prerequisite for issuing offshore wind leases.  IRA § 50265(b)(2)(B),

136 Stat. at 2061.  The lease sale was held on March 29, 2023.  BOEM20207.

## STANDARD OF REVIEW

NEPA claims are reviewed under the "deferential standard of review" in the

Administrative Procedure Act ("APA").  *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir.

2017) ("*Sierra Club II*").  If the equities so counsel, a court may set aside agency action if it was

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§§ 702, 706(2)(A).  This standard of review is "narrow and a court is not to substitute its

judgment for that of the agency."  *Motor Vehicle Mfs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,

463 U.S. 29, 43 (1983).  Instead, the reviewing court determines whether the agency "considered the factors relevant to its decision and articulated a rational connection between the facts found and the choice made."  *Keating v. FERC*, 569 F.3d 427, 433 (D.C. Cir. 2009).  An agency acts arbitrarily or capriciously if it "(1) 'has relied on factors which Congress has not intended it to consider,' (2) 'entirely failed to consider an important aspect of the problem,' (3) 'offered an explanation for its decision that runs counter to the evidence before the agency,' or (4) 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 606 (D.C. Cir. 2016) (quoting *State Farm*, 463 U.S. at 43).

## ARGUMENT

### I.  BOEM's Analysis of Greenhouse Gas Emissions Complied with NEPA

BOEM reasonably analyzed the potential impacts on GHG emissions from Lease Sale 259 and conducted its analysis in accordance with the case law, applicable CEQ regulations, and relevant guidance.  Therefore, BOEM's analysis should be upheld.

#### A.  Analysis of Greenhouse Gas Emissions Under NEPA

As with other impacts, an agency should take a hard look at the impacts of its proposed action on climate change.  *See WildEarth Guardians v. Jewell*, 738 F.3d 298, 309-10 (D.C. Cir. 2013).  Such an analysis should include the incremental impacts on GHG emissions of the proposed action "when added to other past, present, and reasonably foreseeable future actions."  *Id.* at 309 (citing 40 C.F.R. § 1508.7 (2019)).  In *WildEarth Guardians*, the D.C. Circuit held that Bureau of Land Management ("BLM") properly analyzed GHG emissions from a coal mine when it quantified the mine's emissions as well as total state and national GHG emissions and determined both the individual mine's and the region's percentage contribution to state and national emissions.  *Id.* at 309-10.  In other words, the agency was permitted to use the quantity

of GHG emissions, put into an appropriate context, as a proxy for the impact of the proposed

action on climate change.  *Id.* at 309.

Following *WildEarth Guardians*, the D.C. Circuit has continued the approach of

permitting agencies to use direct and indirect GHG emissions as a proxy for climate change

impacts, and subsequent litigation has focused on the adequacy of agency efforts to model those

GHG emissions.  *See Sierra Club I*, 867 F.3d at 201-02 (upholding the Federal Energy

Regulatory Commission's ("FERC") quantification of GHG emissions associated with  liquid

natural gas ("LNG") exports, despite arguments that the Commission should have examined  the

potential for LNG to compete with renewable energy in foreign markets); *Sierra Club II*, 867

F.3d at 1374-75 (holding that FERC violated NEPA by failing to quantify the downstream

emissions of natural gas when authorizing a natural gas pipeline); *WildEarth Guardians v. Zinke*,

368 F. Supp. 3d 41, 67-71 (D.D.C. 2019) (holding that BLM was required to quantify the GHG

emissions associated with oil and gas development when deciding to issue leases).

Consistent with that trend, in *Friends of the Earth*, in an opinion that was vacated as moot

following the enactment of the IRA, the district court found that BOEM had violated NEPA

because it did not model the potential decrease in GHG emissions that might occur if a decision

not to proceed with Lease Sale 257 caused a decrease in foreign demand for oil.  *See* 583 F.

Supp. 3d at 137-47.  In that case, BOEM had argued that while it could (and did) model the

potential reduction in domestic emissions if the sale did not go forward, it could not do the same

for foreign emissions because the agency lacked sufficient data regarding foreign energy

markets.  *See id.* at 136-37.  The court rejected this argument, finding instead that BOEM should

have used available data to conduct a quantitative analysis of the reduction in GHG emissions

associated with the decrease in foreign demand for oil, or it should have explained more

specifically why it could not do so.  *Id.* at 141-44.  This ruling followed similar rulings by the

Ninth Circuit and the District of Alaska.  *See Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d

723, 731-32 (9th Cir. 2020) ("*Liberty*"); *Sovereign Inupiat for a Living Arctic v. U.S. Bureau of

Land Mgmt.*, 555 F. Supp. 3d 739, 762-67 (D. Alaska 2021) ("*Willow*").  As discussed below, for

Lease Sale 259, BOEM conducted additional analysis of GHG emissions associated with foreign

demand for oil in order to bring the analysis into line with the *Friends of the Earth* decision, as

well as the *Liberty* and *Willow* cases.

In addition to quantifying GHG emissions, the dual purposes of NEPA—i.e., informed

decision making and informed public involvement—are best served when an agency provides

context against which to understand the potential magnitude of a proposed action's GHG

emissions and associated climate impacts.  On January 9, 2023, the Council on Environmental

Quality issued interim guidance to federal agencies where it identified four means of providing

such context.  NEPA GHG Guidance, 88 Fed. Reg. 1196 (Jan. 9, 2023) ("2023 Guidance").[3]

That 2023 Guidance, which was published on the same day as the SEIS and six weeks prior to

the ROD challenged here, counsels that agencies should (1) monetize the impacts of emissions

using the social cost of GHG emissions "SC-GHG"); (2) "[w]here helpful," "explain how the

proposed action and alternatives would help meet or detract from achieving relevant climate

action goals and commitments"; (3) "summarize and cite to available scientific literature to help

explain the real-world effects" of climate change; and (4) "provide accessible comparisons or

---

[3] CEQ issued its first guidance regarding the analysis of climate change and GHG emissions in
2016, and this guidance was in place during the NEPA process at issue here.  *See* Guidance on
Consideration of GHG, 81 Fed. Reg. 51,866 (Aug. 5, 2016) ("2016 Guidance").  The 2016
Guidance is available at: https://ceq.doe.gov/guidance/ceq_guidance_nepa-ghg.html (last visited
Aug. 4, 2023).  The 2023 Guidance "builds upon and updates" the 2016 Guidance and is
intended "to provide greater clarity and more consistency in how agencies address climate
change in NEPA reviews."  *See* 2023 Guidance, 88 Fed. Reg. at 1,198.

equivalents to help the public and decision makers understand GHG emissions in more familiar terms." *Id.* at 1,202-03.

## B. BOEM Reasonably Analyzed the Greenhouse Gas Emissions Resulting from Lease Sale 259

BOEM's analysis of Lease Sale 259's GHG emissions fully complied with NEPA, including by quantifying the sale's direct and indirect GHG emissions and providing ample context for agency decisionmakers and the public to understand the effects of those emissions.

Beginning with quantification, BOEM used what has become the standard—a full lifecycle analysis of GHG emissions associated with the lease sale. BOEM19547-49. This includes the upstream emissions associated with exploring for and drilling for oil and gas; midstream emissions associated with refining, processing, and distributing oil and gas products; and downstream emissions associated with consuming oil and gas products. *Id.*; BOEM05858-59. BOEM estimated all three categories of GHG emissions for a "no leasing" scenario (equivalent to the no-action alternative in the 2023 SEIS) and a "leasing scenario" (equivalent to alternative A in the 2023 SEIS). BOEM19548-49; BOEM-5859-61.

BOEM's methodology for modeling GHG emissions is described in detail in the Corrected GHG Addendum. BOEM05858-71. Among other things, the Addendum describes the three models that BOEM relies on to estimate GHG emissions: the Market Simulation Model ("MarketSim"), the Offshore Environmental Cost Model, and the Greenhouse Gas Life Cycle Energy Emissions Model ("GLEEM"). BOEM05861. BOEM's models estimate emissions of $CO_2$, $CH_4$, and $N_2O$ and present combined totals of all three in the form of $CO_2$ equivalent. BOEM05862.

As the Addendum explains, different leasing scenarios trigger different market incentives and dynamics, including both changes in overall demand for energy and changes in demand for

other fuel sources, i.e., fuel switching.  BOEM05859.  And fuel switching, when it occurs, can lead to different GHG emission profiles because substitute sources of energy have varying degrees of GHG emissions associated with them.  *Id.*  BOEM uses the MarketSim model to account for these shifting variables; the model uses an estimate of production from a lease sale and evaluates how that production could affect the markets for other sources of energy across different sectors of the economy, *i.e.*, the residential, commercial, industrial, and transportation sectors.  BOEM05864.  The model also incorporates feedback between the markets for different fuel sources to account for changes in production and demand.  *Id.*  The end result is an estimate of the demand that would exist for oil and gas in both a leasing and no leasing scenario.  BOEM05864-65.  And that result is then processed through GLEEM to calculate the associated lifecycle GHG emissions.  BOEM05865-66.

As applied here, the MarketSim model predicted that domestic energy demand over the forty-year OCS production period would decrease under the no leasing scenario by approximately 138.9 million barrels of oil equivalent ("MMBOE") – roughly a 12.5% decrease from the amount that would be expected under the leasing scenario, which is 1,133.6 MMBOE.  BOEM05868.  Based on these production figures, BOEM estimated using the GLEEM model that, for domestic emissions, the no leasing scenario would produce 27 million fewer tons of $CO_2$ equivalent compared to the leasing alternative.  BOEM05867; BOEM20090.  Over the same forty-year period, the MarketSim model predicted that foreign oil consumption would decrease under the no leasing scenario by approximately 173.5 MMBOE – roughly 0.012% lower than baseline foreign oil consumption, which is 1.4 trillion MMBOE.  BOEM05869.  Based on this difference in production, BOEM estimated that, for foreign emissions, the no

leasing scenario would result in 67 million fewer tons of CO2 equivalent compared to the leasing alternative.  BOEM05869; BOEM20090.

Finally, the Addendum explains that BOEM reported separate results for domestic and foreign markets because the MarketSim model necessarily treats those markets differently due to limitations in the available data.  MarketSim is calibrated to a special run of the Energy Information Agency's ("EIA") National Energy Modeling System ("NEMS") from the 2020 Annual Energy Outlook ("AEO") reference case.  BOEM05863.  And that dataset has more reliable data regarding substitute energy sources within the United States, as opposed to foreign countries.  *Id.*; BOEM05866.  BOEM, therefore, used a slightly different approach to model emissions from the two different markets.  BOEM05866.  As explained in the Addendum, both domestic and foreign market oil prices would be lower in a leasing scenario than in a no leasing scenario, which would lead to increased consumption of oil.  *Id.*  But the increased levels of oil demand would be partially offset by lower consumption levels for other energy sources.  *See id.* The Addendum explains that MarketSim estimates the annual changes in oil consumption and substitute fuels and, for domestic markets, models each potential substitute fuel separately to simulate the changes in energy prices across the various fuel markets.  BOEM05864.  Based on the results of the MarketSim, BOEM then estimates GHG emissions.  BOEM05865-67.  For foreign markets, by contrast, the Addendum explains that BOEM applies a single generic emissions factor for combusted oil, which is based on an emissions factor published by the U.S. Environmental Protection Agency ("EPA"), instead of applying an emissions factor specific to a particular petroleum product.  BOEM05866-67.  While BOEM had declined to model foreign markets in this manner for Lease Sale 257, due to the differences described above, BOEM

15

conducted an analysis of the potential change in foreign emissions for Lease Sale 259 in order to comport with the rulings in the *Liberty*, *Willow*, and *Friends of the Earth* cases.  BOEM05859-61

In addition to the robust quantification and modeling described above, BOEM also provided helpful context to assist agency decisionmakers and the public to understand the proposed Sale's anticipated emissions and the corresponding climate change effect, consistent with the 2023 Guidance.  *See* 88 Fed. Reg. at 1,202.  BOEM first compared the GHG emissions associated with proposed Lease Sale to national emissions targets set based on the Paris Agreement.  BOEM05870-71.  Specifically, BOEM provided a chart showing the amounts of GHG emissions corresponding to the leasing and no leasing scenarios in 2025, 2030, and 2050, and also expressed those emissions in each instance in terms of a percentage of the broader U.S. emissions targets.  BOEM05871.  BOEM also analyzed GHG emissions using estimates of SC-GHG associated with the lease sale both domestically and globally.  BOEM05871-78; BOEM20091.  BOEM estimated, for example, that the lease sale would result in a social cost of $990 million due to domestic GHG emissions and $2.91 billion due to foreign emissions, when assuming a 3% discount rate and an average level of statistical damage.  BOEM05874-75. BOEM's analysis is thus consistent with direction in CEQ's 2023 Guidance to provide context for a proposed action's GHG emissions by monetizing the climate change effects of those emissions and disclosing how the action would detract from achieving relevant climate action goals and commitments.  88 Fed. Reg. at 1202-03.  Consistent with the CEQ guidance, BOEM also summarized and cited the scientific literature on climate change and explained the real-world effects of climate change.  *See id.* at 1203; BOEM019544-47; BOEM02035-37.

In sum, BOEM's analysis of GHG emissions reasonably complied with the relevant case law and is consistent with CEQ's 2023 Guidance.  Specifically, BOEM addressed the sole issue

identified by the court in *Friends of the Earth*, *see* 583 F. Supp. 3d at 137-47, by conducting a quantitative analysis of the change in GHG emissions associated with a reduced demand in foreign consumption.  BOEM05866-67, 5869.  BOEM's analysis fully complied with NEPA. *See WildEarth Guardians*, 738 F.3d at 309-11 (holding that BLM's analysis of GHG emissions in the context of coal mine operations complied with NEPA); *Sierra Club I*, 867 F.3d at 201-02 (holding that FERC's analysis of GHG emissions for its approval of an application to export LNG complied with NEPA); *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1183-86 (D.C. Cir. 2023) (holding that FERC's analysis of GHG emissions relating to the construction of LNG facilities complied with NEPA).

## C.    Plaintiffs' Critiques of BOEM's Analysis Fail to Demonstrate a Violation of NEPA

Plaintiffs begin their criticism of BOEM's climate analysis by implying—incorrectly— that BOEM assumed demand for oil and gas would remain constant regardless of whether Lease Sale 259 occurred.  *See* Pls.' Mem. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mem.") at 23, ECF No. 52-1 (quoting record document out of context for the proposition that "'demand for oil and gas would not disappear' but 'would be fulfilled from alternative sources'"); *id.* (suggesting that BOEM assumed "the same demand" across the leasing and no leasing scenarios).  In fact, BOEM appropriately determined and explained that a no leasing scenario would lead to increased prices and a corresponding reduction in demand, BOEM05859.  And, consistent with that explanation, BOEM determined that 13% of the demand anticipated in the leasing scenario would in fact disappear under the no leasing scenario, rather than being satisfied by other fuels. BOEM05864-65.

That argument aside, Plaintiffs next contend that BOEM relied on outdated data for its modeling, and that BOEM failed to analyze GHG emissions in the context of applicable laws and

standards.  As discussed in detail below, the first argument is without basis because BOEM used

the most recently available data, and BOEM could not wait for more data to become available

because of the deadline established by the IRA.  And the second argument fails because BOEM

did, in fact, provide appropriate context for its analysis of GHG emissions, including by

calculating the social cost of GHG emissions and summarizing and citing available scientific

literature to help explain the real-world effects of climate change, and referencing national

emissions targets based on the Paris Agreement.

        **1.**      **BOEM's Reliance on Available Data from the Energy Information**
                     **Administration Complied with NEPA**

Plaintiffs argue that BOEM violated NEPA by relying on outdated and misleading data.

*See* Pls.' Mem. at 24-29.  Specifically, they contend that BOEM's use of the AEO 2020 report in

the MarketSim model was inappropriate because that data does not anticipate changes in energy

demand based on the IRA and other future energy policies.  *See id.* at 24-26.  More generally,

they argue that BOEM should have anticipated that future conservation measures will reduce

future demand, thus altering the baseline against which they contend BOEM should have

analyzed the impacts of Lease Sale 259.  *See id.* at 26-28.  Plaintiffs' argument is wrong for three

reasons.

First, Plaintiffs' arguments fail because the evidence that BOEM relied on was neither

outdated nor misleading.  The GHG Addendum explained that BOEM relied on the most

recently available, specialized data from the EIA to conduct its analyses of GHG emissions.

BOEM05863.  The EIA, in turn, is an independent agency within the U.S Department of Energy

specifically charged with providing data and analyses relating to energy markets.  BOEM56321.

And BOEM did not have an updated dataset from EIA at its disposal when it conducted its

analysis.  BOEM19939.  BOEM explained in response to comments on the Draft SEIS that the

EIS had "not updated the AEO reference based on passage of the Inflation Reduction Act" in time for BOEM to use it in its NEPA analysis. *Id.* ("BOEM expects this to be completed in 2023."). Therefore, there was no EIA data that BOEM could have used in its model that would have incorporated information regarding changes in energy demand caused by the IRA. And, as BOEM also explained in response to comments, other reports suggested by the EPA did not have the requisite detailed projections of supply and demand that could be incorporated in the MarketSim model. BOEM19940; *see also* BOEM19550.

Insisting that BOEM could have done more, Plaintiffs point to various articles commenting on the IRA and BOEM's leasing program. One is an August 2022 report by the Rhodium Group discussing the IRA and potential impacts on energy demand (Larsen Study).[4] BOEM16896-906. Another is a September 2022 report issued by the Institute for Policy Integrity regarding BOEM's proposed 2023-2028 five-year program. BOEM13606-71. But BOEM was aware of these studies and explained that the data from those studies was incomplete

---

[4] Plaintiffs misleadingly assert that the Larsen Study (also referred to as the "Rhodium Study") found that, "with IRA implementation, national transportation emissions would fall 18 – 26% from 2005 levels by 2030. Pls.' Mem. at 27 (citing BOEM16902). While true, in a portion that Plaintiffs omit, the study goes on to say that, even without the IRA, transportation emissions would still be expected to decrease by 18% to 24%. BOEM16902. Plaintiffs also accuse BOEM of misconstruing the Larsen Study by allegedly misattributing a modest projected decline in the *industrial* sector's petroleum consumption to the nation's entire projected petroleum consumption. Here again, Plaintiffs misinterpret the record. The SEIS explained that, according to the Larsen Study, "the impact to the domestic petroleum market would be very small (a decrease of less than 1% in demand) and a minimal change in supply." BOEM19551. Contrary to Plaintiffs' contention, this explanation is fully consistent with the study, which states in relevant part that "[t]he clean technology provisions in the IRA lead to small reductions (<1%) in petroleum consumption and larger reductions of 3-10% in natural gas production *across the economy*." BOEM21801 (emphasis added). Thus, that statement was not limited to the industrial section, as Plaintiffs claim. *See* Pls.' Mem. at 29. Elsewhere, the Larsen Study stated that "the IRA would increase domestic crude oil production by 0.1%-0.2%, effectively flat, and decrease domestic gas production by 1-5%." BOEM21804.

and incompatible with the MarketSim model.  BOEM19550-51.  And while Plaintiffs tout that the EIA issued another AEO report in 2022, *see* Pls.' Mem. at 25 n.16, this ignores that BOEM relies on specific model runs prepared by the EIA to provide inputs for the MarketSim model, BOEM05863; BOEM78484, and BOEM relied on the most recent model runs that were available at the time of its analysis.  BOEM19550.  In short, BOEM relied upon the most recent, reliable data available to it in modeling GHG emissions and its analysis should be upheld.  *See Theodore Roosevelt P'ship,* 616 F.3d at 511) (Where the agency used an acceptable modeling method, but relied on data that was recently superseded by a new air quality analysis, the "agency's reliance on outdated data [was] not arbitrary and capricious, particularly given the many months required to conduct full analysis with the new data.") (cleaned up); *Oceana v. BOEM*, 37 F. Supp. 3d 147, 160 (D.D.C. 2014) (upholding BOEM's analysis where the record showed "that BOEM gathered as much information as it could"); *see also Friends of the Earth*, 583 F. Supp. 3d at 139 ("The Court therefore gives BOEM's use of the MarketSim model substantial deference").

The fact that BOEM's model was necessarily limited to the AEO 2020 reference case does not, however, mean that BOEM failed to account for future conservation policies in its overall analysis.  To the contrary, the SEIS appropriately recognized that the IRA could reduce the demand for oil and gas in the future.  In the SEIS, BOEM explained that the IRA has provisions intended to help achieve the goal of net-zero GHG emissions, including higher royalty rates and incentives for investments in energy efficiency and renewable energy.  BOEM19485-86; *see also* BOEM19550-51.  In this manner, BOEM analyzed in a qualitative fashion the potential impacts of the IRA on GHG emissions.  And its use of a qualitative analysis in this context was more than reasonable given the lack of available source data and the lack of time to

generate or obtain such data.  *Sierra Club I*, 867 F.3d at 202 (agreeing with the government's argument that a quantitative analysis of certain GHG emissions was not required when it would have been "too speculative" to inform the agency's decision-making); *WildEarth Guardians*, 738 F.3d at 309 (upholding an analysis of GHG emissions where the agency disclosed the assumptions that underlay that analysis).

Plaintiffs next insist that, even if BOEM had incorporated the beneficial impacts of the IRA into the MarketSim model, it still would not be sufficient unless it also somehow incorporated other future changes in policy that would affect energy conservation.  *See* Pls.' Mem. at 25-26 (criticizing the MarketSim model for relying on current, rather than future, policies).  Plaintiffs are correct that BOEM's modeling relies on the AEO 2020, which is based only on current laws and policies, and that is discussed in the GHG Addendum.  BOEM05880. But they fail to explain how BOEM could have incorporated changes to the model based on future laws and policies.  Moreover, BOEM was not required by NEPA to create a model based on speculation about what future laws and policies would be.  *See Theodore Roosevelt Conservation P'ship*, 616 F.3d at 510-12 (finding that it was not arbitrary and capricious for the BLM to analyze ozone concentrations using an older methodology while at the same time developing a new methodology relying on different assumptions); *Oceana*, 37 F. Supp. 3d at 160-61 (upholding BOEM's analysis where the agency relied on generally accepted scientific methods).

Second, it is important to note that BOEM could not simply wait for future data to become available because the IRA directed BOEM to conduct Lease Sale 259 no later than March 31, 2023.  Instead, the relevant CEQ regulations provide guidance to agencies preparing a NEPA analysis when there is incomplete or unavailable information regarding significant

environmental impacts.  In relevant part, 40 C.F.R. § 1502.22 provides that, when "the overall costs of obtaining [such information] are exorbitant or the means to obtain it are not known," an agency should acknowledge the missing information in its NEPA document, explain its relevance to the analysis, summarize the "existing credible scientific evidence," and provide an "evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community."  40 C.F.R. § 1502.22(b).  Importantly, CEQ has clarified that "the term 'overall costs'" as used in Section 1502.22 "encompasses financial costs and other costs *such as costs in terms of time (delay)* and personnel."  *See* 51 Fed. Reg. at 15,622 (emphasis added); *see also Oceana*, 37 F. Supp. 3d at 159 ("BOEM's discussion of the delay in timing of the information being available suffices for purposes of determining whether 'the overall costs' were exorbitant.").

Here, BOEM met the requirements of the regulation by conducting the most complete analysis it could, despite lacking data compatible with its model regarding the anticipated future impact of the IRA.  BOEM analyzed GHG emissions using a generally accepted approach and acknowledged where information was unavailable and could not be incorporated into the model. BOEM05879-80; BOEM19485-86.  And it is clear from the record that the "overall costs" of waiting for additional data to materialize would have been "exorbitant" within the meaning of 40 C.F.R. § 1502.22 because additional data from EIA would not become available until sometime in 2023, *see* BOEM 19486; BOEM19939, and thus too late for BOEM to use it while still meeting its congressionally mandated deadline of March 31, 2023.  *See* IRA § 50264(d), 136 Stat. at 2060.

Third, it is important to note that BOEM had a compressed timeframe in which to complete its NEPA analysis for Lease Sale 259, and BOEM complied with NEPA to the fullest

extent possible in the time available to it.  Inherent in NEPA is a rule of reason, and given the strict deadline imposed by Congress, BOEM did all that was reasonably possible to comply with NEPA.  *See Public Citizen*, 541 U.S. at 767.  When the IRA was signed into law, BOEM had just seven months until the Congressionally mandated deadline of March 31, 2023.  In that amount of time, BOEM had to prepare a Draft SEIS, circulate it for public comment, consider those comments, finalize the SEIS, and issue a decision.  BOEM20099.  Further, BOEM also had to ensure compliance with other statutes, such as OCSLA and the Coastal Zone Management Act ("CZMA").  Pursuant to the CZMA, BOEM was required to consult with affected Gulf states at least ninety days prior to the sale, 15 C.F.R. § 930.36(b), and BOEM was also required to provide a sixty-day review period to affected Governors of any states affected by the lease sale under OCSLA.  43 U.S.C. § 1345(a)-(b).  Finally, BOEM had to reach and issue its decision in a Final Notice of Sale at least thirty days ahead of the actual sale date. 43 U.S.C. § 1337(l).  Thus, even if the Court were to find that it would have been wise for BOEM to delay a decision until it had more data regarding the impact of the IRA on energy markets, it should find here that BOEM fully complied with NEPA because such a delay would have conflicted with the mandate in the IRA to proceed with the sale by a particular date.[5]

---

[5] This case is not similar to *WildEarth Guardians*, 368 F. Supp. 3d 41, because in that case the agency failed to conduct a full lifecycle analysis of GHG emissions.  *See id.* at 67-71.  The claims in this case are also not similar to the ones made in *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321 (D.C. Cir. 2021), where the court faulted FERC for not adequately responding to a comment regarding the agency's use of the social cost of GHG emissions.  *See id.* at 1327-30.  Moreover, BOEM thoroughly responded to the comments regarding its modeling of GHG emissions.  BOEM19931-60.

2.    **BOEM Appropriately and Adequately Contextualized its Disclosure of GHG Emissions, Including By Analyzing Those Emissions in the Context of Relevant Environmental Laws and Policies**

In addition to thoroughly quantifying lifecycle GHG emissions attributable Lease Sale 259, BOEM further complied with NEPA by contextualizing those emissions so that agency decisionmakers and the public could better understand their significance. *See* 40 C.F.R. § 1502.2(d) ("[EISs] shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of NEPA as interpreted in the regulations in this subchapter and other environmental laws and policies."). BOEM provided this valuable context by monetizing the social impact of each incremental ton of project-related GHG emissions, comparing those emissions to appropriate metrics and GHG emission-reduction goals that the United States has adopted based on the Paris Agreement, and discussing the relevant science and impacts of climate change. *See* 88 Fed. Reg. at 1200-03; *see also* Exec. Order No. 13,990 § 5, 86 Fed. Reg. 7,037, 7,040 (Jan. 20, 2021).

Beginning with the monetized impacts, BOEM employed the social cost of GHG emissions, which estimates the net harm to society from a metric ton of GHG emissions in a given year. BOEM19549-50; BOEM05871-75; BOEM20090-91. While Plaintiffs contend that BOEM improperly "waved away" the net 67-million-ton increase that the SEIS and Addendum attributed to Lease Sale 259, *see* Pls.' Mem. at 30, the record shows that BOEM called appropriate attention to this calculation of emissions by, among other things, assigning a social cost of $990 million to emissions from domestically produced and consumed fuels and $2.91 billion to emissions attributable to increased foreign oil consumption. BOEM20090; BOEM05874-75.

Turning to relevant climate policy goals, BOEM appropriately compared the GHG emissions estimates with the United States' goals under the Paris Agreement and the

24

administration's goal of net-zero emissions by 2050, BOEM05870-71; *see also* BOEM19931-32, 19945-46, which is precisely what the CEQ Guidance calls for.  88 Fed. Reg. at 1203.  BOEM's GHG analysis compared the "estimated emissions from the target year to the U.S. [Nationally Determined Contributions ("NDCs") and show[ed] the percentage of the target that is expected to be consumed under the Leasing and No Leasing scenarios." BOEM05870.  This analysis complied with NEPA.

Plaintiffs nonetheless contend that more was required and point to EPA's comments urging BOEM to analyze GHG emissions in the context of the goals of the Paris Agreement and the net-zero goal.  Pls.' Mem. at 32 (citing BOEM17808-09).  But it is simply not true that the SEIS was silent about administration policy goals regarding policy change, including the net-zero 2050 goal set forth in Executive Order 14,008.  *See* Exec. Order No. 14,008 § 201, 86 Fed. Reg. 7619, 7622 (Jan. 27, 2021).  In addition, BOEM prominently highlighted the issue of climate change in the SEIS, discussed the need to transition to clean energy, and discussed the 2021 assessment issued by the Intergovernmental Panel on Climate Change, as well as other recent studies.  BOEM19544-47.  This analysis of climate change builds on the analysis of climate change and GHG emissions in the prior EISs.  BOEM19545; BOEM02035-41 (Programmatic EIS); BOEM03268-71 (Multisale EIS); BOEM04878-79 (2018 SEIS).  Plaintiffs' suggestion that BOEM paid only lip service to the issue of climate change is therefore baseless.[6]

Attempting to bolster their argument, Plaintiffs refer to BOEM's response to a comment on the Draft SEIS, which Plaintiffs claim shows that BOEM failed to consider the

---

[6] *Standing Rock Sioux Tribe v. U.S. Army Corps. of Engineers*, 985 F.3d 1032, 1046-47 (D.C. Cir. 2021), is irrelevant here because, unlike in that case, BOEM did not ignore an important aspect of the action before it.  *See id.* (finding that the Corps violated NEPA by not considering an oil pipeline operator's safety record in evaluating the risk of oil spills).

administration's climate change goals.  *See* Pls.' Mem. at 33 (citing BOEM19889).  In that particular instance, BOEM was responding to a comment stating that BOEM should reconsider the need for the sale in light of the impacts of global warming and international climate change goals.  BOEM19888-89.  In response, BOEM stated that "[i]ssues relating to national and international energy and climate policies are beyond the scope of this analysis, except to the extent they directly pertain to regulatory requirements associated with the Proposed Action."  BOEM19889.  In other words, BOEM explained that it does not set national or international energy policy and instead must evaluate its proposed action in light of existing policies.  Plaintiffs' suggestion that this statement means BOEM entirely ignored national and international climate change standards is a strained reading of BOEM's response and is belied by the record.

In addition, Plaintiffs argue that BOEM violated the NEPA regulations and CEQ guidance by failing to provide context to the GHG emissions figures other than to portray them as small percentages of global and national emissions.  *See* Pls.' Mem. at 34 (citing 40 C.F.R. § 1502.16(b) (2018); 2023 Guidance, 88 Fed. Reg. at 1201).  This assertion is belied by the record because, as discussed above, BOEM used the social cost of GHG emissions and international and national GHG emissions targets to contextualize its analysis, consistent with CEQ's guidance.  BOEM19549-50; BOEM05870-75; BOEM20090-91.  Moreover, the cases they cite do not support their arguments.  Contrary to Plaintiffs' assertions, the error found by the court in the *Friends of the Earth* case is not repeated here.  In that case, the court found that BOEM was required to quantify the GHG emissions associated with a reduction in foreign consumption, 583 F. Supp. 3d at 146, and BOEM did so for Lease Sale 259.  BOEM05866-67, 5869; BOEM19547-50.

26

Plaintiffs cite other cases that have no applicability here.  In *Dine Citizens Against Ruining Our Environment v. Haaland*, 59 F.4th 1016, 1043-44 (10th Cir. 2023), the Tenth Circuit faulted the agency for presenting GHG emissions figures *only* as percentages of international and national totals without using either the social cost of GHG emissions or a carbon budget method to provide context.  Similarly, in *350 Montana v. Haaland*, 50 F.4th 1254, 1265-70 (9th Cir. 2022), the court held that BOEM had failed to justify a finding of no significant impact ("FONSI") by merely referring to GHG emissions as a percentage of global emissions.  These rulings are irrelevant here because BOEM did use the social cost of GHG emissions and also compared the GHG emissions to emissions targets based on different alternatives.  As for *Gulf Restoration Network v. Haaland*, 47 F.4th 795 (D.C. Cir. 2022), GHG emissions were not at issue in that case.  There is simply no legal basis for Plaintiffs' arguments.

Finally, Plaintiffs largely ignore the most salient law that applies to Lease Sale 259—the IRA.  The IRA required the sale to go forward and also served as an important backdrop to BOEM's decision.  BOEM explained the importance of the IRA to its analysis in several places in the SEIS.  BOEM19484-86, 19521-24, 19550-51.  The IRA has many provisions that will aid in achieving the administration's net-zero goal.  BOEM19485-86.  However, the IRA also predicated offshore wind leasing on a certain amount of offshore oil and gas leasing.  BOEM19485.  In other words, in order to obtain the benefits on GHG reduction from offshore wind, BOEM must offer at last sixty million acres for offshore oil and gas leasing in the preceding year.  *Id.*; BOEM20099.  That policy was established by Congress, not by BOEM, and it is one that BOEM must comply with if it wishes to pursue offshore wind leasing, which will have beneficial effects on the nation's GHG emissions.

**II.      BOEM's Analysis of Impacts to the Rice's Whale Complied with NEPA**

BOEM took the requisite hard look at potential impacts to the Rice's whale in the SEIS.

Building on its prior analyses, BOEM evaluated whether new information since the preparation

of the 2018 SEIS would affect its conclusions regarding potential impacts to the Rice's whale

and concluded that it would not.  BOEM19599-602.  BOEM has consulted with the NMFS

regarding potential impacts to the Rice's whale and other species, and the results of that

consultation are reflected in BOEM's analysis.  *Id.*  Plaintiffs argue that BOEM did not

adequately consider new studies, which show that the range of the Rice's whale may be greater

than previously thought.  But NMFS has not expanded its identification of core habitat, which

was identified in a 2020 biological opinion, and at the time of BOEM's decision, NMFS had not

proposed critical habitat for the Rice's whale.  Plaintiffs also wrongly claim that NMFS advised

BOEM to avoid oil and gas development in areas offered for oil and gas leasing, when, in fact,

NMFS's recommendation to avoid development was limited to offshore wind development.

BOEM conducted a reasonably thorough analysis of the potential impacts to the Rice's whale

and its analysis should be upheld.  *See Friends of the Earth*, 583 F. Supp. 3d at 150-55 (rejecting

arguments that BOEM's analysis of impacts to the Rice's whale for Lease Sale 257 violated

NEPA).

BOEM analyzed the potential impacts of offshore oil and gas development on marine

mammals, including the Rice's whale (previously known as the Gulf of Mexico Bryde's whale),

in the Multisale EIS, BOEM03509-52, and the 2018 Supplemental EIS, BOEM04975-83.  The

Rice's whale was listed as an endangered species in 2019.  *See also* Endangered Status, 84 Fed.

Reg. 15,446 (Apr. 15, 2019) (codified at 50 C.F.R. pt. 224) (listing the Gulf of Mexico Bryde's

whale as endangered); Technical Corrections, 86 Fed. Reg. 47,022 (Aug. 23, 2021) (making a

technical correction to designate the Gulf of Mexico Bryde's whale as a separate species now

known as the Rice's whale).  In the listing, NMFS identified the Biologically Important Area for

the Rice's whale in the De Soto Canyon area in the northeastern part of the Gulf.  84 Fed. Reg. at

15,472-73; Incidental Taking of Marine Mammals, 86 Fed. Reg. 5,322, 5,326 (Jan. 19, 2021)

(codified at 50 C.F.R. pt. 217) (map of the Rice's whale core area); BOEM01355.  Following the

listing, NMFS issued a biological opinion, which found that, without mitigation, BOEM's

offshore oil and gas program would likely jeopardize the continued existence of the Rice's

whale.  BOEM00957.  That finding was based on the potential for vessel strikes in the Rice's

whale core area, BOEM00568-72, which was largely removed from leasing by the Gulf of

Mexico Energy Security Act of 2006, Pub. L. No. 109-432 § 104(a), 120 Stat. 2,992, 3003-04

("GOMESA") through June 30, 2022, and was later again removed from leasing from July 1,

2022 through June 30, 2032 via Presidential withdrawal.  BOEM00953-57; BOEM19495-96;

BOEM20111; *see also Friends of the Earth*, 583 F. Supp. 3d at 152-53.  Consistent with that

withdrawal, the Rice's whale core area was not included in Lease Sale 259.  BOEM20111.

In the biological opinion, NMFS found that if the measures in the reasonable and prudent

alternative ("RPA") are adopted, then the proposed action "would not likely jeopardize the

continued existence of the [Rice's] whale."  BOEM01003.  BOEM accepted the RPA and is

implementing the mitigation measures in the RPA through a stipulation (Stipulation 4 in

BOEM's Final Notice of Sale), which will apply to all leases issued as a result of Lease Sale 259

and through conditions of approval on all post-lease activities requiring a BOEM authorization,

permit, or plan that may impact the Rice's whale.  BOEM20111-12; BOEM20246-49.  In April

2021, NMFS issued an amended incidental take statement ("ITS") reflecting updates and noting

that implementation of the RPA removes the jeopardy concern for the Rice's whale.

BOEM01313 (Amended ITS, stating "we determined that the amount or extent of anticipated take is not likely to jeopardize the continued existence of any ESA-listed species or result in the destruction or adverse modification of designated critical habitat, when the [RPA] is implemented"). In February 2023, BOEM completed an ESA Section 7(d) determination reaffirming, among other things, its commitment to comply with the RPA and finding that holding Lease Sale 259 would not jeopardize the continued existence of the Rice's whale while the reinitiated consultation was ongoing. BOEM01305-10. On October 25, 2022, BOEM requested reinitiated consultation with NMFS regarding the 2020 Biological Opinion, in part, to evaluate additional conditions of approval related to pile driving and potential transit through the Rice's Whale Area (as defined in the 2020 biological opinion, BOEM00695, 1002). BOEM01302-04 (reinitiation letter). BOEM committed to implementing any new mitigation measures that result from that consultation. BOEM01307-09 (ESA Section 7(d) determination); BOEM20112 (BOEM ROD).[7] The protected species stipulation in the Lease Sale 259 Final Notice of Sale notifies lessees that post-lease approvals will be subject to the provisions of the most current biological opinion in place at the time. BOEM20247-48.

In the 2023 SEIS, BOEM incorporated by reference its prior analyses and analyzed new information regarding marine mammals, including the Rice's whale, that became available since the 2018 SEIS (BOEM_19596-602). Specifically, BOEM explained the Rice's whale, which was previously thought to be a population of Bryde's whale, was reclassified as a separate species. BOEM19600. BOEM analyzed recent studies regarding the extent of Rice's whale

---

[7] On July 24, 2023, NMFS proposed critical habitat for the Rice's whale. 88 Fed. Reg. 47,453 (July 24, 2023). The critical habitat would include waters along the 100-to-400-meter isobath in the Gulf. *Id.* at 47,461, 47,471-72. The critical habitat was not proposed prior to BOEM's decision regarding Lease Sale 259, and the designation is not final.

observations, including the Soldevilla 2022 Study.  BOEM19600.  It also explained that impacts

to the Rice's whale were "extremely unlikely to occur due to the generally slow vessel transiting

and surveying speeds, limited vessel routes originating from the eastern [Gulf of Mexico], and

the additional mitigations on vessels within the Rice's whale core area (as defined by the 2020

[Gulf of Mexico] Biological Opinion)."  BOEM19600; *see also* BOEM01322-34 (Terms and

Conditions in the Amended ITS); BOEM01000-21 (Biological Opinion RPA and Terms and

Conditions); BOEM01098-122 (Biological Opinion Appendices mitigation measures).

Specifically, mitigation measures are in place to reduce the potential for vessel strikes and avoid

harm to the Rice's whale.  BOEM19900, 19989-90; BOEM01322-34; BOEM01098-122.

BOEM stated that it would continue to consult with NMFS regarding the identification of core

area for the Rice's whale.  BOEM19600.  BOEM also evaluated recent studies on other issues,

including decompression sickness and noise impacts.  BOEM19600-602.  BOEM concluded that

its evaluation of the overall potential impacts to the Rice's whale was unchanged from the 2018

SEIS, meaning that impacts would be negligible to moderate.  BOEM19602.

  BOEM's analysis of impacts to the Rice's whale was reasonable and should be upheld.

*See Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 75 (D.C. Cir. 2011) ("The

focus of the hard look is to ensure that the agency has adequately considered and disclosed the

environmental impact of its actions and that its decision is not arbitrary or capricious.") (citation

and internal quotation marks omitted).  BOEM's analysis of impacts relied on determinations

made by NMFS, the expert agency charged by Congress with protecting threatened and

endangered marine mammals.  *Tacoma, Wash. v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006); *see*

*also* 16 U.S.C. § 1536(a)(2).  NMFS's determinations within its area of expertise are entitled to a

high degree of deference.  *Tacoma*, 460 F.3d at 75.  Where a biological opinion is not directly

challenged, but an action agency's decision relying on it is, the question is whether the agency's

reliance on the biological opinion was arbitrary or capricious.  *Id.* at 75-76.  Here, BOEM's

reliance on NMFS's findings in the Biological Opinion and the Amended ITS, while also taking

a hard look at material and studies available since the Biological Opinion was issued, was

reasonable and should be upheld.  *See id.* at 76.  Plaintiffs' arguments that BOEM nevertheless

violated NEPA should be rejected.

   Plaintiffs first contend that BOEM ignored a body of evidence confirming the presence of

Rice's whale in the western and central Gulf.  Pls. Mem. at 19-20.  But the record amply

demonstrates that BOEM considered relevant evidence, including the Soldevilla 2022 Study.

BOEM19600.  That study found acoustic evidence of the presence of the Rice's whale in the

western and central Gulf, and stated that these findings should be used in designating critical

habitat.  BOEM21838-39.[8]  To date, however, NMFS has not revised the area of core habitat for

the Rice's whale, nor has it issued a final critical habitat designation.  BOEM19600;

BOEM19900.  As BOEM explained in response to comments on the Draft SEIS, "not enough

information is available at this time to confirm [Rice's whale] distribution or any seasonal

movements outside of the core area that is already considered in the [SEIS]."  BOEM19990.

And this statement is supported by a summary of the Rice's whale on NOAA's website,

published after the Soldevilla Study, which says that one Rice's whale was observed in the

western Gulf and that "NOAA Fisheries scientists are conducting research to better understand

the whales' distribution."  BOEM62063.  Plaintiffs also point to a study evaluating potential

areas for aquaculture, which indicates that Rice's whale habitat may extend along the 100-to-

---

[8] Plaintiffs also cite a duplicate copy of the Soldevilla 2022 Study at a different place in the
record.  BOEM58191-208; *see also* Pls.' Mem. at 20.

400-meter isobath, *see* BOEM10946, 10951-52, 10959.  But the data evaluated in this study are

based on research conducted by Soldevilla, NOAA, and other researchers.  BOEM10966

(references 21-26).  Moreover, the study demonstrates that the vast majority of Rice's whale

sightings (all except one) are within the core area.  BOEM10952.  BOEM's determination that

there was not sufficient information to confirm the persistent presence of the Rice's whale

outside of the core area is supported by the record and is owed deference. *See Kleppe v. Sierra*

*Club*, 427 U.S. 390, 412 (1976) ("Resolving these issues requires a high level of technical

expertise and is properly left to the informed discretion of the responsible federal agencies."); *see*

*also Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989).

        Next, Plaintiffs contend that NMFS has advised BOEM to avoid oil and gas leasing in

any portion of the western and central Gulf.  *See* Pls.' Mem. at 21.  This assertion is belied by the

record.  NMFS recommended that the 100-to-400-meter isobath be avoided for purposes of

offshore wind development, BOEM17718, but it did not make any such recommendation

regarding oil and gas development.  NMFS's recommendation was based on the risk posed by

offshore wind development, not offshore oil and gas development.  BOEM17718.  Further,

BOEM has committed to continue consulting with NMFS and, if critical habitat is designated

and/or NMFS requires additional mitigation measures, BOEM will apply them to oil and gas

exploration and development in future lease sales and on post-lease approvals (including for

Lease Sale 259 leases).  BOEM19600; BOEM19900; BOEM01307-09.[9]

---

[9] As indicated above, NMFS proposed critical habitat for the Rice's whale after BOEM's
decision regarding Lease Sale 259.  88 Fed. Reg. 47,453.  When the critical habitat is finalized,
BOEM will apply any additional measures, as required by NMFS, including any terms and
conditions and reasonable and prudent measures, to post-lease activities.  BOEM01307-09.

Plaintiffs also point to a letter from the Marine Mammal Commission ("MMC"), but related to BOEM's Proposed 2023-2028 Five-Year Program, not Lease Sale 259.  BOEM09034-40.  Because the MMC did not submit a letter during the public comment period on the Draft SEIS, BOEM had no opportunity to consider and respond to the MMC's input.  BOEM did, however, analyze the issues identified in the letter, *i.e.*, the potential for the Rice's whale to exist outside of the previously identified NMFS core area.  BOEM19600; BOEM19990.  The fact that BOEM did not follow the MCC's recommendation to avoid the 100-to-400-meter isobath, which the MMC did not make in the context of Lease Sale 259, was not a violation of NEPA because the statute does not mandate a substantive outcome.  *Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227-28 (1980).

Third, Plaintiffs attempt to rely on BOEM's evaluation of wind energy development, but that evaluation also did not occur in the context of offshore oil and gas development.  BOEM is in the process of developing wind energy areas for offshore leasing in the Gulf, which has never occurred there before.  BOEM18447.  Based on several factors, including the Rice's whale, BOEM decided to exclude the 100 to 400-meter isobath from the wind energy areas.  BOEM18480-82, 18490.  But BOEM's evaluation was limited to the offshore wind context.  Oil and gas development poses different risks and has been ongoing in the Gulf of Mexico for decades in those same areas.  Moreover, Plaintiffs have come forward with no evidence that existing oil and gas development in the 100-400-meter isobath outside of the Rice's whale core area has caused harm to the Rice's whale.  BOEM has analyzed the relevant information and made it available to the decision-maker and public, and nothing further is required by NEPA.  *See Sierra Club I*, 867 F.3d at 196.

**III.     BOEM'S Analyzed a Reasonable Range of Alternatives**

NEPA requires an agency to analyze a reasonable range of alternatives.  *Alexandria v. Slater*, 198 F.3d 862, 867 (D.C. Cir. 1999); *see also* 40 C.F.R. § 1502.14(a).  The analysis of alternatives is a pragmatic exercise governed by the stated purpose and need for the proposed action and "must be bounded by some notion of feasibility."  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978); *see also Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991).  A "proposed alternative is reasonable only if it will bring about the ends of the federal action."  *Citizens Against Burlington*, 938 F.2d at 195; *see also Slater*, 198 F.3d at 867.  A court should "uphold [an agency's] discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail."  *Citizens Against Burlington*, 938 F.2d at 196.  In developing alternatives, an agency must take into account "the agency's statutory authorization to act, as well as . . . other congressional directives."  *Id.*

Here, BOEM analyzed a reasonable range of alternatives, including four action alternatives and a no action alternative.  BOEM19495-503.  The four leasing alternatives varied in location (different portions of the Gulf), in size (between a low of 26.74 million acres and a high of 80.51 million acres), and in the environmental stipulations that would be required.  BOEM19495-501.  This was a reasonable range of alternatives, particularly given Congress's mandate in the IRA that BOEM proceed with Lease Sale 259.  *See Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 372 (D.C. Cir. 1981) ("When Congress has enacted legislation approving a specific project, the implementing agency's obligation to discuss alternatives in its environmental impact statement is relatively narrow."); *Sierra Club v. Adams*, 578 F.2d 389, 396 (D.C. Cir. 1978) (Although a congressional act approving an action "does not vitiate the need for an environmental impact statement or a discussion of alternatives (unless explicitly stated in the

35

statute), such action does have a bearing on what is considered a reasonable alternative, and a reasonable discussion.").

Plaintiffs argue that BOEM's analysis of alternatives was inadequate because the impacts caused by each leasing alternative were not different enough.  *See* Pls.' Mem. at 43-44.  But, as a factual matter, BOEM did not find that the impacts of each alternative would be the same.  Although BOEM's summary chart indicates similar levels of potential environmental harm from each leasing alternative, BOEM 19443-45, its analysis of impacts provides more detail as to the potential harm from each alternative.  BOEM's analysis tiers to the analysis in the Multisale EIS, which analyzed each alternative and explained where impacts will be similar between alternatives and where they will not be.  *See*, *e.g.*, BOEM03385-89 (analyzing the impacts to benthic communities of each alternative).  With respect to marine mammals, the Multisale EIS explained that impacts would be similar among the leasing alternatives because marine mammals are widely distributed throughout the Gulf.  BOEM03550-51.  This same finding was reached in the 2018 SEIS, BOEM04979, and in the 2023 SEIS, BOEM19453.  This finding was reasonable and does not show that the range of alternatives was inadequate.  Further, as discussed in section II, *supra*, Plaintiffs are incorrect that BOEM ignored recent information regarding the presence of the Rice's whale in the Gulf.

The cases Plaintiffs rely on are easily distinguished.  Beginning with *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 20 (D.D.C. 2000), the environmental assessments at issue in that case analyzed the impacts of the proposed action and alternatives in "vague terms," and three of the EAs analyzed just the proposed action and the status quo.  *See id.*  The other cases cited are equally inapplicable.  *Greater Yellowstone Coal v. Kempthorne*, 577 F. Supp. 2d 183, 204-05 (D.D.C. 2008) (finding that the agency's analysis of impacts to wildlife from

snowmobiles in Yellowstone National Park was inadequate where the agency's environmental assessment found that the harm from zero snowmobiles and 1,025 snowmobiles per day would be the same); *W. Watersheds Project v. Abbey*, 719 F.3d 1035, 1050-51 (9th Cir. 2013) (finding the analysis of alternatives to be inadequate where each alternative would have authorized the same amount of grazing, albeit with different terms and conditions). As noted above, the range of alternatives here included different acreages, locations, and protective stipulations, and thus provided a sufficiently broad range to facilitate a robust environmental analysis and informed decision making.

Finally, BOEM reasonably declined to analyze in detail additional alternatives proposed by Plaintiffs. BOEM explained, for example, that it did not analyze an alternative that would remove all parcels in De Soto Canyon and the 100 to 400-meter isobath to protect the Rice's whale because, at the time of BOEM's decision, NMFS had identified only the core area and had not yet identified critical habitat. BOEM19898-900. Further, BOEM explained that, if NMFS were to identify critical habitat, it would consult with NMFS and "implement any measures necessary [to] ensure that post-lease actions do not result in jeopardy to the species." BOEM19900; *see also* section II, *supra*. Thus, Plaintiffs' reliance on *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1275 (10th Cir. 2004), is misplaced; far from authorizing the "potential destruction" of possible critical habitat, BOEM has ensured that critical habitat will be protected.

Plaintiffs also claim that BOEM should have analyzed alternatives that "would have been more consistent with U.S. climate commitments and OCSLA's environmental mandates," Pls.' Mem. at 44-45, but it is not clear what they are referring to. If they are suggesting that BOEM did not analyze an alternative below the IRA's sixty-million-acre threshold, they are wrong

37

because BOEM analyzed two alternatives below that threshold: Alternative B – 53.76 million acres and Alternative C – 26.74 million acres.  BOEM19497-99.  BOEM also explained why it eliminated other alternatives, including a reduced leasing alternative, from a detailed analysis. BOEM19900; BOEM19503-05.  This complied with NEPA.  *See* 40 C.F.R. § 1502.14(a) (for alternatives that were not analyzed in detail, an agency should "briefly discuss the reasons for their having been eliminated").

## IV.    BOEM Reasonably Analyzed the Potential Impacts of Oil Spills

BOEM properly analyzed the risk of oil spills and their impacts in its NEPA analyses. BOEM considered the risk of spills of a broad range of sizes, including spills greater than 10,000 barrels and up to a million barrels.  Further, BOEM also appropriately accounted for the factors that Plaintiffs allege caused increased spill risk, including deepwater drilling, hurricanes, and aging infrastructure.  Plaintiffs offer two reasons why BOEM's analysis is inadequate, and neither has merit.

First, they accuse BOEM of excluding spills greater than 10,000 barrels from its analysis. Pls. Mem. at 40.  To the contrary, the record demonstrates that BOEM's analysis of oil spill risk includes a broad range of potential spills, including spills greater than 10,000 barrels. BOEM19531-33.  And Table 3-7 expressly includes "Probability Estimates for Offshore Spills ≥ 10,000 Barrels."  BOEM19533.  BOEM calculated those estimates based on its Oil Spill Risk Assessment ("OSRA") model.  BOEM03537-38; BOEM44655-78.  The OSRA model estimates both probability of oil spills, as well as the location where hypothetical spills might spread. BOEM44666.  The model takes a conservative approach to analyzing the impacts of spills by assuming "that no oil-spill-response activities occur," to ensure it does not underestimate the impacts of a spill.  BOEM44673.  The OSRA study and accompanying model here identified the

38

risks of spills from various sources of up to a million barrels.  BOEM44667.  Thus, Plaintiffs are

simply incorrect that BOEM excluded spills greater than 10,000 barrels from its analysis.  *See*

Pls.' Mem. at 39.

It is true, by contrast, that the OSRA modeling does not include catastrophic spills of

over a million barrels, such as the Deepwater Horizon spill.  BOEM19489; BOEM03537-38; *see*

*also* BOEM44667 (explaining that a catastrophic spill is one over one million barrels).  As

BOEM explained, they were not included because the risk of such spills occurring is very low

and therefore not reasonably foreseeable as defined in the NEPA regulations, 40 C.F.R. §

1502.22(b).  BOEM19489; BOEM20039-40.  But this does not mean BOEM declined to

consider spills of low likelihood with potentially catastrophic consequences.  To the contrary,

BOEM explained that it had prepared a Catastrophic Spill Event technical report on CEQ's

recommendation following the Deepwater Horizon spill, and BOEM updated that report in 2021.

BOEM19489; BOEM20040; BOEM26012-375 (technical report).

This technical report analyzes the likelihood, impacts, and contributing factors of

catastrophic spills on the Gulf, and it includes a review of past incidents, such as the Deepwater

Horizon.  BOEM26030.  The Catastrophic Spill Event Analysis analyzes how a large spill would

impact air quality, water quality, plants, and animals, both onshore and offshore.  *See*, *e.g.*,

BOEM26070-73.  In the SEIS, BOEM also qualitatively analyzed the impacts of the Deepwater

Horizon spill on the environment.  *See*, *e.g.*, BOEM19565 (reviewing new information about

impact of Deepwater Horizon on microbial communities, marshes, and vegetation).  Insofar as

Plaintiffs may object to the fact that BOEM analyzed the potential impacts of a catastrophic spill

separately, BOEM's analytical approach was similarly challenged and upheld in *Oceana*, 37 F.

Supp. 3d at 168-69.  There, the court found that, despite not including the "probability of a

catastrophic oil spill occurring within the OSRA run," BOEM still made "meaningful disclosures about probabilities and updating its data in light of the Deepwater Horizon event." *Id.* at 169. The result should be the same here.

Second, Plaintiffs argue that a variety of factors may cause spills to increase in the future, such as deepwater drilling, hurricanes, and aging infrastructure. Pls.' Mem. at 42. But BOEM reasonably considered these factors. The Multisale EIS, to which the SEIS tiers to, analyzed well-drilling across both shallow and deepwater areas. BOEM03018-19. Further, Plaintiffs are incorrect that the lease sale will necessarily result in more deepwater drilling and that more deepwater drilling increases the risk of spills. Under a low production scenario, development activity is expected to be "evenly spread" between shallower and deeper water, and in a high production scenario, a greater portion of development activity is expected to occur in shallower water. BOEM03019. In addition, contrary to Plaintiffs' assertion regarding the risk of spills in deep water, a study of well incidents indicated that over 80% of spills between 1956 and 2010 occurred in shallow waters of under 300 feet. BOEM03121.[10]

Further, hurricanes, as well as vessel traffic, were also identified as part of the agency's analysis. BOEM03037. BOEM reviewed each hurricane that made landfall between 1995-2015 on the Gulf, a twenty-year period considered by climate experts as "an era of above-normal hurricane activity" which is generally followed by below-normal activity. BOEM03199, 3546. BOEM also considered infrastructure in the Five-Year Program by reviewing a variety of studies on technical improvements on oil rigs; for example, one study noted how a reduction in equipment failures over the years have led to decreased spills. BOEM03094; *see also* section V,

---

[10] While it is true that BOEM has increased deepwater well permits over the years, Plaintiffs have cited to no evidence showing increased rates of spills in deeper water. In fact, the Multisale EIS notes, for example, that "[m]ost pipeline damage occurs in shallow water." BOEM03126.

*infra* (discussing infrastructure impacts).  BOEM's analysis regarding the factors that impact oil spill rates was more than enough to satisfy NEPA.

Finally, despite Plaintiffs' assertions that the rate of spills has increased, spill rates are actually mitigated by post-lease conditions of approval and inspections.  BOEM20109-10; *see also* BOEM20102 (noting the increase of safety standards "to reduce the risk of oil spills" following Deepwater Horizon).  Many of Plaintiffs' concerns, such as the risks associated with increased reservoir pressure, will be monitored as part of "a rigorous regulatory regime to ensure that post-lease drilling activities are conducted in a safe manner."  BOEM20040.  These concerns are properly considered at a later stage because Lease Sale 259 does not by itself authorize oil and gas drilling.  Spill-prevention measures are imposed directly on oil and gas operators who were awarded leases in Lease Sale 259, both by statute and regulation and through post-lease approvals and inspection programs.  For example, operators must submit oil spill response plans before using any facility and will be subject to annual inspections.  BOEM00433, 00496.  In those plans, operators are required to include "worst-case discharge information."  BOEM03131.  These regulatory requirements play an important role for oil spill safety and "this Circuit [has] favorably viewed similar agency reliance on applicable regulatory standards when assessing impacts as part of a NEPA-required analysis."  *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101, 126 (D.D.C. 2017).

## V.     BOEM Included Environmental Justice Communities in its Process, and Properly Analyzed Environmental Justice Impacts

BOEM took care to include and consider environmental justice communities in preparing for Lease Sale 259.  Formally introduced through a series of Executive Orders, environmental justice refers to "the just treatment and meaningful involvement of all people, regardless of income, race, color, national origin, Tribal affiliation, or disability" in federal decision-making.

41

Exec. Order No. 14,096, 88 Fed. Reg. 25,251, 25,253 (Apr. 21, 2023).  Although they provide important internal guidance for federal agencies, these Executive Orders do not "create any right or benefit, substantive or procedural, enforceable at law . . . against the United States."  *Id.* at 25260; Exec. Order No. 14,008, 86 Fed. Reg. at 7,633 (same); Exec. Order No. 12,898, 59 Fed. Reg. 7,629, 7,633 (Feb. 11, 1994) (same), *amended by* Exec. Order No. 14,082, 87 Fed. Reg. 56,861 (Sept. 12, 2022).

Despite the lack of judicial review under the executive orders, this circuit applies the arbitrary and capricious standard in determining whether an agency appropriately considered environmental justice in its NEPA analysis.  *See*, *e.g.*, *Cmtys. Against Runaway Expansion v. F.A.A.*, 355 F.3d 678, 689 (D.C. Cir. 2004); *Red Lake Band of Chippewa Indians v. United States Army Corps of Engineers*, Nos. 20-3817 (CKK), 21-0189 (CKK), 2022 WL 5434208, at *13 (D.D.C. Oct. 7, 2022).  Thus, an agency's commitment for environmental justice mirrors the same twin purposes of NEPA: (1) ensuring public outreach to environmental justice groups throughout the process and (2) taking a hard look at the relevant impacts to underserved communities.  *See Balt. Gas and Elec.*, 462 at 97 (explaining the "twin aims" of NEPA); *Sierra Club II*, 867 F.3d at 1368-69 (applying NEPA to an environmental justice challenge and siding with the agency on that issue).

BOEM conducted outreach to environmental justice communities prior to publishing the Final EIS.  During the development of the Five-Year Program, BOEM reached out to several federally recognized Gulf-area tribes, including the Alabama-Coushatta Tribe of Texas, Caddo Nation of Oklahoma, the Seminole Tribe of Florida, Mississippi Band of Choctaw Indians, the Chitimacha and Tunica-Biloxi Indian Tribes of Louisiana, among others.  BOEM19665, 48337, 48342.  BOEM communicated on multiple occasions with the Seminole Nation of Oklahoma,

Choctaw Nation of Oklahoma, Jen Band of Choctaw Indians, the Poarch Bank of Creek Indians,

who requested further information regarding historical sites and general updates.  BOEM19666.

BOEM is also participating in several environmental justice workshops in the Gulf region as part

of its ongoing commitment to underserved communities.  BOEM20106-07.

     BOEM then thoroughly analyzed how Lease Sale 259 may impact environmental justice

communities.  BOEM03729-30, 19645.  Plaintiffs take issue with the impacts that the offshore

sale might cause due to the presence of onshore oil and gas infrastructure.  Pls.' Mem. at 37.  But

BOEM estimated that Lease Sale 259 would only result in the construction of zero to one new

processing plans or pipeline landfalls, limiting any onshore impacts from the sale to all

communities.  BOEM19645.  In addition, BOEM analyzed new information regarding the

location of minority and low-income communities across the Gulf, the socioeconomic

vulnerability of such communities, and the potential effects of climate change and sea-level rise

on health vulnerability and migration patterns.  BOEM19647-49.  A more detailed analysis about

the impact of shipping noise, traffic, visibility, and water sanitation was conducted in the

Programmatic EIS.  BOEM2561-63.  This robust analysis fully complied with NEPA.  *See*

*Cmtys. Against Runway Expansion*, 355 F.3d at 689 (upholding the FAA's analysis of sound

impacts on minority populations).

     The SEIS also directly analyzed how onshore and offshore infrastructure would impact

environmental justice communities, noting that the impacts among low-income and minority

communities would be "immeasurably small" when compared to cumulative impacts done by

onshore leases, State-regulated leases, and the large amount of non-OCS oil and gas factors (such

as Covid-19) which all play a part in the cumulative human environment.  BOEM19645, 19651.

This assessment of low impact on environmental justice communities is important because one

of the agency's primary goals is to ensure that factors that "disproportionately affect minority or tribal populations" do not go unconsidered. *Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 101.[11]

Finally, there is no basis for Plaintiffs' assertion that BOEM ignored potential impacts to low income and minority communities on the basis that such impacts were outside of BOEM's jurisdiction. As discussed above, BOEM expressly disclosed that up to one gas processing plant and one new pipeline landfall could be constructed over the next 50 years. BOEM19645. The indirect effects of onshore activities outside of BOEM's control were further analyzed in the Multisale EIS, BOEM03709-30, and the 2018 SEIS. BOEM05024-31. The Multisale EIS, for example, analyzes the indirect impacts to onshore oil and gas activity, urban development, pollution, and other activities outside of BOEM's control. BOEM03721-23. This analysis goes well beyond what's required from *Mainella*, which Plaintiffs rely on, in which the agency failed to analyze certain impacts that were actually within its jurisdiction." *Sierra Club v. Mainella*, 459 F.Supp. 2d 76, 104 (D.D.C.). Therefore, BOEM appropriately analyzed environmental justice impacts.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of Federal Defendants on all claims.

Respectfully submitted this 7th day of August, 2023,

TODD KIM
Assistant Attorney General
Environmental & Natural Resource Division

---

[11] *Vecinos* is distinguishable. In that case, the agency reviewed air quality impacts across thirty-one miles, but only reviewed environmental justice impacts up to two miles. *Vecinos*, 6 F.4th at 1330. In contrast, Plaintiffs do not show that BOEM's analysis was skewed by analyzing non-vulnerable communities to a greater extent than other communities.

GUILLERMO A. MONTERO
Assistant Chief, Natural Resources Section

/s/ *Luther L. Hajek*
LUTHER L. HAJEK
Trial Attorney (D.C. Bar: 467742)
United States Department of Justice
Environment and Natural Resources Division
999 18th St.
South Terrace – Suite 370
Denver, CO 80202
Tel: 303-844-1376 / Fax: 303-844-1350
E-mail: luke.hajek@usdoj.gov

/s/ *Alexis G. Romero*
ALEXIS G. ROMERO
Trial Attorney (D.C. Bar: 90006907)
United States Department of Justice
Environment & Natural Resources Division
Natural Resource Section
P.O. Box 7611,
Washington, DC 20044-7611
Tel: 203-353-5885
E-mail: alexis.romero@usdoj.gov

*Attorneys for Federal Defendants.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 7th day of August, 2023, I filed the above pleading with the

Court's CM/ECF system, which provided notice of this filing by e-mail to all counsel of record.

<u>*/s/ Luther L. Hajek*</u>
Luther L. Hajek