**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

HEALTHY GULF, BAYOU CITY
WATERKEEPER, FRIENDS OF THE
EARTH, CENTER FOR BIOLOGICAL
DIVERSITY, NATURAL RESOURCES
DEFENSE COUNCIL, and SIERRA CLUB,

       *Plaintiffs*,

       v.

DEBRA A. HAALAND, LAURA DANIEL-
DAVIS, U.S. DEPARTMENT OF THE
INTERIOR, and BUREAU OF OCEAN
ENERGY MANAGEMENT,

       *Defendants*,

       and

CHEVRON U.S.A. INC., and AMERICAN
PETROLEUM INSTITUTE,

       *Intervenor-Defendants.*

No. 1:23-cv-00604-APM

**MEMORANDUM OF INTERVENOR-DEFENDANTS CHEVRON U.S.A. INC. AND
AMERICAN PETROLEUM INSTITUTE IN OPPOSITION TO PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT, AND IN SUPPORT OF THEIR CROSS-MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................1

STATUTORY AND REGULATORY FRAMEWORK ................................................................2

    A.   The Outer Continental Shelf Lands Act ................................................................2

    B.   The National Environmental Policy Act ................................................................4

    C.   The Inflation Reduction Act ................................................................................5

FACTUAL BACKGROUND ..............................................................................................6

    A.   Interior Approves The 2017-2022 Five-Year Leasing Program ..............................6

    B.   Federal Pause On Oil And Gas Leasing Disrupts Planned Sales ..........................6

    C.   Congress Commands The Bureau To Conduct Remaining Lease
        Sales ...............................................................................................................8

    D.   The Bureau Conducts Lease Sale 259 ................................................................10

STANDARD OF REVIEW ................................................................................................11

ARGUMENT ................................................................................................................12

    I.   Plaintiffs Have Not Proved Their Standing ............................................................12

        A.   Plaintiffs Lack Associational Standing ................................................................12

        B.   Plaintiffs Have Forfeited Any Claim To Organizational Standing ......................19

    II.   A NEPA Impact Analysis Was Not Required Because The Inflation
        Reduction Act Required The Bureau To Hold Lease Sale 259 ......................................20

    III.  Even If NEPA Applied, The Bureau Adequately Considered
        Environmental Impacts And Alternatives ................................................................24

        A.   The Bureau Adequately Considered Impacts On The Rice's Whale ....................25

        B.   Interior Took A Hard Look At Impacts From Climate Change And
            Greenhouse Gas Emissions ................................................................................27

        C.   The Bureau Adequately Considered Environmental Justice Impacts ..................31

        D.   Interior Took A Hard Look At Oil Spill Risk ......................................................34

        E.   The Bureau Considered A Reasonable Range Of Alternatives ............................37

CONCLUSION ..............................................................................................................44

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

CASES:

American Chemistry Council v. Department of Transp.,
    468 F.3d 810 (D.C. Cir. 2006)..........................................................................13

Appalachian Voices v. Bodman,
    587 F. Supp. 2d 79 (D.D.C. 2008)...................................................................15

Association of Civilian Technicians, Mont. Air Chapter No. 29 v. Federal Labor Rels. Auth.,
    22 F.3d 1150 (D.C. Cir. 1994).........................................................................21

Association of Flight Attendants-CWA, AFL-CIO v. Department of Transp.,
    564 F.3d 462 (D.C. Cir. 2009).........................................................................17

Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,
    462 U.S. 87 (1983) ..........................................................................................11

Berka v. U.S. Nuclear Regul. Comm'n,
    2022 WL 412470 (D.C. Cir. Feb. 3, 2022).....................................................13

California v. Watt,
    668 F.2d 1290 (D.C. Cir. 1981)........................................................................2

* Center for Biological Diversity v. Department of Interior,
    563 F.3d 466 (D.C. Cir. 2009)...................................................................passim

* Center for Biological Diversity v. EPA,
    937 F.3d 533 (5th Cir. 2019) ..........................................................12, 16, 17, 20

* Center for Biological Diversity v. FERC,
    67 F.4th 1176 (D.C. Cir. 2023).................................................................passim

Center for L. & Educ. v. Department of Educ.,
    396 F.3d 1152 (D.C. Cir. 2005).......................................................................13

Chamber of Com. v. EPA,
    642 F.3d 192 (D.C. Cir. 2011).........................................................................18

CITGO Asphalt Refin. Co. v. Frescati Shipping Co.,
    140 S. Ct. 1081 (2020) ....................................................................................22

Citizens Against Burlington, Inc. v. Busey,
    938 F.2d 190 (D.C. Cir. 1991)..............................................................37, 38, 43

Citizens Against Rails-to-Trails v. Surface Transp. Bd.,
    267 F.3d 1144 (D.C. Cir. 2001)..................................................................20, 21

City of Olmsted Falls v. FAA,
    292 F.3d 261 (D.C. Cir. 2002).........................................................................15

\* Authorities upon which we chiefly rely are marked with an asterisk.

**TABLE OF AUTHORITIES—Continued**

Page

*City of Scottsdale v. FAA*,
  37 F.4th 678 (D.C. Cir. 2022) ........................................................................ 16

*City of Williams v. Dombeck*,
  151 F. Supp. 2d 9 (D.D.C. 2001) ................................................................... 29

*Coalition on Sensible Transp., Inc. v. Dole*,
  826 F.2d 60 (D.C. Cir. 1987) ........................................................................ 42

*Conservation L. Found. v. Ross*,
  374 F. Supp. 3d 77 (D.D.C. 2019) ...................................................... 37, 38, 42

* *Department of Transp. v. Public Citizen*,
  541 U.S. 752 (2004) ............................................................................... *passim*

*Eastern Band of Cherokee Indians v. Department of Interior*,
  534 F. Supp. 3d 86 (D.D.C. 2021) ................................................................ 18

*Environmental Def. Fund v. FERC*,
  2 F.4th 953 (D.C. Cir. 2021) ........................................................................ 14

*Flaherty v. Raimondo*,
  531 F. Supp. 3d 76 (D.D.C. 2021) ........................................................... 38, 41

* *Florida Audubon Soc'y v. Bentsen*,
  94 F.3d 658 (D.C. Cir. 1996) ............................................. 12, 15, 16, 17

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) ...................................................................... 19

*Friends of Animals v. Ashe*,
  174 F. Supp. 3d 20 (D.D.C. 2016) ................................................................ 14

*Friends of Cap. Crescent Trail v. Federal Transit Admin.*,
  255 F. Supp. 3d 60 (D.D.C. 2017) ................................................................ 27

* *Friends of the Earth v. Haaland*,
  583 F. Supp. 3d 113 (D.D.C. 2022) ......................................................... *passim*

* *Friends of the Earth v. Haaland*,
  2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) ............................................ *passim*

*Friends of Tims Ford v. Tennessee Valley Auth.*,
  585 F.3d 955 (6th Cir. 2009) ........................................................................ 19

*Government of Manitoba v. Bernhardt*,
  923 F.3d 173 (D.C. Cir. 2019) ................................................................. 12, 28

*Grunewald v. Jarvis*,
  776 F.3d 893 (D.C. Cir. 2015) ........................................................... 25, 38, 41

* *Gulf Restoration Network v. Haaland*,
  47 F.4th 795 (D.C. Cir. 2022) ................................................................. *passim*

**TABLE OF AUTHORITIES—Continued**

Page

*Hammond v. Norton*,
370 F. Supp. 2d 226 (D.D.C. 2005) .......................................................................... 33

*Humane Soc'y v. Perdue*,
935 F.3d 598 (D.C. Cir. 2019) .................................................................................. 17

*In re Nat'l Nurses United*,
47 F.4th 746 (D.C. Cir. 2022) ................................................................................... 22

*In re Navy Chaplaincy*,
2020 WL 11568892 (D.C. Cir. Nov. 6, 2020) ......................................................... 12

*International Bhd. of Teamsters v. Department of Transp.*,
724 F.3d 206 (D.C. Cir. 2013) .................................................................................. 24

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162 (2016) .................................................................................................. 21

*Louisiana v. Biden*,
543 F. Supp. 3d 388 (W.D. La. 2021) ......................................................................... 7

*Louisiana v. Biden*,
622 F. Supp. 3d 267 (W.D. La. 2022) ......................................................................... 7

*Louisiana v. Biden*,
45 F.4th 841 (5th Cir. 2022) ....................................................................................... 7

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992) ...................................................................................... 12, 14, 15

*Maine Lobstermen's Ass'n v. National Marine Fisheries Serv.*,
70 F.4th 582 (D.C. Cir. 2023) ................................................................................... 27

*Marsh v. Oregon Nat. Res. Council*,
490 U.S. 360 (1989) .................................................................................................. 11

*Narragansett Indian Tribal Historic Pres. Off. v. FERC*,
949 F.3d 8 (D.C. Cir. 2020) ...................................................................................... 19

*National Ass'n of Home Builders v. EPA*,
667 F.3d 6 (D.C. Cir. 2011) ...................................................................................... 13

*National Comm. for the New River v. FERC*,
373 F.3d 1323 (D.C. Cir. 2004) ................................................................................ 11

*National Wildlife Fed'n v. Army Corps of Eng'rs*,
170 F. Supp. 3d 6 (D.D.C. 2016) .............................................................................. 19

*NetworkIP, LLC v. FCC*,
548 F.3d 116 (D.C. Cir. 2008) .................................................................................. 20

*Nevada v. Department of Energy*,
457 F.3d 78 (D.C. Cir. 2006) ...................................................................................... 4

**TABLE OF AUTHORITIES—Continued**

Page

*New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.*,
  208 F. Supp. 3d 142 (D.D.C. 2016) ........................................................ 14

*North Slope Borough v. Andrus*,
  642 F.2d 589 (D.C. Cir. 1980) ............................................................... 35

*Oceana v. Bureau of Ocean Energy Mgmt.*,
  37 F. Supp. 3d 147 (D.D.C. 2014) ................................................ 5, 11, 35

*Public Emps. for Env't Resp. v. Beaudreau*,
  25 F. Supp. 3d 67 (D.D.C. 2014) ........................................................... 27

* *Rancho Vista del Mar v. United States*,
  2022 WL 16921533 (D.D.C. Nov. 14, 2022) ........................... 4, 11, 20, 23

*Red Lake Band of Chippewa Indians v. Army Corps of Eng'rs*,
  636 F. Supp. 3d 33 (D.D.C. 2022) .................................................. 31, 33

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) .................................................................... 2, 4, 27

*Safari Club Int'l v. Jewell*,
  960 F. Supp. 2d 17 (D.D.C. 2013) ......................................................... 31

*Safari Club Int'l v. Salazar*,
  852 F. Supp. 2d 102 (D.D.C. 2012) ....................................................... 31

*San Juan Audubon Soc'y v. Wildlife Servs., Animal & Plant Inspection Serv.*,
  257 F. Supp. 2d 133 (D.D.C. 2003) ................................................. 16, 18

*Sierra Club v. Army Corps of Eng'rs*,
  803 F.3d 31 (D.C. Cir. 2015) ................................................................ 24

* *Sierra Club v. FERC*,
  867 F.3d 1357 (D.C. Cir. 2017) ............................................. 11, 20, 23, 39

*Sierra Club v. Mainella*,
  459 F. Supp. 2d 76 (D.D.C. 2006) ......................................................... 32

*Stand Up for California! v. Department of Interior*,
  410 F. Supp. 3d 39 (D.D.C. 2019) ......................................................... 36

*Stand Up for California! v. Department of Interior*,
  994 F.3d 616 (D.C. Cir. 2021) ......................................................... 36, 37

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................... 19

*Swanson Grp. Mfg. LLC v. Jewell*,
  790 F.3d 235 (D.C. Cir. 2015) ......................................................... 12, 13

*Theodore Roosevelt Conservation P'ship v. Salazar*,
  616 F.3d 497 (D.C. Cir. 2010) ......................................................... 36, 40

**TABLE OF AUTHORITIES—Continued**

Page

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   661 F.3d 66 (D.C. Cir. 2011)...................................................... 39, 42

*Town of Barnstable v. FAA*,
   740 F.3d 681 (D.C. Cir. 2014)........................................................... 23

*Town of Weymouth v. FERC*,
   2018 WL 6921213 (D.C. Cir. Dec. 27, 2018) ................................. 34

*Twin Rivers Paper Co. LLC v. Securities & Exch. Comm'n*,
   934 F.3d 607 (D.C. Cir. 2019).......................................................... 20

*Viasat, Inc. v. FCC*,
   47 F.4th 769 (D.C. Cir. 2022)........................................................... 18

*WildEarth Guardians v. Bureau of Land Mgmt.*,
   8 F. Supp. 3d 17 (D.D.C. 2014)....................................................... 13

*WildEarth Guardians v. Jewell*,
   738 F.3d 298 (D.C. Cir. 2013)............................................... 13, 28, 40

*WildEarth Guardians v. Zinke*,
   368 F. Supp. 3d 41 (D.D.C. 2019)............................................... 14, 33

STATUTES:

42 U.S.C. § 4332(2)(C)...................................................................... 4, 5

42 U.S.C. §§ 4321-4370f......................................................................... 4

43 U.S.C. § 1332(3).............................................................................. 38

43 U.S.C. § 1334..................................................................................... 2

43 U.S.C. § 1334(a).............................................................................. 38

43 U.S.C. § 1337..................................................................................... 2

43 U.S.C. § 1337(a)(1)............................................................................ 3

43 U.S.C. § 1340(g)(3)............................................................................ 3

43 U.S.C. §1344(a).................................................................................. 3

43 U.S.C. § 1344(b)(3)............................................................................ 5

43 U.S.C. § 1344(c)................................................................................. 3

43 U.S.C. § 1344(d)................................................................................. 3

43 U.S.C. § 1344(d)(3)............................................................................ 3

43 U.S.C. § 1344(e)................................................................................. 3

43 U.S.C. § 1351(c)................................................................................. 4

43 U.S.C. § 1802(2)(A)........................................................................... 2

**TABLE OF AUTHORITIES—Continued**

Page

\* Inflation Reduction Act of 2022,
   Pub. L. No. 117-169, 136 Stat 1818 (Aug. 16, 2022)......................................*passim*

   § 50264.........................................................................................................8

   § 50264(a).................................................................................................8, 21

   § 50264(a)(1).................................................................................................9

   § 50264(a)(2)...............................................................................................21

   § 50264(a)(3).............................................................................................9, 21

   § 50264(a)(4).................................................................................................9

   § 50264(b)...............................................................................................5, 9, 22

   § 50264(b)(2).................................................................................................5

   § 50264(d)..........................................................................................5, 9, 21, 22

   § 50264(e)...................................................................................................5, 9

REGULATIONS:

30 C.F.R. § 550.201(a) (2022).............................................................................3

30 C.F.R. § 550.202 (2022).................................................................................3

30 C.F.R. Part 556, subpart B (2022)....................................................................3

30 C.F.R. Part 556, subpart E (2022)....................................................................3

30 C.F.R. § 556.205 (2022).................................................................................3

30 C.F.R. § 556.308(b) (2022).............................................................................3

40 C.F.R. § 1508.1(q) (2022)...............................................................................4

Notice of Availability (NOA) of and Request for Comments on the Draft Proposed Outer
   Continental Shelf (OCS) Oil and Gas Leasing Program for 2017-2022 (DPP),
   80 Fed. Reg. 4,941 (Jan. 29, 2015).....................................................................6

Notice of Availability (NOA) of and Request for Comments on the 2017-2022
   Outer Continental Shelf (OCS) Oil and Gas Leasing Proposed Program MAA104000,
   81 Fed. Reg. 14,881 (Mar. 18, 2016)...................................................................6

Oil and Gas Lease Sale 257, Notice of Availability of a Record of Decision,
   86 Fed. Reg. 6,365 (Jan. 21, 2021).....................................................................7

E.O. 14008, Tackling the Climate Crisis at Home and Abroad,
   86 Fed. Reg. 7,619 (Jan. 27, 2021).....................................................................7

Oil and Gas Lease Sale 257, Notice to Rescind a Record of Decision,
   86 Fed. Reg. 10,132 (Feb. 18, 2021)...................................................................7

## TABLE OF AUTHORITIES—Continued

Page

OTHER AUTHORITIES:

BOEM, Active Leases – Oil and Gas Lease Sale 259,
 https://bobson.maps.arcgis.com/apps/webappviewer/index.html?id=335e0967
 e81f4bce813c014a695df18b ........................................................................................16

Oil and Gas Lease Sale 257 Final Bid Recap (Nov. 9, 2022),
 https://www.boem.gov/sites/default/files/documents/oil-gas-
 energy/leasing/Sale%20257%20Final%20Bid%20Recap.pdf...................................................8

Oil and Gas Lease Sale 259 Final Bid Recap (July 17, 2023),
 https://www.boem.gov/sites/default/files/documents/oil-gas-
 energy/leasing/Sale-259-Final-Bid-Recap.pdf........................................................................11

Record of Decision for Gulf of Mexico Outer Continental Shelf Oil and Gas
 Lease Sale 257 (Aug. 31, 2021),
 https://www.boem.gov/sites/default/files/documents/oil-gas-energy/GOM-LS-
 257.pdf ..................................................................................................................................8

## INTRODUCTION

Environmental-organization Plaintiffs follow much the same script as past challenges to offshore oil-and-gas lease sales. They claim that the Bureau of Ocean Energy Management (BOEM or the Bureau) prepared an inadequate supplemental environmental impact statement in support of Lease Sale 259, a regionwide lease sale in the Gulf of Mexico, and thus violated the National Environmental Policy Act (NEPA). In the months since Plaintiffs filed their complaint asking this Court to vacate the sale, Lease Sale 259 proceeded as scheduled in March, and the Bureau finished issuing hundreds of leases to the winning bidders—including to Intervenor-Defendants Chevron U.S.A. Inc. and other American Petroleum Institute members.

Plaintiffs filed a similar lawsuit challenging Lease Sale 257, the Bureau's previous Gulf-wide lease sale. But after the district court accepted one of Plaintiffs' NEPA arguments and vacated the sale, Congress stepped in. The Inflation Reduction Act of 2022 reinstated the results of Lease Sale 257 and directed the Bureau to issue leases to winning bidders. And to prevent the exact challenge that Plaintiffs now bring, the Inflation Reduction Act directed the Bureau to conduct two more Gulf-wide lease sales—this Lease Sale 259 and another sale scheduled for September.

All but ignoring the Inflation Reduction Act, Plaintiffs pursue this Hail-Mary lawsuit to vacate the results of Lease Sale 259. Their challenge fails on the merits for three reasons.

First, as a threshold matter, Plaintiffs lack standing. They have not established associational standing, because their bevy of member declarations do not identify any concrete harm to a cognizable interest caused by the Bureau's supposedly inadequate NEPA analysis or redressable by this Court. Second, the Inflation Reduction Act forecloses Plaintiffs' NEPA claims. NEPA requires an environmental analysis only when an agency has the statutory authority to act on the information it gathers, and here the Bureau lacked authority to not hold

Lease Sale 259. Third, even if Plaintiffs could skirt the Inflation Reduction Act, the Bureau's environmental-impacts analysis fully complied with NEPA. Plaintiffs are disappointed that the Bureau did not agree with their arguments, but disappointment does not amount to a NEPA violation. It is "well settled that NEPA itself does not mandate particular results." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).

This Court should deny Plaintiffs' motion for summary judgment and grant Intervenor-Defendants' cross-motion for summary judgment.

## STATUTORY AND REGULATORY FRAMEWORK

This case involves the interaction of three federal statutes: the Outer Continental Shelf Lands Act (OCSLA), the National Environmental Policy Act (NEPA), and the Inflation Reduction Act of 2022. Lease sales are ordinarily governed by OCSLA and NEPA, but the Inflation Reduction Act set specific rules for Lease Sale 259, the sale challenged in this action.

### A.     The Outer Continental Shelf Lands Act

OCSLA aims to "make [Outer Continental Shelf] resources available to meet the Nation's energy needs as rapidly as possible." 43 U.S.C. § 1802(2)(A). Because OCSLA "has an objective—the expeditious development of OCS resources"—it "recognize[s] that some degree of adverse [environmental] impact is inevitable." *California v. Watt*, 668 F.2d 1290, 1316 (D.C. Cir. 1981). To facilitate "the expeditious but orderly development of OCS resources," OCSLA provides the Department of the Interior a four-stage procedural framework to develop an offshore oil well. *Center for Biological Diversity v. Department of Interior*, 563 F.3d 466, 472-473 (D.C. Cir. 2009) (citation omitted); *see* 43 U.S.C. §§ 1334, 1337. That process is "pyramidic in structure, proceeding from broad-based planning to an increasingly narrower focus as actual development grows more imminent," a "multi-tiered approach" designed "to forestall premature litigation regarding adverse environmental effects that . . . will

flow, if at all, only from the latter stages of OCS exploration and production." *Center for Biological Diversity*, 563 F.3d at 473 (citations omitted).

*First*, OCSLA mandates that Interior create a five-year oil and gas leasing program, which includes "a schedule of proposed lease sales indicating, as precisely as possible, the size, timing, and location of leasing activity which [the Secretary] determines will best meet national energy needs for the five-year period following its approval or reapproval." 43 U.S.C. §1344(a). Preparing the five-year leasing program requires multiple rounds of comments, draft proposals, a final draft proposal, final secretarial approval, and submission of the proposed final program to Congress and the President. *Id.* § 1344(c), (d); 30 C.F.R. § 556.205 (2022); *see generally* 30 C.F.R. Part 556, subpart B (2022). Once finalized, OCSLA mandates that all lease sales be conducted in accordance with the five-year leasing program. 43 U.S.C. § 1344(d)(3) ("[N]o lease shall be issued unless it is for an area included in the approved leasing program."). Although the Secretary may later revise the program, any "significant" revision is subject to the same consultation-and-notice requirements as the original program. *Id.* § 1344(e); *see also* 30 C.F.R. § 556.205.

*Second*, Interior conducts the lease sales described in the five-year program. 43 U.S.C. § 1337(a)(1). Lease sales are conducted by competitive sealed bidding, 30 C.F.R. § 556.308(b) (2022), and leases are awarded according to a multi-step process governed by federal regulation, *see generally* 30 C.F.R. Part 556, subpart E (2022). Once a lease is issued, the operator may not begin exploration, development, or production until plans are submitted and approved. 30 C.F.R. §§ 550.201(a), 550.202 (2022).

*Third*, "Interior reviews and determines whether to approve the lessees' more extensive exploration plans." *Center for Biological Diversity*, 563 F.3d at 473; *see* 43 U.S.C. § 1340(g)(3).

3

*Finally*, Interior and affected state and local governments review the lessee's detailed development plans, which, among other things, must set forth the specific work to be performed, the environmental safeguards to be implemented, and the safety standards to be met.  43 U.S.C. § 1351(c).

### B.    The National Environmental Policy Act

NEPA also applies to the administration of offshore leasing.  42 U.S.C. §§ 4321-4370f. NEPA is a procedural statute that aims both to inform agency decisionmakers of the environmental effects of proposed major federal actions and make relevant information available to the public.  *Robertson*, 490 U.S. at 350.  To meet these dual purposes, NEPA requires each agency to "assess the environmental consequences of 'major Federal actions.' "  *Nevada v. Department of Energy*, 457 F.3d 78, 87 (D.C. Cir. 2006) (citation omitted).  For any major federal action—defined as "an activity or decision subject to Federal control and responsibility," 40 C.F.R. § 1508.1(q) (2022)—that "significantly affect[s] the quality of the human environment," the agency must prepare an environmental impact statement (EIS) detailing "(i) reasonably foreseeable environmental effects of the proposed agency action; (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented; [and] (iii) a reasonable range of alternatives to the proposed agency action."  42 U.S.C. § 4332(2)(C).  But NEPA does not apply to "agency decisions that are nondiscretionary," *Rancho Vista del Mar v. United States*, 2022 WL 16921533, at *7 (D.D.C. Nov. 14, 2022), such as "where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions," *Department of Transp. v. Public Citizen*, 541 U.S. 752, 770 (2004).  Where NEPA does apply, it only "prescribes the necessary process" that agencies must undertake, and "does not mandate particular results."  *Robertson*, 490 U.S. at 350.

OCSLA specifies that the first stage of offshore leasing—development of the five-year leasing program—is a major federal action requiring preparation of an EIS.  43 U.S.C. § 1344(b)(3); 42 U.S.C. § 4332(2)(C).  But neither NEPA nor OCSLA require the Bureau to develop a new EIS at each subsequent stage of the leasing process.  Instead, NEPA allows "a tiered approach to preparing an EIS," meaning that the Bureau can supplement the programmatic EIS as needed at later more site-specific stages.  *Center for Biological Diversity*, 563 F.3d at 474. Tiering allows the agency to "eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review."  *Oceana v. Bureau of Ocean Energy Mgmt.*, 37 F. Supp. 3d 147, 162 (D.D.C. 2014) (citation omitted).

### C.     The Inflation Reduction Act

The Inflation Reduction Act of 2022 amended the default rules in OCSLA and NEPA for the 2017-2022 Leasing Program's remaining lease sales.  Pub. L. No. 117-169, 136 Stat 1818 (Aug. 16, 2022).  The Inflation Reduction Act directed the Bureau to "reinstate[ ]" Lease Sale 257, § 50264(b) (capitalization altered), which had been vacated by court order, and specified that the Bureau "shall conduct Lease Sale 259 [and Lease Sale 261] in accordance with the Record of Decision approved by the Secretary on January 17, 2017" for the 2017-2022 Leasing Program, § 50264(d), (e); *see* BOEM02838-40 (January 17, 2017 Record of Decision approving 2017-2022 Leasing Program of "10 sales in the GOM Program Area" that "would be region-wide and include unleased acreage not subject to moratorium or otherwise unavailable, in the Western, Central, and Eastern Gulf of Mexico").

Further, to guarantee that offshore oil and gas leasing would continue in the Gulf of Mexico, the Inflation Reduction Act conditioned Interior's ability to issue offshore leases for wind development on holding an oil and gas lease sale of at least 60 million acres within the preceding year.  § 50265(b)(2).

## FACTUAL BACKGROUND

### A.      Interior Approves The 2017-2022 Five-Year Leasing Program.

After years of careful planning, including the Bureau's review of over two million

comments, *see* 80 Fed. Reg. 4,941 (Jan. 29, 2015); 81 Fed. Reg. 14,881 (Mar. 18, 2016); scores

of public meetings; and the development of a Programmatic EIS, *see* BOEM01900-02837,

Interior approved the 2017-2022 Leasing Program, BOEM02840.  The record of decision—the

Secretary's final written approval of the 2017-2022 leasing program—directed the Bureau to

proceed with ten scheduled lease sales in the Gulf of Mexico over the five program years—one

sale in 2017, two each in 2018-2021, and one in 2022.  BOEM02840; BOEM01645;

BOEM01647-1648.  These sales were to be "region-wide and include unleased acreage not

subject to moratorium or otherwise unavailable, in the Western, Central, and Eastern Gulf of

Mexico."  BOEM02840.  This "region-wide sale approach ma[de] the entire leasable Gulf of

Mexico OCS area available in each lease sale," BOEM01645, with the goal of "provid[ing]

greater flexibility to industry, including more frequent opportunities to bid on rejected,

relinquished, or expired OCS lease blocks," BOEM02840.

After approving the 2017-2022 Leasing Program, the Bureau issued a "Multisale EIS,"

tiered from the Programmatic EIS, analyzing the potential environmental impacts of a single

region-wide lease sale that "would apply to any of the 10 proposed GOM lease sales."

BOEM02926.  The Bureau later issued the 2018 Supplemental EIS—tiered from the Multisale

EIS and the Programmatic EIS—"for each of the remaining proposed regionwide lease sales

scheduled in the 2017-2022 Five-Year Program."  BOEM04707.

### B.      Federal Pause On Oil And Gas Leasing Disrupts Planned Sales.

By January 2021, seven of the ten Gulf-wide lease sales had proceeded as scheduled.

That changed with the eighth, Lease Sale 257.  Preparations for the sale began normally, with

6

Interior proposing to "lease all available, unleased blocks within the proposed regionwide lease sale area for oil and gas operations."  86 Fed. Reg. 6,365 (Jan. 21, 2021).  But President Biden then issued an executive order that directed Interior to "pause new oil and natural gas leases . . . in offshore waters pending completion of a comprehensive review and reconsideration of Federal oil and gas permitting and leasing practices."  E.O. 14008, Tackling the Climate Crisis at Home and Abroad, 86 Fed. Reg. 7,619, 7,624 (Jan. 27, 2021).  Interior accordingly cancelled Lease Sale 257 "to comply with [the] Executive Order," 86 Fed. Reg. 10,132, 10,123 (Feb. 18, 2021), and did not schedule the Five-Year Program's two remaining sales, Lease Sales 259 and 261, *Louisiana v. Biden*, 622 F. Supp. 3d 267, 287-288 (W.D. La. 2022).

Thirteen States soon sought to enjoin both the "pause" directed by the Executive Order and Interior's cancellation of Lease Sale 257.  *Louisiana v. Biden*, 543 F. Supp. 3d 388, 413 (W.D. La. 2021), *vacated and remanded*, 45 F.4th 841 (5th Cir. 2022).  The district court concluded that "pausing, stopping and/or cancelling lease sales scheduled in the OCSLA Five-Year Plan would be significant revisions of the plan" that "the Agency Defendants have no authority to make . . . without going through the procedure mandated by Congress," and preliminarily enjoined the leasing pause.  *Id.* at 413, 417.  The Fifth Circuit later vacated that injunction as insufficiently specific, 45 F.4th 841, 846 (5th Cir. 2022), and the district court reissued a permanent injunction the next day, 622 F. Supp. 3d at 299-300.  The district court reiterated that the Executive Order's direction to pause leasing "was a 'significant' revision of the 2017-2022 Five-Year Plan that violated the OCSLA," and the court concluded that Interior's cancellation of Lease Sale 257 was contrary to law, arbitrary and capricious, and violated notice and comment requirements under the Administrative Procedure Act.  *Id.* at 289, 294.  The court

permanently enjoined Interior from implementing the Executive Order to halt "new oil and gas leases . . . in offshore waters."  *Id.* at 298-299.

In accordance with the preliminary injunction, Interior issued a new record of decision "to hold oil and gas Lease Sale 257 as a GOM region-wide lease sale."  Record of Decision for Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale 257 2 (Aug. 31, 2021), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/GOM-LS-257.pdf.  Four of the organizational plaintiffs in this suit—Healthy Gulf, Friends of the Earth, Sierra Club, and Center for Biological Diversity—then sued to stop or vacate the sale for alleged NEPA violations.  *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 128 (D.D.C. 2022), *vacated and remanded*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) (per curiam).  Lease Sale 257 proceeded as scheduled in November 2021, with industry bidding nearly $200 million for 308 tracts covering 1.7 million acres in the Gulf.  *See* Oil and Gas Lease Sale 257 Final Bid Recap 1-2 (Nov. 9, 2022), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale%20257%20Final%20Bid%20Recap.pdf.  The district court invalidated the results of the sale soon after, preventing Interior from issuing leases to the winning bidders.  *Friends of the Earth*, 583 F. Supp. 3d at 162.

The 2017-2022 Leasing Program expired in June 2022, with Lease Sale 257 vacated by court order and Interior having made no effort to hold Lease Sales 259 and 261.

### C.    Congress Commands The Bureau To Conduct Remaining Lease Sales.

Congress intervened while the district court's vacatur of Lease Sale 257 was on appeal.  The Inflation Reduction Act of 2022 changed the law for the remaining "lease sales under the 2017-2022 Outer Continental Shelf Leasing Program."  § 50264 (capitalization altered).  Congress identified the Five-Year Program's three uncompleted Gulf of Mexico lease sales by name—Lease Sales 257, 259, and 261.  § 50264(a).  Congress defined Lease Sale 257 as the sale

"that was approved in the [amended] Record of Decision" in 2021. § 50264(a)(1). And

Congress defined Lease Sales 259 and 261 as the numbered sales "described in the 2017–2022

Outer Continental Shelf Oil and Gas Leasing Proposed Final Program published on November

18, 2016, and approved by the Secretary in the Record of Decision issued on January 17, 2017."

§ 50264(a)(3)-(4).

Congress overrode the district court's order vacating Lease Sale 257 for NEPA

noncompliance in a section titled "Lease Sale 257 Reinstatement." § 50264(b) (capitalization

altered). Because Lease Sale 257 had already occurred, Congress directed the Secretary to

"accept the highest valid bid for each tract or bidding unit of Lease Sale 257 for which a valid

bid was received," "provide the appropriate lease form to the winning bidder to execute and

return," and "promptly issue to the high bidder a fully executed lease." *Id.*

The Inflation Reduction Act likewise listed specific "requirement[s]" for Lease Sales 259

and 261. § 50264(d)-(e) (capitalization altered). Congress specified that "the Secretary shall

conduct Lease Sale 259 [and 261] in accordance with the Record of Decision approved by the

Secretary on January 17, 2017" for the 2017-2022 Leasing Program. *Id.* The Act directed the

Secretary to conduct Lease Sale 259 by "not later than March 31, 2023" and Lease Sale 261 by

"not later than September 30, 2023." *Id.*

Because the Inflation Reduction Act "required issuance of the leases won in Lease Sale

257," the D.C. Circuit held that Plaintiffs' challenge to Lease Sale 257 was moot. *Friends of the

Earth*, 2023 WL 3144203, at *1. Even if the Bureau's environmental analysis violated NEPA,

"the result will be the same: The highest bidders will receive their leases." *Id.* The D.C. Circuit

rejected Plaintiffs' argument that NEPA still applied to the lease sale, holding that "by placing a

nondiscretionary obligation on the Department to issue the leases, the Inflation Reduction Act

makes clear that the issuance of the leases is no longer subject to NEPA." *Id.* at *2. And "[c]ontrary to the environmental groups' assertion, reading the Inflation Reduction Act to create a nondiscretionary statutory obligation does not implicitly repeal NEPA," but instead "merely interprets the Inflation Reduction Act to require an action that is outside NEPA's scope." *Id.* at *2 n.1. The D.C. Circuit vacated the district court's decision and remanded with instructions to dismiss the case as moot. *Id.* at *2.

D.     **The Bureau Conducts Lease Sale 259.**

As a result of the Inflation Reduction Act, Interior acknowledged that "Lease Sale 259, the ninth lease sale in the GOM scheduled under the 2017-2022 National OCS Oil and Gas Program, is now required to be held." BOEM20094. And although the Bureau agreed it "ha[d] no discretion on whether to hold Lease Sale 259," it chose to prepare a Supplemental EIS—the fourth EIS prepared for lease sales in the Gulf—"to follow its normal leasing process to the fullest extent possible." BOEM20094; *see also* BOEM19440 ("This Supplemental EIS is expected to inform the lease sale processes for GOM oil and gas Lease Sales 259 and 261, which BOEM is required to hold as directed in the Inflation Reduction Act of 2022."). Following the direction of the 2017-2022 Leasing Program, the Bureau accordingly scheduled a "regionwide lease sale" of "all available unleased blocks," absent certain excluded areas. BOEM20095.

Plaintiffs are six environmental organizations (including the same four that challenged Lease Sale 257) seeking to vacate Lease Sale 259 for alleged noncompliance with NEPA. Plaintiffs complain that the Bureau's Supplemental EIS for Lease Sale 259 failed to take a hard look at environmental impacts on the Rice's whale, climate change and greenhouse gas emissions, environmental justice, and oil-spill risk. Plaintiffs also complain that the Bureau did not consider a "reasonable range of alternatives" in the Supplemental EIS. Pls.' Br. 18.

A few weeks after Plaintiffs filed this complaint, the Bureau held Lease Sale 259 as the Inflation Reduction Act commanded.  Industry bid nearly $310 million for 313 tracts covering 1.6 million acres of the Gulf.  *See* Oil and Gas Lease Sale 259 Final Bid Recap 1-2 (July 17, 2023), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/leasing/Sale-259-Final-Bid-Recap.pdf.  The Bureau accepted bids and issued leases for 295 tracts.  *Id.* at 2.

## STANDARD OF REVIEW

"Courts review agency compliance with NEPA through the Administrative Procedure Act."  *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 799 (D.C. Cir. 2022).  In NEPA cases, the "role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."  *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97-98 (1983).  Courts review compliance with NEPA under a "rule of reason," *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 373 (1989), and this "narrow" standard of review does not empower a court to "substitute its judgment for that of the agency," *Oceana*, 37 F. Supp. 3d at 154 (citation omitted).  "An environmental impact statement is reviewed to ensure that the agency took a hard look at the environmental consequences of its decision to go forward with the project," *National Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) (citations omitted), but courts "should not flyspeck an agency's environmental analysis, looking for any deficiency no matter how minor," *Sierra Club v. FERC*, 867 F.3d 1357, 1368 (D.C. Cir. 2017) (citation omitted).

At the same time, NEPA does not apply to "agency decisions that are nondiscretionary," *Rancho Vista del Mar*, 2022 WL 16921533, at *7, meaning that "when the agency has no *legal* power to prevent a certain environmental effect, there is no decision to inform, and the agency need not analyze the effect in its NEPA review," *Sierra Club*, 867 F.3d at 1372; *see also Public*

*Citizen*, 541 U.S. at 770 ("[W]here an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect.").

## ARGUMENT

### I.   Plaintiffs Have Not Proved Their Standing.

Plaintiffs bear the burden of establishing standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992), yet their opening brief "addressed standing only in a footnote," *Center for Biological Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019).  That cursory treatment does not satisfy Plaintiffs' summary-judgment burden.

#### A.   Plaintiffs Lack Associational Standing.

Plaintiffs assert associational standing based on their members' supposed "recreational, aesthetic, informational, commercial, and scientific interests," Pls.' Br. 18 n.12, but that unspecified list "does nothing . . . to identify the evidence required at summary judgment," *Government of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019).  Plaintiffs needed to identify "specific facts, not 'mere allegations,' to substantiate each leap necessary for standing," *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 666 (D.C. Cir. 1996) (en banc) (citation omitted), because this Court "will not presume the missing facts necessary to establish an element of standing," *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015) (citation omitted).  Plaintiffs have therefore "forfeited any argument for standing on behalf of [their] members by failing to develop it beyond a conclusory recitation of elements."  *In re Navy Chaplaincy*, 2020 WL 11568892, at *2 (D.C. Cir. Nov. 6, 2020); *see also Government of Manitoba*, 923 F.3d at 179 ("A party forfeits an argument by mentioning it only in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." (citation omitted)).

Even if this Court were to excuse Plaintiffs' forfeiture, Plaintiffs have not established that any member has standing to sue in her own right.  Because Plaintiffs assert "the 'archetypal procedural injury' in arguing that [the government] failed to take a 'hard look' at the environmental impacts of the leases and prepare a legally adequate EIS under NEPA," *WildEarth Guardians v. Bureau of Land Mgmt.*, 8 F. Supp. 3d 17, 26-27 (D.D.C. 2014), "the courts relax— while not wholly eliminating—the issues of imminence and redressability, but *not* the issues of injury in fact or causation," *Center for L. & Educ. v. Department of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (emphasis added).  And here, no member has shown an injury in fact that is fairly traceable to Lease Sale 259 and redressable by a favorable decision.  Plaintiffs therefore cannot assert associational standing on their behalf.

1.  Plaintiffs have not "show[n] that at least one specifically-identified member has suffered an injury-in-fact," *American Chemistry Council v. Department of Transp.*, 468 F.3d 810, 815, 820 (D.C. Cir. 2006), because they have not established "some connection between the alleged procedural injury and a substantive injury that would otherwise confer Article III standing," *National Ass'n of Home Builders v. EPA*, 667 F.3d 6, 15 (D.C. Cir. 2011).  Indeed, some of the declarations fail the basic prerequisite of "identify[ing] individual injured members." *Swanson Grp. Mfg.*, 790 F.3d at 242; *see, e.g.*, Templeton Decl. ¶ 5 (alleging injuries to group's "board members, staff, members, and activists"); Galvin Decl. ¶ 10 (similar).

Most of the members' asserted injuries are simply not cognizable under Article III. Many members claim harm from the effects of global climate change, *see* Wiygul Decl. ¶¶ 23-27; Skrmetta Decl. ¶¶ 46-49; Eustis Decl. ¶ 24; Saxon Decl. ¶ 19; Foster Decl. ¶ 16, but circuit precedent is clear that Plaintiffs "cannot establish standing based on the effects of global climate change."  *WildEarth Guardians v. Jewell*, 738 F.3d 298, 307 (D.C. Cir. 2013), *see also Berka v.*

*U.S. Nuclear Regul. Comm'n*, 2022 WL 412470, at *1 (D.C. Cir. Feb. 3, 2022) ("asserted injury based on climate change is not a particularized injury"); *Center for Biological Diversity*, 563 F.3d at 478-479 (same); *WildEarth Guardians v. Zinke*, 368 F. Supp. 3d 41, 62 (D.D.C. 2019) (same); *Friends of Animals v. Ashe*, 174 F. Supp. 3d 20, 29 (D.D.C. 2016) (same). Plaintiffs likewise cannot establish standing based on "an ecosystem perspective," Wiygul Decl. ¶ 15; *see also* Guckian Decl. ¶¶ 8-9; Cook Decl. ¶ 8; Saxon Decl. ¶ 11; Jacob Decl. ¶¶ 32-33; Eustis Decl. ¶ 28; Skrmetta Decl. ¶¶ 34, 36, 41, as the Supreme Court has rejected assertions of standing based on members' use of a "contiguous ecosystem" that is "adversely affected." *Defenders of Wildlife*, 504 U.S. at 565. Nor can Plaintiffs establish standing based on an " 'animal nexus' approach, whereby anyone who has an interest in studying or seeing the endangered animals anywhere on the globe has standing," *id.* at 565-566; *see, e.g.*, Guckian Decl. ¶ 6, or by "examin[ing] whether the environment in general has suffered an injury," in lieu of "an injury that affects [Plaintiffs' members] in a personal and individual way," *Center for Biological Diversity*, 563 F.3d at 478 (citation omitted); *see, e.g.*, Eustis Decl. ¶ 22; Saxon Decl. ¶ 11. The same goes for complaints about witnessing a mere "eyesore." Shereda ¶ 5; *see Environmental Def. Fund v. FERC*, 2 F.4th 953, 970 (D.C. Cir. 2021) (finding "nothing in the existing case law to suggest that a person who incidentally views something unpleasant has suffered an injury-in-fact for purposes of standing").

Even for those members that identify some aesthetic or recreational interest, their asserted harms are not concrete. Some members claim interests in observing species like the Gulf sturgeon and Rice's whale, but "there is no evidence that any of these individual plaintiffs actually have plans to go to [the Gulf] to see these animals." *New England Anti-Vivisection Soc'y v. United States Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 173 (D.D.C. 2016); *see, e.g.*,

Skrmetta Decl. ¶ 25 ("I have never seen a Gulf sturgeon in the wild but find joy knowing they swim in the waters that surround me and just the possibility that I may encounter one."); Saxon Decl. ¶ 18 ("I am gladdened by the[] existence" of the Rice's whale and "would love to see one of these majestic animals in their natural habitat.").  A vague interest in observing wildlife "will not suffice on its own 'without any description of concrete plans, or indeed even any specification of when the plaintiff will be deprived of the opportunity to observe the potentially harmed species.'" *Center for Biological Diversity*, 563 F.3d at 479 (citation omitted).  And this Court cannot rely on one member's assurances that he is "going back out onto the federal OCS," although "[t]here is no telling when launches and other infrastructure will be back in place" to allow him to do so, as "the ability to go offshore and fish is by its nature indefinite."  Wiygul Decl. ¶¶ 12, 14.  "Such 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."  *Defenders of Wildlife*, 504 U.S. at 564.

Plaintiffs' members also lack the necessary "geographic proximity to the action challenged."  *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002).  "In the case of broad rulemaking" like Lease Sale 259, "a court may not assume that the areas used and enjoyed by a prospective plaintiff will suffer all or any environmental consequences that the rule itself may cause."  *Florida Audubon Soc'y*, 94 F.3d at 667.  Indeed, a "plaintiff's need to show that its particularized interests are threatened is especially acute when the government action at issue is not one located at a particular site, but instead involves a rule whose application has a broad geographic impact."  *Appalachian Voices v. Bodman*, 587 F. Supp. 2d 79, 86 (D.D.C. 2008) (citation omitted).  Plaintiffs' members assert largely coastal interests beyond the geographic scope of the lease sale.  *See, e.g.*, Skrmetta Decl. ¶¶ 22, 34 (coastal Mississippi); Jacob Decl.

¶ 27 (wetlands in Galveston Bay watershed); Saxon Decl. ¶¶ 9-10 (Texas barrier islands); Foster Decl. ¶¶ 5-6, 10 (Port Aransas); Shereda ¶ 5 (upper Texas coast); Wiygul ¶ 3 (Biloxi Bay).  And because these members have not demonstrated that their coastal interests are likely to be harmed by Lease Sale 259, they "have not demonstrated such a geographic nexus to any asserted environmental injury."  *Florida Audubon Soc'y*, 94 F.3d at 668; *see also Center for Biological Diversity*, 937 F.3d at 538 ("Courts cannot simply presume pollution discharged in one place will affect would-be plaintiffs everywhere.").

Moreover, the map of bids received in Lease Sale 259, which proceeded a few weeks after Plaintiffs filed their complaint, confirms that any harm to these members' coastal interests was entirely speculative.  *See* BOEM, Active Leases – Oil and Gas Lease Sale 259, https://bobson.maps.arcgis.com/apps/webappviewer/index.html?id=335e0967e81f4bce813c014a 695df18b.  Plaintiffs have offered no evidence demonstrating that their members are harmed by drilling tens of miles or hundreds of miles away, *City of Scottsdale v. FAA*, 37 F.4th 678, 679 (D.C. Cir. 2022) (requiring evidence)—nor does the lease sale itself even authorize drilling.

2.  Even if this Court "were to assume that [Plaintiffs] have provided specific factual support for the proposition that the wildlife areas they enjoy suffer a demonstrably increased risk of [oil and gas] pollution in the future, [they] have not shown that such particularized injury would be fairly traceable" to Lease Sale 259, "as is necessary for standing."  *Florida Audubon Soc'y*, 94 F.3d at 669.

Plaintiffs' members have failed to trace any alleged harms to their members' claimed recreational and aesthetic interests to Lease Sale 259, as opposed to existing oil and gas operations in the Gulf, and so they have not "show[n] that 'it is substantially probable' that the defendants' procedural breach will cause [their] injury."  *San Juan Audubon Soc'y v. Wildlife*

*Servs., Animal & Plant Inspection Serv.*, 257 F. Supp. 2d 133, 142 (D.D.C. 2003) (quoting

*Florida Audubon Soc'y*, 94 F.3d at 664).  "Given the existing extensive and widespread network

of supporting industries and infrastructure for offshore oil- and gas-related industry and its

associated labor force, the impacts of routine activities related to a single OCS lease sale are

expected to be negligible, widely distributed, and to have little impact."  BOEM20015; *see also*

BOEM19502 ("the cancellation of a single lease sale would not significantly change the

environmental impacts of overall OCS oil- and gas-related activity," as "activities from existing

leases would continue").  Indeed, Plaintiffs' members largely claim injury from existing

operations.  *See, e.g.*, Cook Decl. ¶ 5.  But Plaintiffs had to demonstrate that it is "substantially

probable" that Lease Sale 259—as opposed to some other agency action approving other oil and

gas operations—will cause their members' asserted injuries.  That is, Plaintiffs "must

demonstrate that the pollutants that will cause their assumed injuries will be discharged pursuant

to the [challenged action], and not pursuant to some other authority or in violation of law."

*Center for Biological Diversity*, 937 F.3d at 544.  "Not to require that a plaintiff show that its

particularized injury resulted from the government action at issue would effectively void the

particularized injury requirement."  *Florida Audubon Soc'y*, 94 F.3d at 669.

   Plaintiffs cannot close the gap in the causal chain with their members' insistence that they

"know that continued and expanded oil and gas operations in the region" will "exacerbate" their

alleged harms.  Saxon Decl. ¶¶ 14-15.  They "offer[ ] no authority for [such] claim[s],"

*Association of Flight Attendants-CWA, AFL-CIO v. Department of Transp.*, 564 F.3d 462, 465

(D.C. Cir. 2009), and "on summary judgment, a party cannot establish standing with conclusory

allegations of an affidavit," *Humane Soc'y v. Perdue*, 935 F.3d 598, 603 (D.C. Cir. 2019)

(citation omitted).  The members' declarations "essentially opine that the [Lease Sale] will result

in damage without citing any supporting evidence, thereby falling short of Plaintiffs' burden to present record evidence establishing standing." *Eastern Band of Cherokee Indians v. Department of Interior*, 534 F. Supp. 3d 86, 117 (D.D.C. 2021) (cleaned up).

Plaintiffs also cannot establish standing based on members that can "only aver that any significant adverse effects *may* occur at some point in the future." *Chamber of Com. v. EPA*, 642 F.3d 192, 202 (D.C. Cir. 2011) (cleaned up); *see, e.g.*, Jacob Decl. ¶ 31 ("new oil and gas leasing *may* increase the need for additional onshore development" and "also *may* increase water pollution in the Gulf" (emphases added)); Eustis Decl. ¶ 16 ("These wastes *can* poison and contaminate sea turtles and habitat." (emphasis added)); Skrmetta Decl. ¶ 29 ("I fear that oil and gas development in the Gulf of Mexico *may* have worsened . . . habitat conditions" (emphasis added)). That is particularly true when Plaintiffs' causal chain rests on speculation that industry *might* operate "oil tankers that could leak or even explode," Foster Decl. ¶ 12, or that hypothetical "oil spills from offshore oil and gas operations *may* reach" coastal habitats, Saxon Decl. ¶ 21 (emphasis added); *see also* Cook Decl. ¶ 9 ("[W]e would not be able to eat fish from the Gulf *if* they were contaminated by another oil spill." (emphasis added)). "To ground standing on the risk of future harm, a party must show both that the risk is substantial and that the challenged action substantially increases it." *Viasat, Inc. v. FCC*, 47 F.4th 769, 779 (D.C. Cir. 2022). These members' equivocations miss the mark. Plaintiffs "cannot substitute speculation for substantial probability, and hope that doing so will carry them across the causation bridge." *Eastern Band of Cherokee Indians*, 534 F. Supp. 3d at 116 (citation omitted); *see also San Juan Audubon Soc'y*, 257 F. Supp. 2d at 140 ("[P]laintiffs present no evidence to support a showing of substantial probability.").

3.  For similar reasons, Plaintiffs have failed to meet even the relaxed standard of redressability for procedural injuries.  *National Wildlife Fed'n v. Army Corps of Eng'rs*, 170 F. Supp. 3d 6, 15 (D.D.C. 2016) ("Although it is true that the redressability requirement is 'relaxed' for plaintiffs asserting procedural injuries, 'relaxed' does not mean erased.") (citation omitted). That is because Plaintiffs' members assert harms that are tied to existing oil and gas "projects that will remain unchanged by any correction of procedural errors" as to Lease Sale 259.  *Id.* at 16; *see also Friends of Tims Ford v. Tennessee Valley Auth.*, 585 F.3d 955, 971 (6th Cir. 2009) (group lacked standing to bring NEPA claim alleging ongoing harm to members' aesthetic and recreational enjoyment of reservoir where suit did not seek remedial measures to counteract or prevent harms allegedly caused by existing docks).  Because Plaintiffs have not shown that correcting the agency's supposed NEPA deficiencies "*could* still change the substantive outcome in the [members'] favor," they fail to establish redressability.  *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020); *see also Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998) ("Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court; that is the very essence of the redressability requirement.").

**B.    Plaintiffs Have Forfeited Any Claim To Organizational Standing.**

Plaintiffs assert standing only "on behalf of their members," Pls.' Br. 18 n.12, and not on their "own behalf," *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). Because Plaintiffs have not asserted organizational standing, this Court need not parse Plaintiffs' declarations to craft an argument on their behalf.  But even an exhaustive review of those declarations would come up short:  Although Plaintiffs offered statements from their "organizations' leaders," "those declarations were submitted to satisfy the second and third prongs of the associational-standing test," and not to establish standing "based on their own

interests as organizations." *Center for Biological Diversity*, 937 F.3d at 537; *see, e.g.*, Templeton Decl. ¶ 5.  Plaintiffs have therefore forfeited any claim to organizational standing. *Twin Rivers Paper Co. LLC v. Securities & Exch. Comm'n*, 934 F.3d 607, 615 (D.C. Cir. 2019) ("[T]he ordinary rules of forfeiture apply to standing," "includ[ing] the basic precept that arguments generally are forfeited if raised for the first time in reply." (citation omitted)); *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008) ("arguments in favor of subject matter jurisdiction can be waived by inattention or deliberate choice").  And without associational or organizational standing, Plaintiffs' suit cannot proceed.

## II.   A NEPA Impact Analysis Was Not Required Because The Inflation Reduction Act Required The Bureau To Hold Lease Sale 259.

Plaintiffs complain about what they perceive as various deficiencies in the Bureau's supplemental EIS, but none of those issues bear on any "decision" to hold Lease Sale 259, which Congress specifically mandated in the Inflation Reduction Act.  Whatever the Bureau's ordinary discretion in determining whether and when to hold lease sales, the Inflation Reduction Act superseded it.  The text is clear: the Bureau "shall conduct Lease Sale 259."  § 50264(d).  The Inflation Reduction Act thus "plac[es] a nondiscretionary obligation on the Department" to conduct Lease Sale 259, meaning that it "is no longer subject to NEPA."  *Friends of the Earth*, 2023 WL 3144203, at *2.  Impact analyses are not required for "agency decisions that are nondiscretionary."  *Rancho Vista del Mar*, 2022 WL 16921533, at *7; *see also Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001) ("The touchstone of whether NEPA applies is discretion.").  The reason is plain: "The purpose of NEPA is to help agencies and the public make informed decisions," "[b]ut when the agency has no *legal* power to prevent a certain environmental effect, there is no decision to inform, and the agency need not analyze the effect in its NEPA review."  *Sierra Club*, 867 F.3d at 1372; *see also Public Citizen*,

541 U.S. at 769 ("It would not, therefore, satisfy NEPA's 'rule of reason' to require an agency to prepare a full EIS due to the environmental impact of an action it could not refuse to perform."); *Center for Biological Diversity v. FERC*, 67 F.4th 1176, 1185 (D.C. Cir. 2023) (explaining that agency's NEPA analysis must be "cabined" by "the limits of its delegated statutory authority").

The Inflation Reduction Act's command that the Bureau "shall conduct Lease Sale 259," § 50264(d), meant that "the agency d[id] not have sufficient discretion to affect the outcome of its actions"—"and therefore NEPA is inapplicable." *Citizens Against Rails-to-Trails*, 267 F.3d at 1151. The plain text shows the Bureau's lack of discretion: "The word 'shall' generally indicates a command that admits of no discretion on the part of the person instructed to carry out the directive." *Association of Civilian Technicians, Mont. Air Chapter No. 29 v. Federal Labor Rels. Auth.*, 22 F.3d 1150, 1153 (D.C. Cir. 1994); *see also Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016) ("the word 'shall' usually connotes a requirement").

Context confirms that the Bureau had no discretion to refuse to hold Lease Sale 259. Other sections of the Inflation Reduction Act discuss the actions that the Secretary of the Interior *may* take, *see, e.g.*, § 50251(a) ("The Secretary *may* grant leases, easements, and rights-of-way . . . ." (emphasis added)); § 50251(a)(2) ("The Secretary *may* conduct wind lease sales . . . ." (emphasis added)), and "[w]hen a statute distinguishes between 'may' and 'shall,' it is generally clear that 'shall' imposes a mandatory duty," *Kingdomware Techs.*, 579 U.S. at 172. Congress also specifically defined the term "Lease Sale 259," *see* § 50264(a)(3) ("The term 'Lease Sale 259' means the lease sale numbered 259 described in the 2017-2022 [OCS] Oil and Gas Leasing Proposed Final Program . . . ."), and specified the sale's scope, *see* § 50264(d) ("the Secretary shall conduct Lease Sale 259 in accordance with the Record of Decision approved by the Secretary on January 17, 2017"). "The text thus forecloses" any argument that the Bureau

"merely has an elective 'right'" to hold Lease Sale 259, "but no duty to do so." *CITGO Asphalt Refin. Co. v. Frescati Shipping Co.*, 140 S. Ct. 1081, 1088 n.3 (2020); *see also In re Nat'l Nurses United*, 47 F.4th 746, 754 (D.C. Cir. 2022) ("When context confirms that 'shall' is used in its ordinary, mandatory sense, it imposes a clear duty to act.").

The D.C. Circuit's opinion on Lease Sale 257 is instructive on the Bureau's nondiscretionary duty to hold Lease Sale 259. Shortly after the district court vacated Lease Sale 257 on NEPA grounds, Congress "enact[ed] 'outcome-altering legislation in [the] pending civil case[ ]." *Friends of the Earth*, 2023 WL 3144203, at *2 (citation omitted). The Inflation Reduction Act "reinstate[d]" the once-vacated sale by commanding that the Bureau "shall . . . accept the highest valid bid for each tract," "shall . . . provide the appropriate lease form," and "shall promptly issue to the high bidder a fully executed lease." § 50264(b) (capitalization altered). The D.C. Circuit "read[ ] the Inflation Reduction Act to create a nondiscretionary statutory obligation" to issue leases won in Lease Sale 257. *Friends of the Earth*, 2023 WL 3144203, at *2 n.1. "And by placing a nondiscretionary obligation on the Department to issue the leases, the Inflation Reduction Act makes clear that the issuance of the leases is no longer subject to NEPA." *Id.* at *2. The Inflation Reduction Act "require[d] an action that is outside NEPA's scope." *Id.* at *2 n.1. The same is true for the statute's equally unconditional command that the Bureau "shall conduct Lease Sale 259." § 50264(d). Any textual differences between the provisions for "Lease Sale 257 Reinstatement" and "Requirement for Lease Sale 259" reflect only that Lease Sale 257 had already occurred when the Inflation Reduction Act passed, whereas Lease Sale 259 was not even scheduled. § 50264(b), (d) (capitalization altered). Nothing in the text indicates that Congress afforded the Bureau discretion over Lease Sale 259 that it plainly lacked over Lease Sale 257.

Moreover, the contents of Plaintiffs' NEPA objections confirm that Lease Sale 259 is "an action that is outside NEPA's scope." *Friends of the Earth*, 2023 WL 3144203, at *2 n.1. Plaintiffs complain that the Bureau failed to take a hard look at environmental impacts on the Rice's whale, climate change and greenhouse gas emissions, environmental justice, and oil spills, but the Bureau had no obligation to "consider environmental information if it has no statutory authority to act on that information." *Sierra Club*, 867 F.3d at 1372. That makes this sale, as a sale mandated by the Inflation Reduction Act, unlike the Lease Sale 257 litigation, in which the district court held (pre-enactment of the Inflation Reduction Act) that in an ordinary OCSLA sale "BOEM had the ability to cancel Lease Sale 257 on the ground that it would be too harmful to the environment, making it a legally relevant cause of the direct and indirect environmental effects it approves." *Friends of the Earth*, 583 F. Supp. 3d at 141 (cleaned up). Here, no amount of expanded Rice's whale habitat would have allowed the Bureau to "cancel" Lease Sale 259. *See infra*, pp. 25-27. The same goes for "grave overestimate[s] of GHG emissions in the no action alternative," Pls.' Br. 24; *see infra*, pp. 27-31, or any supposedly insufficient "analysis of the impacts of Lease Sale 259" on "the Gulf's most vulnerable residents," Pls.' Br. 37; *see infra*, pp. 31-34, or oil-spill risk, *see infra*, pp. 34-37. The Bureau's consideration of these issues would have had "no effect on the agency's actions, and therefore NEPA is inapplicable." *Rancho Vista del Mar*, 2022 WL 16921533, at *7-8 (cleaned up); *see also Public Citizen*, 541 U.S. at 768 ("Since FMCSA has no ability categorically to prevent the cross-border operations of Mexican motor carriers, the environmental impact of the cross-border operations would have no effect on FMCSA's decisionmaking—FMCSA simply lacks the power to act on whatever information might be contained in the EIS."); *Town of Barnstable v. FAA*, 740 F.3d 681, 691 (D.C. Cir. 2014) ("Because the FAA simply lacks the power to act on whatever information

might be contained in the environmental impact statement, NEPA does not apply to its no hazard determinations." (cleaned up)).

Moreover, whether the Bureau had any discretion over the scope of Lease Sale 259 makes no difference in this case.  For every issue except the Rice's whale, Plaintiffs' "only theory of NEPA deficiency" is based on the decision to hold Lease Sale 259 *at all*.  *Sierra Club v. Army Corps of Eng'rs*, 803 F.3d 31, 48 (D.C. Cir. 2015).  Plaintiffs do not identify any alternative scope involving climate change, environmental justice, or oil-spill risk.  And although Plaintiffs suggest (at 44) that the Bureau should have considered excluding leasing in "depths between 100 and 400 meters in the western and central Gulf," ostensibly to protect the Rice's whale, they do not explain how the Bureau's wholesale exclusion of such a broad swath of unleased acreage would have been consistent with the Inflation Reduction Act's mandate to hold Lease Sale 259 "in accordance" with the Five Year Leasing Program, which said nothing about withdrawing Rice's whale habitat from leasing.  *See International Bhd. of Teamsters v. Department of Transp.*, 724 F.3d 206, 216-217 (D.C. Cir. 2013) (although plaintiffs "identified several alternatives the agency should have pursued," "the short and dispositive answer to [their] argument is that the agency lacks authority to impose the alternatives").

## III.   Even If NEPA Applied, The Bureau Adequately Considered Environmental Impacts And Alternatives.

No amount of textual jiu-jitsu can transform a nondiscretionary obligation into an exercise of discretion subject to NEPA.  But even if Plaintiffs could wish away the commands of the Inflation Reduction Act, the Bureau's analysis fully satisfied any NEPA obligation.

Underlying Plaintiffs' arguments is their view that no additional offshore (or onshore) oil and gas development should be permitted because they believe it results in more harm than good. Plaintiffs complain about the Bureau's assessment in the Supplemental EIS of environmental

impacts on the Rice's whale, climate change and greenhouse gas emissions, environmental

justice, and oil-spill risk, as well as the Bureau's alternatives analysis.  But "NEPA is not a

suitable vehicle for airing grievances about the substantive policies adopted by an agency, as

NEPA was not intended to resolve fundamental policy disputes."  *Grunewald v. Jarvis*, 776 F.3d

893, 903 (D.C. Cir. 2015) (citation omitted).  And courts "consistently decline to flyspeck an

agency's environmental analysis."  *Center for Biological Diversity*, 67 F.4th at 1182.  Plaintiffs'

invitation to second-guess the Bureau should likewise be rejected.

    **A.**    **The Bureau Adequately Considered Impacts On The Rice's Whale.**

Plaintiffs' grievances as to the Rice's whale can be distilled to a single complaint—that

the Bureau ignored Plaintiffs' preferred study in the administrative record.  Pls.' Br. 19-22

(discussing Soldevilla study at BOEM21821-40).  The Soldevilla study attempted to identify

Rice's whale calls by evaluating acoustic data collected at six sites in the Gulf from June 2016-

August 2017.  BOEM21823.  Two of those sites were located in the whales' existing core habitat

in the eastern Gulf—an area already excluded from leasing by congressional moratorium and

presidential withdrawal.  *See* BOEM21823; *Friends of the Earth*, 583 F. Supp. 3d at 151; Defs.'

Br. 29.  Outside this area, one site did not detect any whale calls; the other three detected calls on

just 1%, 6%, and 15.7% of the days sampled—"compared to 90−100% of days present per

month typical at eastern GOM sites."  BOEM21831; BOEM21836.  From those sparse numbers,

the study postulated that there "seem to be fewer whales or more sparsely spaced whales in the

western GOM compared to the eastern GOM"—perhaps just two animals, although "it remains

unknown" whether those were the same whales detected in the eastern Gulf.  BOEM21836-37.

Indeed, the study recognized that determining "how many whales are found in the western

GOM" was "a difficult question to answer from [the study's] sparse single-sensor autonomous

moored passive acoustic units."  BOEM21836.  Likewise, it "remains unknown whether animals

occur in the northcentral GOM," or "in deeper waters and southern waters."  BOEM21838-39.
The study tepidly concluded that "[t]he presence of whales in the western GOM *suggests* they
*may* have an increased risk of interaction with *potentially* harmful human activities."
BOEM21838 (emphases added).

Although Plaintiffs say (at 19) that the Bureau "ignored [this] body of evidence," they
concede a few pages later (at 20-21) that the Bureau *did*, in fact, consider the Soldevilla study.
The Supplemental EIS reviewed "new information available since publication of the 2018 GOM
Supplemental EIS," including the Soldevilla study, and concluded "it does not change the
conclusions presented in the 2017-2022 GOM Multisale EIS and 2018 GOM Supplemental EIS."
BOEM19599-600 (capitalization altered); BOEM19602.  In response to comments, the Bureau
reiterated that it "reviewed the recent July 2022 publication (Soldevilla et al. 2022) indicating
that it is plausible that the Rice's whale's distribution is broader," but had concluded that "not
enough information is available at this time to confirm their distribution or any seasonal
movements outside of the core area that is already considered in this Supplemental EIS."
BOEM19990.  That conclusion accords with the Soldevilla study's own finding that "Rice's
whales do not appear to exhibit seasonal migrations," BOEM21836, and that more research was
needed to "determine the number and overall spatial density of whales" in the western Gulf, "as
well as the potential distribution in deeper waters and southern waters."  BOEM21838-39.  The
Bureau thus found no reason to deviate from its treatment of Rice's whales in the Multisale EIS
and 2018 Supplemental EIS, BOEM19602; BOEM19999, challenges to which the district court
in the Lease Sale 257 litigation already rejected, *see Friends of the Earth*, 583 F. Supp. 3d at
151-155 (Rice's whale "was extensively considered" in Multisale EIS).

The Bureau satisfied any NEPA obligation when it considered the Soldevilla study and rejected it as too speculative.  "NEPA does not require a 'worst case analysis.'"  *Maine Lobstermen's Ass'n v. National Marine Fisheries Serv.*, 70 F.4th 582, 596 (D.C. Cir. 2023) (quoting *Robertson*, 490 U.S. at 356).  Plaintiffs' "claims boil down to an argument" that the Bureau "did not reach the substantive conclusion they desired, but that is not sufficient." *Friends of Cap. Crescent Trail v. Federal Transit Admin.*, 255 F. Supp. 3d 60, 67 (D.D.C. 2017), *aff'd*, 877 F.3d 1051 (D.C. Cir. 2017).

To the extent Plaintiffs complain (at 21) that the Bureau "ignored" the recommendations of two other agencies, neither of Plaintiffs' record citations have anything to do with Lease Sale 259.  *See* Defs.' Br. 32-34.  One is an internal memorandum on wind energy development—not oil and gas leasing, BOEM17718, and its "recommendation to avoid development was limited to offshore wind development," Defs.' Br. 28.  Plaintiffs' other record citation is a comment letter on the Bureau's proposed five-year leasing program for 2023-2028, not on Lease Sale 259.  BOEM09038.  Both documents, moreover, relied on the Soldevilla study that the Bureau considered and reasonably rejected.  BOEM17718; BOEM09038.  And even if these agencies *had* submitted comments on the Supplemental EIS for Lease Sale 259, the Bureau had no obligation to adopt their views.  *Public Emps. for Env't Resp. v. Beaudreau*, 25 F. Supp. 3d 67, 124 (D.D.C. 2014) ("[A]lthough an agency should consider the comments of other agencies, it does not necessarily have to defer to them when it disagrees." (citation omitted)).  NEPA "does not mandate particular results."  *Robertson*, 490 U.S. at 350.

## B.   Interior Took A Hard Look At Impacts From Climate Change And Greenhouse Gas Emissions.

Plaintiffs complain (at 24-25) that the Bureau's estimation of greenhouse gases resulting from Lease Sale 259 relied on "outdated and misleading data about future oil demand" in the

agency's Market Simulation Model (MarketSim), which is one of three models the Bureau uses

to estimate life cycle greenhouse gas emissions.  BOEM05861.  MarketSim is "calibrated" to

data from the U.S. Energy Information Administration's 2020 energy report, BOEM05863,

which the Bureau used to establish its "baseline scenario" in the supplemental EIS,

BOEM19550; *see also* Defs.' Br. 18-20.

   Plaintiffs say (at 25) that the 2020 energy report and the resulting MarketSim analysis are

outdated because they do not "incorporate conservation measures in place in 2023" such as the

Inflation Reduction Act.  But as the Supplemental EIS explained, the Energy Information

Administration had not yet issued its post-Inflation Reduction Act energy report—containing

"the necessary data for BOEM to quantifiably analyze the impacts of the IRA on its future GHG

analyses"—and the report was "not expected to be published in the timeframe of this NEPA

analysis."  BOEM19550-51 & n.5.  "Because current science does not allow for the specificity

demanded by the [Plaintiffs], the [Bureau] was not required to identify [Inflation Reduction

Act's] specific effects on the climate in order to prepare an adequate EIS."  *WildEarth*

*Guardians*, 738 F.3d at 309.  Moreover, the supplemental EIS acknowledged the "limitations of

the baseline and modeling associated with both the IRA and net-zero goals," and although the

Bureau was "unable to provide a quantitative analysis," it still "provide[d] a qualitative

analysis."  BOEM19939; *see, e.g.*, BOEM19522; BOEM19544-53; BOEM21675; *see also*

Defs.' Br. 20-21.  Although Plaintiffs hint in a footnote that the Bureau could have used the

Energy Information Administration's 2022 energy report, they do not explain why the Bureau

was obligated to do so.  Pls.' Br. 25 n.16; *Government of Manitoba*, 923 F.3d at 179.  Indeed, as

the 2022 report includes data only through 2021, using it in the analysis would not remedy

Plaintiffs' gripes about not including 2022 data.  *See* Defs.' Br. 19 ("[T]here was no EIA data

that BOEM could have used in its model that would have incorporated information regarding changes in energy demand caused by the IRA.").

Plaintiffs nonetheless insist that the Bureau should have adopted EPA's recommendations to use post-Inflation Reduction Act "current trajectories," Pls.' Br. 27-28, based on a Department of Energy report, BOEM17808-09. As the Bureau explained, however, that report did not "provide a detailed projection of supply and demand as a result of the IRA or other recent legislation," although the Bureau "would welcome such projections." BOEM19940. The Bureau likewise explained that recent publications purporting to analyze potential effects of the Inflation Reduction Act were "not complete nor compatible with BOEM's modeling," and "[m]ost of them focus[ed] on the IRA's impact on the electricity and natural gas sectors" rather than domestic oil consumption. BOEM19550-51 & n.5; *see also* BOEM19486; BOEM19522; Defs.' Br. 19-20 ("BOEM was aware of these studies and explained that the data from those studies was incomplete and incompatible with the MarketSim model."). The Bureau's consideration of these studies and its explanation as to why it did not rely upon them were reasonable and satisfy NEPA. *City of Williams v. Dombeck*, 151 F. Supp. 2d 9, 23 (D.D.C. 2001) ("NEPA does not require that we decide whether an [EIS] is based on the best scientific methodology available, nor does NEPA require us to resolve disagreements among various scientists as to methodology." (citation omitted)). Plaintiffs' quibbling (at 28-29) with the Bureau's reading of one of those studies does not make out a NEPA violation. *See* Defs.' Br. 19 n.4.

Plaintiffs also harp on the Bureau's supposed failure to address various national and international climate commitments, but the whole point of the Supplemental EIS is that it is *supplemental*—the other EISs to which the Supplemental EIS is tiered already addressed those

commitments.  *See, e.g.*, BOEM02035-41; BOEM02673; BOEM02679; BOEM02689;

BOEM02699; BOEM03268-77; BOEM03294; BOEM04878-79; *see Gulf Restoration Network*,

47 F.4th at 800 (D.C. Cir. 2022) ("Through tiering, an agency may first assess 'broad

environmental consequences' in a programmatic EIS and later supplement that analysis with

'narrower EISs analyzing the incremental impacts' of specific actions." (citation omitted)).  The

Supplemental EIS permissibly "summarize[d], and incorporate[d] by reference, the

environmental issues discussed in the programmatic EIS."  *Id.*; *see* BOEM19909-10;

BOEM19931.

Indeed, this Court rejected Plaintiffs' identical argument in their Lease Sale 257

challenge, holding that "previous EISs" already "included an extensive discussion of climate

change and were unflinching in their recognition of the threat climate change presents to

humanity."  *Friends of the Earth*, 583 F. Supp. 3d at 148-149.  Plaintiffs do not address that

holding or explain why this Court should reach a different result.

Moreover, the Supplemental EIS was hardly "silent or dismissive," Pls.' Br. 32, as to its

consistency with various climate goals, *see generally* Defs.' Br. 25-26.  The Bureau

"acknowledge[d] the inherent tension created between the climate goals of the Administration,

and the requirements of the" Inflation Reduction Act, which, by tying renewable energy

development to a minimum amount of offshore acreage for oil and gas leasing, "makes

continued OCS oil and gas leasing over the next 10 years more likely in order to continue

implementing OCS renewable energy leasing."  BOEM19881; *see also* BOEM19887;

BOEM19939-40; BOEM19947; BOEM20077.  The Bureau repeated that explanation in

response to comments insisting that national and international climate policies require the United

States to "cut off all oil and gas use by 2030," take "immediate and robust action to halt fossil

fuels investments," and "stop" "[n]ew oil leases."  BOEM19888-89.  The Bureau also reminded

commenters that these broader "[i]ssues related to national and international energy and climate

policies are beyond the scope of this analysis, except to the extent they directly pertain to

regulatory requirements associated with the Proposed Action."  BOEM19889.  NEPA requires

nothing more.  *See Safari Club Int'l v. Jewell*, 960 F. Supp. 2d 17, 77 (D.D.C. 2013) ("the

agency adequately responded to the comments submitted . . . by explaining that these comments

are outside the scope of this rulemaking" (cleaned up)); *Safari Club Int'l v. Salazar*, 852 F. Supp.

2d 102, 117 (D.D.C. 2012) ("[N]ot answering those comments that were outside of the scope of

this rulemaking is not arbitrary and capricious.").

### C.    The Bureau Adequately Considered Environmental Justice Impacts.

Plaintiffs also take issue (at 35-39) with the Bureau's environmental justice analysis, but

"as with other components of its NEPA review, an agency is not required to select the course of

action that best serves environmental justice, only to take a 'hard look' at such issues."  *Red Lake

Band of Chippewa Indians v. Army Corps of Eng'rs*, 636 F. Supp. 3d 33, 59 (D.D.C. 2022)

(citation omitted).  The Bureau did so here.

Plaintiffs' assertion (at 37) that the Supplemental EIS entirely failed to "provide any

detail" as to onshore impacts of the sale on environmental justice communities ignores the

broader context in which the Bureau conducted its analysis.  The Supplemental EIS is tiered to

the Multisale EIS and the 2018 Supplemental EIS, both of which extensively analyzed the

potential social and environmental justice impacts of conducting an area-wide offshore lease

sale.  *See*, *e.g.*, BOEM03709-30; BOEM19644; *see also* Defs.' Br. 42-43.  The Bureau also

addressed "new information" in the Supplemental EIS prepared for Lease Sale 259,

BOEM19647-49, none of which "alter[ed] the impact conclusion for social factors" in the

Multisale EIS and the 2018 Supplemental EIS, BOEM19652.  Considering the "larger

socioeconomic context of the GOM region" and its "long-lived, well-developed, and extensive industry," with "substantial infrastructure in place," the Bureau concluded that onshore and cumulative impacts of one additional lease sale on *all* Gulf communities "would be immeasurably small."  BOEM19644-45.  Given decades-old oil and gas development in the Gulf of Mexico and the projected 50-year lifespan of any given lease, the Bureau's view that one lease sale does not "materially change overall environmental impacts" is reasonable.  *Gulf Restoration Network*, 47 F.4th at 800.

Plaintiffs' reliance (at 39) on *Sierra Club v. Mainella*, 459 F. Supp. 2d 76 (D.D.C. 2006), is inapposite.  In Plaintiffs' own reading, that case involved environmental impacts that "could not occur" absent the challenged agency action.  Pls.' Br. 39.  Here, however, the Bureau rationally concluded that existing offshore and onshore oil and gas development and production, as well as future leasing, would maintain Gulf oil and gas infrastructure independent of any single additional lease sale.  *See, e.g.*, BOEM19638 (describing impact of onshore production); BOEM19502-03 (explaining that cancellation of one offshore sale would not appreciably diminish impacts from existing and future leases, and "[g]iven the Gulf of Mexico's OCS oil and gas leasing history and the recent enactment of the Inflation Reduction Act of 2022, it seems unlikely that no future leasing is reasonably foreseeable in the short term (at least the next 10 years)").

Plaintiffs also complain (at 37-38) that the Bureau failed to consider how offshore drilling will drive the need for onshore processing, and Plaintiffs point to "[s]everal new infrastructure projects" they suggest could harm Gulf communities—but that juxtaposition is misleading.  These "new infrastructure projects" are "directly related to the longstanding *onshore shale boom*," not because of any need to process oil drilled *offshore*.  BOEM19637-38 (emphasis

added).  Plaintiffs do not point to any record evidence indicating that Lease Sale 259 could have

site-specific impacts on onshore infrastructure.  *See Red Lake Band of Chippewa Indians*, 2022

WL 5434208, at *14 (rejecting plaintiffs' environmental-justice argument where "they offer[ed]

no evidence to demonstrate that such specific locations are tied to areas implicated by the

activities authorized" by the challenged action).  And to the extent Plaintiffs demand site-specific

analysis of the impact of Lease Sale 259 on "maintain[ing]" unidentified existing infrastructure

on unidentified populations living in close proximity to specific infrastructure, Pls.' Br. 37

(citation omitted), "NEPA does not require an agency to issue these types of wholly speculative

assessments at the leasing stage, even assuming an irretrievable commitment of resources."

*WildEarth Guardians*, 368 F. Supp. 3d at 66; *see also id.* ("At the leasing stage, [the agency]

could not reasonably foresee the projects to be undertaken on specific leased parcels.").  Indeed,

these alleged future onshore impacts are the result of potential decisions made by third parties

that may occur even if no Lease Sale 259 leases are ever issued or developed, but rather as a

result of production from existing or future offshore leases and onshore oil and gas projects.  *See*,

*e.g.*, BOEM19638 (describing substantial role of onshore production); *see also Hammond v.

Norton*, 370 F. Supp. 2d 226, 243 (D.D.C. 2005) (alleged socioeconomic impacts were "outside

the scope of NEPA" because they "could easily follow even if [the challenged action] had *no*

environmental impacts").  Given the speculative nature of any site-specific analysis at this stage,

it was reasonable for the Bureau to assume impacts were equally distributed in the program

area—meaning that any further analysis of cumulative impacts of other industrial activity would

be purely speculative at this point, and therefore of no assistance to the decisionmaker.  That the

Bureau "may continue to assess impacts as more information becomes available does not

indicate that [it] failed to take a 'hard look' at the environmental consequences of its proposed action here." *WildEarth Guardians*, 368 F. Supp. 3d at 67 (citation omitted).

Because the Bureau concluded that all Gulf communities would be equally, and minutely, affected, BOEM19644-52, the Bureau reasonably found no environmental justice impact. *See Town of Weymouth v. FERC*, 2018 WL 6921213, at * 2 (D.C. Cir. Dec. 27, 2018) (agency reasonably concluded that project "would not disproportionately affect environmental justice communities" because effects would be similar to those experienced by non-environmental justice communities).

### D. Interior Took A Hard Look At Oil Spill Risk.

Plaintiffs complain (at 39) that the supplemental EIS failed to consider the effects of oil spills greater than 10,000 barrels, but they yet again ignore that tiering allowed the Bureau to rely on its previous EISs. *Gulf Restoration Network*, 47 F.4th at 800. The Supplemental EIS is tiered from the 2017-2022 Programmatic EIS, the Multisale EIS and the 2018 Supplemental EIS, all of which concluded that spills greater than 10,000 barrels were extremely unlikely. BOEM02005-08; BOEM0222; BOEM02972; BOEM04832. The Programmatic EIS explained that spills of that size are "well outside of the normal range of probability that could result from OCS exploration, development, and production activities involving rigs, facilities, pipelines, tankers, and/or support vessels" and "not an expected outcome of the Proposed Action," BOEM02207; *see also* BOEM02007, particularly "as a result of the comprehensive reforms to OCS oil and gas regulation and oversight put in place after the Deepwater Horizon event," BOEM02221. The Programmatic EIS nevertheless evaluated "the potential impacts of such a low-probability incident," BOEM02207, including "consideration of fate and transport of oil, region-specific physical and environmental factors, and potential impacts for each evaluated resource." BOEM02739; *see also* BOEM02209-21. The Multisale EIS likewise addressed "the reasonably

foreseeable impacts that could result in the exceedingly unlikely event that such a spill were to occur," BOEM02972, as did the 2018 Supplemental EIS, BOEM04798; BOEM04858; BOEM04862; BOEM04887-88.  And the Bureau relied on "more than 50 years of OCS oil-spill data that provide[d] comprehensive information for oil-spill risk analysis."  BOEM20055; *see also* BOEM20042.  Plaintiffs make much (at 41) of the percent risk of spills, but these numbers are identical to those in the Multisale EIS and 2018 Supplemental EIS, *see* BOEM03116-17; BOEM04833, which Plaintiffs do not challenge, and NEPA does not obligate the agency to select an alternative with no, or even relatively less, environmental risk.

The Bureau found no reason to deviate from its previous conclusion that catastrophic spills are not reasonably foreseeable, BOEM19597; BOEM20055, and it "simply had no obligation" to do so, *Gulf Restoration Network*, 47 F.4th at 801.  At "[t]he lease sale phase," "[t]he awful prospect of a major oil spill—the worst case—is far removed from categorical relevance at this stage."  *North Slope Borough v. Andrus*, 642 F.2d 589, 605 (D.C. Cir. 1980); *see also Friends of the Earth*, 583 F. Supp. 3d at 133 n.6 ("the agency did not have to consider the still-uncertain costs and benefits of a 'worst case' oil spill at the lease sale stage").

The Bureau nevertheless went above and beyond any obligation by (yet again) calculating the risk of spills of 10,000 to a million barrels using its Oil Spill Risk Assessment (OSRA) model, BOEM19531-33, and "[P]laintiffs do not persuasively explain why BOEM had to calculate the probability of a catastrophic oil spill [of greater than a million barrels] within the OSRA run," *Oceana*, 37 F. Supp. 3d at 168.  Even so, the Bureau also prepared a technical report for catastrophic spills of over a million barrels, BOEM19445; BOEM19489; BOEM26012-375; *see also* Defs.' Br. 38-39, that, among other things, analyzed possible impacts on "marine mammals, including the Rice's whale," as well as "the impacts of the Deepwater Horizon

explosion, oil spill, and response," BOEM19992; BOEM19999; BOEM20030; *see also* BOEM26012-375. Plaintiffs say nothing about this technical report. And because the Bureau "could have omitted the [report] altogether without violating NEPA," "the fact that the [Bureau] did address those impacts does not create an opportunity for [Plaintiffs] to challenge the quality of the review." *Stand Up for California! v. Department of Interior*, 410 F. Supp. 3d 39, 56 (D.D.C. 2019), *aff'd*, 994 F.3d 616 (D.C. Cir. 2021).

The record also belies Plaintiffs' insistence (at 41) that the Bureau arbitrarily "ignored" two oil spills occurring in 2004 and 2017. The Bureau *did* consider the effects of the 2017 spill; the Bureau updated its analysis to "remove[] the statement that the Deepwater Horizon was the only oil spill >10,000 bbl," and concluded that this "single spill d[id] not change the overall conclusions of the analysis presented in the Supplemental EIS." BOEM20041. And while the Bureau did not quantitatively analyze the 2004 incident, that was because the event "is not considered a single large spill" under the Bureau's methodology, BOEM20041, and the Multisale EIS and 2018 Supplemental EIS had already addressed it, BOEM03107-08; BOEM05542-43. Far from ignoring these spills, the Bureau addressed both.

Plaintiffs' complaint (at 42) that the Bureau "ignore[d] factors" that increase the risk of spills, such as severe hurricanes, deepwater drilling, aging infrastructure, and longer pipelines, is also belied by the record; the Multisale EIS and 2018 Supplemental EIS explained that pipelines can fail due to corrosion, accidents, and weather. BOEM03071-72; BOEM03126-27; BOEM04821-22; BOEM04849; BOEM05002; BOEM05546-47. Again, the Supplemental EIS was tiered to those existing analyses. *See* Defs.' Br. 40. "Nothing in the law requires agencies to reevaluate their existing environmental analyses each time the original methodologies are surpassed by new developments." *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d

497, 512 (D.C. Cir. 2010).  And as courts in this circuit "have time and again made clear, a supplemental EIS must be prepared only where new information provides a *seriously* different picture of the environmental landscape."  *Stand Up for California! v. Department of Interior*, 994 F.3d 616, 629 (D.C. Cir. 2021) (citation omitted).  Plaintiffs do not attempt to meet that standard.

As for Plaintiffs' objections (at 42) to deepwater drilling, this Court has already explained to Plaintiffs that "[w]hile drilling depth will almost certainly be a relevant consideration for the agency later on, Intervenor-Defendants persuasively argue that BOEM had no obligation to consider it right now."  *Friends of the Earth*, 583 F. Supp. 3d at 150.  "[B]ecause the risks of deepwater drilling are necessarily site-specific, BOEM had taken the requisite hard look required for the lease sale stage," as "[s]uch post-lease operational issues will receive ample review that must also comply with NEPA at the later exploration and production stages."  *Id.*  This Court need not entertain Plaintiffs' attempt at a second bite of the apple.

### E.    The Bureau Considered A Reasonable Range Of Alternatives.

Plaintiffs' insistence (at 43-45) that the Bureau failed to consider a reasonable range of alternatives under NEPA fares no better.  As with their other complaints, Plaintiffs invite this Court to "flyspeck" the Bureau's consideration of alternatives.  *Center for Biological Diversity*, 67 F.4th at 1182.  But a reviewing court must "uphold [the agency's] discussion of alternatives so long as the alternatives are reasonable and the agency discusses them in reasonable detail."  *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 196 (D.C. Cir. 1991).

In an alternatives analysis, "the first step is to determine whether the agency's objectives in its action are reasonable."  *Conservation L. Found. v. Ross*, 374 F. Supp. 3d 77, 111-112 (D.D.C. 2019).  Here, "[t]he purpose of and need for the proposed . . . GOM lease sale . . . is to offer for lease those areas that may contain economically recoverable oil and gas resources."

BOEM19484.  As the Supplemental EIS explained, "these fuels currently are fundamental to powering the U.S. economy."  BOEM19484.

Plaintiffs do not challenge the Bureau's stated objectives.  Nor could they.  OCSLA directs the expeditious development of offshore oil and gas resources.  *See* 43 U.S.C. §§ 1332(3), 1334(a).  Moreover, Congress expressly directed the Bureau to conduct Lease Sale 259—and included provisions in the Inflation Reduction Act "predicat[ing] offshore wind leasing on a certain amount of offshore oil and gas leasing."  Defs.' Br. 27; *see also id.* ("[I]n order to obtain the benefits on GHG reduction from offshore wind, BOEM must offer at least sixty million acres for offshore oil and gas leasing in the preceding year.").  In other words, the Bureau's stated objectives in the Supplemental EIS are consistent with and compelled by congressional directives.  *See* BOEM19484; Defs.' Br. 27 ("That policy was established by Congress, not by BOEM, and it is one that BOEM must comply with if it wishes to pursue offshore wind leasing, which will have beneficial effects on the nation's GHG emissions."); *see also Citizens Against Burlington*, 938 F.2d at 196 ("[A]n agency should always consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives.").

Once the agency's "objectives pass muster, they serve as the needed reference for the court's evaluation of the range of alternatives, which serves as the second step of the inquiry," because it is "[t]he goals of an action that delimit the universe of the action's reasonable alternatives."  *Conservation L. Found.*, 374 F. Supp. 3d at 112 (citation omitted).  "This inquiry . . . involves considerable deference to the agency's expertise and policy-making role."  *Id.* (citation omitted); *see also Grunewald*, 776 F.3d at 903.  At bottom, "an EIS need only consider

a limited range of alternatives to the relevant action, defined by the agency's objectives."
*Flaherty v. Raimondo*, 531 F. Supp. 3d 76, 86 (D.D.C. 2021).

The Bureau satisfied any obligation to do so here.[1]  The Bureau thoroughly analyzed a "no action" alternative and four action alternatives.  *See* BOEM19494.  The action alternatives were potential lease sales: (A) "encompassing all three planning areas within . . . the Gulf of Mexico OCS" with limited area exclusions, BOEM19495-96; (B) limited to the Central Planning Area and a portion of the Eastern Planning Area, excluding the Western Planning Area, BOEM19497; (C) limited to the Western Planning Area, excluding the Central and Eastern Planning Areas, BOEM19498; and (D) combining any of the features of the other alternatives, and allowing the exclusion of areas that would otherwise be subject to certain lease stipulations designed to protect benthic communities and areas south of Baldwin County, Alabama, BOEM19494; BOEM19500-01.  The Supplemental EIS identified Alternative D as the preferred option, which "could result in adverse economic effects" by increasing the area exclusions, but would include benefits to "sensitive benthic and visual resources."  BOEM19501.  The Bureau ultimately chose a modified form of Alternative D that excluded a few additional blocks. BOEM20095-96.

Taken together, the Supplemental EIS identified a spectrum of leasing options ranging from 28 to 80 million acres of leasing, with exclusions to protect a variety of offshore interests. "Given the Bureau's purpose for its action, it chose a reasonable range of alternatives."

---

[1] Again, because the Inflation Reduction Act commanded the Bureau to conduct Lease Sale 259 as a Gulf-wide lease sale, the Bureau had no obligation to consider *any* action alternatives; the information would not have helped the Bureau make any "decision" to hold the region-wide sale commanded by the Inflation Reduction Act.  *See supra*, pp. 20-24.  And because the Bureau had no obligation to consider alternatives where "it ha[d] no statutory authority to act on that information," *Sierra Club*, 867 F.3d at 1372, Plaintiffs' complaints about the Bureau's alternatives analysis are dead on arrival.

*Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 74 (D.C. Cir. 2011); *see also id.* ("The Bureau evaluated five alternatives . . . that differed primarily in the degree of mitigation required and the size of the core area available for year-round drilling."); *WildEarth Guardians*, 738 F.3d at 310 (agency considered reasonable range of alternatives where it "discussed five separate alternatives in the FEIS at length . . . and analyzed the environmental impact of each").

Plaintiffs raise three challenges to this reasonable assessment, but none of them square with the breadth of the Bureau's analysis, the record, or the legal standards governing alternatives review under NEPA.

*First*, Plaintiffs complain (at 43) that the Supplemental EIS failed to "adequately explain why" the four action alternatives were expected to result in similar impacts.  But that ignores the context and purpose of the Supplemental EIS.  Plaintiffs challenge alternatives that are "derived from the analysis" in the Multisale EIS and 2018 Supplemental EIS, BOEM19512, and such tiering is not arbitrary and capricious, *see Theodore Roosevelt Conservation P'ship*, 616 F.3d at 512.  Moreover, the Bureau's analysis in the Supplemental EIS "represent[ed] the *incremental contribution* of a lease sale to the cumulative impacts from past, present, and future activities in the GOM," BOEM19512, and the Bureau explained that cancellation (or reduction) of a single lease sale was not likely to reduce impacts in light of the extensive, longstanding, and continuing oil and gas development of the Gulf, BOEM19502.  "This analysis was not arbitrary," as "Interior has a statutory obligation to make the Shelf available for development to meet national energy needs." *Gulf Restoration Network*, 47 F.4th at 800; *see also id.* (explaining that no action alternative reasonably concluded that cancellation of one offshore lease sale would not significantly change environmental impacts); *Center for Biological Diversity*, 67 F.4th at 1182

40

("It was reasonable for the [agency] to consider the reality of economic and development opportunities . . . .").

The Supplemental EIS is also more limited in scope than Plaintiffs suggest, aiming only "to focus on any relevant significant new information, methodologies, and/or issues since publication of the previous lease sale NEPA documents from which it tiers."  BOEM19494.  To that end, "BOEM's subject-matter experts" conducted a search "for each resource to consider new information" and "determined through literature searches and communications with other agencies and academia that there was no new information . . . that would alter the impact conclusions to the potential impacts from a lease sale."  BOEM19514.  To the extent Plaintiffs point to a study on the Rice's whale in an attempt to undermine the Bureau's conclusions, Pls.' Br. 44, those arguments fail for the same reasons already discussed, *see supra*, pp. 25-27.

*Second*, Plaintiffs argue that the Bureau selected "an unreasonably narrow range of alternatives" to consider in the Supplemental EIS.  Pls. Br. 44.  But the Supplemental EIS considered a range of action alternatives with different exclusions of tracts from leasing, varying by tens of millions of acres, and reasonably explained how the impacts of the alternatives differed or not.  BOEM19495-503.  NEPA requires no more.  Agencies "need not consider every possible alternative that could address an objective," and instead have "discretion to choose a manageable number of alternatives to present a reasonable spectrum of policy choices that meet the goals of the action."  *Flaherty*, 531 F. Supp. 3d at 86 (citation omitted); *see also Grunewald*, 776 F.3d at 904 ("If the agency's objectives are reasonable, we will uphold the agency's selection of alternatives that are reasonable in light of those objectives." (citation omitted)).

Plaintiffs' vague assertion (at 44) that the alternatives were "unreasonably narrow" does not overcome the Bureau's reasonable exercise of its discretion, nor does it provide a basis to

second-guess the agency's analysis.  These alternatives fell "within the numerous 'judgment calls' and 'line-drawing decisions' that are 'vested with the agencies, not the courts.'" *Conservation L. Found.*, 374 F. Supp. 3d at 114 (quoting *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 66 (D.C. Cir. 1987)).  "The Bureau selected a reasonable range of alternatives in light of its purpose; it was under no obligation to include a scaled-back-development alternative that would not bring about the ends of the federal action."  *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 74-75 (citation omitted).[2]

*Finally*, Plaintiffs repackage their argument that the Supplemental EIS inadequately considered potential future impacts to the Rice's whale by contending that the Bureau erred in failing to consider an alternative suggested by Plaintiffs that would exclude leasing in areas that—upon Plaintiffs' reading—constitute essential habitat.  *See* Pls.' Br. 45.  Again, Plaintiffs' argument improperly assumes that their reading of certain studies controls the Bureau's decisionmaking; it does not.  *See supra*, pp. 25-27.  That the Supplemental EIS did not formally consider the specific exclusions that Plaintiffs suggest is immaterial.  The Bureau's options were not as limited as Plaintiffs' argument assumes in demanding analysis of further alternatives with additional permutations of leasing area exclusions.  "[I]f the Agency's options were limited to choosing or rejecting an alternative *in toto*, perhaps the formal permutation would have some significance," "[b]ut this clearly was not the case," *Conservation L. Found.*, 374 F. Supp. 3d at 115, because the Bureau ultimately chose to pursue a modified version of one of the broader alternatives set out in the Supplemental EIS.

---

[2] And again, the Bureau was simply not obligated to consider any alternative to the Gulf-wide lease sale mandated by the Inflation Reduction Act, as the Bureau's analysis was "cabined" by "the limits of its delegated statutory authority."  *Center for Biological Diversity*, 67 F.4th at 1185; *see supra*, pp. 20-24.

Viewed as a whole, Plaintiffs' insistence that the Bureau's alternatives analysis hew to their policy preferences cannot overcome the reasonable spectrum of alternatives considered by the Supplemental EIS or governing law.  The Bureau tiered its analysis of a range of alternatives to the Multisale EIS and 2018 Supplemental EIS, and had its experts canvas new information made available in the intervening years.  To be sure, Plaintiffs could devise any number of alternatives as substitutes for these allegedly "narrow" alternatives considered in the Supplemental EIS.  But "[p]racticality demands" that "an agency cannot be expected to conduct a comprehensive analysis of every conceivable variation to its proposed action."  *Id.* at 113.  The question is not whether, in Plaintiffs' view, the Bureau's choices were wise, but rather whether the agency's judgment was "uninformed."  *Citizens Against Burlington*, 938 F.2d at 199.  The record demonstrates it was not.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment should be denied,

and Intervenor-Defendants' cross-motion for summary judgment should be granted.

Respectfully submitted,

/s/ Steven J. Rosenbaum
Steven J. Rosenbaum (D.C. Bar 331728)
Bradley K. Ervin (D.C. Bar 982559)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
Phone:  (202) 662-6000
Fax:  (202) 662-6291
srosenbaum@cov.com

Counsel for American Petroleum Institute

/s/ Catherine E. Stetson
Catherine E. Stetson (D.C. Bar 453221)
Sean Marotta (D.C. Bar 1006494)
Dana A. Raphael (D.C. Bar 1741559)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

Nikesh Jindal (D.C. Bar 492008)
Ashley C. Parrish (D.C. Bar 464683)
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 737-0500
njindal@kslaw.com
aparrish@kslaw.com

Nicole Bronnimann (D.D.C. No. TX0044)
KING & SPALDING LLP
1100 Louisiana Street, Suite 4100
Houston, TX 77002
(713) 751-3200
nbronnimann@kslaw.com

Sarah C. Bordelon (D.C. Bar 987135)
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511
(775) 327-3011
scbordelon@hollandhart.com

Tina Van Bockern (D.D.C. No. CO0100)
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
(303) 295-8107
trvanbockern@hollandhart.com

Counsel for Chevron U.S.A. Inc.

August 14, 2023

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of August, 2023, I caused a true and correct copy of the foregoing to be filed with the Court electronically and served by the Court's CM/ECF System upon the listed counsel of record.

*/s/ Catherine E. Stetson*
Catherine E. Stetson