**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEALTHY GULF, et al., | Case No. 1:23-cv-00604-APM |
| *Plaintiffs,* | |
| v. | |
| DEBRA A. HAALAND, et al., | |
| *Defendants,* | |
| and | |
| CHEVRON U.S.A. INC. and AMERICAN PETROLEUM INSTITUTE, | |
| *Intervenor-Defendants.* | |

**PLAINTIFFS' COMBINED OPPOSITION AND REPLY**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................... iii

INTRODUCTION ....................................................................................... 1

ARGUMENT .............................................................................................. 2

I.      The Bureau Failed to Consider Impacts to Rice's Whale in the Western
        and Central Gulf ................................................................................ 2

II.     The Bureau's GHG Analysis Violates NEPA and is Arbitrary and
        Capricious ......................................................................................... 8

        A.      The Bureau relied on outdated and misleading information to mask
                the true GHG impacts of Lease Sale 259 ...................................... 9

        B.      The FSEIS failed to contextualize lease sale emissions with federal
                climate policies and international commitments ............................ 20

III.    The Bureau Failed to Take a Hard Look at Environmental Justice Impacts ........ 24

IV.     The Bureau Failed to Take a Hard Look at Oil Spill Risks ................................. 28

V.      The Bureau Failed to Consider Reasonable Alternatives ..................................... 31

VI.     Plaintiffs Have Standing to Bring this Action ....................................................... 34

        A.      Plaintiffs have demonstrated concrete recreational, aesthetic,
                commercial, and other injuries .................................................... 35

        B.      Plaintiffs' injuries are fairly traceable to the Bureau's faulty NEPA
                analysis for Lease Sale 259 ......................................................... 37

        C.      Plaintiffs' injuries will be redressed by a favorable decision
                requiring the Bureau to redo its NEPA analysis ......................... 39

        D.      Industry has failed to show that Plaintiffs lack standing to bring
                this action ................................................................................. 39

VII.    The IRA's Direction to Hold Lease Sale 259 Did Not Absolve the Bureau
        of its NEPA Obligations ................................................................. 42

CONCLUSION ............................................................................................ 45

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*350 Montana v. Haaland*,
    50 F.4th 1254 (9th Cir. 2022) ....................................................................................23

*Am. Library Ass'n v. F.C.C.*,
    401 F.3d 489 (D.C. Cir. 2005) ...................................................................................40

*American Oceans Campaign v. Daley*,
    183 F.Supp.2d 1 (D.D.C. 2000) .................................................................................33

*California v. Bernhardt*,
    472 F.Supp.3d 573 (N.D. Cal. 2020) ...........................................................................4

*Carpenters Indus. Council v. Zinke*,
    854 F.3d 1 (D.C. Cir. 2017) .......................................................................................39

*Center for Biological Diversity v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) .....................................................................................12

*Center for Biological Diversity v. U.S. Dep't of the Interior*,
    563 F.3d 466 (D.C. Cir. 2009) .............................................................................38, 41

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ...................................................................................................25

*City of Olmsted Falls v. FAA*,
    292 F.3d 261 (D.C. Cir. 2002) ...................................................................................40

*City of Tacoma v. FERC*,
    460 F.3d 53 (D.C. Cir. 2006) .......................................................................................4

*Diné Citizens Against Ruining Our Env't v. Haaland*,
    59 F.4th 1016 (10th Cir. 2023) .............................................................................11, 23

*Eagle Cnty. Colo. v. Surface Transp. Bd.*,
    No. 22-1019, 2023 WL 5313815 (D.C. Cir. Aug. 18, 2023) .....................................26

*Env't Health Tr. v. Fed. Commc'ns Comm'n*,
    9 F.4th 893 (D.C. Cir. 2021) .......................................................................................4

*Florida Audubon Soc'y v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) ...............................................................................39, 41

*Food & Water Watch v. FERC*,
    28 F.4th 277 (D.C. Cir. 2022) ...................................................................................43

*Forelaws on Bd. v. Johnson*,
  743 F.2d 677 (9th Cir. 1984) ................................................................43, 44

*\*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*,
  528 U.S. 167 (2000) ..............................................................................35, 39

*Friends of the Earth v. Haaland*,
  No. 22-5036, 2023 WL 3144203 (D.C. Cir. 2023) ......................................45

*Friends of the Earth v. Haaland*,
  583 F.Supp.3d 113 (D.D.C. 2022) ...................................................... *passim*

*Fund for Animals v. Hall*,
  448 F.Supp.2d 127 (D.D.C. 2006) ................................................................4

*Greater Yellowstone Coal. v. Kempthorne*,
  577 F.Supp.2d 183 (D.D.C. 2008) .........................................................32, 33

*Gulf Restoration Network v. Haaland*,
  47 F.4th 795 (D.C. Cir. 2022) .................................................................5, 22

*Hunter v. FERC*,
  711 F.3d 155 (D.C. Cir. 2013) ...................................................................44

*Izaak Walton League of Am. v. Marsh*,
  655 F.2d 346 (D.C. Cir. 1981) .............................................................32, 44

*Jones v. Gordon*,
  792 F.2d 821 (9th Cir. 1986) ......................................................................45

*Kern v. BLM*,
  284 F.3d 1062 (9th Cir. 2002) .....................................................................31

*Larson v. Valente*,
  456 U.S. 228 (1982)....................................................................................39

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992)..............................................................................35, 37

*Maine Cmty. Health Options v. United States*,
  140 S.Ct. 1308 (2020).................................................................................44

*Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*,
  274 F.Supp.3d 1074 (D. Mont. 2017)..........................................................28

*Mountain States Legal Found. v. Glickman*,
  92 F.3d 1228 (D.C. Cir. 1996) ...................................................................37

*N.C. Fisheries Ass'n v. Gutierrez,*
  518 F.Supp.2d 62 (D.D.C. 2007) ........................................................................37

*New York v. Nuclear Regul. Comm'n,*
  681 F.3d 471 (D.C. Cir. 2012) .....................................................................29, 31

*North Slope Borough v. Andrus,*
  642 F.2d 589 (D.C. Cir. 1980) ...........................................................................31

*Oceana v. BOEM,*
  37 F.Supp.3d 147 (D.D.C. 2014) ................................................................17, 29

*Oglala Sioux Tribe v. Nuclear Regul. Comm'n,*
  896 F.3d 520 (D.C. Cir. 2018) .............................................................................6

*Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS,*
  482 F.Supp.2d 1248 (W.D. Wash. 2007) ...........................................................16

*Public Emps. for Env't Resp. v. Beaudreau,*
  25 F.Supp.3d 67 (D.D.C. 2014) ...........................................................................6

*Sierra Club v. DOE,*
  867 F.3d 189 (D.C. Cir. 2017) ...............................................................17, 18, 43

*Sierra Club v. EPA,*
  21 F.4th 815 (D.C. Cir. 2021) ..............................................................................7

*Sierra Club v. EPA,*
  292 F.3d 895 (D.C. Cir. 2002) ...........................................................................35

*\*Sierra Club v. FERC,*
  827 F.3d 36 (D.C. Cir. 2016) .................................................................35, 37, 38, 39

*Sierra Club v. Mainella,*
  459 F.Supp.2d 76 (D.D.C. 2006) ...........................................................26, 27, 45

*Sierra Club v. U.S. Dep't of Agric.,*
  777 F.Supp.2d 44 (D.D.C. 2011) .......................................................................45

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  985 F.3d 1032 (D.C. Cir. 2021) .........................................................................15

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs,*
  255 F.Supp.3d 101 (D.D.C. 2017) .....................................................................31

*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ...........................................................................................35

*Theodore Roosevelt Conservation P'ship v. Salazar*,
    616 F.3d 497 (D.C. Cir. 2010) ..................................................................16, 17

*United Transp. Union v. ICC*,
    891 F.2d 908 (D.C. Cir. 1989) ........................................................................40

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
    6 F.4th 1321 (D.C. Cir. 2021) ........................................................................21

*Village of Barrington v. Surface Transp. Bd.*,
    636 F.3d 650 (D.C. Cir. 2011) ..................................................................24, 44

*\*WildEarth Guardians v. Jewell*,
    738 F.3d 298 (D.C. Cir. 2013) ........................................................35, 38, 42

*WildEarth Guardians v. Zinke*,
    368 F.Supp.3d 41 (D.D.C. 2019) ....................................................18, 28, 42

*\* Authorities upon which we chiefly rely are marked with an asterisk*

## Regulations

30 C.F.R. § 550.269 ..................................................................................................31

40 C.F.R. § 1500.1 ...............................................................................................8, 11

40 C.F.R. § 1500.2 ..................................................................................................43

40 C.F.R. § 1502.2 ..................................................................................................20

40 C.F.R. § 1502.14 ..........................................................................................31, 43

40 C.F.R. § 1502.15 ................................................................................................12

40 C.F.R. § 1502.20 ................................................................................................19

40 C.F.R. § 1502.22 ......................................................................................11, 12, 14

40 C.F.R. § 1502.24 ...........................................................................................8, 11

40 C.F.R. § 1503.4 ....................................................................................................7

## Federal Register Notices

87 Fed. Reg. 14,332 (Mar. 14, 2022) .....................................................................13

87 Fed. Reg. 25,710 (May 2, 2022) ........................................................................13

88 Fed. Reg. 47,453 (July 24, 2023) .......................................................................34

88 Fed. Reg. 58,310 (Aug. 25, 2023)..............................................................................................8

88 Fed. Reg. 1196 (Jan. 9, 2023) ...................................................................... *passim*

**Other Authorities**

Pub. L. No. 117-169, 136 Stat. 1818 (2022).........................................................42, 44

## INTRODUCTION

The Gulf of Mexico is one of the nation's most diverse and productive ecosystems, but decades of industrial oil and gas development and increasing harms from climate change have taken a heavy toll on the region's communities and wildlife. These harms will intensify because of the decision by the Bureau of Ocean Energy Management ("Bureau") to approve Gulf of Mexico Lease Sale 259, one of the largest offshore oil and gas lease sales in U.S. history. Although the National Environmental Policy Act ("NEPA") required that the Bureau take a "hard look" at the environmental impacts of its decision and consider reasonable alternatives and mitigation measures to reduce such impacts, the agency failed to meet these obligations.

The opposition briefs filed by the Bureau and Intervenor-Defendants Chevron U.S.A. Inc. and the American Petroleum Institute ("Industry") offer nothing to show that the agency satisfied NEPA. For example, the Bureau ignores evidence of Rice's whale habitat in the western and central Gulf and the impacts of Lease Sale 259 on this critically endangered species, while failing to consider current science provided by Plaintiffs, federal agencies, and others. With regard to greenhouse gases ("GHG"), the Bureau inaptly relies on allegedly limited data and time to justify its defective and incomplete analysis. Instead of showing that the Final Supplemental Environmental Impact Statement ("FSEIS") properly considered environmental justice or oil spill risks, the Bureau and Industry cite to earlier NEPA reviews that similarly fail to provide the required analysis of these issues. Nor did the Bureau provide any justification for failing to consider reasonable, less harmful alternatives to this massive lease sale.

In addition, there is no merit to Industry's contention that Plaintiffs lack standing to bring this action, which is well established by the declarations submitted with Plaintiffs' opening brief. Finally, Industry is mistaken that NEPA review was somehow precluded by the Inflation Reduction Act ("IRA"), which required the Bureau to hold the sale but did not otherwise limit

the Bureau's ability to determine the size or scope of leasing or exempt the Bureau from any legal requirements, including NEPA.

## ARGUMENT

**I.** **The Bureau Failed to Consider Impacts to Rice's Whale in the Western and Central Gulf**

The Bureau evaluated impacts on Rice's whale only in its core habitat in the eastern Gulf. *See* BOEM19600. In doing so, the Bureau failed to properly consider record evidence of Rice's whale's extended habitat in the western and central Gulf or address multiple agencies' analyses and recommendations to avoid energy development activities throughout this habitat. The post hoc rationalizations in the Bureau's brief do not make up for the FSEIS's shortcomings.

The Bureau now claims to have "analyzed recent studies regarding the extent of Rice's whale observations, including the Soldevilla 2022 Study." ECF No. 55 ("BOEM Br.") at 30-31. But the FSEIS cited the Soldevilla et al. (2022) study only for the proposition that vessel strikes are unlikely due to slow vessel speeds and other mitigations within Rice's whale's core area in the eastern Gulf. BOEM19600. When discussing Rice's whale's range, the FSEIS did not mention—let alone analyze—Soldevilla et al. (2022)'s finding that Rice's whale has a "persistent occurrence" beyond the eastern Gulf. *Id.*; BOEM21838. Nor did the Bureau's response to comments properly analyze the study, instead summarily dismissing Soldevilla et al. (2022) after mischaracterizing its findings as merely indicating the plausibility of Rice's whale distribution beyond the core habitat. *See* BOEM19990; ECF No. 52-1 ("Pls. Br.") at 20-21. In fact, Soldevilla et al. (2022) presented robust evidence of the whale's extended habitat in the western and central Gulf and corroborated earlier Rice's whale sightings in the western Gulf.

BOEM21835, 21838.[1] And any uncertainty regarding the seasonality of Rice's whale's movements within the Gulf, *see* BOEM19990; BOEM Br. 32; ECF No. 57 ("API Br.") at 26, has no bearing on the whale's confirmed *presence* outside of the eastern Gulf, BOEM21838.

The FSEIS also failed to properly address other recent studies. For instance, it did not even mention the September 2022 National Marine Fisheries Service ("NMFS") habitat study regarding aquaculture impacts on vulnerable marine species, which included the central and western Gulf in Rice's whale habitat. *See* BOEM10959. The Bureau's effort to discount that study on the grounds that it showed most whale sightings were within the eastern Gulf is both belated (because the Bureau said nothing about it in the record) and beside the point. *See* BOEM Br. 32-33.[2] Even if all but one sighting were in the eastern Gulf, the Bureau is obliged to consider evidence of whales' presence in the western and central Gulf, particularly for a critically endangered species that has only about 50 whales. BOEM33666, 21821-22. Moreover, contrary to the Bureau's assertion, *see* BOEM Br. 32-33, NMFS defined the whale's habitat in its study based not only on long-term passive acoustic monitoring from Soldevilla et al. (2022), but also on "sightings" and "habitat suitability modeling" that the agency's scientists had recently conducted. BOEM10946, 10951-52, 10959-60. In the FSEIS, the Bureau did not consider NMFS' new habitat modeling or its recognition of Rice's whale's extended habitat.

Having failed to consider that information in its FSEIS, the Bureau disavows its responsibility to do so by hiding behind NMFS' earlier analyses. BOEM Br. 31-32. Those analyses—a 2019 endangered species listing, a 2020 biological opinion, and an April 2021

---

[1] Industry, for their part, offers their own misguided interpretation of Soldevilla et al. (2022), ECF No. 57 at 25-26, ignoring the study's conclusion that "the persistent occurrence of Rice's whale has been documented for the northwestern Gulf." BOEM21838.

[2] For the same reasons, the Bureau's new reliance on statements on NMFS' website, *see* BOEM Br. 32, does not make up for the FSEIS's omissions.

incidental take regulation—all pre-date Soldevilla et al. (2022) and other record evidence demonstrating Rice's whale's extended habitat. It is therefore no surprise that NMFS' earlier decisionmaking processes did not incorporate that later evidence. But that does not excuse the Bureau from considering such evidence in its FSEIS.[3] *See, e.g.*, *Fund for Animals v. Hall*, 448 F.Supp.2d 127, 136 (D.D.C. 2006) (explaining differences between ESA section 7 and NEPA).

Nor does NMFS' failure to designate critical habitat give the Bureau a free pass to disregard recent studies that identify habitat in the western and central Gulf. *California v. Bernhardt*, 472 F.Supp.3d 573, 624 (N.D. Cal. 2020) ("NEPA mandates that an agency use state of the art science"). The Bureau's concession, BOEM Br. 30 n.7 & 33 n.9, that NMFS has now proposed critical habitat that *includes* the very waters in the western and central Gulf at issue here lays bare the absurdity of the Bureau's argument. The Bureau cannot dismiss evidence of Rice's whale's extended habitat simply because, at the time, NMFS had not yet updated its prior analyses in response to that evidence. *City of Tacoma v. FERC*, 460 F.3d 53 (D.C. Cir. 2006), does not counsel otherwise. *See* BOEM Br. 31-32. Unlike in *Tacoma*, where the City had not presented FERC with any new information after NMFS and its sister agency prepared a biological opinion, here the Bureau had new evidence from Soldevilla et al. (2022), NMFS' 2022 study, and other assessments. Adherence to NMFS' 2020 Biological Opinion, without addressing that new information, is arbitrary and capricious. *Cf. Env't Health Tr. v. Fed. Commc'ns Comm'n*, 9 F.4th 893, 910 (D.C. Cir. 2021) ("While imitation may be the highest form of

---

[3] The Bureau also points to its commitment in its February 2023 ESA section 7 determination to implement any new mitigation measures that result from consultation and its conclusion that Lease Sale 259 would not jeopardize Rice's whale. BOEM Br. 30. That no jeopardy determination was based on potential impacts to Rice's whale in the eastern Gulf and assumed that the Bureau could and would incorporate any additional mitigation measures as necessary based on continuing consultation with NMFS. *See* BOEM01305-10. It is irrelevant in determining whether the Bureau's FSEIS complied with NEPA.

flattery, it does not meet even the low threshold of reasoned analysis required by the [Administrative Procedure Act]").

The Bureau also attempts to sidestep recommendations from both NMFS and the Marine Mammal Commission that it exclude Rice's whale's extended habitat from development activities. BOEM Br. 33-34. As a preliminary matter, the Bureau's observation in its brief, BOEM Br. 33,[4] that these recommendations were not specific to Lease Sale 259 misses the point—the Bureau failed to consider that both agencies accepted the whale's habitat in the central and western Gulf. Moreover, NMFS' February 2022 wind energy recommendation, which Plaintiffs never claimed had focused on oil and gas development (*see* Pls. Br. 21; *contra* BOEM Br. 33), demands attention here because it provides yet more evidence that the Bureau ignored salient new information about Rice's whale's habitat. In its letter to the Bureau, NMFS explained that "increasing evidence from sighting data, passive acoustic monitoring (PAM), and habitat suitability modeling" showed Rice's whale's "persistent" occurrence in the western and central Gulf. BOEM17718. NMFS then considered potential impacts of offshore wind development activities on Rice's whale in that extended habitat, including vessel strikes, entanglement, habitat destruction, impacts to prey, and noise impacts, among others, and recommended no offshore wind leasing or development within the "*known distribution of Rice's whales in the western and central [Gulf]*." *Id.* The Bureau's failure to even acknowledge NMFS' confirmation of Rice's whale's persistent occurrence in the western and central Gulf or its

---

[4] Industry also notes that NMFS' recommendation is specific to wind energy development. *See* API Br. 27 (referring to an "internal memorandum" but citing NMFS' letter).

analysis of the impacts of wind energy development—many of the same types of impacts that oil and gas development creates, *see* Pls. Br. 20[5]—renders its FSEIS inadequate.

The Bureau's promises of future consultation with NMFS and additional mitigation measures do not rectify these omissions from the FSEIS. *See* BOEM Br. 33. NEPA requires an agency to evaluate impacts *before* deciding to take an action. *Oglala Sioux Tribe v. Nuclear Regul. Comm'n*, 896 F.3d 520, 532 (D.C. Cir. 2018) ("[NEPA's] requirement that a detailed environmental impact statement be made for a 'proposed' action makes clear that agencies must take the required hard look *before* taking that action."). And Industry's observation that the Bureau was not obligated to adopt other agencies' views, API Br. 27, does not absolve the Bureau of its duty to consider those views presented in the record and the evidence they rely on. *See Public Emps. for Env't Resp. v. Beaudreau*, 25 F.Supp.3d 67, 124 (D.D.C. 2014) ("an agency should consider the comments of other agencies").

The Bureau's explanation for ignoring the Marine Mammal Commission's recommendations regarding future Gulf oil leasing fares no better.[6] *See* BOEM Br. 34. The Bureau contends it had no opportunity to consider or respond to the Commission's input because the Commission had not submitted a letter during the public comment period. *Id.* That objection is curious, to say the least, since Plaintiffs submitted the Commission's input to the Lease Sale 259 record *during* the public comment period. BOEM09034 (attachment to Earthjustice et al. comments). The Bureau had full opportunity—indeed, an obligation—to consider it, but did not.

---

[5] The Bureau also faults Plaintiffs for not presenting evidence of harm to Rice's whale in the western and central Gulf. BOEM Br. 34. Plaintiffs' brief explained the heightened risks Rice's whales face in those regions. Pls. Br. 20. These risks are particularly consequential because the loss of one individual whale could drive the species to extinction. *Id.* (citing BOEM10959).
[6] Industry notes that the Commission's letter addressed the proposed 2023-2028 5-year Program for oil and gas leasing in the Gulf rather than specifically Lease Sale 259. API Br. 27. But they do not explain the significance of this distinction. Nor is there one.

*See* 40 C.F.R. § 1503.4(a). And the Bureau's post hoc claim to have "analyze[d] the issues identified in the letter," BOEM Br. 34, is wrong. In its FSEIS, the Bureau did not consider Rice's whale's confirmed presence in the western Gulf or the Commission's recommendation to exclude all 100-400m deep waters from all oil and gas lease sales in the Gulf. *See* BOEM09038, 19600 (considering impacts to Rice's whale only in eastern Gulf).

Industry similarly excuses the Bureau's failure to consider NMFS' and the Commission's recommendations on the ground that they both relied on Soldevila et al. (2022). API Br. 27. As explained above, the Bureau's dismissal of Soldevila et al. (2022) was arbitrary and unsupported by the record. In any event, the agencies' recommendations also relied on other assessments that the Bureau ignored. *See* BOEM17718 (relying on sightings, acoustics, and habitat suitability modeling), 09038 (citing NMFS' habitat analysis).

Finally, the Bureau waves away its failure to acknowledge its own recent evaluation of Rice's whale's extended habitat for wind energy development. BOEM Br. 34. In that context, the Bureau assigned the 100-400m deep waters in the western and central Gulf a wind energy suitability score of zero explicitly *because they constituted Rice's whale habitat*. BOEM18480, 18459. The Bureau may come to different conclusions about siting wind and oil development based on an assessment of their respective impacts. BOEM Br. 34. But nothing in the FSEIS supports counsel's position that wind and oil development in the western and central Gulf present different risks to Rice's whale. Nor could it, since the Bureau failed entirely to identify Rice's whale habitat beyond the eastern Gulf. And post hoc rationalizations of counsel cannot substitute for a reasoned analysis from the agency. *Sierra Club v. EPA*, 21 F.4th 815, 826 (D.C. Cir. 2021). These arguments also do not explain or excuse the Bureau's decision to dismiss the

evidence of Rice's whale's extended habitat for purposes of Lease Sale 259 when it had previously accepted that habitat as a given for purposes of wind development.[7]

The Bureau needed to engage with this record evidence in its FSEIS. Its failure to consider impacts from this sale to Rice's whale in the central and western Gulf—particularly given other agencies' *and its own prior recognition of that habitat*—violates NEPA's hard look requirement.

## II.      <u>The Bureau's GHG Analysis Violates NEPA and is Arbitrary and Capricious</u>

The Bureau agrees with Plaintiffs' GHG arguments in multiple respects: NEPA requires a thorough analysis of the direct and indirect GHG emissions of fossil fuel projects like this one, and courts should carefully scrutinize agency GHG analyses and reject those that are unsupported by the record. BOEM Br. 11-13. A GHG analysis, like any discussion in an environmental impact statement ("EIS"), must be of "high quality" and represent "accurate scientific analysis." 40 C.F.R. §§ 1500.1, 1502.24. The Council on Environmental Quality's ("CEQ") 2016 and 2023 GHG guidance apply to this lease sale and can serve as a yardstick by which the Bureau's NEPA compliance should be evaluated. BOEM Br. 11-13. GHG emissions must be "put into an appropriate context" to understand their impacts. *Id*. And a touchstone of this Court's review is whether the agency's GHG disclosures serve the dual purposes of NEPA: informed agency decisionmaking and full public disclosure. *Id*. at 12.

Rather than contest Plaintiffs' presentation of how the FSEIS's GHG analysis is fundamentally flawed, the Bureau and Industry devote most of their energies to arguments that the agency was constrained by data and time limitations from providing any better analysis. But these constraints, to the extent they even exist, do not excuse the Bureau from its duty to provide

---

[7] The Bureau has also excluded Rice's whale habitat in the central and western Gulf from Lease Sale 261. *See* 88 Fed. Reg. 58,310 (Aug. 25, 2023).

a robust NEPA analysis and discussion using available information. As Plaintiffs explained, the Bureau incorrectly found a marginal difference in GHG emissions from developing over a billion barrels of crude oil and trillions of cubic feet of gas by comparing them to a hypothetical alternative that bears no resemblance to reality. The Bureau barely makes an effort to dispute Plaintiffs' showing that this comparison was profoundly flawed. Further, the Bureau failed to disclose the conflict between decades of new fossil fuel development and the nation's climate policies and international commitments—which call for a sharp reduction in fossil fuel use during the lifetime of these leases. Most consequentially, the agency relied on these misleading and incomplete findings to approve the sale. The GHG analysis failed to inform decisionmakers about the true implications of this decision, and it failed to disclose them to the public.

   **A.**     **The Bureau relied on outdated and misleading information to mask the true GHG impacts of Lease Sale 259**

   Plaintiffs' opening brief details how the Bureau relied on an erroneous and misleading comparison between Lease Sale 259's GHG emissions—a staggering 360 million tons, even before international oil consumption was added—and the hypothetical emissions that would occur without the lease sale. Pls. Br. 22-35. All parties agree that the model chosen to make these estimates, MarketSim, relies on a U.S. government estimate of energy uses through 2050 based on laws and regulations on the books as of 2019. *Id.* at 25. As Plaintiffs documented, this approach ignores laws and policies adopted after 2019 (like tighter vehicle efficiency standards and the IRA), as well as other social, economic, and legal forces (including international commitments like the Paris Agreement) that will be hugely consequential in shifting the trajectory of energy use away from fossil fuels during the lifetime of these leases. *Id.* at 25-27. By overestimating GHG emissions in the "no leasing" scenario to which lease sale emissions are

compared, the analysis gravely underestimates the total GHG emissions of this decision—undercutting NEPA's twin goals of informed decisionmaking and public disclosure.

The Bureau's response mostly sidesteps Plaintiffs' argument. It does not dispute that MarketSim assumes only a tiny decline in gasoline consumption and virtually no decline at all in GHG emissions between 2019 and 2050.[8] Pls. Br. 26; BOEM56322. Nor does it dispute that this assumption is wildly misaligned with government priorities and international commitments, or that extensive record evidence reveals the assumption to be implausible as a matter of fact. *Id*.; BOEM13614 (MarketSim is "relatively simple" model that assumes "no new policies are implemented"). Indeed, the Bureau has nothing to say about most of the evidence cited by Plaintiffs demonstrating that the most consequential assumptions in its GHG model—that neither fuel consumption nor GHG emissions would meaningfully decline between now and 2050—were flat wrong. Pls. Br. 27-28; BOEM13621 (study explaining why "climate effects" of leasing "are far greater than BOEM currently projects").

Instead, the Bureau complains that the more accurate information was not "present[ed] . . . in a way that is compatible with [the Bureau]'s modeling framework." BOEM19551; BOEM Br. 18-23. It further argues that the congressionally mandated timeframe for a lease sale decision did not allow it time to develop better inputs. BOEM Br. 18-23. This argument must be rejected for several reasons.

First, it is not even correct: at a minimum, the updated 2022 Energy Information Administration Annual Energy Outlook ("AEO 2022") information was released in March 2022

---

[8] BOEM incorrectly suggests that Plaintiffs' argument is about something much less consequential: that is, certain capabilities in the MarketSim model to address market dynamics, *e.g.*, shifting oil demand up or down depending upon production levels and resulting impacts on prices. BOEM Br. 17.

and available in time to use during this process. BOEM07573 (discussing AEO 2022 results on modeling). The Bureau relied on AEO 2022 information in its draft 2023-2028 Program EIS, released in July 2022, six months *before* the FSEIS.[9] It could have done the same here.

Second, nothing about this choice was mandated by regulation, precedent, guidance, or court order. If the only data available for a chosen form of analysis result in an obviously incorrect conclusion, that is not a defense of the approach but rather demonstrates that the Bureau should have chosen a different method. 40 C.F.R. §§ 1500.1, 1502.24 (requiring accuracy and quality of scientific analysis); BOEM13631 (MarketSim unable to "model the energy sector with the robustness that the problem demands"; Bureau should transition to different model). Indeed, this was the core of this Court's previous ruling in *Friends of the Earth v. Haaland*, which set aside the Bureau's GHG analysis despite its claim that it lacked adequate data to assess foreign emissions. 583 F.Supp.3d 113, 143-44 (D.D.C. 2022), *vacated as moot*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) (BOEM "should have either given a quantitative estimate . . . or explained more specifically why it could not have done so"); *see also Diné Citizens Against Ruining Our Env't v. Haaland*, 59 F.4th 1016, 1042 (10th Cir. 2023) (setting aside GHG analysis that did not use "accurate science").

The Bureau argues that it has complied with 40 C.F.R. § 1502.22, which governs how to address incomplete or unavailable information in an EIS. But this regulation proves Plaintiffs' point that the Bureau failed to justify its use of outdated information. The regulation states:

> When . . . there is incomplete or unavailable information, *the agency shall always make clear that such information is lacking.*

---

[9] BOEM, *2023–2028 National Outer Continental Shelf Oil and Gas Leasing Proposed Program* 1-4 (July 2022), https://www.boem.gov/sites/default/files/documents/oil-gas-energy/national-program/2023-2028_Proposed%20Program_July2022.pdf (document "considers projections based on the Energy Information Agency (EIA)'s 2022 Annual Energy Outlook (AEO) reference case").

(a) If the incomplete information . . . is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information . . . cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, *the agency shall include* within the environmental impact statement:

(1) a statement that such information is incomplete or unavailable;

(2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

(3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and

(4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

40 C.F.R. § 1502.22 (emphasis added); *see also* 88 Fed. Reg. 1196, 1202 (Jan. 9, 2023) (GHG guidance saying that if quantitative estimate is unavailable, agencies "should provide a qualitative analysis and its rationale for determining that a quantitative analysis is not possible"). By arguing that it has complied with this regulation, the Bureau concedes that information on future fossil fuel demand and consumption is "incomplete and unavailable," as well as "essential to a reasoned choice among alternatives." 40 C.F.R. § 1502.22. Such a concession is inescapable: a dataset that incorrectly assumes U.S. liquid fossil fuel uses and GHG emissions will not meaningfully decline by 2050 is "incomplete" at best. And the conclusions about the GHG emissions from Lease Sale 259 are perhaps the single most crucial fact relevant to a decision about a project involving over a billion barrels of crude oil and trillions of cubic feet of new gas. They are hence "essential to a reasoned choice" for the agency's final decision. *See also* 40 C.F.R. §§ 1502.15 (data and analysis must be commensurate with importance of impact), 1502.2(b) (impacts must be discussed in proportion to significance); *Center for Biological*

*Diversity v. Bernhardt*, 982 F.3d 723, 740 (9th Cir. 2020) (finding that the Bureau "has the statutory authority to act on the emissions resulting from foreign oil consumption. If it later concludes that such emissions will be significant, it may well approve another alternative included in the EIS or deny the lease altogether").

The Bureau's argument that it complied with this regulation fails. First, the Bureau has not established that including better information would be "exorbitant" to obtain. BOEM Br. 22. While the Bureau was acting under a congressionally imposed time constraint, no one demanded that the agency develop a new technical model or new complex datasets. Nor do Plaintiffs demand that the Bureau speculate about future policies. *See* BOEM Br. 21. The Bureau had many options to provide decisionmakers and the public with better information that would not have taken significant additional time or resources, let alone "exorbitant" effort. For example, it could have incorporated the AEO 2022 reference case in MarketSim. It could have modeled the effects of GHG reduction rules that were in place at the time it was preparing the SEIS, similar to what at least one commenter was able to do. BOEM07515 (comments submitted to BOEM that included modeling using AEO 2022 reference case updated with then-current transportation policies); *see also* 87 Fed. Reg. 25,710 (May 2, 2022) (setting corporate average fuel economy standard for light duty vehicles); 87 Fed. Reg. 14,332 (Mar. 14, 2022) (enabling California and state GHG emissions reduction and zero emission policies for light-duty vehicles). It could have disclosed the full amount of emissions from the lease sale, while presenting different scenarios for the "no action" emissions based on varying assumptions. Or it could have offered an appropriate qualitative discussion of the no-action emissions, highlighting the uncertainty of future emissions and the limits of the Energy Information Association data. None of these would have involved any notable expense or delay, let alone "exorbitant" efforts.

Second, even assuming that better information would have been impossible to obtain, the Bureau did not comply with the section 1502.22(b) disclosures for such situations. Nothing close to the required discussion and analysis appears in the FSEIS, the GHG analysis, or anywhere else in the record. The Bureau never says critical information is incomplete and unavailable; it never discusses the relevance of the missing information; it does not summarize existing credible evidence; and it provides no GHG evaluation based on "theoretical approaches or research methods generally accepted in the scientific community." 40 C.F.R. § 1502.22(b). In fact, the FSEIS analyzes "incomplete and unavailable information" in almost every section *except* the GHG section. *See, e.g.*, BOEM19556, 19601, 19626. Instead of analyzing these factors, the FSEIS declared its unqualified "conclusion" that the Bureau "finds that there is only a marginal difference in domestic [GHG] emissions from Alternative A relative to those of the No Action Alternative." BOEM19550-51. Erasing any doubt about its views on the matter, the agency even incorrectly proclaimed this is the "best available and credible approach" to assessing GHGs. *Id*. If the section 1502.22(b) factors are intended to spotlight critically important but incomplete information, the Bureau's analysis came nowhere close to fulfilling that goal.

Moreover, outside of a conclusory insistence that its analysis complies with "relevant guidance," BOEM Br. 10, the Bureau makes no effort to respond to Plaintiffs' demonstration that its analysis fails to comply with CEQ GHG guidance, as well as the U.S. Environmental Protection Agency's ("EPA") critiques in its comment letters. CEQ GHG guidance explicitly advises that a project's emissions should not be compared to business as usual, but against scenarios that incorporate policies aimed at reducing GHG emissions. *See* Pls. Br. 27 (citing 88 Fed. Reg. at 1205 (GHG comparison should be "against scenarios or energy use trends that are consistent with achieving science-based GHG reduction goals, such as those pursued in the

Long-Term Strategy of the United States")). Nor does it address EPA's critique that the GHG

comparison should be to "current trajectories (consistent with Paris 2030 and net-zero 2050

goals) for energy production and demand," assuming instead that rules on the books as of 2019

would remain in place for decades. BOEM17808-09, 20095-98 (second comment letter from

EPA), 07609 (similar comment from public). Its failure to address these critiques, outside of

complaining that it had no better data for its preferred model, is the essence of "arbitrary and

capricious" agency action. *See Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985

F.3d 1032, 1049 (D.C. Cir. 2021) (agency cannot fail to explain NEPA decision in light of

conflicting information in the record); *Friends of the Earth*, 583 F.Supp.3d at 144 (Bureau's

"total lack of attention" to shortcomings in GHG analysis was "disconcerting").

      Sidestepping the core issue, the Bureau takes issue with minor details around individual

citations.[10] But it does not dispute the more significant matter: that its data assume fossil use and

GHG emissions will be essentially the same in 2050 as they were in 2019. This assumption is out

of step with reality, record evidence, and the directives of expert agencies like EPA and CEQ—

rendering the FSEIS arbitrary. The Bureau's attempt to muddy the waters with text-parsing

exercises and minor technical disputes should not distract the Court.

---

[10] For example, the Bureau insists that it did not misrepresent the results of one of the studies
mentioned in Plaintiffs' brief. BOEM Br. 19 n.4. Its nitpick is not well taken, as the sentence that
that Bureau points to is in the study's discussion of the IRA's effects on the industrial sector, and
there is no indication that the sentence was intended to have the much more sweeping and out of
context meaning that the Bureau would like to attach to it. More important than any text parsing
is that the study generally refers to the IRA as a "turning point" and "game changer" for driving
down GHG emissions—evidence that undermines the FSEIS's conclusions. BOEM16896.
Finally, in its attempt to discredit Plaintiffs' argument, the Bureau inadvertently concedes that
record data showed that transportation emissions are expected to significantly decline even
without the IRA. BOEM Br. 19 n.4 (citing BOEM16902). Of course, the Bureau makes no
attempt to explain why it chose to rely on a model and data that ignore this decline, outside of
claiming that better data would not have fit into its technical model.

Next, the Bureau and Industry point to a handful of qualifiers in the GHG narrative recognizing that some uncertainties exist in the GHG analysis. BOEM Br. 19-20. While it is encouraging that BOEM "recognizes the need" to use the best information "and to address the policy mandates" for reducing GHGs (even if it promised to do so only at some unspecified point in the future), BOEM05880, limited qualifiers buried in text or appendices cannot salvage BOEM's arbitrary conclusion. *See Pac. Coast Fed'n of Fishermen's Ass'ns v. NMFS*, 482 F.Supp.2d 1248, 1255 (W.D. Wash. 2007) (finding it "improper under NEPA" to relegate important information to an appendix). The GHG Report concludes that life cycle emissions from leasing "are largely similar" to not leasing, and that any differences are "marginal." BOEM05868. The same conclusion is repeated in the FSEIS. BOEM19550. Nor do any qualifiers appear in the Record of Decision ("ROD"), which summarizes and relies on the FSEIS and GHG analysis in a way that confirms that the Bureau's decision rested on a finding of negligible GHG emissions and fails to acknowledge the serious questions raised as to the validity of that conclusion. BOEM20104 (domestic GHGs "are slightly higher than, but largely similar, to the lifecycle CO2e estimated for the No Leasing Alternative"; incorporating foreign emissions changes that "only slightly" increase; GHG conclusions "are not appreciably different" from earlier EISs; "[t]aking into account the relative GHG emissions and impacts, I find that the national interest weighs in favor of holding Lease Sale 259."). The Bureau cannot salvage an FSEIS that reached a flawed conclusion with a few sentences that concede some uncertainty.

This case is not at all like the ones the Bureau relies on, where the D.C. Circuit set limits on necessary revisions to technical data in light of new information, especially where there was no objection to using the older data during the NEPA process. *See Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 511 (D.C. Cir. 2010). Here, EPA and many others

objected to the Bureau's use of stale and biased data to reach misleading conclusions. In fact, this Court has already rejected reliance on *Salazar* where the Bureau did not act "reasonably" in excluding a key factor from its GHG analysis. *Friends of the Earth*, 583 F.Supp.3d at 145. Nor is *Sierra Club v. Department of Energy* instructive, where the Court deferred to an agency's technical determination that assessing a particular source of GHGs "would be far too speculative to be useful." 867 F.3d 189, 199 (D.C. Cir. 2017). Here, the Bureau made no such determination; nor is it "speculative" to analyze declining future emissions in line with national policies. Instead, the Bureau relied on inappropriate data to reach an implausible conclusion, ignoring repeated technical critiques and explicit on-point guidance from expert agencies that its approach was flawed. *Cf. Oceana v. BOEM*, 37 F.Supp.3d 147, 160 (D.D.C. 2014) (more up-to-date oil spill data not available).

The Bureau next claims that Plaintiffs want the agency to "create a model based on speculation about what future laws and policies would be." BOEM Br. 21. That is not Plaintiffs' position. Phasing out fossil fuel use to achieve sharply declining and ultimately zero GHG emissions is the *current* policy of the United States. BOEM78522. Policies aside, sharply declining GHGs are an inevitable response to the climate crisis and changes in energy use are already well underway, like the accelerating electrification of transportation. Pls. Br. 26-27. Plaintiffs do not want the Bureau to "speculate" on what specific regulations might look like in the future; they want an EIS acknowledging that current policies like existing GHG-reduction policies, as well as the Long-Term Strategy and Paris commitments, already commit the nation to a far steeper decarbonization trajectory than reflected in the FSEIS. Moreover, the record is clear that, because of international commitments and because "climate policies have tended to get stronger over time," there are "strong reasons to doubt that current policies will remain

unchanged." BOEM13617. Accounting for these anticipated changes is not speculative. But the Bureau failed to address these comments.

NEPA requires agencies to engage in "reasonable" forecasting. *Sierra Club v. DOE*, 867 F.3d at 198. On this record, the Bureau's choice of a future baseline that bears no relationship to the government's own policies and changes in the real world is far from "reasonable." Indeed, this case is similar to *Friends of the Earth*, where this Court held that "there is little doubt that a more complete consideration of" GHGs "would have significantly informed BOEM's decision." 583 F.Supp.3d at 140; *see also WildEarth Guardians v. Zinke*, 368 F.Supp.3d 41, 70 (D.D.C. 2019) (agency could have "expressed the forecasts as ranges" and "explained the uncertainties" but "was not entitled to simply throw up its hands"); 88 Fed. Reg. at 1202 (CEQ GHG guidance directing that agencies should use "range" of emissions estimates were appropriate). Here, the Bureau was given precise instructions on how it could have better modeled future emissions scenarios in its substitution analysis, *see, e.g.*, BOEM13618-21, but similarly threw up its hands and ignored them.

For their part, Industry stitches together out-of-context quotes from *Friends of the Earth* to argue that this Court has already rejected the "identical argument" about GHG emissions. API Br. 30. But the part of that decision Industry relies upon has no bearing on Plaintiffs' arguments. There, this Court rejected a claim that new climate science triggered a duty to prepare a supplemental EIS on Lease Sale 257. *Friends of the Earth*, 583 F.Supp.3d at 148-49. Here, Plaintiffs make no such claim, instead arguing that BOEM's assessment of GHGs in the existing FSEIS for Lease Sale 259 is arbitrary and capricious based on this administrative record. *Friends of the Earth* is certainly instructive here—it rejected the Bureau's justification for ignoring a key factor in its GHG analysis—but not for the reasons Industry states. 583 F.Supp.3d at 146.

Industry's next argument, that earlier EISs from other stages in the Outer Continental Shelf Lands Act ("OCSLA") process satisfied the Bureau's obligations here, also fails. The programmatic EIS on the offshore leasing 2017-2022 Program is dated November 2016, and the multi-sale Gulf of Mexico EIS is dated March 2017, multiple administrations ago. BOEM01900, 03211. Unsurprisingly, these documents do not reference any conflict between the GHG emissions from offshore leasing and the current climate policy framework. NEPA requires the Bureau to discuss the GHG emissions from *this* lease sale—which were not known or disclosed in previous EISs. *Friends of the Earth*, 583 F.Supp.3d at 126 ("the multi-step framework of OCSLA" does not "lessen the rigor of the 'hard look' that NEPA requires"). The fact that the 2015 Paris Agreement is mentioned in programmatic reviews at earlier stages of the process is hardly material. In any event, while agencies are encouraged to "tier" to earlier EISs where appropriate, they need to explicitly state that they are doing so and identify where the relevant information can be found. 40 C.F.R. § 1502.20. No such statement can be found in the FSEIS or GHG Report when it comes to climate commitments and policies. It is not surprising that the Bureau does not join Intervenors' strained arguments.

In sum, while the Bureau has some flexibility to choose the format to present GHG information in an EIS, its presentation cannot be arbitrary. Pls. Br. 23 (collecting cases overturning GHG analyses). Moreover, a key measure of the FSEIS's validity is whether its conclusions—here, that lease sale GHGs are "largely similar" to and only "marginally" different from GHGs without the project, based on a comparison to an implausible baseline—advance NEPA's twin goals of informed decisionmaking and public disclosure. The answer is unquestionably no. And even though the IRA directed the Bureau to hold the sale in some form, a more fulsome disclosure of GHGs would have been important to the decisionmaking process

and allowed the Bureau to modify the sale to limit adverse impacts. The Bureau could have held

a significantly smaller sale, using the information in the FSEIS to balance the benefits of

renewable energy options that were linked to the sale's size. Or it could have provided additional

mitigation, such as requiring GHG offsets, or temporal limits on continued fossil fuel

development consistent with a Paris-compliant GHG trajectory. These are the kinds of benefits

NEPA is intended to promote, but they did not occur here.

### B.    The FSEIS failed to contextualize lease sale emissions with federal climate policies and international commitments

Plaintiffs' second argument is that the Bureau failed to put Lease Sale 259's emissions in

the appropriate context by adequately disclosing the conflict between the GHG implications of

the sale and other national policies and international commitments—which call for the rapid

phaseout of fossil fuel GHGs within the lifetime of these leases. Pls. Br. 32-35. The Bureau

agrees with Plaintiffs that NEPA requires it to "contextualize" GHG emissions so that

decisionmakers and the public can understand their significance. BOEM Br. 24. The Bureau does

not disagree that its FSEIS must include a discussion of how an agency decision will achieve or

undermine NEPA's overarching goals of environmental protection, as well as other

environmental statutes and policies. Pls. Br. 30-31. Instead, the question here is whether the

Bureau's truncated discussion—which barely mentions the government's ambitious climate

policies and international commitments and how Lease Sale 259 will undermine them—satisfies

that duty. The Bureau's defense of the FSEIS is unavailing.

Neither the Bureau nor Industry says a word about 40 C.F.R. § 1502.2(d), the NEPA

regulation that requires the agency to document how alternatives advance or hinder other

environmental laws and policies. They remain silent about CEQ guidance (outside of implicitly

conceding its applicability) that expressly states that GHG emissions must be discussed "in the

context of relevant climate action goals and commitments," and how alternatives would "help meet or detract" from such goals. Pls. Br. 31; 88 Fed. Reg. at 1203. They have no response to EPA's critical comments that the Bureau was failing this test, even though EPA is the nation's authority on assessing GHGs. *Id.*; *see Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021) (NEPA analysis deficient where agency "failed to respond to significant opposing viewpoints concerning the adequacy of its analyses of the projects' [GHG] emissions"). Nor does either dispute record evidence that oil and gas production needs to phase out in the near future to meet climate commitments, creating an irreconcilable conflict between this long-term leasing decision and other national priorities.

Instead, the Bureau mostly pivots to its inclusion of a social cost of carbon analysis. BOEM Br. 24. This is a misdirection, since Plaintiffs have not challenged this part of the FSEIS. The Bureau does not argue that the social cost of carbon metric substitutes for analyzing how the lease sale collides with federal climate policy. Nor could it, as this metric serves an entirely different purpose. While Plaintiffs remain baffled how the Bureau so readily determined Lease Sale 259's impacts were negligible despite a cost in the billions of dollars from the incremental increase in GHG emissions, BOEM20091, the social cost of carbon discussion alone does not satisfy the Bureau's undisputed obligation to explain how lease sale emissions affect federal climate policy. 88 Fed. Reg. at 1203.

The Bureau also insists that it was not "silent" about federal climate policies in the FSEIS. BOEM Br. 25. But the document speaks for itself. The FSEIS, GHG Report, and ROD do not so much as mention Executive Order 14008, the administration's signature climate policy. Nor does the Bureau say a word about the Long-Term Strategy, which is the primary document laying out the government's vision for a transition away from fossil fuels and meeting its Paris

commitments. Instead, the only mention of the U.S.'s ambitious climate goals appears in a footnote to a table, which refers obliquely to the "net-zero" target for 2050. BOEM05871. That note offers that it is not providing any comparison between lease sale emissions and the 2050 target because the target is zero, and hence "an equal amount of emissions would have to be removed from the atmosphere to achieve the net-zero emissions target." *Id*. This confounding statement—which is wildly misaligned with U.S. policies calling for a transition to renewable energy—cannot satisfy the discussion required by section 1502.2(d) and other regulations.

The Bureau also complains that Plaintiffs have taken its statement that such policies are "beyond the scope" of the FSEIS out of context. BOEM Br. 26 (citing BOEM19889 ("Issues related to national and international energy and climate policies are beyond the scope of this analysis.")). This attempt to parse the response to comments is puzzling, as the comments directly raised the concern that lease sale emissions would collide with government policies. BOEM19889 ("The Biden-Harris Administration has committed to a 50% reduction in [U.S.] emissions by 2030, and net zero emissions by 2050."). In any event, if the Bureau did not intend for this particular comment to address the concern—repeated by many other commenters—that the FSEIS failed to disclose the inconsistency between the lease sale and government climate policies, it means that the Bureau ignored the issue altogether. Nowhere else in the response to comments is the issue addressed. Given that this concern was a focus of commenters, and an issue addressed by relevant CEQ guidance, this failure to either correct the FSEIS or offer a rational explanation for not doing so is fatal. *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 803 (D.C. Cir. 2022) ("an agency must respond to objections that on their face seem legitimate" (cleaned up)).

As Plaintiffs explained, the situation differs slightly when it comes to the Paris Agreement. Pls. Br. 32-33. In contrast to Executive Order 14008 and the Long-Term Strategy, the GHG Report does at least refer to the Paris commitments. But the Bureau's truncated analysis is limited to presenting lease sale emissions as a percentage of total annual emissions theoretically available under a Paris-compliant GHG trajectory. BOEM05871. Plaintiffs provide an extensive discussion of why presenting projected emissions as a percentage of global totals violates NEPA. Pls. Br. 10-11, 34-35; *Dine Citizens*, 59 F.4th at 1043 ("Simply stating what percentage the emissions will make up of regional, national, and global emissions does not meaningfully inform the public or decisionmakers about the impact of the emissions."); *350 Montana v. Haaland*, 50 F.4th 1254, 1272 (9th Cir. 2022) (presenting GHGs as "global and domestic comparisons" inconsistent with NEPA duty to provide "high quality" information and "accurate scientific analysis" (cleaned up)).

The Bureau all but ignores this discussion, except to imply that any concerns are resolved by including the social cost of carbon. BOEM Br. 26-27. Contrary to this suggestion, neither *Dine Citizens* nor *350 Montana*—which both rejected the same presentation of GHGs as tiny percentages of larger volumes—suggests that including the social cost of carbon insulates a misleading presentation of emissions. And CEQ guidance answers this issue definitively: "NEPA requires more than a statement that emissions from a proposed Federal action or its alternatives represent only a small fraction of global or domestic emissions." 88 Fed. Reg. at 1201. Given that no party disputes that there is already far more fossil fuel in development than is consistent with the Paris framework, Pls. Br. 10-11, the Bureau's portrayal of lease sale emissions as a tiny fraction of the nation's Paris commitment is arbitrary.

Both the Bureau and Industry anchor their final arguments to the IRA, observing that Congress made the choice to move ahead with Lease Sale 259. Yet again, the argument sidesteps the issue. The Bureau's decision, as well as the national conversation around fossil fuel leasing, would have benefited from a coherent analysis of GHG impacts. The Bureau could have required a smaller sale, potentially even one under the 60-million-acre wind leasing threshold if the GHG costs of the sale outweighed the benefits of offshore wind. *Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 665 (D.C. Cir. 2011) (NEPA allows the agency to "make decisions based on environmental factors not expressly identified in the agency's underlying statute" (citation omitted)). Alternatively, the Bureau could have required mitigation of GHG impacts, or set time limits on fossil extraction consistent with commitments. 88 Fed. Reg. at 1206 ("Given the urgency of the climate crisis, CEQ encourages agencies to mitigate GHG emissions to the greatest extent possible."). Additionally, a more informed disclosure of GHG implications could inform future congressional actions related to leasing. Instead, the Bureau found that Lease Sale 259 would have minimal GHG emissions and ignored or downplayed the conflict between the sale and federal climate policy. The IRA does not insulate the Bureau from this Court's review.

In sum, the FSEIS failed to adequately address the conflict between lease sale GHG emissions and federal climate policies and thereby failed to comply with NEPA's touchstone goals, as it did not adequately inform decisionmakers about this key issue or fully and fairly disclose the GHG implications of this lease sale to the public. It ignored federal climate policies and dismissed lease sale emissions as a tiny percentage of total national emissions under Paris obligations. This is the essence of arbitrary and capricious action, and this Court should reject it.

III.    **The Bureau Failed to Take a Hard Look at Environmental Justice Impacts**

The Bureau has failed to overcome Plaintiffs' arguments that it did not take the required "hard look" at the reasonably foreseeable, significant environmental justice impacts of Lease

24

Sale 259, or provide any authority for its rationale for ignoring such impacts in the FSEIS. First, the Bureau claims that it "conducted outreach to environmental justice communities" prior to issuing the FSEIS, including tribal consultation on the 2017-2022 Program as required by Executive Order 13175. BOEM Br. 42-43. However, other than summarizing these conversations, there is nothing in the Bureau's response or the FSEIS to show how these required consultations contributed to its analysis of environmental justice impacts. *See* BOEM19665-66. The Bureau also cites to the ROD, which notes—in response to EPA comments on the FSEIS— that the agency is "participating in several environmental justice workshops in the Gulf region." BOEM Br. 43; BOEM20106-07; *see* BOEM20098 (EPA finding that the FSEIS did not "fully address[] several of EPA's recommendations related to the analysis of potential disproportionately high and adverse impacts to minority and low-income populations"). While admitting that EPA is "correct" in its assessment, the Bureau does not explain how these later workshops will save the FSEIS's deficient analysis. *See* BOEM20106-07; *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) (APA review is "based on the full administrative record that was before the [agency] at the time [it] made [its] decision.").

The Bureau next claims that it did "thoroughly analyze" Lease Sale 259's impacts on environmental justice communities, citing to a handful of pages from the FSEIS, the 2017 Lease Sale EIS, and the 2017-2022 Program EIS. BOEM Br. 43-44; *see* API Br. 31. However, nothing in these pages provides the hard look at environmental justice impacts that NEPA requires. Rather, these pages highlight how the Bureau reached its arbitrary and unsupported conclusion that Lease Sale 259 "would not produce environmental justice impacts in the GOM region" by asserting that (1) affected communities are "onshore and distant from Federal OCS oil- and gas-related activities," and (2) it "has no regulatory authority" over onshore infrastructure.

BOEM19645; *see* BOEM03729 ("the permitted activities of petroleum exploration, extraction, and production that occur on these leaseholds are distant from human habitation"), 03730 ("BOEM has no regulatory authority over any onshore activities"), 02561-63 ("onshore activity is outside BOEM jurisdiction"). As discussed in Plaintiffs' opening brief, neither of these rationales provides a valid basis for the Bureau's findings. Pls. Br. 36-39; *see Eagle Cnty. Colo. v. Surface Transp. Bd.*, No. 22-1019, 2023 WL 5313815, *14-15 (D.C. Cir. Aug. 18, 2023) (holding that EIS for Utah rail line designed to promote oil production was required to consider downstream impacts from Gulf refineries where oil would be transported).

Nor does the Bureau's assertion in the 2017-2022 Program EIS that Gulf "communities relying solely on subsistence harvests have done so in tandem with the offshore oil industry since 1947." BOEM02561-63. While this statement raises a potential environmental justice concern, nowhere does the Bureau analyze the impacts of its action on these communities or consider alternatives or mitigation that could reduce such impacts. Similarly, the thumbnail descriptions of studies in the FSEIS's "New Information" section, which never analyze the impacts of Lease Sale 259 or other reasonably foreseeable indirect and cumulative effects, *see* BOEM19646-52, cannot save this faulty analysis. *See* API Br. 31-32. And even if some of the onshore infrastructure mentioned in this section is "related to the longstanding onshore shale boom," API Br. 32, this must still be accounted for in the discussion of cumulative impacts.[11]

The Bureau incorrectly attempts to distinguish the court's decision in *Sierra Club v. Mainella*, 459 F.Supp.2d 76 (D.D.C. 2006), by claiming that the agency in that case "failed to

_____

[11] CEQ, *Environmental Justice, Guidance Under the National Environmental Policy Act* 9 (Dec. 10, 1997) (agency should consider "disproportionately high and adverse human health or environmental effects . . . even if certain effects are not within the control or subject to the discretion of the agency proposing the action"), https://www.epa.gov/sites/default/files/2015-02/documents/ej_guidance_nepa_ceq1297.pdf.

analyze certain impacts that were actually within its jurisdiction." BOEM Br. 44. As the court

noted, however, whether the Park Service had "jurisdiction" over activities outside of park

boundaries was not relevant to its NEPA analysis, barring the existence of statutory authority

that would prevent the Park Service from addressing such impacts. *Mainella*, 459 F.Supp.2d at

103-05. As in *Mainella*, the Bureau had the authority to consider such impacts and take action

that could have reduced these impacts, regardless of its "jurisdiction" over onshore

infrastructure, and its failure to do so violated NEPA. Industry's suggestion that *Mainella* is

inapposite because the impacts of Lease Sale 259 would occur "absent the challenged agency

action," API Br. 32, ignores the holding of the case and relies on the same arbitrary conclusions

in the FSEIS attempting to downplay the impacts of this massive lease sale.

Furthermore, the Bureau cannot excuse its dismissal of environmental justice concerns by

claiming that it did analyze such impacts. *See* BOEM Br. 44; API Br. 31. The Bureau's claim

that it "disclosed" in the FSEIS that "0-1" gas processing plant and "0-1" pipeline landfall could

be constructed over the next 50 years ignores the disproportionate and cumulative impacts of

existing infrastructure on Gulf communities, *see* Pls. Br. 9, and only provides further evidence of

its disregard for considering such impacts. *See* BOEM19645. The 2017 Lease Sale EIS and 2018

Lease Sale EIS fare no better. While these reviews acknowledge the onshore infrastructure that

supports offshore leasing, they arbitrarily dismiss such impacts "because BOEM has no

regulatory authority over any onshore activities, including their location." BOEM03730, 05031.

Contrary to CEQ guidance, Industry claims that an analysis of infrastructure impacts

related to Lease Sale 259 would be "speculative" and "of no assistance to the decisionmaker."

API Br. 33-34. Yet the Bureau was clearly capable of assessing (rather than ignoring) the

pollution impacts of such infrastructure, as demonstrated by its calculation of the midstream (i.e.,

refining, storage, and distribution) GHG emissions. *See* BOEM19548, 21570; *Mont. Env't Info. Ctr. v. U.S. Office of Surface Mining*, 274 F.Supp.3d 1074, 1092 (D. Mont. 2017) (finding that agency's argument that it could not evaluate health impacts of coal trains "is undercut by the [NEPA] analysis of greenhouse gas emissions" from such transportation). And while Industry cites to *WildEarth Guardians v. Zinke* for the proposition that an agency could not foresee the impacts on "specific leased parcels," that court specifically found that "the leasing stage is the point of no return with respect to emissions" and the agency "was therefore required to fully analyze the reasonably foreseeable impacts of those emissions." 368 F.Supp.3d at 66; *see id*. at 69 ("NEPA required that BLM reasonably quantify the GHG emissions resulting from oil and gas development on the leased parcels in the aggregate").

IV.    **The Bureau Failed to Take a Hard Look at Oil Spill Risks**

The record does not support the Bureau's assertions that it properly considered oil spill risks, including spills greater than 10,000 barrels, catastrophic spills, or other factors such as deepwater drilling that are making offshore oil and gas development more dangerous. *See* BOEM Br. 38-41; API Br. 34-35. First, the Bureau claims that it did estimate the risk of spills greater than 10,000 barrels in its Oil Spill Risk Assessment ("OSRA") model, which identified the risk of spills up to a million barrels. BOEM Br. 38-39. Plaintiffs have not disputed that the FSEIS provided an estimate of spills greater or equal to 10,000 barrels. *See* Pls. Br. 41. However, the OSRA model—as described in the 2017 Lease Sale EIS—improperly determined that *Deepwater Horizon* was the only spill greater than 10,000 barrels during the prior 15 years, was a "low-probability" event, and thus should not be included in the model. BOEM03115-17 ("During the last 15 years, the only ≥10,000-bbl spill was the Deepwater Horizon. However, this spill is considered to be a low-probability catastrophic event, which is not reasonably foreseeable and is therefore not included."), 04832 (same), 03537-38. The Bureau then reproduced these

28

findings in the FSEIS. BOEM19531-35. The Bureau's response to comments on this issue, *see* API Br. 36 (citing BOEM20041), failed to address these faulty conclusions.

Despite repeatedly stating that larger oil spills are "not reasonably foreseeable" and "not included" in its analysis, BOEM03115, 19645, the Bureau now claims that it did evaluate the impacts of a catastrophic spill in its Catastrophic Spill Event technical report and qualitatively in the FSEIS. BOEM Br. 39; API Br. 35-36. Yet even when referencing this report, the Bureau repeats its assertion that a catastrophic spill in the Gulf "is not reasonably foreseeable nor a part of the Proposed Action" and discounts its consideration in the FSEIS. BOEM19489, 20040 ("the analysis should not be overly emphasized in this Supplemental EIS to avoid confusion over whether it is or is not part of a Proposed Action"). The Bureau also fails to explain how its summary of new science on the continuing harms from *Deepwater Horizon* factored into its oil spill risk analysis. *See* BOEM19565. Furthermore, the Bureau's argument that its approach of separately analyzing the potential impacts of a catastrophic spill should be upheld pursuant to *Oceana v. BOEM*, 37 F.Supp.3d 147 (D.D.C. 2014), misses the mark. *See* BOEM Br. 39-40. The existence of this separate report is not the issue. Rather, it was arbitrary for the Bureau to exclude spills greater than 10,000 barrels, including catastrophic spills such as *Deepwater Horizon*, from the oil spill risk analysis as "not reasonably foreseeable." *See New York v. Nuclear Regul. Comm'n*, 681 F.3d 471, 478, 482 (D.C. Cir. 2012) (agency may only dispense with analyzing the consequences of accident if "the harm in question is so remote and speculative as to reduce the effective probability of its occurrence to zero" (cleaned up)).

The record also does not support the Bureau's claim that it properly considered factors increasing the probability of future oil spills, including deepwater drilling, increased hurricane severity, and aging infrastructure. BOEM Br. 40-41; *see* API Br. 36-37. Despite substantial

record evidence showing the movement of offshore drilling into deeper waters, Pls. Br. 42, the cited pages from the 2017 Lease Sale EIS ignore that this is an issue and even assume more drilling in shallower waters under a high production scenario. *See* BOEM03018-19. Similarly, the Bureau's statement that most spills "between 1956 and *2010*" have occurred in shallow waters, BOEM Br. 40 (emphasis added) (citing BOEM03121), disregards the fact that Gulf oil production has only shifted to deeper water since that time. *See, e.g.*, BOEM17301 (Tbl. 2.1, "Total oil production by decade and water depths of extraction from US waters of the Gulf of Mexico, 1948–2018").

With regard to hurricanes, the Bureau cites to a few pages of the 2017 Lease Sale EIS that discuss hurricanes in the context of background regarding navigation and "natural events," as well as impacts to marine mammals. *See* BOEM03037, 03198, 03546. But nowhere does the Bureau connect the impacts of the powerful hurricanes hitting the Gulf in recent years with oil spill risks. Regardless of whether the Gulf will experience "above-normal" or "below-normal" hurricane activity (or perhaps both) in the next 50 years, *see* BOEM Br. 40, the Bureau has failed to address the fact that the number of Category 4 and 5 storms—and resulting oil spill risk—is likely on the rise. BOEM10096, 14041 (2018 IPCC Report finding that "[t]he proportion of intense tropical cyclones (Category 4–5) and peak wind speeds of the most intense tropical cyclones are projected to increase at the global scale with increasing global warming (high confidence)"). On aging infrastructure, Industry cites several record pages addressing pipeline failure, API Br. 36, but fails to show how this information factored into the oil spill risk analysis.

Finally, there is no merit to the Bureau's claim that other risks, such as those associated with reservoir pressure, "are properly considered at a later stage because Lease Sale 259 does not by itself authorize oil and gas drilling." BOEM Br. 41; *see* API Br. 35, 37. As the Bureau is

aware, the Department of the Interior's manual and regulations provide categorical exclusions from NEPA for later stages, i.e., exploration plans and development and production plans, in the western and central Gulf. 516 Department Manual § 15.4(A); 30 C.F.R. § 550.269(a). This makes the lease sale stage the last point at which an EIS is definitively required. *See Friends of the Earth*, 583 F.Supp.3d at 133-34. Because there may be no "later stage" where these risks are evaluated, *North Slope Borough v. Andrus*, 642 F.2d 589 (D.C. Cir. 1980)—where a second EIS was required for the development and production stage—is inapplicable here. *See* API Br. 35. "NEPA is not designed to postpone analysis of an environmental consequence to the last possible moment. Rather, it is designed to require such analysis as soon as it can reasonably be done." *Kern v. BLM*, 284 F.3d 1062, 1072 (9th Cir. 2002).

Finally, the Bureau cannot rely on post-lease conditions and measures as a substitute for properly assessing oil spill risks in the FSEIS. *See* BOEM Br. 41. While the Bureau cites to *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F.Supp.3d 101 (D.D.C. 2017), that case makes clear that any agency cannot simply reason that "adherence to [a] response plan" would minimize potential oil spill impacts, without a proper consideration of those impacts. *Id*. at 134. Given the potential devastating consequences of another spill like *Deepwater Horizon* and the informational purposes of NEPA, the Bureau had a fundamental obligation to properly analyze "the probabilities of potentially harmful events and the consequences if those events come to pass." *New York*, 681 F.3d at 478. It has failed to do so.

## V.  __The Bureau Failed to Consider Reasonable Alternatives__

The Bureau has also failed to justify its refusal to consider a reasonable range of alternatives to Lease Sale 259, violating the "heart of the [EIS]." 40 C.F.R. § 1502.14(a). As an initial matter, section 50264 of the IRA did not dictate how the Bureau must conduct Lease Sale 259, and in no way constrained the Bureau's consideration of alternatives. *See* BOEM Br. 35;

API Br. 38-39. As the Bureau has already conceded, "[w]hile section 50264 requires BOEM to hold Lease Sale 259, the IRA does not disturb the bulk of BOEM's normal leasing process, including the resolution of questions regarding the scope of the lease sale and the terms of the resulting leases." BOEM20099; *see infra* Arg. Part VII. Thus, this is not a situation where Congress approved construction of a specific infrastructure project, and the agency's "obligation to discuss alternatives in its [EIS] is relatively narrow." *Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 372 (D.C. Cir. 1981).

Similarly, the fact that the FSEIS tiered to earlier NEPA reviews, API Br. 40, did not restrict the consideration of alternatives. *See, e.g.*, BOEM02927 ("as described in the Five-Year Program, any individual lease sale could be scaled back during the prelease sale process to offer a smaller area should circumstances warrant"), 04768 ("analyses may be applied and supplemented as necessary to inform decisions for each of the remaining proposed lease sales scheduled in the 2017-2022 Five-Year Program"). In fact, the alternative ultimately chosen—"a subset of the blocks analyzed as Alternative D"—added exclusions (such as draft and final Wind Energy Areas) that were not part of earlier reviews. *See* BOEM20100-01, 19899-90.

While Plaintiffs do not dispute that the FSEIS's action alternatives technically varied in location and size, BOEM Br. 35-36; API Br. 39-41, the Bureau has failed to show how its illogical conclusions that each alternative would result in the same or similar impacts allowed for informed decisionmaking or meaningful analysis. *See Greater Yellowstone Coal. v. Kempthorne*, 577 F.Supp.2d 183, 204-05 (D.D.C. 2008) (alternatives that resulted in the same determination of "negligible to moderate" impacts prevented meaningful evaluation of differences). The pages of the 2017 Lease Sale EIS cited by the Bureau regarding impacts to deepwater benthic communities vividly demonstrate this problem. *See* BOEM03385 (impacts of Alternative A

expected to be "negligible"), 03386 (Alternative B impacts "expected to be the same as Alternative A, i.e., negligible"), 03387 (Alternative C impacts "expected to be the same as Alternative A, i.e., negligible"), 03388 (Alternative D impacts "expected to be the same as Alternatives A-C, i.e., negligible"). The Bureau also admits that its conclusions in the FSEIS regarding impacts to the Rice's whale (and other marine mammals) were the same as in the 2018 Lease Sale EIS, BOEM Br. 36, ignoring significant new information revealed about this species' habitat over the past few years. *See supra* Arg. Part I.

The Bureau's attempt to distinguish the cases cited by Plaintiffs fails. *See* BOEM Br. 36-37. As the court stated in *American Oceans Campaign v. Daley*, 183 F.Supp.2d 1 (D.D.C. 2000), defendants violated NEPA where their review "discuss[ed] the environmental impacts of the proposed action and alternative(s) in vague and general terms, without discussing what the impact would be to the specific [essential fish habitats] that the [regulations] are intended to protect." *Id*. at 20. Here, the Bureau's finding that the impacts of all action alternatives would be the same "because marine mammals are widely distributed throughout the Gulf" ignores the specific habitat areas used by different species and the varying locations of drilling activities under each alternative. *See* BOEM Br. 36. Similarly, the court in *Greater Yellowstone* found the agency's alternatives analysis to be insufficient not because the alternatives themselves were too similar, but because, like here, "all alternatives studied resulted in the same determination of 'negligible to moderate' impacts on wildlife [which] prevents the decision maker from meaningfully evaluating the difference between the alternatives." 577 F.Supp.2d at 204.

Finally, there is no merit to the Bureau's explanation for failing to consider other reasonable alternatives proposed by Plaintiffs, such as an alternative that would exclude leasing in Rice's whale habitat in De Soto Canyon and within 100-400m deep waters in the western and

central Gulf. BOEM17818, 19899. The Bureau claims that at the time of its decision, "NMFS had identified only the core area and had not yet identified critical habitat." BOEM Br. 37. Yet the Bureau fails to acknowledge that NMFS had presented it with significant new information regarding Rice's whale habitat in the western and central Gulf (which led it to exclude such areas from offshore wind leasing) over a year *before* its decision on Lease Sale 259. *See supra* Arg. Part I; BOEM 17718. Not surprisingly, NMFS has now proposed to designate these areas as Rice's whale critical habitat. 88 Fed. Reg. 47,453 (July 24, 2023).

It is illogical for the Bureau to claim that it "has ensured that [Rice's whale] critical habitat will be protected," BOEM Br. 37, having just opened such areas for oil and gas leasing and production for the next 50 years. Moreover, the Bureau's claim that it did not consider any other reduced leasing alternative "because [it] had no additional benefits over Alternative D," BOEM19900, highlights the absurdity of its alternatives analysis, which seemingly would have reached the same impacts conclusion under any alternative, and is directly contradicted by the Bureau's decision in the ROD to select new exclusions that were never analyzed in the FSEIS. Finally, nothing in the IRA requires each offshore oil and gas lease sale to be greater than 60 million acres to allow for wind leasing. The Bureau's failure to consider reasonable alternatives in the FSEIS, without any adequate justification, violated NEPA.

## VI.   <u>Plaintiffs Have Standing to Bring this Action</u>

Contrary to the meritless arguments made by Industry, *see* API Br. 12-20, Plaintiffs have adequately demonstrated standing with regard to the claims and relief sought in this action through declarations submitted with their motion for summary judgment. *See* ECF Nos. 52-2 to 52-12. Plaintiffs are organizations that have associational standing to sue "on behalf of [their] members when [their] members would otherwise have standing to sue in their own right . . . ."

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000).[12]
For members to establish standing, they "must show (1) [they have] suffered an 'injury in fact'
that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;
(2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as
opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id*.
Plaintiffs meet these requirements here.

### A.    Plaintiffs have demonstrated concrete recreational, aesthetic, commercial, and other injuries

In environmental cases, plaintiffs may satisfy the injury-in-fact requirement by
"aver[ring] that they use the affected area and are persons for whom the aesthetic and
recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at
183 (cleaned up); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While
generalized harm to . . . the environment will not alone support standing, if that harm in fact
affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."). It is
well settled that an agency's failure to adequately prepare an EIS "before taking action with
adverse environmental consequences constitutes the archetypal procedural injury redressable
under Article III." *Sierra Club v. FERC*, 827 F.3d 36, 43 (D.C. Cir. 2016) (cleaned up); *see
Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573 n.7 (1992). In such situations, the imminence and
redressability requirements for a plaintiff are relaxed, while the rest of the standing inquiry is the
same. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013).

---

[12] Plaintiffs assert associational standing on behalf of their members, not organizational standing.
*See* API Br. 19-20. It is not contested that Plaintiffs meet the other two factors for associational
standing in that (1) the interests they seek to protect are germane to their institutional purposes,
and (2) the relief sought under the APA does not require the participation of individual members.
*See Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).

Here, the declarations submitted by Plaintiffs sufficiently demonstrate injury-in-fact through their members' use of the Gulf for recreational, aesthetic, commercial, and scientific purposes, which will be injured by the Bureau's decision to approve Lease Sale 259 in violation of NEPA and the APA. For example, Healthy Gulf member Scott Eustis is a New Orleans resident who takes regular trips to the Gulf as an ecological guide to observe wildlife, including trips to Sackett Bank on the Outer Continental Shelf. ECF No. 52-3 ("Eustis Decl."), ¶¶ 1, 12-14. Mr. Eustis described the harm that Lease Sale 259's pollution and development impacts will have on fish and wildlife in the Gulf, as well as the aesthetic impacts from additional oil platforms and other infrastructure associated with this expanded offshore drilling. *Id.* ¶¶ 16, 23, 27-28. Friends of the Earth and Sierra Club member Kenneth Saxon is a resident of Brownsville, Texas, owns beachfront property on South Padre Island, and routinely visits Gulf beaches and parks for recreation and wildlife encounters. ECF No. 52-6 ("Saxon Decl."), ¶¶ 2, 8-10, 13. Mr. Saxon avers that increased oil and gas activities from Lease Sale 259, and the resulting pollution and industrial activity, will harm these interests and diminish his family's enjoyment of activities such as surfing, fishing, and visiting the beach. *Id.* ¶¶ 14-18, 21, 25.

Healthy Gulf and Sierra Club member Louis Skrmetta is a Biloxi, Mississippi resident who runs a small business that offers daily wildlife cruises and a ferry service to Ship Island, a part of the Gulf Islands National Seashore, and personally enjoys the aesthetics and wildlife in the Gulf. ECF No. 52-2 ("Skrmetta Decl."), ¶¶ 2, 10-11, 24. Mr. Skrmetta describes how these interests will be impaired by additional offshore drilling under Lease Sale 259, including impacts from pollution, artificial light and noise, drilling platforms, and oil spills, on his recreational, aesthetic, and commercial interests. *Id.* ¶¶ 29-34, 36, 42, 45. Sierra Club and Healthy Gulf member Robert Wiygul, a resident of Ocean Springs, Mississippi, regularly visits Gulf waters to

fish and enjoy the region's unique wildlife, which he finds threatened by oil and gas activities

proposed under Lease Sale 259 though spills, pollution, seismic activity, and infrastructure such

as drilling platforms and pipelines. ECF 52-12 ("Wiygul Decl."), ¶¶ 2-28. Based on these

declarations, among others, Plaintiffs have demonstrated an injury-in-fact. *See Lujan*, 504 U.S. at

562-63 ("the desire to use or observe an animal species, even for purely esthetic purposes, is

undeniably a cognizable interest for purpose of standing"); *Sierra Club v. FERC*, 827 F.3d at 44

("credible claims of exposure to increased noise and its disruption of daily activities, backed up

by specific factual representations in an affidavit or declaration, are sufficient to satisfy Article

III's injury-in-fact requirement"); *N.C. Fisheries Ass'n v. Gutierrez*, 518 F.Supp.2d 62, 82

(D.D.C. 2007) (economic harm is a "canonical example of injury in fact sufficient to establish

standing"); *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996) (if

standing "can be shown for at least one plaintiff, we need not consider the standing of the other

plaintiffs to raise that claim").

## B.   Plaintiffs' injuries are fairly traceable to the Bureau's faulty NEPA analysis for Lease Sale 259

With regard to the second factor, the Supreme Court has explained that Plaintiffs' injuries

must be "fairly traceable to the challenged action of the defendant, and not the result of the

independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (cleaned

up). The causal chain for procedural injuries contains two links: "one connecting the omitted

NEPA analysis to some substantive government decision that may have been wrongly decided

because of the lack of proper NEPA analysis," and one connecting that decision "to the

plaintiff's particularized injury." *Sierra Club v. FERC*, 827 F.3d at 44 (cleaned up). Plaintiffs are

not required to "show that but for the alleged procedural deficiency the agency would have

reached a different substantive result. All that is necessary is to show that the procedural step was connected to the substantive result." *WildEarth Guardians*, 738 F.3d at 306 (cleaned up).

Here, the challenged lease sale opened 73.3 million acres of the Gulf of Mexico, the vast majority of unleased available acreage, to oil and gas leasing. BOEM20101. The Bureau has predicted that Lease Sale 259 will result in up to 1,750 new exploration and development wells, 280 new production structures, over 2,000 km of new pipelines, and over 541,000 service vessel round trips. BOEM19520. Production from the sale includes up to 1.12 billion barrels of oil and 4.4 trillion cubic feet of gas over the next 50 years. BOEM06089. As discussed in Plaintiffs' brief, the FSEIS is grossly deficient in multiple ways, including by failing to adequately consider harm to Rice's whale, oil spill risks, environmental justice, and climate harms, as well as less harmful alternatives. *See* Pls. Br.; *Sierra Club v. FERC*, 827 F.3d at 44 ("it is sufficient for standing purposes that the aesthetic injury follows from an inadequate [EIS] whether or not the inadequacy concerns the same environmental issue that causes their injury" (cleaned up)).

Consequently, Plaintiffs' alleged injuries from expanded oil and gas operations in the Gulf are fairly traceable to the Bureau's improper NEPA analysis for Lease Sale 259, which authorizes the activities that will harm the interests of Plaintiffs' members. *See Friends of the Earth*, 583 F.Supp.3d at 130 n.3 (in challenge to Gulf Lease Sale 257, finding that defendants' "alleged failure to comply with NEPA led directly to the Record of Decision and the holding of Lease Sale 257," enabling the oil and gas development causing Plaintiffs' personal, recreational, aesthetic, and commercial injuries); *Center for Biological Diversity v. U.S. Dep't of the Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009) (in challenge to 2007-2012 Program, "Interior's adoption of an irrationally based Leasing Program could cause a substantial increase in the risk to [plaintiffs'] enjoyment of the animals affected by the offshore drilling").

38

### C.   Plaintiffs' injuries will be redressed by a favorable decision requiring the Bureau to redo its NEPA analysis

Plaintiffs have also demonstrated redressability. *See Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017) (Kavanaugh, J.) ("[I]f a government action causes an injury, enjoining the action usually will redress that injury."). To satisfy this element, Plaintiffs must show that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181. Plaintiffs "need not show that a favorable decision will relieve [their] every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).

Here, if the Court were to find that the FSEIS failed to comply with the APA and NEPA and require the Bureau to redo its analysis, Plaintiffs' members' injuries would likely be redressed through a proper consideration of the harms posed by Lease Sale 259 and mitigation measures that could address such impacts. *See, e.g.*, Skrmetta Decl., ¶¶ 50-53; Eustis Decl., ¶ 29; Saxon Decl., ¶¶ 25-27; Wiygul Decl., ¶ 29; *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 665 (D.C. Cir. 1996) (to determine whether an injury will likely be redressed by a favorable decision, courts must "assume for purposes of standing that [the plaintiff] will ultimately receive the relief sought"). Thus, Plaintiffs' injuries are redressable because granting the requested relief would at least mitigate, if not eliminate, the alleged harm. *See Sierra Club v. FERC*, 827 F.3d at 44 (finding that vacatur of decision for NEPA violation would redress Plaintiffs' injuries).

### D.   Industry has failed to show that Plaintiffs lack standing to bring this action

Industry's various contentions that Plaintiffs lack standing, which rely heavily on cherry-picked, out-of-context statements from Plaintiffs' declarations, must be rejected. *See* API Br. 12-20. As an initial matter, Industry is wrong that Plaintiffs have "forfeited any argument for standing" by raising it in a footnote. API Br. 12-13. Plaintiffs pled associational standing in their complaint, ECF No. 1 at ¶¶ 14-22, provided extensive standing declarations with their summary

judgment motion, and do not concede an argument by addressing it in opposition to a motion.
*See* LCvR 7(b). This is especially true given that Plaintiffs reasonably believed that their
standing is self-evident, *see* Pls. Br. 18 n.12, as evidenced by the lack of opposition to Plaintiffs'
standing by the Bureau. *See Am. Library Ass'n v. F.C.C.*, 401 F.3d 489, 495 (D.C. Cir. 2005)
(agency's lack of opposition to petitioner's standing lent "credence to the reasonableness of
petitioners' assumption that standing was self-evident").

    With regard to injury-in-fact, Industry ignores the declarations provided by Plaintiffs that
establish "some connection between the alleged procedural injury and a substantive injury that
would otherwise confer Article III standing." *See United Transp. Union v. ICC*, 891 F.2d 908,
918 (D.C. Cir. 1989). As discussed above, Plaintiffs are not relying on "harm from the effects of
global climate change" or other non-particularized injuries, API Br. 13-14, but identified
member-specific recreational, aesthetic, and other injuries resulting from the Bureau's failure to
comply with NEPA and the APA in approving Lease Sale 259. Industry ignores these members'
stated, concrete intentions to engage in wildlife viewing, recreation, and other activities on the
Gulf. *See, e.g.*, Eustis Decl., ¶ 14 ("I am planning on another birding trip to Sackett Bank in
2023"); Saxon Decl., ¶ 10 ("We are planning a trip back to the Laguna Atascosa Refuge in May
before the hottest part of summer sets in"); Skrmetta Decl., ¶ 53 ("I plan on running my business
and regularly captaining daily excursions for the foreseeable future"); Wiygul Decl., ¶ 16 ("I will
be taking visitors out to Horn Island to fish on Friday, June 16, 2023").

    Contrary to Industry's assertions, API Br. 15-16, there is no "geographic proximity" test
to establish injury-in-fact. *See City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002)
("geographic proximity does not, in and of itself, confer standing on any entity under NEPA or
any other statute"). Not only have Plaintiffs' members demonstrated interests and plans related

directly to the lease sale area, *see, e.g.*, Eustis Decl., ¶¶ 12-14; Wiygul Decl., ¶ 14, but it is undisputed that Lease Sale 259 will have impacts far beyond drilling or "the scope of the lease sale," and on species that move in and out of the lease sale area. *See, e.g.*, BOEM19448-49 (discussing impacts to Coastal Habitats and Coastal Barrier Beaches), 19520 (cataloging total pipelines and vessel round trips inside and outside the Gulf OCS), 19653 ("Unavoidable impacts to onshore water quality would occur as a result of discharges such as runoff and effluent discharges from existing onshore infrastructure and vessel traffic").

There is also no basis for Industry's contention that Plaintiffs' injuries are not fairly traceable to the challenged action, i.e., the Bureau's decision to approve Lease Sale 259. *See Fla. Audubon Soc.*, 94 F.3d at 663 (causation examines whether it is "substantially probable . . . that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff"). As discussed above, in Plaintiffs' declarations, and throughout Plaintiffs' brief, Lease Sale 259 will (not "may") result in significant impacts by opening 73.3 million acres of the Gulf to oil and gas development. *See* Pls. Br.; Saxon Decl., ¶ 18 ("It is my understanding that Lease Sale 259 offers parcels in the Rice's whale's habitat and would contribute to additional risk of harm from increased industrial activity in this area"); Wiygul Decl., ¶ 13 ("The wide open leasing that the BOEM is proposing now in Lease Sale 259 would open up even areas where there aren't any rigs to drilling platforms, pipelines and everything that goes with them"). Courts in this Circuit have routinely found that similar offshore lease sales, and even the five year planning process that precedes such sales, cause similar injuries. *See Friends of the Earth*, 583 F.Supp.3d at 130 n.3; *Center for Biological Diversity*, 563 F.3d at 479.

Finally, given that Plaintiffs' injuries are fairly traceable to Lease Sale 259, there is no merit to Industry's assertion that Plaintiffs' harms "will remain unchanged by any correction of

procedural errors" regarding Lease Sale 259. *See* API Br. 19; *WildEarth Guardians*, 738 F.3d at

308 (plaintiffs' injuries "are caused by the allegedly unlawful ROD and would be redressed by

vacatur of the ROD on the basis of any of the procedural defects identified in the FEIS").

## VII.   The IRA's Direction to Hold Lease Sale 259 Did Not Absolve the Bureau of its NEPA Obligations

Nothing in the IRA's instruction to hold Lease Sale 259 eliminated the Bureau's usual

discretion over the scope and conditions of the sale or released the Bureau from its NEPA

obligations. The Bureau was therefore required to consider relevant evidence and analyze the

significant environmental impacts of the sale under NEPA.

Industry—not the Bureau—now argues that the IRA presented the Bureau with a binary

choice: to hold Lease Sale 259 without conducting a NEPA review, or to not hold the lease sale

at all and violate the IRA. API Br. 20-21. But the plain text of the IRA did not constrain the

Bureau's discretion in this manner. The IRA only directed the Bureau to take a specific action: to

conduct Lease Sale 259, in accordance with the ROD for the 2017-2022 Program, no later than

March 31, 2023. Pub. L. No. 117-169, 136 Stat. 1818 at § 50264(d) (2022). Section 50264(d)

says nothing about the applicability of NEPA to this sale. *Id*. It is also silent as to the remainder

of the Bureau's ordinary discretion over the sale. *Id*. For example, section 50264(d) does not

dictate the size, location, or any conditions, such as additional mitigation measures to curb

potential environmental effects, of Lease Sale 259. *Id.*; Pls. Br. 12-13. Instead, Congress left

these important determinations to the Bureau, allowing it to exercise its usual decisionmaking

authority and still comply with the IRA's mandate to hold the sale. *See WildEarth Guardians*,

368 F.Supp.3d at 51-52 (where statute requires oil and gas leasing but agency retains "discretion

to determine where" and "under what terms and conditions oil and gas development should

occur," agency must "consider" environmental impacts "when making [leasing] decisions");

*Forelaws on Bd. v. Johnson*, 743 F.2d 677, 680-81 (9th Cir. 1984) (holding that NEPA analysis was required for time-limited action mandated by statute where "administrator possesse[d] a great deal of discretion" over terms of action, including terms that "might have varying effects upon the environment"). This broad discretion was subject to NEPA's requirement to consider adverse environmental consequences. *See id.*; *Sierra Club v. FERC*, 867 F.3d at 196.

Industry's argument that the IRA deprived the Bureau of its ability to choose an alternative scope for the sale by requiring that it be held in accordance with the ROD for the 2017-2022 Program overreads the IRA. API Br. 21. The ROD defined the sale's scope broadly, affording the Bureau plenty of flexibility to shape Lease Sale 259. BOEM02838-40. Other than ensuring that the sale be "region-wide and include unleased acreage not subject to moratorium or otherwise unavailable, in the Western, Central, and Eastern Gulf," the Bureau was free to choose where and how many acres to include (or exclude) from each region and what conditions to apply to the lease sale. BOEM02840. It had the discretion—and indeed, the obligation—to consider and choose from a number of alternatives that would be consistent with the purpose and need of the sale while also avoiding adverse environmental effects, including potentially holding a much smaller sale or imposing additional mitigation measures. *See* 40 C.F.R. §§ 1500.2(e), 1502.14; *Food & Water Watch v. FERC*, 28 F.4th 277, 282 (D.C. Cir. 2022) (agency must evaluate "reasonable alternatives to a contemplated action" (citation omitted)).

Notably, the Bureau did not raise this argument, and admitted during the NEPA process that "the IRA does not disturb the bulk of BOEM's normal leasing process, including the resolution of questions regarding the scope of the lease sale and the terms of the resulting leases." BOEM20099. In conducting the analysis challenged here, the Bureau considered options

with different block exclusions, undermining Industry's suggestion that the 2017-2022 Program ROD deprived the Bureau of its discretion over the sale's scope. BOEM20107-09.

Seeking support for their strained reading of section 50264(d), Industry contrasts its mandate to hold the lease sale with other IRA sections that discuss actions Interior "may take." API Br. 21-22. But this is beside the point—nothing in section 50264(d)'s directive to hold Lease Sale 259 suggests that the Bureau did not have to follow otherwise applicable law in holding the sale. If Congress wanted to exempt the sale from the requirements of NEPA, it could have done so.[13] In fact, it expressly repealed otherwise applicable requirements in other sections of the IRA. *See, e.g.*, IRA §§ 10101(k)(1)(B)(i) & (ii)(II), (D)(i) (exempting compliance with provisions of the Internal Revenue Code of 1986); § 22002(a) (exempting compliance with the Farm Security and Rural Investment Act of 2002 in appropriating funds); *see Maine Cmty. Health Options v. United States*, 140 S.Ct. 1308, 1323 (2020) ("when Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning" (cleaned up)).

Industry's efforts to equate the IRA's treatment of Lease Sale 257 and Lease Sale 259, API Br. 22, also miss the mark. Congress's directive regarding Lease Sale 257 differs in meaningful ways from its instruction regarding Lease Sale 259. Section 50264(b)(1) mandated that the Bureau "accept the highest valid bid for each tract or bidding . . . for which a valid bid

---

[13] Industry does not explicitly argue that Congress impliedly waived the Bureau's NEPA obligations. In any event, nothing in the plain language or legislative history of the IRA reflects a "clear and manifest" intent to exempt Lease Sale 259 from NEPA compliance. *Hunter v. FERC*, 711 F.3d 155, 159 (D.C. Cir. 2013); *see Vill. of Barrington*, 636 F.3d at 662-63 ("courts have found clear congressional intent to impliedly repeal NEPA only where there was 'a clear and unavoidable conflict' between an agency's organic statute and NEPA" (citation omitted)); *Izaak Walton League*, 655 F.2d at 366-67 (stating that courts require "very strong evidence in the legislative history demonstrating a congressional desire to repeal NEPA"); *Forelaws*, 743 F.2d at 683.

was received," and then "promptly issue to the high bidder a fully executed lease . . . ." In *Friends of the Earth v. Haaland*, the D.C. Circuit found that this language imposed a nondiscretionary duty on the Bureau to issue leases for Lease Sale 257 and held that the issuance of these leases was no longer subject to NEPA because, even if the Bureau conducted a new NEPA analysis for the sale, it would still have to issue these leases to comply with the IRA. No. 22-5036, 2023 WL 3144203, at *1-2 (D.C. Cir. 2023).

For Lease Sale 259, by contrast, the IRA only directs the Bureau to hold a sale described in the 2017-2022 Program ROD by a specific date. Indeed, within the general contours of holding a "region-wide" sale that "include[s] unleased acreage not subject to moratorium or otherwise unavailable," the Bureau has considerable latitude to shape the sale and still comply with the IRA. BOEM02840. The IRA thus should not be read so broadly to remove the Bureau's statutory obligation to consider the impacts of the sale and act pursuant to these considerations. *See Sierra Club v. U.S. Dep't of Agric.*, 777 F.Supp.2d 44, 66 (D.D.C. 2011) (where an agency's role is not "merely ministerial" and "significant . . . authority and discretion [are] entrusted" to it, it must "take the environmental impacts of its actions into account when making decisions"); *Mainella*, 459 F.Supp.2d at 105 (holding that NEPA applied when agency was "only constrained by *its own regulation* from considering impacts" and "information on impacts" would be "useful to [agency] in its decisionmaking process" (emphasis in original)); *Jones v. Gordon*, 792 F.2d 821, 826 (9th Cir. 1986) (emphasizing "congressional desire" for "liberal [] interpretation[s]" that "accommodate the application of NEPA").

## CONCLUSION

For the foregoing reasons, the Court should declare that the Bureau's decision to hold Lease Sale 259 violated NEPA and the APA.

Respectfully submitted this 1st day of September, 2023.

/s/ George Torgun
George Torgun (*pro hac vice*)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
gtorgun@earthjustice.org

Jan E. Hasselman (DC Bar No. WA0029)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone
415-217-2040 Fax
jhasselman@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Bayou City Waterkeeper, Friends of the Earth, and Center for Biological Diversity*

/s/ Kristen Monsell
Kristen Monsell (DC Bar No. CA00060)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94612
510-844-7137 Telephone
510-844-7150 Fax
kmonsell@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity*

/s/ Thomas Zimpleman
Thomas Zimpleman (DC Bar No. 1049141)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St., Suite 300
Washington, DC 20005
202-513-6244 Telephone
tzimpleman@nrdc.org

Julia K. Forgie (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second St.
Santa Monica, CA 90401
310-434-2351 Telephone
jforgie@nrdc.org

Irene Gutierrez (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter St., 21st Floor
San Francisco, CA 94104
415-875-6187 Telephone
igutierrez@nrdc.org

Melanie D. Calero (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
40 W. 20 Street
New York, NY 10011
212-727-4546 Telephone
mcalero@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense
Council*

*/s/ Devorah Ancel*
Devorah Ancel (*pro hac vice*)
SIERRA CLUB
PO Box 4998
Austin, TX 78765
415-845-7847 Telephone
303-449-6520 Fax
devorah.ancel@sierraclub.org

*Attorney for Plaintiff Sierra Club*