**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEALTHY GULF, BAYOU CITY WATERKEEPER, FRIENDS OF THE EARTH, CENTER FOR BIOLOGICAL DIVERSITY, NATURAL RESOURCES DEFENSE COUNCIL, and SIERRA CLUB,<br><br>*Plaintiffs*,<br><br>v.<br><br>DEBRA A. HAALAND, LAURA DANIEL-DAVIS, U.S. DEPARTMENT OF THE INTERIOR, and BUREAU OF OCEAN ENERGY MANAGEMENT,<br><br>*Defendants*,<br><br>and<br><br>AMERICAN PETROLEUM INSTITUTE, and CHEVRON U.S.A. INC.,<br><br>*Intervenor-Defendants.* | No. 1:23-cv-00604-APM |

**SUPPLEMENTAL BRIEF OF INTERVENOR-DEFENDANTS AMERICAN
PETROLEUM INSTITUTE AND CHEVRON U.S.A. INC.**

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................................. ii

INTRODUCTION ...............................................................................................................................1

ARGUMENT......................................................................................................................................1

    I.    Plaintiffs' Reliance On CEQ Regulations Confirms Their Challenge Fails......................2

    II.   The CEQ Regulations Are *Ultra Vires* ...............................................................................9

CONCLUSION..................................................................................................................................10

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page

**CASES:**

*California v. Bernhardt*,
    472 F. Supp. 3d 573 (N.D. Cal. 2020) ........................................................................... 5

*City of Portland v. EPA*,
    507 F.3d 706 (D.C. Cir. 2007) ........................................................................................ 7

*Covad Commc'ns Co. v. FCC*,
    450 F.3d 528 (D.C. Cir. 2006) ........................................................................................ 7

*DOT v. Public Citizen*,
    541 U.S. 752 (2004) ....................................................................................................... 3

*EarthReports, Inc. v. FERC*,
    828 F.3d 949 (D.C. Cir. 2016) ........................................................................................ 6

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ..................................................................................................... 10

*Gulf Restoration Network v. Haaland*,
    47 F.4th 795 (D.C. Cir. 2022) ........................................................................................ 6

* *Marin Audubon Society v. FAA*,
    121 F.4th 902 (D.C. Cir. 2024) ........................................................................... 1, 5, 9, 10

*Mayo v. Reynolds*,
    875 F.3d 11 (D.C. Cir. 2017) .......................................................................................... 6

*Nevada v. DOE*,
    457 F.3d 78 (D.C. Cir. 2006) .......................................................................................... 8

*Patterson v. United States*,
    999 F. Supp. 2d 300 (D.D.C. 2013) ................................................................................ 9

*Sierra Club v. FERC*,
    867 F.3d 1357 (D.C. Cir. 2017) ...................................................................................... 2

*United States ex rel. Scutellaro v. Capitol Supply, Inc.*,
    2017 WL 1422364 (D.D.C. Apr. 19, 2017) .................................................................... 9

*Vecinos para el Bienestar de la Comunidad Costera v. FERC*,
    6 F.4th 1321 (D.C. Cir. 2021) ........................................................................................ 4

\* Authorities upon which we chiefly rely are marked with an asterisk.

## TABLE OF AUTHORITIES—Continued

Page

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ................................................................. 10

**STATUTES:**

5 U.S.C. § 553 ............................................................................ 7

16 U.S.C. § 1533(d) ................................................................... 9

\* 42 U.S.C. § 4332
   (C)(i) ...................................................................................... 3, 8
   (C)(iii) ........................................................................................ 9
   (E) .............................................................................................. 5

42 U.S.C. § 4333 ....................................................................... 10

42 U.S.C. § 4336(a)(4) ............................................................... 3

42 U.S.C. § 4336e(10)(B)(vii) .................................................... 3

42 U.S.C. § 4342 ........................................................................ 9

42 U.S.C. § 4344 ........................................................................ 9

43 U.S.C. § 1334(a)(1) ............................................................... 8

**REGULATIONS:**

40 C.F.R. § 1500.1(b) ................................................................ 5

40 C.F.R. § 1500.2(e) ................................................................ 9

40 C.F.R. § 1502.14 ............................................................... 2, 9

40 C.F.R. § 1502.16(b) .............................................................. 3

40 C.F.R. § 1502.2(d) ................................................................ 4

40 C.F.R. § 1502.22 ................................................................... 4
   (b) .............................................................................................. 5
   (b)(4) ......................................................................................... 8

40 C.F.R. § 1502.24 ................................................................... 5

## TABLE OF AUTHORITIES—Continued

Page

40 C.F.R. § 1502.9
   (a) ............................................................................................................................ 7
   (b) ............................................................................................................................ 7
   (c) ............................................................................................................................ 7

40 C.F.R. § 1503.4 ............................................................................................................ 7

40 C.F.R. § 1508.25(c) ..................................................................................................... 3

40 C.F.R. § 1508.7 (2019) ............................................................................................... 3

40 C.F.R. § 1508.8(b) ...................................................................................................... 3

43 C.F.R. § 46.10(a)(2) .................................................................................................. 10

88 Fed. Reg. 1,196 (Jan. 9, 2023) ................................................................................... 4

Exec. Order 11514, 35 Fed. Reg. 4,247 (Mar. 7, 1970) ................................................. 9

Exec. Order 11991, 42 Fed. Reg. 26,967 (May 25, 1977) ............................................. 9

Exec. Order 12898, 59 Fed. Reg. 7,629 (Feb. 11, 1994) ........................................... 4, 5

**OTHER AUTHORITY:**

CEQ, *Environmental Justice: Guidance Under the National Environmental Policy Act*
   (Dec. 10, 1997), https://ceq.doe.gov/docs/ceq-regulations-and-
   guidance/regs/ej/justice.pdf ................................................................................... 4, 5

**INTRODUCTION**

The Court ordered supplemental briefing on the effect of *Marin Audubon Society v. FAA*, 121 F.4th 902 (D.C. Cir. 2024), in this case. The Court need not reach the issue if it concludes that Plaintiffs lack standing or that the Bureau had no obligation to consider the effects Plaintiffs identify because the Inflation Reduction Act (IRA) required the Bureau to hold Lease Sale 259. But if this Court rejects Intervenors' arguments on those issues, then the principles of *Marin Audubon* establish yet another reason, in addition to those already briefed, why Plaintiffs' NEPA challenge fails.

*Marin Audubon* recognized that the Council on Environmental Quality (CEQ)'s regulations, "which purport to govern how all federal agencies must comply with [NEPA], are *ultra vires*" and unenforceable because CEQ "had no lawful authority to promulgate these regulations." 121 F.4th at 908, 914. Plaintiffs' entire lawsuit is infected top to bottom by Plaintiffs' reliance on CEQ regulations that far exceed NEPA's statutory requirements.

Applying *Marin Audubon* also implicates the question currently before the Supreme Court: whether NEPA "requires an agency to study environmental impacts beyond the proximate effects of the action over which the agency has regulatory authority." Pet. Br. i, *Seven Cnty. Infrastructure Coal. v. Eagle Cnty.*, No. 23-975 (U.S. Aug. 28, 2024). Under NEPA's text, the answer is no. An agency need not do more once it clears NEPA's minimum requirements, *id.* at 50, and courts should "not address" arguments demanding further environmental analysis, *Marin Audubon*, 121 F.4th at 908. Because the CEQ regulations are *ultra vires* and exceed NEPA's statutory requirements, they provide no basis for setting aside Lease Sale 259.[1]

---

[1] Intervenors do not address any remedy issues, consistent with this Court's order. *See* ECF 46.

# ARGUMENT

## I. Plaintiffs' Reliance On CEQ Regulations Confirms Their Challenge Fails.

The CEQ regulations permeate Plaintiffs' entire lawsuit. But because the CEQ regulations are *ultra vires*, and because Plaintiffs' demands of the Bureau exceed NEPA's statutory requirements, the Bureau had no judicially enforceable obligation to consider or follow them. Lease Sale 259's Supplemental EIS cannot be found insufficient based on Plaintiffs' belief that the Bureau should have done more.

***1. Inflation Reduction Act.*** As an initial matter, the principles of *Marin Audubon* underscore that the Bureau had no obligation to consider the effects about which Plaintiffs complain—and, thus, that any purported defects in the Bureau's analysis are not grounds to challenge Lease Sale 259. The Bureau recognized that the IRA required it to hold Lease Sale 259, yet nevertheless chose to prepare a wide-ranging Supplemental EIS "in accordance with current NEPA regulations and the Council on Environmental Quality (CEQ) guidance." BOEM19890. That is, despite the IRA, the Bureau believed it had to consider the environmental effects of canceling Lease Sale 259 "to comply with regulations implementing NEPA," BOEM19906; *see also* BOEM19502 ("NEPA's implementing regulations provide that an EIS must include the analysis of a No Action Alternative" (citing 40 C.F.R. § 1502.14))). Under *Marin Audubon*, however, the CEQ regulations are *ultra vires* and cannot color the Bureau's environmental obligations, particularly in light of Congress's direction to hold Lease Sale 259.

All but one of Plaintiffs' claims are fundamentally about whether the Bureau should have held Lease Sale 259 *at all*—not about the scope of the sale—and thus depend on the Bureau's discretion to cancel lease sales. *See* ECF 63 at 7-11. But the IRA's command that the Bureau hold Lease Sale 259 left the Bureau with "no statutory authority to act on th[e] information" that Plaintiffs say the Bureau should have considered. *Sierra Club v. FERC*, 867 F.3d 1357, 1372

2

(D.C. Cir. 2017) (emphasis omitted); *see* ECF 67 at 1–2; 42 U.S.C. §§ 4336(a)(4), 4336e(10)(B)(vii).  And Plaintiffs' remaining claim—urging a vastly reduced scope based on the Rice's whale—is not consistent with the Gulf-wide sale of all available acreage that Congress demanded.  ECF 63 at 10.  Whatever defects Plaintiffs believe the analysis contains, the Bureau's voluntary decision to consider additional environmental information cannot be judicially enforceable grounds for faulting Lease Sale 259.

     2. ***Greenhouse Gas Emissions.***  Plaintiffs' greenhouse-gas arguments are based on Plaintiffs' interpretation of CEQ's *ultra vires* regulations and guidance that far exceed NEPA's requirements.  Plaintiffs cite the CEQ regulations to insist that the Bureau was required to analyze the "cumulative effects" of Lease Sale 259, *see* ECF 52-1 at 2 (citing 40 C.F.R. § 1508.25(c))—defined as an action's "incremental impact" when added to "past, present, and reasonably foreseeable future actions," including those taken by other agencies and private parties, 40 C.F.R. § 1508.7 (2019).  But NEPA contains no similar requirement; an agency need consider only an action's "reasonably foreseeable environmental effects."  42 U.S.C. § 4332(C)(i).  Plaintiffs' argument that agencies must consider "the lifecycle GHG emissions of projects they authorize," ECF 52-1 at 22 (citing 40 C.F.R. §§ 1502.16(b), 1508.8(b))—including emissions from all " 'downstream' consumption and onshore processing of oil and gas" yet-to-be extracted from yet-to-be-built wells, BOEM02037—fails for the same reason.  The global climate effects of combusting fuel intended to be extracted in the future are simply too remote for Lease Sale 259 to be a legally relevant cause—and certainly where the Bureau has no control over combustion choices.  *See DOT v. Public Citizen*, 541 U.S. 752, 767 (2004) (NEPA requires "reasonably close causal relationship" akin to "proximate cause" in tort law (citation omitted)).

The Bureau also did not have any obligation to address—and the judiciary cannot enforce—the CEQ regulation Plaintiffs say requires contextualizing agency decisions within broader "climate goals." Oral Arg. Tr. 39 (citing 40 C.F.R. § 1502.2(d)); *see* ECF 52-1 at 33; ECF 59 at 20. Nor did the Bureau have any obligation to follow what Plaintiffs characterize as the requirements in situations where information is "incomplete and unavailable." ECF 59 at 12 (quoting 40 C.F.R. § 1502.22); *see* Oral Arg. Tr. 37 (Plaintiffs arguing that "[§] 1502.22 tells us exactly the roadmap of what to do in that kind of situation"). And the Bureau had no obligation to consider the CEQ guidance that Plaintiffs repeatedly tout. *See* 88 Fed. Reg. 1,196, 1,202 (Jan. 9, 2023) (cited at ECF 52-1 at 22, 27, 31, 34-35; ECF 59 at 12, 14, 18, 21, 23, 24). The effects of "processing, refining, transporting, and end-use of the fossil fuel being extracted, including combustion of the resources," *id.* at 1,204, far exceed NEPA's proximate-cause-based standard.

Although Plaintiffs identify cases invalidating NEPA findings for "inadequately addressed GHG emissions," ECF 52-1 at 23, those cases did so based on the agency's noncompliance with CEQ's regulations—without addressing whether those regulations were judicially enforceable or whether NEPA itself required the analysis. *See, e.g.*, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1329 (D.C. Cir. 2021) (faulting agency for failing to address 40 C.F.R. § 1502.22). Because the CEQ regulations are *ultra vires* and exceed NEPA's requirements, these cases do not support Plaintiffs.

**3. *Environmental Justice*.** Plaintiffs' environmental-justice claim is not judicially cognizable. The concept of "environmental justice"—analysis through a socioeconomic-, racial-, or minority-impact lens—arises from an executive order that by its own terms does not "create any right to judicial review," *see* Exec. Order 12898, 59 Fed. Reg. 7,629, 7,632-33 (Feb. 11, 1994), and unenforceable CEQ guidance, *see* CEQ, *Environmental Justice: Guidance Under*

4

*the National Environmental Policy Act* (Dec. 10, 1997), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf.  Nothing in NEPA requires that agencies specially consider potential impacts on "minority populations and low-income populations" over any other community.  59 Fed. Reg. at 7,629.  Nor does NEPA require agencies to assess the "cumulative impacts" of development—let alone development beyond the Bureau's purview of oil-and-gas leasing—on environmental-justice communities.  *See* ECF 52-1 at 38.  The environmental-justice provisions of executive orders and CEQ guidance are not judicially enforceable, and Plaintiffs' corresponding claim is not cognizable.  *See Marin Audubon*, 121 F.4th at 911-915.

    *4. Rice's Whales.*  Plaintiffs' complaints as to Rice's whales are likewise based on unenforceable CEQ regulations.  Plaintiffs' argument that the Bureau "ignored" the Soldevilla study is based on CEQ regulations that some courts have interpreted as mandating agencies use "state of the art science."  ECF 52-1 at 19 (quoting *California v. Bernhardt*, 472 F. Supp. 3d 573, 624 (N.D. Cal. 2020), which cited 40 C.F.R. §§ 1500.1(b), 1502.22(b), 1502.24).  But NEPA does not require agencies to prognosticate using "state of the art science"; rather, agencies need only consider "reliable data and resources."  42 U.S.C. § 4332(E).

    The Bureau did that here.  It permissibly determined that the Soldevilla study was too inconclusive to alter the Bureau's longstanding understanding of Rice's whale habitat.  *See* ECF 56-1 at 25-27.  By contrast, the Bureau's formal consultation with the National Marine Fisheries Service (NMFS)—the expert agency charged with determining the habitat of endangered species—was a "reliable" resource.  After a formal consultation, NMFS determined that although Rice's whales *may* traverse the Gulf more broadly, mitigation measures should be limited to the whales' core habitat in the Eastern Gulf of Mexico—an area already excluded from future oil-and-gas development—where the whales are consistently present.  BOEM00568-69;

5

BOEM00952-53; BOEM01002.  The Bureau has adopted NMFS's recommended measures in every lease sale since then, including Lease Sale 259.  BOEM19882.  It was reasonable for the Bureau, after assessing the Soldevilla study, to determine that there were " 'no grounds' for requiring more stringent conditions" when the agency charged with the "expertise to promulgate regulations" imposing those conditions had not done so, *EarthReports, Inc. v. FERC*, 828 F.3d 949, 957 (D.C. Cir. 2016), and where, if NMFS later changed its guidance, the Bureau could at that point "consult with NMFS" to identify mitigations for post-lease activities if necessary, BOEM19900; *see* BOEM19453; BOEM19600; BOEM19662-63; BOEM19882; BOEM19990; ECF 62 at 4, 25; ECF 54 at 29-32; Oral Arg. Tr. 46-50, 55-56.  NEPA did not require the Bureau to proceed ahead of the expert agency, to adopt Plaintiffs' interpretation of the Soldevilla study, or to entertain Plaintiffs' "worst case" thinking.  *See* ECF 56-1 at 27; *see also Mayo v. Reynolds*, 875 F.3d 11, 24 (D.C. Cir. 2017) ("NEPA is not a suitable vehicle for airing grievances about the substantive policies adopted by an agency, as NEPA was not intended to resolve fundamental policy disputes." (citations and quotation marks omitted)).

That the Bureau repeatedly addressed the Soldevilla study also makes this case different from *Gulf Restoration Network v. Haaland*, 47 F.4th 795 (D.C. Cir. 2022), in which the Bureau did not address the contents of a report despite having "promised" to do so, *id.* at 803.  And unlike *Gulf Restoration Network*, in which the at-issue report cast doubt on another agency's enforcement capabilities that the Bureau had presumed were "rigorous," *id.*, nothing in this record criticized NMFS's baseline recommendation for oil-and-gas activities or otherwise suggested that NMFS was unable execute its obligations.  *See* Oral Arg. Tr. 95.

Plaintiffs also argue that the Bureau failed to respond to Plaintiffs' comments pointing to other agencies' recommendations in different agency actions.  *See* ECF 52-1 at 21.  That claim is

6

based on unenforceable CEQ regulations purporting to establish notice-and-comment requirements, *see* ECF 1 ¶ 136 (citing 40 C.F.R. §§ 1502.9(a)-(c), 1503.4)—not NEPA itself, and not the APA's separate notice-and-comment requirements, 5 U.S.C. § 553, because lease sales are not rulemakings. Without any legal obligation to respond to Plaintiffs, this claim fails.

Even when the law requires agencies to respond to comments, agencies "need not address every comment," and "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006) (citations omitted); *see also* Oral Arg. Tr. 92-98. Whatever Soldevilla's relevance, all agree the Bureau addressed the study. Oral Arg. Tr. 6; ECF 56-1 at 27; ECF 62 at 5. And the Bureau addressed Plaintiffs' request, based on the Soldevilla study, that the Bureau remove the 100-400 meter isobaths from the sale. *E.g.*, BOEM19899-901; BOEM19987-90; BOEM20056.

The Bureau owed no separate response on the Marine Mammal Commission's letter involving a different leasing program that merely repeated Soldevilla. Nor was the Bureau obligated to address NMFS's recommendation in the wind-leasing context to exclude wind development in the 100-400 meter isobaths; that the Bureau preliminarily adopted NMFS's wind recommendation without elaboration (the Bureau did not address Soldevilla, which was not yet published, *see* BOEM21821; BOEM18459; BOEM18490), reflects only that the Bureau has consistently followed NMFS's recommendations where given. NMFS declined to issue similar guidance in the context of oil-and-gas leasing—let alone for Lease 259 specifically—and the Bureau had no obligation to speculate as to a different agency's differing choices in different contexts. The Soldevilla study's significance was plainly a "ventilated" issue in Lease Sale 259. *City of Portland v. EPA*, 507 F.3d 706, 714 (D.C. Cir. 2007) (citation omitted). Requiring some

further explanation where NEPA requires none is just a backdoor attempt at forcing the Bureau to entertain Plaintiffs' preferred interpretation of an inconclusive study, rather than deferring to agency decisions properly made based on "reliable data and resources" as NEPA requires.[2]

    **5. *Oil-Spill Risk*.** Plaintiffs' claim that the Bureau inadequately considered oil-spill risk is likewise premised on the CEQ regulations. Plaintiffs' chief complaint is that the Bureau determined that certain large spills are not reasonably foreseeable as they are unlikely to occur. ECF 52-1 at 40. Plaintiffs say those conclusions conflict with CEQ regulations "defin[ing] the term 'reasonably foreseeable' to include 'impacts which have catastrophic consequences, even if their probability of occurrence is low.' " *Id*. (quoting 40 C.F.R. § 1502.22(b)(4)). But that regulation—purporting to require agencies to analyze "catastrophic, low-probability impacts" that are not "based on pure conjecture," BOEM19489 (quoting 40 C.F.R. § 1502.22(b)(4))—is unenforceable and goes beyond NEPA's requirements. NEPA is concerned with an action's "reasonably foreseeable environmental effects," 42 U.S.C. § 4332(C)(i), not low-probability, conjectural events. Extremely low-probability oil spills are not the natural and probable consequences of the Bureau's decision to hold Lease Sale 259, particularly given the agencies' significant permitting reforms. *See* ECF 63 at 20; ECF 54 at 39; Oral Arg. Tr. 72-73, 104; BOEM19487-88; BOEM19529. NEPA requires more than but-for causation, and Plaintiffs' demand for a higher standard based on the CEQ regulations is unenforceable.

    **6. *Reasonable Range of Alternatives*.** Plaintiffs' arguments that the Bureau considered an "unreasonably narrow range of alternatives," ECF 52-1 at 44, likewise exceeds NEPA's requirement that an EIS include "a reasonable range of alternatives . . . that are technically and

---

[2] Plaintiffs also were not prejudiced by any lack of response given the IRA's command to hold Lease Sale 259 and the agencies' "procedures for subsequent consideration" of new information. *Nevada v. DOE*, 457 F.3d 78, 90 (D.C. Cir. 2006); *see* ECF 62 at 25; 43 U.S.C. § 1334(a)(1).

8

economically feasible, and meet the purpose and need" of the action.  42 U.S.C. § 4332(C)(iii).  Plaintiffs advance a higher standard based on the CEQ regulations, believing the Bureau must "[r]igorously explore . . . *all* reasonable alternatives," ECF 52-1 at 42 (quoting 40 C.F.R. § 1502.14) (emphasis added), and must evaluate alternatives that "avoid or minimize adverse effects," *id.* (quoting 40 C.F.R. § 1500.2(e)).  That unenforceable guidance exceeds NEPA's requirements and provides no basis for judicially second-guessing a lease sale Congress dictated.

## II.     The CEQ Regulations Are *Ultra Vires*.

*Marin Audubon*'s holding that the CEQ regulations are *ultra vires* binds this Court.  *Patterson v. United States*, 999 F. Supp. 2d 300, 310-311 (D.D.C. 2013).  But even from first principles, the CEQ regulations are unenforceable.[3]

Congress defined CEQ's role as merely advisory within the "Executive Office of the President."  42 U.S.C. § 4342; *see id.* § 4344.  Congress did not include in CEQ's "duty and function" any grant of rulemaking authority—in sharp contrast to the "clear language Congress typically uses to confer rulemaking authority."  *Marin Audubon*, 121 F.4th at 912; *see, e.g.*, 16 U.S.C. § 1533(d) (directing Commerce Secretary to issue "[p]rotective regulations" under Endangered Species Act).  Where NEPA refers to "administrative regulations," it is for individual "agencies of the Federal Government"—*not* CEQ—to ensure they act in "conformity" with NEPA.  42 U.S.C. § 4333.

CEQ has never traced its supposed rulemaking authority to any statute, instead relying on an executive order.  *See* Exec. Order 11991, 42 Fed. Reg. 26,967 (May 25, 1977).[4]  But it is well

---

[3] These arguments are properly made in a supplemental brief.  *See United States ex rel. Scutellaro v. Capitol Supply, Inc.*, 2017 WL 1422364, at *20 n.26 (D.D.C. Apr. 19, 2017).

[4] A previous order merely called for CEQ to develop "guidelines" implementing NEPA, *see* Exec. Order 11514, 35 Fed. Reg. 4,247, 4,248 (Mar. 7, 1970), a direction that conforms to CEQ's purely advisory role, *see Marin Audubon*, 121 F.4th at 910, 913.

established that an "executive order is not 'law' within the meaning of the Constitution." *Marin Audubon*, 121 F.4th at 908 (citation omitted); *see also, e.g.*, *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000) ("[A]n administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588 (1952) (executive orders cannot usurp the "law-making power of Congress").

The CEQ regulations are also not enforceable through Interior's rulemaking authority. Interior has "neither adopted the content of the CEQ regulations nor incorporated those rules by reference." *Marin Audubon*, 121 F.4th at 915.[5]  Interior's NEPA-related rules are used "for compliance with" the CEQ regulations, 43 C.F.R. § 46.10(a)(2), and do not establish any independent requirements. Confirming as much, Interior, in this case and others, "repeatedly invoked the CEQ regulations, not [its] own rules, as the source of the overarching regulatory framework [it] applied." *Marin Audubon*, 121 F.4th at 915. Indeed, Plaintiffs in this case rely exclusively on the CEQ regulations—not Interior's. The handful of Interior regulations Plaintiffs cite are leasing, not NEPA, related. *See, e.g.*, ECF 52-1 at 4. Absent rulemaking authority from Congress, CEQ's pronouncements are nonbinding guidance. That guidance provides no basis to fault the Bureau's lease sale.

## CONCLUSION

*Marin Audubon* confirms that Plaintiffs' summary-judgment motion should be denied and the Government's and Intervenors' summary-judgment motions granted.

---

[5] Even if Interior had incorporated CEQ's regulations, Interior could have done so "only for the original 1978 version," because "Interior's current rules went into effect in 2007," and Interior "could not have adopted a body of rules that did not exist at the time." *Marin Audubon*, 121 F.4th at 915.

10

Respectfully submitted,

*/s/ Steven J. Rosenbaum*
Steven J. Rosenbaum (D.C. Bar 331728)
Bradley K. Ervin (D.C. Bar 982559)
COVINGTON & BURLING, LLP
One CityCenter
850 Tenth Street N.W.
Washington, D.C. 20001
Phone: (202) 662-6000
Fax: (202) 662-6291
srosenbaum@cov.com

*Counsel for American Petroleum Institute*

*/s/ Sean Marotta*
Catherine E. Stetson (D.C. Bar 453221)
Sean Marotta (D.C. Bar 1006494)
Dana A. Raphael (D.C. Bar 1741559)
HOGAN LOVELLS US LLP
555 Thirteenth Street N.W.
Washington, D.C. 20004
(202) 637-5491
cate.stetson@hoganlovells.com
sean.marotta@hoganlovells.com
dana.raphael@hoganlovells.com

Nikesh Jindal (D.C. Bar 492008)
Ashley C. Parrish (D.C. Bar 464683)
KING & SPALDING LLP
1700 Pennsylvania Avenue N.W.
Washington, D.C. 20006
(202) 737-0500
njindal@kslaw.com
aparrish@kslaw.com

Nicole Bronnimann (D.D.C. No. TX0044)
KING & SPALDING LLP
1100 Louisiana Street, Suite 4100
Houston, TX 77002
(713) 751-3200
nbronnimann@kslaw.com

Sarah C. Bordelon (D.C. Bar 987135)
HOLLAND & HART LLP
5441 Kietzke Lane, Suite 200
Reno, NV 89511
(775) 327-3011
scbordelon@hollandhart.com

Tina Van Bockern (D.D.C. No. CO0100)
HOLLAND & HART LLP
555 Seventeenth Street, Suite 3200
Denver, CO 80202
(303) 295-8107
trvanbockern@hollandhart.com

*Counsel for Chevron U.S.A. Inc.*

December 13, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on December 13, 2024, I caused a true and correct copy of the foregoing to be filed with the Court electronically and served by the Court's CM/ECF System upon the listed counsel of record.

*/s/ Sean Marotta*
Sean Marotta
