**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| **HEALTHY GULF, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| **DOUG BURGUM,[1] et al.,** | ) | **Case No. 23-cv-604 (APM)** |
| **Defendants,** | ) | |
| **and** | ) | |
| **CHEVRON U.S.A. INC. and AMERICAN PETROLEUM INSTITUTE,** | ) | |
| **Intervenor-Defendants.** | ) | |

_____

<u>**MEMORANDUM OPINION**</u>

This case arises out of the Bureau of Ocean Energy Management's (BOEM's) administration of oil and gas leasing programs in the Gulf of Mexico.  In February 2023, BOEM approved Lease Sale 259, which opened up more than 70 million acres in the western, central, and eastern Gulf for development.  Concerned about the ecological vulnerability of this region and the long-term consequences of increasing oil and gas production, six environmental organizations filed suit to challenge BOEM's decision.  They allege that the Bureau violated its statutory obligation to evaluate the lease sale's environmental impacts and consider a reasonable range of alternatives.  In particular, Plaintiffs argue that BOEM's assessment of greenhouse gas emissions, harms to Rice's whale, environmental justice impacts, oil spill risks, and other leasing scenarios failed to provide the "hard look" that federal law requires.  For the reasons set forth below, the

---

[1] The court substitutes as a defendant the newly appointed Secretary of the Interior, Doug Burgum, for the former Secretary, Deb Haaland.  _See_ Fed. R. Civ. P. 25(d).

court agrees as to the first two issues but not the remainder.  The court therefore grants in part and denies in part the cross-motions for summary judgment filed by the parties and the intervenors.

## I.    BACKGROUND

### A.    Legal Framework

#### 1.    *Outer Continental Shelf Lands Act*

The Outer Continental Shelf (OCS) is a vast underwater expanse beginning a few miles off the U.S. coast, where states' jurisdiction ends, and extending roughly 200 miles into the ocean, to the seaward limit of the United States' jurisdiction.  *Ctr. for Sustainable Econ. v. Jewell*, 779 F.3d 588, 592 (D.C. Cir. 2015) (citing 43 U.S.C. § 1331(a)).  Beneath the OCS lies billions of barrels of oil and trillions of cubic feet of natural gas.  *Id.*  To facilitate the orderly and environmentally responsible exploration and extraction of these resources, Congress enacted the Outer Continental Shelf Lands Act (OCSLA).  43 U.S.C. § 1331 *et seq.*  The Act authorizes the Secretary of the Interior to open up areas of the OCS for development and establishes a procedural framework for doing so.  *Ctr. for Sustainable Econ.*, 779 F.3d at 594.[2]  Specifically, Interior (acting through BOEM) "must undertake a four-stage process before allowing development of an offshore well, with each stage more specific than the last and more attentive to the potential benefits and costs of a particular drilling project."  *Id.*  During the first stage, Interior prepares a five-year schedule of proposed lease sales across the OCS.  43 U.S.C. § 1344.  During the second stage—the stage at issue here—Interior solicits bids and issues leases for specific tracts.  *Id.* § 1337.  During the third stage, Interior reviews lessees' exploration plans.  *Id.* § 1340.  During the fourth and final stage, Interior and affected state and local governments review lessees' development and production plans.  *Id.* § 1351.  If a plan fails to meet certain requirements, Interior may require

---

[2] The OCSLA also establishes "[r]igorous substantive requirements" accompanying each procedural stage, *Ctr. for Sustainable Econ.*, 779 F.3d at 594, but those requirements are not implicated in this case.

modification of the plan, disapprove the plan, or cancel the lease altogether.  *See id.* §§ 1334(a)(2), 1337(b)(5), 1340(c)(1), 1351(h).

## 2.    *National Environmental Policy Act*

The National Environmental Policy Act (NEPA) "'declares a broad national commitment to protecting and promoting environmental quality,' and brings that commitment to bear on the operations of the federal government."  *Sierra Club v. FERC*, 867 F.3d 1357, 1367 (D.C. Cir. 2017) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 348 (1989)).  At the heart of NEPA is the procedural requirement that federal agencies prepare, and solicit public comment on, an Environmental Impact Statement (EIS) whenever they propose a "major Federal action significantly affecting the quality of the human environment."  *Id.* (alteration and citation omitted).  The EIS is a detailed analysis, prepared with expert assistance, of the projected environmental impacts of the proposed action, including reasonable alternatives for completing the action.  *Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 68–69 (D.C. Cir. 2011).

Importantly, NEPA "does not mandate 'particular substantive environmental results.'"  *Id.* at 68 (quoting *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 371 (1989)).  As is "well established," the statute is "essentially procedural."  *Id.* (citation omitted).  So long as "the adverse environmental effects of the proposed action are adequately identified and evaluated, [an] agency is not constrained by NEPA from deciding that other values outweigh the environmental costs."  *Robertson*, 490 U.S. at 350.  In other words, "NEPA merely prohibits uninformed—rather than unwise—agency action."  *Id.* at 351.

### B.    Factual Background

Lease Sale 259 is the tenth in a series of offshore oil and gas lease sales originally proposed by BOEM as part of the 2017–2022 OCS Oil and Gas Leasing Program (the 2017–2022 Five-Year Leasing Program).  J.A. Vol. I, ECF No. 64-1 [hereinafter J.A. Vol. I], at 112 (ECF pagination).[3] Consistent with its NEPA obligations and the segmented OCSLA leasing process, BOEM initially prepared environmental impact statements for the 2017–2022 Five-Year Leasing Program (the Programmatic EIS), *id.* at 120, and the 10 Gulf of Mexico[4] lease sales included in that program (the Multisale EIS), *id.* at 171.  In 2018, BOEM completed a supplemental environmental impact statement to update information in the Multisale EIS and inform subsequent leasing decisions (the 2018 Supplemental EIS).  *Id.* at 322.  The 2017–2022 Five-Year Leasing Program expired in June 2022, and the last sale held under that program was Lease Sale 257.  J.A. Vol. II, ECF No. 64-2 [hereinafter J.A. Vol. II], at 554; Fed. Defs.' Combined Cross-Mot. for Summ. J. and Opp'n to Pls.' Mot. for Summ. J., ECF No. 54 [hereinafter Fed. Defs.' Mem.], at 6.

Two months later, in August 2022, Congress enacted the Inflation Reduction Act (IRA).  Pub. L. No. 117-169, 136 Stat. 1818 (Aug. 16, 2022).  Section 50264 of the Act mandated that Lease Sale 257, which had been vacated by a district court, be reinstated, and that the three remaining sales in the 2017–2022 Five-Year Leasing Program (Lease Sales 258, 259, and 261) be held.  136 Stat. at 2059–60.  With regard to Lease Sale 259, Congress ordered that the sale take place no later than March 31, 2023.  *Id.* at 2060.

---

[3] ECF pagination is used for all Joint Appendix citations.

[4] On January 20, 2025, President Trump issued an executive order directing that "[t]he area formerly known as the Gulf of Mexico" be renamed the "Gulf of America."  Exec. Order No. 14,172, 90 Fed. Reg. 8629, 8630 (Jan. 20, 2025).  Because the governing statutes refer to this geographic area as the "Gulf of Mexico," *see* 43 U.S.C. §§ 1331(a) (citing 43 U.S.C. § 1301), 1337(a), the court continues to use that name.  *See Daniels v. Exec. Dir. of Florida Fish & Wildlife Conservation Comm'n,* 127 F.4th 1294, 1299 n.1 (11th Cir. 2025).

To carry out this directive, BOEM completed a fourth environmental impact statement focused on Lease Sales 259 and 261 (the 2023 Supplemental EIS). This EIS was intended "to aid in the determination of whether or not new available information indicates if either [lease sale] would result in new significant impacts not analyzed in the [Multisale EIS] or the [2018 Supplemental EIS]." J.A. Vol. II at 135. In crafting the scope and content of its updated evaluation, BOEM looked to pre-2020 regulations promulgated by the Council on Environmental Quality (CEQ).[5] *Id.* at 133; Fed. Defs.' Mem. at 4 n.1. A draft of the EIS was made available for public comment on October 6, 2022, J.A. Vol. I at 402, and a final version was published on January 9, 2023, J.A. Vol. II at 127.[6] Based on the analysis and conclusions in that statement, as well as the earlier statements prepared by the agency, *id.* at 466–67, BOEM issued a Record of Decision authorizing Lease Sale 259 on February 22, 2023, *id.* at 466–80. Specifically, BOEM offered for lease 13,600 blocks covering approximately 73.3 million acres in the western, central,

---

[5] The regulations in effect at the time the 2023 Supplemental EIS was prepared are available at ECF No. 54-1.

Last year, a divided panel of the D.C. Circuit ruled that CEQ lacks authority to promulgate binding regulations implementing NEPA. *Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 908–15 (D.C. Cir. 2024). On January 31, 2025, the en banc court denied the parties' petitions for rehearing en banc. *Marin Audubon Soc'y v. FAA*, No. 23-1067, 2025 WL 374897 (D.C. Cir. Jan. 31, 2025). Seven of the twelve judges concurred on the ground that "the panel majority's rejection of the CEQ's authority to issue binding NEPA regulations was unnecessary to the panel's disposition." *Id.* (Srinivasan, C.J., concurring in the denial of rehearing en banc).

Soon thereafter, CEQ issued an interim final rule, effective April 11, 2025, removing the CEQ regulations implementing NEPA from the Code of Federal Regulations. *See Removal of National Environmental Policy Act Implementing Regulations*, 90 Fed. Reg. 10610 (Feb. 25, 2025). The interim final rule states that "agencies should, in defending actions they have taken, continue to rely on the version of CEQ's regulations that was in effect at the time that the agency action under challenge was completed." *Id.* at 10614. CEQ contemporaneously published guidance endorsing that approach. *See Memorandum for Heads of Departments and Agencies: Implementation of the National Environmental Policy Act* at 1 (Feb. 19, 2025), available at https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-Memo-Implementation-of-NEPA-02.19.2025.pdf ("[A]lthough CEQ is rescinding its NEPA implementing regulations at 40 C.F.R. parts 1500–1508, agencies should consider voluntarily relying on those regulations in completing ongoing NEPA reviews or defending against challenges to reviews completed while those regulations were in effect.").

Because BOEM has not disclaimed its reliance on the CEQ regulations in effect at the time the 2023 Supplemental EIS was prepared, the court considers BOEM's arguments based on those regulations.

[6] BOEM later issued an errata sheet for the 2023 Supplemental EIS to make corrections to its greenhouse gas emissions analysis. J.A. Vol. II at 455.

and eastern Gulf of Mexico.  *Id.* at 467–68; Fed. Defs.' Mem. at 9.  The sale was held on March 29,

2023, two days before the congressionally mandated deadline.  J.A. Vol. II at 482.

## C.    Procedural History

Plaintiffs filed this action on March 6, 2023, challenging BOEM's decision to approve

Lease Sale 259.  *See* Compl., ECF No. 1 (hereinafter Compl.).  They contend that the 2023

Supplemental EIS supporting that decision is deficient in several respects.  Chevron, an energy

company that participated in the lease sale, and the American Petroleum Institute, a trade

association that represents companies involved in the oil and gas industry, successfully intervened

to defend the lease sale.

Now before the court are cross-motions for summary judgment filed by the parties and the

intervenors.  *See* Pls.' Mot. for Summ. J., ECF No. 52; Fed. Defs.' Combined Cross-Mot. for

Summ. J. and Opp'n to Pls.' Mot. for Summ. J., ECF No. 54; Intervenor-Defs.' Cross-Mot. for

Summ. J., ECF No. 56.  Having considered the briefing and held a hearing on the matter, *see*

Oct. 28, 2024 Tr. of Mot. Hr'g Proceedings, ECF No. 80 [hereinafter Hr'g Tr.], the court grants

the motions in part and denies the motions in part.

## II.    LEGAL STANDARD

The APA provides the vehicle for review of NEPA-based challenges to federal agency

actions.  *Sierra Club*, 867 F.3d at 1367.  When evaluating cross-motions for summary judgment

under the APA, "the Rule 56 standard does not apply."  *Dakota Res. Council v. U.S. Dep't of*

*Interior*, No. 22-cv-1853 (CRC), 2024 WL 1239698, at *5 (D.D.C. Mar. 22, 2024).  Instead, "the

district judge sits as an appellate tribunal," and "[t]he entire case on review is a question of law."

*Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (internal quotation marks

and citation omitted).  Judicial review is therefore limited to "deciding, as a matter of law, whether

the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Ipsen Biopharmaceuticals, Inc. v. Becerra*, 678 F. Supp. 3d 20, 29 (D.D.C. 2023) (internal quotation marks and citation omitted), *aff'd*, 108 F.4th 836 (D.C. Cir. 2024).

The controlling standard in this case is § 706(2)(A) of the APA, which requires a reviewing court to set aside any agency action, finding, or conclusion that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *El Puente v. U.S. Army Corps of Eng'rs*, 100 F.4th 236, 246 (D.C. Cir. 2024) (quoting 5 U.S.C. § 706(2)(A)). "An agency's action is arbitrary and capricious if it has failed to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Delaware Riverkeeper Network v. FERC*, 753 F.3d 1304, 1313 (D.C. Cir. 2014)).

## III.    DISCUSSION

### A.    Standing

At the threshold, Intervenors argue that the court lacks subject matter jurisdiction over Plaintiffs' challenge to Lease Sale 259 because Plaintiffs lack standing under Article III of the Constitution.[7] The court holds otherwise.

---

[7] Intervenors also contend that Plaintiffs "forfeited any argument for standing on behalf of their members by failing to develop it beyond a conclusory recitation of elements" in their opening brief. Mem. of Intervenor-Defs. in Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Cross-Mot. for Summ. J., ECF No. 56-1, at 12 (alteration and citation omitted). As the D.C. Circuit has recognized, however, requiring parties "to include long jurisdictional statements in practically all opening briefs for fear that the court might find their standing less than self-evident . . . would waste, rather than conserve, judicial resources and impose an unnecessary burden on litigants." *Am. Libr. Ass'n v. FCC*, 401 F.3d 489, 494 (D.C. Cir. 2005). Accordingly, the D.C. Circuit has directed plaintiffs "who [are] unsure whether the court will comprehend [their] standing" to "provide the court with enough information to ensure that standing can be confirmed." *Id.* at 495. Then, "if a party raises a comprehensible challenge to a [plaintiff's] standing, the [plaintiff] is well advised to respond with precision and clarity to make it clear that standing is present." *Id.* That is exactly what Plaintiffs did here: They raised standing in a footnote in their opening brief, *see* Mem. in Supp. of Pls.' Mot. for Summ. J., ECF No. 52-1, at 18 n.12; submitted 11 declarations to support their assertions of standing, *see* ECF Nos. 52-2 to 52-12; and fleshed out their arguments in response to Intervenors' challenge, *see* Pls.' Combined Opp'n and Reply in Supp. of Mot. for Summ. J., ECF No. 58, at 34–42. Intervenors have identified no prejudice from this approach, and the court sees none, as Intervenors were afforded ample opportunity to rebut Plaintiffs' arguments in

Article III limits the "judicial Power" of federal courts to "Cases" and "Controversies," U.S. Const. art. III, § 2, cl. 1, and "there is no justiciable case or controversy unless the plaintiff has standing," *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017). Plaintiffs in this case are membership organizations that bring suit on behalf of their members. *See* Mem. in Supp. of Pls.' Mot. for Summ. J., ECF No. 52-1 [hereinafter Pls.' Mem.], at 18 n.12; Pls.' Combined Opp'n and Reply in Supp. of Mot. for Summ. J., ECF No. 58 [hereinafter Pls.' Reply], at 35 n.12. To establish standing on this basis, known as associational or representational standing, Plaintiffs must demonstrate that: (1) "at least one of their members would otherwise have standing to sue in his or her own right"; (2) "the interests they seek to protect are germane to their organizations' purposes"; and (3) "neither the claim[s] asserted nor the relief requested requires the participation of individual members." *Sierra Club v. EPA*, 755 F.3d 968, 973 (D.C. Cir. 2014). So long as one plaintiff satisfies these requirements, the court has jurisdiction to hear this suit. *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017).

No party disputes that the interests at stake are germane to Plaintiffs' conservation-oriented purposes, or that the remedies sought may be awarded without the involvement of any individual member. *See United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (recognizing that "'individual participation' is not normally necessary when an association seeks prospective or injunctive relief for its members"). Standing thus turns on whether Plaintiffs have identified at least one member who satisfies the familiar tripartite test for Article III standing: (1) the member has suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) the injury is "fairly traceable to the challenged action of the defendant"; and (3) the injury is "likely" to be "redressed by a favorable decision." *Friends*

---

their reply brief (which they took full advantage of, *see* Reply Mem. of Intervenor-Defs. in Supp. of Cross-Mot for Summ. J., ECF No. 63, at 1–7). The court thus finds that Plaintiffs have not forfeited their standing arguments.

*of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

Where, as here, a plaintiff challenges an agency's failure to comply with its procedural obligations, the usual standing inquiry comes with a "twist." *Am. Fuel & Petrochemical Manufacturers v. EPA* (*AFPM*), 937 F.3d 559, 592 (D.C. Cir. 2019); *see Sierra Club v. FERC*, 827 F.3d 36, 43 (D.C. Cir. 2016) ("It is settled law that 'an agency's failure to prepare (or adequately prepare) an Environmental Impact Statement before taking action with adverse environmental consequences' constitutes the 'archetypal procedural injury' redressable under Article III." (alteration and citation omitted)).  In such cases, "the primary focus of the standing inquiry is not the imminence or redressability of the injury to the plaintiff, but whether a plaintiff who has suffered personal and particularized injury has sued a defendant who has caused that injury." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (en banc); *see WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013) (explaining that courts "relax the redressability and imminence requirements for a plaintiff claiming a procedural injury," but not "the requirement of injury in fact").  Accordingly, the court begins its analysis with the injury-in-fact element.

### 1.    *Injury in Fact*

The touchstone of this element is whether BOEM's failure to follow NEPA affects Plaintiffs' members' concrete interests in a manner distinct from society as a whole.  *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 479 (D.C. Cir. 2009) ("A plaintiff must show that he is not simply injured as is everyone else, lest the injury be too general for court action[.]" (internal quotation marks and citation omitted)).  To demonstrate injury sufficient for standing, then, Plaintiffs must do more than invoke "[t]he mere violation" of a procedural

requirement, *Florida Audubon Soc'y*, 94 F.3d at 664; "generalized harm" to the environment, *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009); and "'some day' intentions" to visit the area impacted by the challenged action, *id.* at 496.  Specifically, Plaintiffs must show that the claimed procedural violation—i.e., the allegedly deficient EIS—"demonstrably increased some specific risk of environmental harms that imperil [their] members' particularized interests in a species or habitat with which the members share a geographic nexus." *Growth Energy v. EPA*, 5 F.4th 1, 27 (D.C. Cir. 2021) (quoting *AFPM*, 937 F.3d at 592).  Under longstanding precedent, this requirement is satisfied where plaintiffs "aver that [their members] use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Laidlaw*, 528 U.S. 167, 183 (2000) (quoting *Sierra Club v. Morton,* 405 U.S. 727, 735 (1972)); *see, e.g.*, *Ctr. for Sustainable Econ.*, 779 F.3d at 596 (standing established where members' declarations "state[d] that their economic and aesthetic interests would be harmed by additional [oil and gas] leasing in the Gulf of Mexico and the Beaufort and Chukchi Seas off the Alaskan coast" and that "both individuals plan[ned] to continue using those specific marine and coastal ecosystems for commercial and recreational purposes during the years covered by" the challenged OCS leasing program); *WildEarth Guardians*, 738 F.3d at 305–06 (standing established where members' affidavits "attest[ed] to [their] aesthetic interests in the land surrounding the [lease] tracts and specific plans to visit the area regularly for recreational purposes").

Plaintiffs readily clear this bar.  Their members have identified specific wildlife areas along the coasts of Texas, Louisiana, and Mississippi that they use and enjoy, both now and in the future. *See, e.g.*, Decl. of Louis Skrmetta, ECF No. 52-2, ¶¶ 3, 7, 10–11, 20, 22, 24, 26–27, 33–34; Decl. of Scott Eustis, ECF No. 52-3, ¶¶ 1, 9–14, 23, 27–28; Decl. of Kenneth Saxon, ECF No. 52-6,

¶¶ 4, 6, 8–10, 13–15, 25. And as BOEM itself concluded, such areas will likely be affected by oil and gas operations on the Lease Sale 259 tracts. *See* J.A. Vol. II at 138–40, 142–44, 347–48 (describing the lease sale's impacts on air quality, water quality, and coastal habitats, among other resources); *accord id.* at 469 ("Possible adverse impacts from expected OCS oil- and gas-related activities and reasonably foreseeable accidental events include degradation of wetlands, coastal resources, benthic habitat, and pelagic habitat; behavioral changes to fish, sea turtles, marine mammals, and birds; mortality of individual organisms; and changes in air and water quality.").

Intervenors object that the areas identified are "beyond the geographic scope of the lease sale" and thus cannot supply the necessary "geographic nexus to [Plaintiffs' members'] asserted environmental injur[ies]." Mem. of Intervenor-Defs. in Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Cross-Mot. for Summ. J., ECF No. 56-1 [hereinafter Intervenors' Mem.], at 15–16 (citing *Florida Audubon Soc'y*, 94 F.3d at 668). According to Intervenors, the only areas that *can* satisfy this requirement are those "parcel[s] subject to future oil and gas production on tracts encompassed by Lease Sale 259." Reply Mem. of Intervenor-Defs. in Supp. of Cross-Mot for Summ. J., ECF No. 63 [hereinafter Intervenors' Reply], at 4.

Intervenors' interpretation of the "geographic nexus" requirement is too narrow. It is true that, "to establish standing[,] plaintiffs must show that they 'use the area affected by the challenged activity and not an area roughly in the vicinity of' a project site." *Summers*, 555 U.S. at 499 (quoting *Lujan*, 504 U.S. at 566); *accord AFPM*, 937 F.3d at 595 (standing established where "the members of the [organizational plaintiff] share a geographic nexus with areas likely affected by the [challenged action]").[8] But Intervenors cite no authority holding that the only area "affected"

---

[8] The "geographic nexus" requirement thus ensures that there is "a particularized risk of injury to the plaintiff's interests" rather than to "the environment in general" and, therefore, to the world at large. *Florida Audubon Soc'y*, 94 F.3d at 667; *accord Massachusetts Coal. for Immigr. Reform v. U.S. Dep't of Homeland Sec.*, 698 F. Supp. 3d 10,

by the challenged activity is the area in which that activity occurs.  On the contrary, when evaluating a party's standing to challenge a government leasing program, courts in this Circuit have consistently considered areas beyond the specific tracts leased.  *See, e.g.*, *Ctr. for Sustainable Econ.*, 779 F.3d at 595–96 (considering, in suit challenging Interior's approval of five-year oil and gas leasing program, which included 12 lease sales in the Gulf of Mexico, member's use of "Gulf waters and coastlines"); *WildEarth Guardians*, 738 F.3d at 306 (considering, in suit challenging Interior's leasing of public lands for mining operations, members' interests in "the land surrounding the West Antelope II tracts" on which mining would occur); *Dakota Res. Council*, 2024 WL 1239698, at *6 (considering, in suit challenging Interior's approval of six oil and gas lease sales, members' enjoyment of "the areas surrounding the lease tracts" on which drilling would occur).  Plaintiffs have therefore demonstrated a sufficient geographic nexus for purposes of standing.[9]

### 2.    Causation

"In NEPA procedural-injury cases, an adequate causal chain contains two links: one connecting the [allegedly deficient] EIS to some substantive government decision that may have been wrongly decided because of the lack of an adequate EIS, and one connecting that substantive decision to the plaintiff's particularized injury."  *Sierra Club*, 827 F.3d at 44 (original alteration, internal quotation marks, and citation omitted).  "The first link does not require the plaintiff to show that but for the alleged procedural deficiency the agency would have reached a different

23 (D.D.C. 2023) (describing the "geographic nexus" requirement as "a way to police the boundaries of the particularization requirement").  Importantly, "geographic proximity does not, in and of itself, confer standing on any entity under NEPA or any other statute."  *City of Olmsted Falls v. FAA*, 292 F.3d 261, 267 (D.C. Cir. 2002).  "Rather, it is the concrete and particularized injury which has occurred or is imminent *due to* geographic proximity to the action challenged that gives rise to Article III standing."  *Id.*

[9] Accordingly, the court need not determine whether asserted interests in the Gulf of Mexico are too generalized to establish injury in fact.  *See* Intervenors' Reply at 3.

substantive result.  All that is necessary is to show that the procedural step was connected to the substantive result." *WildEarth Guardians*, 738 F.3d at 306.  As for the second link, "[t]he [plaintiff] need not show that harm to a member has in fact resulted from the [agency's] procedural failures, but the [plaintiff] must demonstrate that there is a substantial probability that local conditions will be adversely affected by the final decision infected with procedural failures and thus harm a member." *AFPM*, 937 F.3d at 592–93 (original alteration, internal quotation marks, and citations omitted).  Notably, "[t]he deficiency need not be directly tied to the members' specific injuries." *Sierra Club*, 867 F.3d at 1366.  "[I]t is sufficient for standing purposes that the [asserted] injury follows from an inadequate Environmental Impact Statement whether or not the inadequacy concerns the same environmental issue that causes [the asserted] injury." *Sierra Club*, 827 F.3d at 44 (original alteration, internal quotation marks, and citation omitted).

Both links are present here.  As to the first, BOEM's alleged failure to adequately evaluate the environmental impacts of Lease Sale 259 is plainly connected to its decision to approve Lease Sale 259.  To be sure, Congress ordered BOEM to hold the lease sale.  Under the IRA, however, BOEM retained discretion to set the sale's terms and conditions, including (among other things) its location, size, and environmental stipulations.  *See infra* Part III.B.  Thus, had BOEM complied with its NEPA obligations, the scope of Lease Sale 259 may well have been different.  *Cf. AFPM*, 937 F.3d at 594 ("As to causation, the [agency's] alleged failure to comply with its [statutory] obligations is plainly connected to the setting of standards in the [challenged] Rule[.]"); *Powder River Basin Res. Council v. U.S. Dep't of Interior*, 749 F. Supp. 3d 151, 162 (D.D.C. 2024) ("BLM may have provided for fewer mitigating measures than it would have otherwise in approving the Project" due to the alleged deficiency in the EIS).  Plaintiffs have also established a causal connection between BOEM's approval of Lease Sale 259 and their members' asserted injuries.  As

discussed above, BOEM itself found that the activities associated with the lease sale would likely degrade coastal habitats like the ones Plaintiffs' members use and enjoy.  *See* J.A. Vol. II at 138–39, 142–44, 347–48; *accord id.* at 469.

Intervenors press several arguments to the contrary, but none are persuasive.  First, they claim that the alleged injuries are traceable to *existing* oil and gas operations in the Gulf. Intervenors' Mem. at 16; Intervenors' Reply at 5.  In Intervenors' telling, Lease Sale 259 does not "contribut[e] to" Plaintiffs' members' harms because "in a world in which Lease Sale 259 doesn't happen, these harms are exactly the same."  Hr'g Tr. at 83:9-13.  But the harm that Plaintiffs' members allege—and the harm that entitles them to bring this suit—is the incremental harm that will likely result from the *expansion* of oil and gas operations pursuant to Lease Sale 259, not the cumulation of existing oil and gas operations in the Gulf of Mexico.  Thus, the harms incurred with or without Lease Sale 259 might be the same in *kind*, but they are not the same in *magnitude*. As the D.C. Circuit has recognized, "[e]ven if [the member] would suffer a similar type of harm in the absence of the [challenged action], the [challenged action] will cause him to suffer an additional quantum of that harm."  *Sierra Club v. FERC*, 827 F.3d 59, 67 (D.C. Cir. 2016) (holding that an injury attributable to an "increase in operations" at a natural gas terminal is sufficient to establish standing).  That is all Article III demands.  *See United States v. Students Challenging Regul. Agency Procs.*, 412 U.S. 669, 690 n.14 (1973) (reasoning that "an identifiable trifle is enough for standing" because the injury-in-fact requirement "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem"); *Chem. Mfrs. Ass'n v. EPA*, 859 F.2d 977, 982 (D.C. Cir. 1988) (affirming that "an identifiable trifle will do"); *see also Sierra Club v. U.S. Dep't of Interior*, 899 F.3d 260, 284

14

(4th Cir. 2018) ("[T]he causation element of standing does not require the challenged action to be the sole or even immediate cause of the injury.").[10]

Intervenors also point out that the lease sale itself does not authorize drilling, which they say is the real cause of Plaintiffs' members' injuries. Intervenors' Mem. at 16. This argument defies common sense. After all, the very purpose of Lease Sale 259 was to enable successful bidders "to explore for, develop, and produce oil and natural gas." J.A. Vol. II at 466. Lest any doubt remain, the American Petroleum Institute itself argued, when seeking to intervene, that it "has Article III standing—and thus a sufficient interest to support intervention [in this case]— because its members are the high bidders on and likely will own leases and conduct, *inter alia*, exploration, development, *and drilling operations*[.]" Mot. of the American Petroleum Institute for Leave to Intervene as a Def., ECF No. 40, at 7 (emphasis added). Against this backdrop, it is "a hardly speculative exercise in naked capitalism" to conclude that successful bidders will drill for the resources they paid to extract. *See Sierra Club*, 755 F.3d at 975 ("[O]nce the EPA promulgated the Gasification Exclusion Rule, it was 'a hardly speculative exercise in naked capitalism' to predict that facilities with existing gasification units on site would take advantage of the Exclusion for which they lobbied."); *Conservation L. Found. v. Ross*, 422 F. Supp. 3d 12, 25 (D.D.C. 2019) ("The Court is hard pressed to see why assuming that fishermen will do what the Habitat Amendment was passed to enable them to do is a 'very speculative inference' or 'assumption.'" (alterations omitted)). With that, the court turns to the third and final element of standing.

---

[10] It is true that Plaintiffs' members' declarations also describe the impacts from existing oil and gas operations in the Gulf of Mexico, but such observations do not, as Intervenors suggest, undermine Plaintiffs' case for standing. "If anything," those observations "give[] credence to" the members' assertions that "additional [oil and gas operations] will compound [their] aesthetic and recreational injur[ies]." *Sierra Club*, 827 F.3d at 66; *see Dakota Res. Council*, 2024 WL 1239698, at *6 (crediting members' observations as to "the effects of existing oil and gas development already occurring on public lands they recreate on" when assessing standing).

### 3. Redressability

"[T]he relaxed redressability requirement is met when correcting the alleged procedural violation *could* still change the substantive outcome in the [plaintiff's] favor; the [plaintiff] need not go further and show that it *would* effect such a change." *Narragansett Indian Tribal Historic Pres. Off. v. FERC*, 949 F.3d 8, 13 (D.C. Cir. 2020). In making this determination, the court must assume that Plaintiffs will ultimately receive the relief sought. *Florida Audubon Soc'y*, 94 F.3d at 665; *BP Energy Co. v. FERC*, 828 F.3d 959, 963 (D.C. Cir. 2016); *see* Compl. at 6 (¶ 10), 42–43 (¶¶ 1–8).

Vacatur, which is the "standard remedy" for a NEPA violation, would clearly redress the injuries asserted by Plaintiffs' members. *Standing Rock Sioux Tribe v. U.S. Army Corps of Engineers*, 255 F. Supp. 3d 101, 147 (D.D.C. 2017) (collecting cases). As the D.C. Circuit has explained, "if the [agency] is required to adequately consider each environmental concern, it could change its mind about authorizing the lease offering," or decide to authorize a different lease offering. *WildEarth Guardians*, 738 F.3d at 306; *see AFPM*, 937 F.3d at 595 (reasoning that the redressability requirement was met because "[t]here remains at least the possibility that the [agency] could set different standards" (internal quotation marks and citation omitted)). No surprise, then, that the D.C. Circuit has repeatedly found redressability satisfied in NEPA cases involving government leasing programs. *See, e.g.*, *WildEarth Guardians*, 738 F.3d at 306; *Ctr. for Sustainable Econ.*, 779 F.3d at 596; *Ctr. for Biological Diversity*, 563 F.3d at 479.

Intervenors nevertheless insist that the court cannot consider vacatur as a potential remedy in this case, given the IRA's mandate to hold Lease Sale 259. Intervenors' Reply at 5–7. But that argument misses the mark. To start, it runs up against D.C. Circuit precedent holding that "the redressability prong of the standing test is not an inquiry into the scope of the court's power to

grant relief." *In re Thornburgh*, 869 F.2d 1503, 1511 (D.C. Cir. 1989) (internal quotation marks and citation omitted); *see, e.g.*, *Ipsen Biopharmaceuticals*, 678 F. Supp. 3d at 35 (assuming for purposes of redressability that "the Court has the authority to vacate the FDA's decision and does so"); *Rancho Vista del Mar v. United States*, 640 F. Supp. 3d 112, 121 (D.D.C. 2022) (declining to analyze the government's claim that "ordering [the requested relief] would be beyond the Court's power" under the rubric of standing).

More importantly, it ignores the alternative forms of relief the court *can* grant.  No party disputes that BOEM "ha[s] the authority to impose additional mitigation [measures] on post-lease activities," including "exploration and development."  Hr'g Tr. at 76:6-11; *see N. Slope Borough v. Andrus*, 642 F.2d 589, 595 (D.C. Cir. 1980) (recognizing that the OCSLA "contemplates future consideration by the Secretary of environmental problems developing after the lease sale" and "authorizes the Secretary to impose subsequent restrictions on the lessees as the need arises"); *see also Sec'y of the Interior v. California*, 464 U.S. 312, 321 (1984) (explaining that "an OCS lease authorizes the holder to engage only in preliminary exploration; further administrative approval is required before full exploration or development may begin").  Thus, even if Lease Sale 259 were not vacated, Plaintiffs could still obtain meaningful relief from a court order directing BOEM to augment its NEPA analysis, which could, in turn, prompt BOEM to reexamine the terms of the leases issued.  That is enough for redressability.  *See Sierra Club*, 899 F.3d at 285 ("Petitioners' injuries are redressable because granting the requested relief would at least mitigate, if not eliminate, the alleged harm."); *Antilles Cement Corp. v. Fortuno*, 670 F.3d 310, 318 (1st Cir. 2012) ("To carry its burden of establishing redressability, [a plaintiff] need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm."); *Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) (same).

Intervenors' contention that Plaintiffs' members' injuries "are tied to existing oil and gas projects" and therefore "will remain unchanged by any correction of procedural errors" likewise fails. Intervenors' Mem. at 19; Intervenors' Reply at 7. As discussed above, the harm that Plaintiffs seek to redress is the incremental harm from the *expansion* of oil and gas operations in the Gulf of Mexico—not the cumulation of existing oil and gas operations. A court order vacating BOEM's approval of Lease Sale 259 would unquestionably relieve that harm, for it would bar further oil and gas development on the constituent tracts. And although that harm might not be fully eliminated by a court order requiring BOEM to more thoroughly evaluate the environmental impacts of the lease sale, such an order could, at least, alleviate it.

In sum, Plaintiffs have shown that their members would have standing to sue in their own right. The court thus concludes that Plaintiffs have associational standing to bring this suit.

### B.    Applicability of NEPA

Intervenors next argue that the IRA "place[d] a nondiscretionary obligation on [BOEM] to conduct Lease Sale 259, meaning that it [was] no longer subject to NEPA." Intervenors' Mem. at 20. In other words, because "the Bureau had no discretion to refuse to hold Lease Sale 259," it was not required to conduct an environmental impact analysis in the first place. *Id.* at 20–21.

Intervenors are correct that "[t]he touchstone of whether NEPA applies is discretion." *Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001). Consequently, for NEPA to be held inapplicable, BOEM's role under the IRA must have been "merely ministerial," such that BOEM lacked "sufficient discretion to affect the outcome of" Lease Sale 259. *Id.*

Intervenors have not made that showing here. For starters, they erroneously conflate the removal of BOEM's discretion to *hold* the lease sale with the removal of BOEM's discretion to

*determine the scope* of that sale, including its location, size, and environmental stipulations.  *See* 43 U.S.C. § 1337(a); *see also N. Slope Borough*, 642 F.2d at 595 (recognizing, in the context of an OCS oil and gas lease sale, that "lease stipulations which circumscribe activities permitted to the lessees" represent "part of the Secretary's attempt to protect wildlife from the outset"); *accord* Fed. Defs.' Mem. at 3 ("The decisions made at [the lease sale] stage include whether and when to hold a sale, which lease blocks to offer in the sale, and the terms of the sale.").  But these are distinct considerations, and Intervenors do not contest BOEM's traditional discretion in either domain.[11]

The question, then, is whether the IRA removed BOEM's discretion not only as to the occurrence of Lease Sale 259, but also as to the scope of Lease Sale 259.  Intervenors cite two IRA provisions which they say "specifically defined the term 'Lease Sale 259' and specified the sale's scope."  Intervenors' Mem. at 20–21 (citing §§ 50264(a)(3) and 50264(d)).  Notably, Intervenors do not spell out what that scope is or explain how it aligns with the lease sale that BOEM ultimately approved and Intervenors now defend.  *See* J.A. Vol. II at 467–68 (Record of Decision for Lease Sale 259 specifying the blocks offered for lease); *id.* at 469 (specifying the royalty rate implemented); *id.* at 476–79 (specifying the lease stipulations required); *see also id.* at 466 ("While section 50264 requires BOEM to hold Lease Sale 259, the IRA does not disturb the bulk of

---

[11] Intervenors instead argue that "whether the Bureau had any discretion over the scope of Lease Sale 259 makes no difference in this case" because "Plaintiffs' only theory of NEPA deficiency is based on the decision to hold Lease Sale 259 *at all*."  Intervenors' Mem. at 24 (internal quotation marks and citation omitted).  The court thinks this mischaracterizes Plaintiffs' position.  On the first page of their summary judgment motion, Plaintiffs acknowledged that the IRA "directed the Bureau to hold a lease sale of some kind," but they objected to the scope of the sale authorized, as well as the agency's failure to adequately evaluate the sale's impacts along four dimensions and consider a reasonable range of alternatives.  Pls.' Mem. at 1 (asserting that the IRA "did not require the Bureau to offer more than 73 million acres of the Gulf" and alleging five deficiencies in the 2023 Supplemental EIS).  And while Intervenors make much of the fact that Plaintiffs "ask this court to declare that the Bureau's *decision* to hold Lease Sale 259 violates NEPA and the APA," Pls.' Mem. at 2 (emphasis added); *see* Intervenors' Reply at 10, it is that decision—not the EIS underlying it—which "constitutes final agency action" under the APA.  *Gov't of Province of Manitoba v. Zinke*, 849 F.3d 1111, 1115 (D.C. Cir. 2017).

BOEM's normal leasing process, including the resolution of questions regarding the scope of the lease sale and the terms of the resulting leases."). No matter, for Intervenors' interpretation is clearly belied by the statute and the record.

The IRA defined "Lease Sale 259" as "the lease sale numbered 259 described in the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program published on November 18, 2016, and approved by the Secretary in the Record of Decision issued on January 17, 2017[.]" § 50264(a)(3), 136 Stat. at 2059. It further directed that "the Secretary [of the Interior] shall conduct Lease Sale 259 in accordance with the Record of Decision approved by the Secretary on January 17, 2017[.]" § 50264(d), 136 Stat. at 2060.

Both of those documents addressed the first stage of the OCSLA leasing process—preparation of the five-year leasing program. *See* J.A. Vol. I at 110–18 (2017–2022 Proposed Final Program); *id.* at 167–69 (Record of Decision for 2017–2022 Five-Year Leasing Program). As the D.C. Circuit has recognized, that stage "involve[s] only the identification and mapping of areas that *might* be suitable for leasing." *Ctr. for Biological Diversity*, 563 F.3d at 480 (emphasis added) (internal quotation marks and citation omitted) (holding that NEPA challenges to a five-year OCS oil and gas leasing program were not ripe for review); *see also Ctr. for Sustainable Econ.*, 779 F.3d at 593 n.6 (explaining that a five-year leasing program "consists of a schedule of proposed lease sales and related planning steps for those sales" and "serves as the template for the Government's leasing of drilling rights on the OCS for the five-year period following its preparation"). "Thus, while an area excluded from the [five-year] leasing program cannot be leased, explored, or developed, an area included in the program may be excluded at a later stage." *California v. Watt*, 712 F.2d 584, 588 (D.C. Cir. 1983); *accord* J.A. Vol. I at 172–73 (Multisale EIS stating: "Pursuant to the OCSLA staged leasing process, for each lease sale proposed in the

Five-Year Program, BOEM makes individual decisions on whether and how to proceed with a proposed lease sale. . . . [A]s described in the Five-Year Program, any individual lease sale could be scaled back during the prelease sale process to offer a smaller area should circumstances warrant.").

The Proposed Final Program reflected this uncertainty: "The inclusion of an area in the Proposed Final Program or an approved program [ ] does not necessarily mean that a lease sale will be held in that area.  Each lease sale that is scheduled in the approved 2017–2022 Program will be subject to a prelease evaluation and decision process . . . ."  BOEM, *2017–2022 Outer Continental Shelf Oil and Gas Leasing Proposed Final Program* at S-1 (Nov. 2016) [hereinafter Proposed Final Program].[12]  And while the Proposed Final Program listed "11 potential lease sales in four OCS planning areas," including 10 in the Gulf of Mexico, J.A. Vol. I at 112, it offered only general descriptions of them:

> Ten sales total during the 2017–2022 Program, with one sale in 2017; two sales each year in 2018, 2019, 2020, and 2021; and one sale in 2022; offering available unleased acreage not subject to Congressional moratorium or otherwise unavailable in the combined Western, Central, and Eastern GOM Planning Areas in each sale.

Proposed Final Program at 11-3 to -4 (describing the chosen option for the Gulf of Mexico region).

The Record of Decision approving that program adopted the same high-level approach. J.A. Vol. I at 167–69.  In fact, it did not even mention Lease Sale 259.  It did, however, acknowledge the need for further consideration of lease terms, such as mitigation measures designed to avoid or minimize environmental harm, "during subsequent stages" of the leasing process.  *Id.* at 168.

---

[12]    Available    at    https://www.boem.gov/sites/default/files/oil-and-gas-energy-program/Leasing/Five-Year-Program/2017-2022/2017-2022-OCS-Oil-and-Gas-Leasing-PFP.pdf.    Some pages of this document were omitted from the Joint Appendix, so the court also cites to the publicly available version posted on BOEM's website.

On this record, Intervenors' contention that the IRA specified the scope of Lease Sale 259 falls flat. To be sure, BOEM had to conduct the lease sale "in accordance with" the 2017–2022 Five-Year Leasing Program. § 50264(d), 136 Stat. at 2060. But that is true of every OCSLA lease sale. *See* 43 U.S.C. § 1344(d)(3) ("[N]o lease shall be issued unless it is for an area included in the approved leasing program and unless it contains provisions consistent with the approved leasing program[.]"); *Ctr. for Sustainable Econ.*, 779 F.3d at 594 ("In the second stage, Interior issues leases in accordance with the [five-year leasing] program."). In any event, the 2017–2022 Program merely established the contours of each lease sale included therein, and it was up to BOEM to fill in the details.

Rather than grapple with these conspicuous gaps in their position, Intervenors fall back on an unpublished D.C. Circuit decision addressing another lease sale mandated by the IRA, Lease Sale 257. Intervenors' Mem. at 22 (citing *Friends of the Earth v. Haaland*, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023)). There, the court ruled that the IRA imposed "a nondiscretionary obligation on [BOEM] to issue the leases." *Friends of the Earth*, 2023 WL 3144203, at *2. But Intervenors gloss over the critical distinction between that case and this one: At the time the IRA was enacted, Lease Sale 257—unlike Lease Sale 259—*had already occurred*. *Id.* at *1 (explaining that "the controversy arose after [BOEM] auctioned leases to extract resources from federal waters in the Gulf of Mexico" and that the IRA was enacted while the appeal of the district court order vacating BOEM's approval of Lease Sale 257 was pending). That is why the IRA called for Lease Sale 257's "reinstatement" (rather than its "requirement"), defined Lease Sale 257 with respect to the Record of Decision for Lease Sale 257 in particular (rather than the 2017–2022 Five-Year Leasing Program more broadly), and specifically instructed BOEM "to accept high valid bids, provide lease forms, and promptly issue leases." *Id.* (citing § 50264(b),

136 Stat. at 2059–60); *compare* § 50264(b), 136 Stat. at 2059 (entitled "Lease Sale 257 Reinstatement"), *with* § 50264(d), 136 Stat. at 2060 (entitled "Requirement for Lease Sale 259"); *see* § 50264(a)(1), 136 Stat. at 2059 (defining "Lease Sale 257" as "the lease sale numbered 257 that was approved in the Record of Decision described in the notice of availability of a record of decision issued on August 31, 2021, entitled 'Gulf of Mexico, Outer Continental Shelf, Oil and Gas Lease Sale 257,' and is the subject of the final notice of sale entitled 'Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sale 257'").

Intervenors dismiss these textual differences as mere quirks in timing, *see* Intervenors' Mem. at 22, but it is timing that determines the extent of BOEM's discretion. Because Lease Sale 257 had proceeded past the second stage of the OCSLA leasing process by the time the IRA was enacted, the location, size, and terms of the sale had already been set. All BOEM had to do, then, was restore what had already been done. The same cannot be said for Lease Sale 259. BOEM therefore retained its usual discretion to decide the scope of the sale, as well as its legal duty to comply with NEPA. BOEM itself does not argue otherwise. *See* Hr'g Tr. at 73:6-25.

### C.    NEPA Analysis

Turning, then, to the merits of Plaintiffs' claims, the central question in this case is whether BOEM adequately evaluated the environmental impacts of Lease Sale 259. "Under NEPA, an agency must take a 'hard look' at the environmental effects of its proposed action." *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 75 (quoting *Nevada v. U.S. Dep't of Energy*, 457 F.3d 78, 92–93 (D.C. Cir. 2006)). "An EIS is deficient, and the agency action it undergirds is arbitrary and capricious, if the EIS does not contain 'sufficient discussion of the relevant issues and opposing viewpoints,' or if it does not demonstrate 'reasoned decisionmaking[.]'" *Sierra Club*, 867 F.3d at 1368 (quoting *Nevada*, 457 F.3d at 93, and *Delaware Riverkeeper Network*,

753 F.3d at 1313); *see Myersville Citizens for a Rural Cmty., Inc. v. FERC*, 783 F.3d 1301, 1324–25 (D.C. Cir. 2015) ("[A]n agency has taken a 'hard look' at the environmental impacts of a proposed action if the statement contains sufficient discussion of the relevant issues and opposing viewpoints, and the agency's decision is fully informed and well-considered." (original alteration, internal quotation marks, and citation omitted)).

"When reviewing an agency's compliance with NEPA, the rule of reason applies[.]" *Ctr. for Biological Diversity v. FERC*, 67 F.4th 1176, 1182 (D.C. Cir. 2023) (quoting *Minisink Residents for Env't Pres. & Safety v. FERC*, 762 F.3d 97, 112 (D.C. Cir. 2014)). Accordingly, the court will not "'flyspeck' [the] agency's environmental analysis, looking for any deficiency no matter how minor." *WildEarth Guardians*, 738 F.3d at 308 (quoting *Nevada*, 457 F.3d at 93). Nor will the court "second-guess substantive decisions committed to the discretion of the agency." *Sierra Club v. U.S. Dep't of Energy*, 867 F.3d 189, 196 (D.C. Cir. 2017) (quoting *Delaware Riverkeeper Network*, 753 F.3d at 1313); *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30 (1983) (stating that, under the "arbitrary and capricious" standard of review, "a court is not to substitute its judgment for that of the agency"). Consistent with the "well settled" notion that "NEPA merely prohibits uninformed—rather than unwise—agency action," *Robertson*, 490 U.S. at 350–51, the court's task is "to ensure that the agency has adequately considered and disclosed the environmental impact of its actions," *El Puente*, 100 F.4th at 246 (citation omitted).

With these principles in mind, the court directs its attention to the five sections of the 2023 Supplemental EIS that Plaintiffs challenge as deficient: (1) estimation of greenhouse gas emissions; (2) assessment of harms to Rice's whale; (3) discussion of environmental justice issues; (4) analysis of oil spill risks; and (5) consideration of reasonable alternatives.

>    *1.    Greenhouse Gas Emissions*

To analyze Lease Sale 259's contribution to climate change, BOEM estimated life cycle greenhouse gas emissions under leasing and no-leasing scenarios, then calculated the total social cost of those emissions.  J.A. Vol. II at 242–46; *id.* at 456–59; *see also* J.A. Vol. I at 369–400. BOEM also compared the sale's greenhouse gas emissions to national emissions targets, J.A. Vol. I at 387–88; expanded on its previous discussions of climate change, J.A. Vol. II at 239–42; and described the IRA's consistency (or lack thereof) with U.S. climate goals and energy needs, *id.* at 179–81, 216–17, 373–76.  Plaintiffs contend that this analysis falls short in two respects: first, by "us[ing] outdated and misleading data about future oil demand," Pls.' Mem. at 24–29, and second, by "fail[ing] to contextualize lease sale [greenhouse gas] emissions with federal climate policies and international climate commitments," *id.* at 30–35.

>    a.    <u>Scope of Analysis</u>

To understand Plaintiffs' first argument, one must understand BOEM's methodology for quantifying greenhouse gas emissions.  As BOEM explained in its Corrected Addendum to the 2023 Supplemental EIS, different leasing scenarios—and therefore different levels of OCS oil and gas production—affect energy markets in different ways.  *See* J.A. Vol. I at 375–79; *accord* Fed. Defs.' Mem. at 13–14.  An increase in OCS oil and gas production changes not only the demand for oil and gas, but also the demand for other fuel sources and, in turn, for energy overall.  Because different fuel sources emit different amounts of greenhouse gases, determining the degree of substitution (i.e., switching) between fuel sources in response to a proposed lease sale constitutes an important step in the emissions analysis.  *See* J.A. Vol. I at 379 (stating that "energy market impacts and substitution rates [ ] are important factors in the larger analysis and comparison of

[greenhouse gas] emissions that could occur under the No Leasing scenario and the Leasing scenario").

The Market Simulation Model, or MarketSim, enables BOEM to account for substitutions across energy markets and thereby ascertain how energy production and consumption would shift under an OCS leasing program. *Id.* at 380–82. To make these determinations, MarketSim must first establish a baseline—here, the no-leasing scenario. *Id.* at 381. For that, MarketSim relies on projections of energy supply, demand, and prices provided by the U.S. Energy Information Administration (EIA)—specifically, "a special run of the [EIA's] National Energy Modeling System from the [ ] *Annual Energy Outlook* reference case." *Id.* at 380–82, 397; *accord* J.A. Vol. II at 245, 398; J.A. Vol. III, ECF No. 64-3 [hereinafter J.A. Vol. III], at 294–95. The *Annual Energy Outlook* (AEO) reference case, however, "is based only on current policies and laws." J.A. Vol. I at 397; *see also* J.A. Vol. III at 295 (explaining that "[t]he AEO2020 Reference case represents EIA's best assessment of how U.S. and world energy markets will operate through 2050" and "generally assumes that current laws and regulations that affect the energy sector, including laws that have end dates, are unchanged throughout the projection period"). That means MarketSim's no-leasing scenario "do[es] not account for expected shifts in energy markets" due to laws, like the IRA, that were enacted after the AEO reference case was created—even if those laws were in effect when the EIS was prepared. J.A. Vol. II at 398; *see id.* at 245 (confirming that the AEO projections used for the 2023 Supplemental EIS "are based on laws and policies set before the passage of the IRA" and therefore "the baseline scenario does not integrate, nor do their [*sic*] results account for impacts from the IRA"); *accord* Fed. Defs.' Mem. at 20 (acknowledging that "BOEM's model was necessarily limited to the AEO 2020 reference case"). Put another way,

BOEM's baseline for estimating greenhouse gas emissions excludes existing laws and policies that postdate the AEO reference case used.

This limitation poses a problem, Plaintiffs say, because it "fundamentally skews" BOEM's analysis. Pls.' Mem. at 25; *see* Pls.' Reply at 9–10. It doesn't take a PhD to understand why. As the D.C. Circuit recently explained:

> When conducting an environmental analysis of a proposed action under NEPA, an agency compares the action's projected environmental effects to the existing condition of the environment. Through that comparison, the agency can ascertain the magnitude of the proposed action's environmental impacts. The agency's choice of the baseline for comparison matters a great deal. If the baseline is artificially high, the agency might erroneously conclude that even highly disruptive actions will have minimal incremental environmental effects.

*Marin Audubon Soc'y v. FAA*, 121 F.4th 902, 915–16 (D.C. Cir. 2024). Applying this logic, the D.C. Circuit concluded that an agency acts arbitrarily when it "measure[s] environmental impacts against an improper baseline." *Id.* at 917; *accord North Carolina Wildlife Fed'n v. North Carolina Dep't of Transp.*, 677 F.3d 596, 603 (4th Cir. 2012) ("Without accurate baseline data, an agency cannot carefully consider information about significant environment impacts[,] resulting in an arbitrary and capricious decision." (original alterations and citation omitted)).

The same logic applies here. Laws and policies can incentivize certain patterns of energy production and consumption, thereby altering the mix of energy sources. If an agency fails to account for such changes when establishing its baseline scenario, it may underestimate or overestimate the resulting greenhouse gas emissions and, ultimately, a proposed action's environmental impacts. BOEM itself recognized as much. When discussing the weaknesses of its emissions modeling, BOEM conceded that, "[i]f additional climate policies are put into place, there could be major changes in future energy markets and corresponding changes in how oil supply reduction may impact the markets." J.A. Vol. I at 397; *see also id.* at 396

27

("acknowledg[ing] the uncertainty in results derived from using model inputs that are based on current policies and technological capabilities").  BOEM further identified the IRA as one such policy, stating: "Many of [the IRA's] provisions are expected to alter the composition of supply and demand within energy markets over the coming decades."  J.A. Vol. II at 217; *accord id.* at 99 (EPA's comment that "[t]he Inflation Reduction Act is expected to have a significant influence on long-term energy demand and economics").  Absent consideration of these undeniably important issues, it is difficult to see how BOEM could have engaged in "reasoned decisionmaking."  *Sierra Club*, 867 F.3d at 1368 (citation omitted).

BOEM's chief defense is that it "relied on the most recently available, specialized data from the EIA to conduct its analyses of [greenhouse gas] emissions."  Fed. Defs.' Mem. at 18.  As BOEM points out, at the time it performed these analyses, the EIA had not yet released updated projections based on the IRA, and BOEM could not afford to wait for those projections given the congressionally mandated deadline to hold Lease Sale 259.  Fed. Defs.' Mem. at 18–22 (citing J.A. Vol. II at 181, 245, 398).  What's more, BOEM maintains, the reports cited by commenters "did not have the requisite detailed projections of supply and demand that could be incorporated into the MarketSim model."  *Id.* at 19 (citing J.A. Vol. II at 245, 398–99).

This argument misses the mark.  The issue here is not BOEM's failure to incorporate some other dataset into MarketSim when estimating greenhouse gas emissions; it's BOEM's failure to address information wholly *omitted* from MarketSim—information that, by BOEM's own admission, could have "major" implications for energy markets.  J.A. Vol. I at 397.  The points raised by BOEM adequately explain why it could not have used more up-to-date data in MarketSim.  Where BOEM falters, however, is in explaining why it could not have employed

some degree of forecasting to account for legal and regulatory developments postdating the AEO reference case used.  *See* Pls.' Mem. at 23; Pls.' Reply at 18.

The D.C. Circuit has long held that "NEPA analysis necessarily involves some 'reasonable forecasting,'" and "agencies may sometimes need to make educated assumptions about an uncertain future."  *Sierra Club*, 867 F.3d at 1374 (citing *Delaware Riverkeeper Network*, 753 F.3d at 1310); *accord Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973).  This case is no exception.  The mere fact that BOEM lacked data compatible with its chosen model does not mean BOEM lacked data suitable for purposes of an emissions analysis.  Nor does it demonstrate BOEM's inability to reasonably obtain such information.  *See Birckhead v. FERC*, 925 F.3d 510, 520 (D.C. Cir. 2019) ("It should go without saying that NEPA [ ] requires the [agency] to at least *attempt* to obtain the information necessary to fulfill its statutory responsibilities."); *Delaware Riverkeeper Network*, 753 F.3d at 1310 ("While [NEPA] does not demand forecasting that is 'not meaningfully possible,' an agency must fulfill its duties to 'the fullest extent possible.'" (citation omitted)).[13]

BOEM cites *Theodore Roosevelt Conservation Partnership v. Salazar*, 616 F.3d 497 (D.C. Cir. 2010), for the proposition that "rel[ying] upon the most recent, reliable data available" is not arbitrary or capricious, Fed. Defs.' Mem. at 20, but BOEM's reliance on that case is misplaced.  There, the Bureau of Land Management had conducted an air quality analysis as part of its EIS for a proposed natural gas project.  616 F.3d at 510.  That analysis relied on a method that, by the agency's own admission, "used outdated measurements and assumptions."  *Id.*

---

[13] Indeed, BOEM's discussion of "recent publications that include results from modeling the impact of the IRA on domestic energy supply and demand" indicates that at least some relevant information was available at the time the 2023 Supplemental EIS was prepared.  J.A. Vol. II at 245; *see id.* at 398–99 (BOEM's response to comments concerning its modeling of greenhouse gas emissions).  Notably, BOEM did not question the credibility of these studies; it merely characterized them as "not complete nor compatible with BOEM's modeling."  *Id.* at 245; *see id.* at 399.

One month later, the Bureau adopted a different method for future assessments, but decided to use the estimates derived from the old method to evaluate the project's impacts on ozone concentrations, rather than undertake a new air quality analysis. *Id.* The plaintiffs claimed that decision violated NEPA. *Id.* Notably, there were no allegations that the outdated information affected the agency's baseline or that the agency had failed to engage in reasonable forecasting; the only question was whether the Bureau's initial assessment was invalidated by its adoption of a new method. *Id.* at 511.

The answer, the D.C. Circuit held, was no. For one thing, the agency had adequately explained that the challenged method "was an acceptable method at the time the air quality analysis was completed" and, if anything, "likely resulted in *overestimates* of the actual ozone impacts that would occur." *Id.* (emphasis added) (alteration, internal quotations marks, and citation omitted). More importantly, "[n]othing in the law requires agencies to reevaluate their existing environmental analyses each time the original methodologies are surpassed by new developments." *Id.* at 510–12. As the D.C. Circuit observed, some projects "are designed to span several decades, and it is not surprising that scientific conventions and protocols develop and change in that time." *Id.* at 512. Requiring agencies to redo their environmental analyses whenever a better method is developed would thus mire them in a potentially "endless" process. *Id.* at 511. NEPA, the D.C. Circuit concluded, does not mandate such a cumbersome approach.

The court's holding in this case is fully consistent with the D.C. Circuit's in *Theodore Roosevelt Conservation Partnership*. Should BOEM decide to abandon MarketSim tomorrow, it would not need to redo its analysis of greenhouse gas emissions for Lease Sale 259. But nothing in *Theodore Roosevelt Conservation Partnership* absolves BOEM of failing to take a "hard look" at greenhouse gas emissions in the first instance. That is especially true where, as here, the

deficiency undermines the very foundation of the agency's analysis—its choice of baseline. *See Marin Audubon Soc'y*, 121 F.4th at 915–16.

Of course, quantifying the effects of laws and policies that postdate the applicable AEO reference case may not be feasible in every case. *See, e.g.*, *Sierra Club*, 867 F.3d at 198–99 (holding that an agency need not perform a quantitative impact analysis that it determines, based on its expertise, "would be far too speculative to be useful"); *WildEarth Guardians*, 738 F.3d 298 at 309 (concluding that an agency "was not required to identify specific effects on the climate in order to prepare an adequate EIS" where "current science [did] not allow for the specificity demanded"); *see also Gulf Restoration Network v. Haaland*, 47 F.4th 795, 802 (D.C. Cir. 2022) (ruling that an agency "need not consider regulatory developments that are so inchoate as to be 'not meaningfully possible' to analyze" (quoting *Delaware Riverkeeper Network*, 753 F.3d at 1310)). But BOEM "has not provided a satisfactory explanation for why this is such a case." *Sierra Club*, 867 F.3d at 1374.

BOEM's purported "qualitative analysis" of "the potential impacts of the IRA on [greenhouse gas] emissions" likewise fails to provide the "hard look" NEPA demands. Fed. Defs.' Mem. at 20 (citing J.A. Vol. II at 180–81, 245–46). In a section describing the "relationship between the Inflation Reduction Act of 2022, OCS oil and gas lease sales, and OCS renewable energy lease sales," BOEM stated that the IRA expands offshore wind leasing, "includes provisions aimed at furthering progress in achieving net-zero greenhouse gas emissions," and will, according to one study, cause "a decrease in [domestic] consumption of petroleum of less than 1 percent," while "the [domestic] supply of crude oil remains relatively flat." J.A. Vol. II at 180–81 (citing Larsen et al. 2022). This section, however, made no mention of how such changes might affect BOEM's baseline scenario and, consequently, its overall assessment of Lease Sale 259's

greenhouse gas emissions.  BOEM's actual emissions analysis offered little clarity; it simply "acknowledge[d] that there is incomplete and unavailable information or data related to the impacts of the IRA on energy markets" and noted that "[a] recent study suggests that, at least for the domestic petroleum market, the IRA would not change BOEM's exploration and development scenarios or conclusions regarding global GHG emissions."  *Id.* at 245–46 (citing Larsen et al. 2022).  But acknowledging the absence of information on a given issue does not amount to a reasoned analysis of that issue.  Nor does a conclusory assertion about a single study.

Apparently recognizing as much, BOEM insists that it followed CEQ guidance advising agencies how to address "incomplete or unavailable information" when preparing an EIS.  Fed. Defs.' Mem. at 21–22 (citing 40 C.F.R. § 1502.22(b)).  Here again, BOEM's discussion is found wanting.  Although BOEM disclosed that it lacked information on the IRA's impacts because "data compatible with BOEM's modeling methodology . . . is not expected to be published in the timeframe of this NEPA analysis," J.A. Vol. II at 245, it offered no explanation as to why it could not have employed "some other analytical framework, as 'generally accepted in the scientific community' within the meaning of [40 C.F.R. § 1502.22(b)]," to evaluate such impacts, *Vecinos para el Bienestar de la Comunidad Costera v. FERC*, 6 F.4th 1321, 1330 (D.C. Cir. 2021).  BOEM's assertion that it "conduct[ed] the most complete analysis it could," Fed. Defs.' Mem. at 22, is thus unsupported by the record.  *See Oceana v. BOEM*, 37 F. Supp. 3d 147, 159 (D.D.C. 2014) (§ 1502.22 "commands the agency to provide as comprehensive an analysis it can with the information available to it").

In sum, BOEM failed to take a "hard look" at Lease Sale 259's greenhouse gas emissions because it did not adequately examine laws and policies postdating the 2020 AEO reference case

or satisfactorily explain why it could not do so.[14]  *See Sierra Club*, 867 F.3d at 1368 (holding that an agency violates NEPA "if [its] EIS does not contain 'sufficient discussion of the relevant issues'" (citation omitted)).  The court acknowledges that BOEM, in completing its NEPA analysis, was operating within a relatively compressed timeframe fixed by Congress.  But an agency cannot fulfill NEPA's twin purposes of "informed public comment" and "informed decisionmaking" when it disregards, without justification, factors that the agency itself deems important to the analysis.  *Id.*  NEPA may not demand perfection, but it demands more than what BOEM has offered here.

### b.    Contextualization of Emissions

BOEM fares better with respect to contextualizing the significance of Lease Sale 259's estimated greenhouse gas emissions.  *See* 40 C.F.R. § 1502.2(d) (stating than an EIS should discuss how the proposed action "will or will not achieve the requirements of sections 101 and 102(1) of [NEPA] and other environmental laws and policies").  To start, BOEM monetized the social cost of the emissions attributable to the proposed lease sale, which totaled $3.9 billion ($990 million from increased domestic emissions plus $2.91 billion from increased foreign emissions).  J.A. Vol. II at 456–57.  BOEM then compared its emissions estimates to (1) the United States' emissions targets under the Paris Agreement[15] and (2) the Biden Administration's net-zero emissions target by 2050.[16]  J.A. Vol. I at 387–88; *see* J.A. Vol. II at 242, 455 (incorporating by reference the *Greenhouse Gas Emissions and Social Cost Analysis* Addendum (2022) and Corrected Addendum (2023)).  BOEM further disclosed that "new emissions from OCS

---

[14] In reaching this conclusion, the court takes no position as to what laws and policies are sufficiently relevant and refined to warrant inclusion in BOEM's analysis; that is for BOEM to determine in the first instance.

[15] On January 20, 2025, President Trump issued an executive order withdrawing the United States from the Paris Agreement.  Exec. Order No. 14,162, 90 Fed. Reg. 8455, 8455 (Jan. 20, 2025).

[16] This target was set forth in Executive Order 14,008, 86 Fed. Reg. 7619, 7622 (Jan. 27, 2021), which was revoked by Executive Order 14,148 on January 20, 2025, 90 Fed. Reg. 8237, 8238 (Jan. 20, 2025).

development or substitute sources of energy will count against the planet's carbon budget"—
i.e., "the amount of global emissions that can be emitted before a certain amount of warming
occurs."  J.A. Vol. I at 388.

Elsewhere in the 2023 Supplemental EIS, BOEM built on its earlier assessments of climate
change by examining policy papers, scientific studies, and other documents published since the
last EIS.  J.A. Vol. II at 240 (concluding that "[t]his new information contributes to BOEM's
understanding of climate change issues, but it does not change the conclusions presented in the
2017–2022 National OCS Program EIS, 2017–2022 GOM Multisale EIS, and 2018 GOM
Supplemental EIS").  Of particular note here, BOEM also acknowledged the tension between oil
and gas leasing programs and U.S. climate goals.  Oil and natural gas, BOEM explained, "currently
are fundamental to powering the U.S. economy," but production and consumption of these
resources "contribute to climate change, which poses a significant global threat."  *Id.* at 179.
BOEM thus made clear that, "[t]o meet [the Biden Administration's] targets and to reduce reliance
on and demand for oil and gas, the U.S. would have to drastically change the way it consumes and
supplies energy, requiring an increase in renewable energy production, electrification, energy
efficiency, and reduced consumption."  *Id.*

According to BOEM, the IRA deepened that tension by tying offshore wind development
to offshore oil and gas development.  *See id.* at 180 ("[T]he IRA predicates continued OCS offshore
wind leasing on a particular rate of OCS oil and gas leasing.  Halting oil and gas leasing on the
OCS would also halt OCS renewable energy leasing, which has otherwise accelerated sharply in
recent years."); *id.* at 373 ("BOEM acknowledges the inherent tension created between the climate
goals of the [Biden] Administration, and the requirements of the IRA that not only must BOEM
hold Lease Sales 259 and 261 but also that a minimum number of offshore acreage for oil and gas

leasing must be offered for sale within the 12 months prior to issuance of a lease for offshore wind development.").    Although the IRA included measures aimed at reducing greenhouse gas emissions, *id.* at 180, the bottom line was that "continued OCS oil and gas leasing" was "more likely" under the IRA, at least in the short term, "in order to continue implementing OCS renewable energy leasing," *id.* at 373; *see id.* at 197 ("In the short term BOEM anticipates continued leasing because of the passage of the Inflation Reduction Act of 2022 and its stipulation that oil and gas lease sales be offered prior to renewable energy leases being issued."); *see also id.* at 217 (noting that "[m]any net-zero pathways also include some level of oil and natural gas consumption").

Contrary to Plaintiffs' assertions, then, BOEM was neither "silent" as to nor "dismissive" of Lease Sale 259's (in)compatibility with U.S. climate goals.  Pls.' Mem. at 32.  Moreover, BOEM's assessment of greenhouse gas emissions amounted to more than a mere "portrayal of project emissions as a small percentage of total emissions."  *Id.* at 34.  Because BOEM reasonably contextualized the magnitude of its emissions estimates, it fulfilled its obligations under NEPA.

## 2.    *Rice's Whale*

Plaintiffs' second challenge concerns BOEM's evaluation of Lease Sale 259's impacts on Rice's whale, an endangered species only known to reside in the Gulf of Mexico.  J.A. Vol. II at 295.  Specifically, Plaintiffs claim that BOEM arbitrarily limited the geographic scope of its analysis to the whale's "primary core habitat . . . in the northeastern [Gulf of Mexico]," *id.*, despite findings from recent studies "confirm[ing] Rice's whale distribution in the western and central Gulf" and recommendations from other agencies "recogniz[ing] the significance of these studies and advis[ing] the Bureau to completely avoid development activities in the known distribution of Rice's whales in the western and central Gulf," Pls.' Mem. at 19–22.  The court agrees, but rests on a slightly narrower rationale: BOEM acted arbitrarily by failing to address the National Marine

Fisheries Service's (NMFS's) determination that the whale's habitat range extends into the western and central Gulf.  *See* J.A. Vol. II at 95; Pls.' Reply at 5–6.

That determination arose as follows: BOEM, in assessing "the potential for vessel strikes" to Rice's whale, adopted NMFS's definition of the whale's core area, as set forth in the 2020 Biological Opinion on the Federally Regulated Oil and Gas Program Activities in the Gulf of Mexico.  J.A. Vol. II at 295; *see* J.A. Vol. I at 14, 21, 25 (Biological Opinion stating that Rice's whales "are consistently found in the northeastern Gulf of Mexico in the De Soto Canyon area" and identifying "vessel collisions" as one of "the most significant" threats to this species). Approximately two years after issuing that opinion, NMFS submitted comments to BOEM on a proposed wind leasing program in the Gulf of Mexico.  J.A. Vol. II at 94.  In a section entitled "Rice's whale," NMFS acknowledged its earlier finding as to the whale's "core habitat area in the northeastern [Gulf]."  *Id.* at 95.  "However," NMFS continued, "increasing evidence . . . is showing Rice's whale's occurrence in the western and central [Gulf]," and their occurrence there "is persistent," NMFS concluded.  *Id.*  Based on that evidence, as well as the potential "stressors" imposed by offshore wind leasing, NMFS recommended that BOEM prohibit such leasing "within the boundaries of the currently known distribution of Rice's whales in the western and central [Gulf]."  *Id.*  Plaintiffs, for their part, called attention to these statements when commenting on the Draft Supplemental EIS for Lease Sale 259 and even quoted them verbatim.  J.A. Vol. I at 428–29, 429 nn.320 & 321 (Comments of Natural Resources Defense Council) (quoting J.A. Vol. II at 95); *see* J.A. Vol. II at 109 & n.72 (Comments of Earthjustice et al.) (urging BOEM to "account for new data and analysis showing that [Rice's whale] persistently occurs in the Western and Central Planning Areas" and citing J.A. Vol. II at 95).

It is axiomatic that, "[t]o engage in reasoned decisionmaking, an agency must respond to 'objections that on their face seem legitimate.'" *Gulf Restoration Network*, 47 F.4th at 803 (quoting *PPL Wallingford Energy LLC v. FERC*, 419 F.3d 1194, 1198 (D.C. Cir. 2005)). Accordingly, "[a]n agency's 'failure to respond meaningfully' to objections raised by a party renders its decision arbitrary and capricious." *PPL Wallingford Energy*, 419 F.3d at 1198 (collecting cases).

*Gulf Restoration Network v. Haaland*, 47 F.4th 795 (D.C. Cir. 2022), is instructive. There, "BOEM repeatedly factored [the Bureau of Safety and Environmental Enforcement's] (BSEE's) work into its analysis," but "fail[ed] to address a Government Accountability Office (GAO) report about deficiencies in BSEE's enforcement of existing safety and environmental regulations." *Id.* at 803. The D.C. Circuit concluded that "BOEM's failure to address the report was arbitrary" because "BOEM itself had repeatedly acknowledged the importance of BSEE enforcement to its analysis of environmental risks" and "the GAO report, while hardly conclusive on this point, raised seemingly legitimate concerns about enforcement effectiveness." *Id.* at 803.

Here, "BOEM's analysis of impacts [on Rice's whale] relied on determinations made by NMFS" as to the whale's habitat range. Fed. Defs.' Mem. at 31; *see* J.A. Vol. II at 295 (applying NMFS's definition of core area and citing the 2020 Biological Opinion); *see also* Fed. Defs.' Mem. at 28 ("BOEM has consulted with the NMFS regarding potential impacts to the Rice's whale and other species, and the results of that consultation are reflected in BOEM's analysis." (citing J.A. Vol. II at 294–97)). And yet, when Plaintiffs highlighted "significant new information concerning the habitat range of the endangered Rice's whale," including NMFS's recognition that "the currently known distribution of Rice's whales" encompasses "the western and central [Gulf of Mexico]," J.A. Vol. I at 428–29, BOEM made no mention of it, *see* J.A. Vol. II at 423 (BOEM's

response to Plaintiffs' comments, in which BOEM noted one study "indicating that it is plausible that the Rice's whale's distribution is broader" than previously understood but stated that "not enough information is available at this time to confirm [the whale's] distribution or any seasonal movements outside of the core area" (citing Soldevilla et al. 2022, *see* J.A. Vol. II at 530)); *see also id.* at 387, 420–29 (BOEM's responses to comments regarding Rice's whale and other marine mammals).

BOEM's omission of NMFS's assessment is particularly glaring given BOEM's own averment that NMFS is "the expert agency charged by Congress with protecting threatened and endangered marine mammals" and is therefore "entitled to a high degree of deference." Fed. Defs.' Mem. at 31; *see* Fed. Defs.' Reply in Supp. of Mot. for Summ. J., ECF No. 62 [hereinafter Fed. Defs.' Reply], at 4. True, NMFS's assessment appeared in comments on a wind leasing program, not an oil and gas leasing program. But BOEM does not contend that a species' distribution depends on the type of leasing program at issue—that defies common sense. Nor does it dispute that the distribution of Rice's whale bore directly on its evaluation of Lease Sale 259's impacts on Rice's whale—indeed, the whale's distribution set the parameters of BOEM's evaluation.

In its brief, BOEM points out that "NMFS has not expanded its identification of [the whale's] core habitat, which was identified in [the] 2020 biological opinion" on which BOEM relied. Fed. Defs.' Mem. at 28; *see id.* at 32 (citing J.A. Vol. II at 295, 387). The problem with this defense is twofold. For starters, it does not appear in the record. *See* J.A. Vol. II at 387 (stating that no *critical* habitat had yet been designated for Rice's whale under the Endangered Species Act, *see* 16 U.S.C. § 1532(5)(A) (defining "critical habitat" as specific areas "essential to the conservation of the species")); *Delaware Riverkeeper Network*, 753 F.3d at 1313 ("We may not supply a reasoned basis for the agency's action that the agency itself has not given." (quoting *State*

*Farm*, 463 U.S. at 43)). Even if it did, BOEM would still have to explain why restricting the geographic scope of its impact analysis to the species' core habitat is reasonable when faced with credible evidence of the species' "persistent" occurrence outside of that area. J.A. Vol. II at 95, 547; *see Powder River Basin Res. Council v. Bureau of Land Mgmt.*, 37 F. Supp. 3d 59, 75 (D.D.C. 2014) (holding that an agency's "decision to confine the geographic area for its environmental impacts analysis" must be "reasonable"); *Gulf Restoration Network*, 47 F.4th at 803 (emphasizing that an agency "may not reach a conclusion that 'runs counter to the evidence'" (quoting *State Farm*, 463 U.S. at 43)).

To the extent BOEM argues that NMFS's updated assessment need not be addressed because it was not formalized in a biological opinion, *see* Fed. Defs.' Reply at 4, or included in comments on Lease Sale 259 submitted by NMFS itself, *see id.* at 5, these arguments are foreclosed by the principles of reasoned decisionmaking. Under this Circuit's precedent, the objections raised by a party need only be facially legitimate to trigger the agency's obligation to respond. *See Gulf Restoration Network*, 47 F.4th at 803 (concluding that BOEM arbitrarily declined to consider a report authored by another agency and raised by commenters). Here, NMFS was sufficiently confident in its assessment of Rice's whale's extended distribution to base its recommendation to BOEM (albeit in a different context) on that assessment. *See* J.A. Vol. II at 95 (NMFS "recommends no offshore wind leasing and/or development occur within the boundaries of the currently known distribution of Rice's whales in the western and central [Gulf of Mexico], between the 100 to 400 meter isobaths."). And by BOEM's own admission, NMFS is the expert on such matters. Thus, regardless of whether BOEM ultimately agreed with NMFS's assessment, it could hardly classify comments invoking that assessment as illegitimate.

Intervenors attempt to rehabilitate BOEM's evaluation by underscoring NMFS's "reli[ance] on the [same] study that the Bureau considered and reasonably rejected" and casting the study's conclusion about the extended distribution of Rice's whale as "tepid[]." Intervenors' Mem. at 25–27 (citing Soldevilla study, *see* J.A. Vol. II at 530). As a preliminary matter, the court doubts that the study is as insignificant as Intervenors suggest. BOEM itself frames the "study's conclusion" as "provid[ing] evidence of the persistent occurrence of some Rice's whales over a broader distribution in the Gulf than previously considered." Fed. Defs.' Reply at 3 (citing J.A. Vol. II at 547 ("[T]hese data provide evidence for the persistent occurrence of some Rice's whales over a broader distribution in the [Gulf of Mexico] than previously understood.")). In any event, NMFS—the expert in this field—expressly credited the study in recognizing "the currently known distribution of Rice's whales in the western and central [Gulf of Mexico]." J.A. Vol. II at 95 (citing Soldevilla study, *see* J.A. Vol. II at 530). Far from rectifying BOEM's failure to address NMFS's assessment, this fact makes it all the more puzzling that BOEM declined to acknowledge—let alone explain—its difference of opinion in the 2023 Supplemental EIS. *See Gulf Restoration Network*, 47 F.4th at 804 (holding that BOEM "should have explained its position in an EIS" where it "relied on an assumption of effective enforcement" and disputed whether the evidence presented by commenters "raise[d] significant concerns about BSEE enforcement").

To be sure, BOEM is entitled to draw its own conclusions based on the evidence before it. *See Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive."); *Hughes River Watershed Conservancy v. Johnson*, 165 F.3d 283, 288 (4th Cir. 1999) ("Although an agency should consider the comments of other agencies, it does not necessarily

have to defer to them when it disagrees. Agencies are entitled to rely on the view of their own experts."). What BOEM cannot do, however, is "have it both ways"—it "cannot simultaneously rely on" NMFS's determinations, "then brush off comments about" those determinations. *Delaware Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015). That is the archetype of arbitrary and capricious decisionmaking. *See PPL Wallingford Energy*, 419 F.3d at 1198 ("[U]nless the agency answers objections that on their face seem legitimate, its decision can hardly be classified as reasoned." (original alteration, internal quotation marks, and citation omitted)).

### 3.    *Environmental Justice*

Plaintiffs next take issue with BOEM's determination that Lease Sale 259 would produce "immeasurably small" impacts on low-income and minority communities. Pls.' Mem. at 35–39. That determination is unreasonable, Plaintiffs say, because BOEM failed to consider the lease sale's indirect and cumulative effects on these communities—specifically, the effects of onshore oil and gas infrastructure. *Id.* at 37–38; *accord* Hr'g Tr. at 15–18. The record, however, says otherwise.

The purpose of an environmental justice analysis is "to evaluate whether the [proposed action] would have disproportionately high and adverse human health or environmental effects on low-income or minority populations." *Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 688 (D.C. Cir. 2004). Like the other components of an EIS, this analysis "must be reasonable and adequately explained." *Sierra Club*, 867 F.3d at 1368 (internal quotation marks and citation omitted). An agency fails to satisfy this standard if, for example, it offers no more

than "a bare-bones conclusion" that low-income and minority communities would not be disproportionately harmed. *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 140.[17]

It is true that BOEM's "Environmental Justice Determination" in the 2023 Supplemental EIS consisted of just one paragraph. J.A. Vol. II at 340. But the 2023 Supplemental EIS was not the only EIS to address this issue. As its name indicates, the 2023 Supplemental EIS built on BOEM's prior assessments in the Multisale EIS and the 2018 Supplemental EIS. Such "tiering" is permitted (and even encouraged) under CEQ guidance. *See* 40 C.F.R. §§ 1502.20, 1508.28; *Theodore Roosevelt Conservation P'ship*, 616 F.3d at 511–12.

BOEM initially conducted a 20-page analysis of "social factors," including environmental justice, in the Multisale EIS. J.A. Vol. I at 299–320. That EIS analyzed the impacts of a single proposed lease sale (Lease Sale 249), which was representative of the other proposed lease sales in the 2017–2022 Five-Year Leasing Program, such as Lease Sale 259. *See id.* at 172–73 (stating that "the analyses contained in this Multisale EIS examine impacts from a single proposed lease sale" and that "[t]he findings of these analyses can be applied individually to each of the subsequent proposed lease sales"); *accord* Hr'g Tr. at 67:10-13 (BOEM's counsel confirming that the Multisale EIS "analyzes the impacts of a typical sale in the Gulf," "so it's not different from Lease Sale 259").

At the outset, BOEM observed that "[t]he petroleum industry as a whole in the Gulf of Mexico region" is "well-developed, expansive, extensive, and deeply intertwined in the [region's] communities and economies," and thus "[a] single proposed lease sale would mostly solely help

---

[17] Executive Order 12,898 required federal agencies to address environmental justice impacts as part of their NEPA analysis. *Sierra Club*, 867 F.3d at 1368. That order was rescinded by Executive Order 14,173, 90 Fed. Reg. 8633, 8634 (Jan. 21, 2025), parts of which were then enjoined in February 2025. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-cv-333 (ABA), 2025 WL 573764, at *31 (D. Md. Feb. 21, 2025), *opinion clarified*, No. 25-cv-333 (ABA), 2025 WL 750690 (D. Md. Mar. 10, 2025). Because the court concludes that BOEM's environmental justice analysis was not arbitrary or capricious, it need not decide whether such an analysis is independently mandated by NEPA.

to maintain what decades of economic development have built, the complex Gulf of Mexico region that exists today." J.A. Vol. I at 299. From there, BOEM identified the geographic areas that were analyzed, including their socioeconomic and racial makeup, *id.* at 302–05; evaluated the impacts of routine activities, accidental events, and cumulative activities, including impacts from both OCS and non-OCS oil- and gas-related activities, *id.* at 305–16; discussed how those impacts would vary by alternative, *id.* at 317–18; and concluded with an "Environmental Justice Determination," *id.* at 319–20.

To assess the environmental justice impacts of a single proposed lease sale, BOEM "considered potential cumulative, direct, and indirect impacts to minority and low-income populations in the analysis area." *Id.* at 319. BOEM reasoned that oil exploration, extraction, and production "would not have any direct impacts on low-income and minority populations" because these activities "are distant from human habitation." *Id.* As for indirect impacts, BOEM determined that such impacts "*would* occur onshore and would result from the operations of the extensive infrastructure system that supports all onshore and offshore oil and gas activities." *Id.* (emphasis added). BOEM further recognized that "much" of that infrastructure "is located in coastal Louisiana and Texas, and to a lesser extent in Mississippi's Jackson County and Alabama's Mobile County." *Id.* at 319–20. And it carefully distinguished "fabrication and supply facilities," which "are concentrated around coastal ports," from "downstream processing" infrastructure, which "is concentrated in industrial corridors farther inland." *Id.* at 320. That distinction was important, BOEM implied, because "[t]he proportion of Federal OCS contribution to downstream infrastructure use has not yet and, most likely, may never be possible to determine as it is dependent on highly unpredictable market demands and prices." *Id.* at 320. BOEM also noted that "[p]otential environmental justice impacts that may arise from downstream support activities

cannot be influenced by BOEM's decisionmaking because BOEM has no regulatory authority over any onshore activities, including their location." *Id.* "Therefore," BOEM concluded, "a proposed lease sale would not adversely affect minority and low-income populations." *Id.*

BOEM "reexamined" its social factors analysis in both the 2018 Supplemental EIS and the 2023 Supplemental EIS by considering "new information available since publication of the [previous] EIS," but ultimately concluded that "[n]o new information was discovered that would alter the impact conclusion for social factors presented in the [previous] EIS." J.A. Vol. I at 351–57; J.A. Vol. II at 339–47. Accordingly, in the 2018 Supplemental EIS, BOEM reiterated its earlier determination that "a proposed lease sale would not adversely affect minority and low-income populations." J.A. Vol. I at 358. In the 2023 Supplemental EIS, BOEM observed that Lease Sale 259 would "call for 0-1 new gas processing plant and 0-1 new pipeline landfall." J.A. Vol. II at 340. BOEM reasoned that the lease sale's impacts on minority and low-income populations would nevertheless be "immeasurably small" because these populations "are located onshore and distant from Federal OCS oil- and gas-related activities" and "are located within the larger context of onshore and State-regulated nearshore oil and gas activities that are connected to downstream infrastructure over which BOEM has no regulatory authority." *Id.*

Against this backdrop, the court is hard-pressed to conclude that BOEM failed to take a "hard look" at Lease Sale 259's environmental justice impacts. Plaintiffs do not point to any new information that BOEM failed to consider, and at this stage, it is not known where additional infrastructure (if any) would be built. Perhaps Plaintiffs would have a stronger claim had the agency wholly refused to conduct an environmental justice analysis, and had justified this refusal by invoking the distance between coastal communities and offshore drilling or its lack of regulatory authority over downstream activities. *See Sierra Club*, 867 F.3d at 1369. As the

analysis stands, however, the court sees no deficiencies serious enough to defeat NEPA's goals of fostering informed public comment and decisionmaking.

### 4.    Risk of Oil Spills

Plaintiffs' challenge to BOEM's oil spill risk analysis fails for similar reasons.  According to Plaintiffs, two errors infected this analysis: the exclusion of the 2010 Deepwater Horizon oil spill, and the failure to consider certain variables that increase the risk of a spill.  Pls.' Mem. at 39–43; Pls.' Reply at 28.

BOEM does not deny that it excluded Deepwater Horizon when estimating the number, size, and probability of oil spills under each alternative.  *See* Fed. Defs.' Mem. at 39 (acknowledging that BOEM's Oil Spill Risk Analysis (OSRA) modeling "does not include catastrophic spills of over a million barrels, such as the Deepwater Horizon spill").  It made that choice because Deepwater Horizon was, in BOEM's judgment, an outlier.  *See* J.A. Vol. I at 199 ("[T]his spill is considered to be a low-probability catastrophic event, which is not reasonably foreseeable and is therefore not included."); *id.* at 201 ("Extreme events such as the Deepwater Horizon oil spill skew the average and, as such, does not provide a useful statistical measure."); *id.* at 283 ("A spill size group for ≥10,000 [barrels] was not included . . . because the catastrophic Deepwater Horizon oil spill . . . was the only spill in this size range during 1996–2010 and such a spill is not reasonably foreseeable in the future; thus, limited conclusions can be made from a single data point."); *id.* at 330 ("During the last 15 years, the only platform- or pipeline-related spill ≥10,000 [barrels] was the Deepwater Horizon.  However, this spill is considered to be a low-probability catastrophic event, which is not reasonably foreseeable and is therefore not included."); *see also* J.A. Vol. II at 450 (acknowledging that there was one spill ≥10,000 barrels in 2017 but

determining that "this single spill does not change the overall conclusions of the analysis presented in the Supplemental EIS").

But that does not mean BOEM failed to make meaningful disclosures about the probability and consequences of such an event. *See* Pls.' Mem. at 41. As Plaintiffs acknowledge, BOEM modeled a range of potential spills, including spills greater than 10,000 barrels. *Id.* (citing J.A. Vol. II at 228); Pls.' Reply at 28. BOEM also prepared a 143-page report assessing "the potential effects of a low-probability catastrophic spill" on 16 different resources in the Gulf of Mexico, which it incorporated into the 2023 Supplemental EIS by reference. J.A. Vol. II at 184; *see also* J.A. Vol. III at 9–167 (*Gulf of Mexico Catastrophic Spill Event Analysis* Report (2021)); 40 C.F.R. § 1502.21 (allowing agencies to incorporate material into an EIS by reference). Notably, the hypothetical spill it evaluated was based in part on Deepwater Horizon. *See* J.A. Vol. III at 28 (stating that the "hypothetical scenario" developed "is based on the two largest magnitude, blowout-related oil spills that have occurred in the Gulf of Mexico, i.e., Ixtoc I and Deepwater Horizon event").

Plaintiffs have identified no deficiencies in BOEM's methodology, nor do they question BOEM's decision to publish its catastrophic oil spill analysis as a standalone report. *See* Pls.' Reply at 29. The court is therefore unpersuaded as to the inadequacy of BOEM's oil spill modeling. *See Oceana*, 37 F. Supp. 3d at 168–69 (concluding that BOEM's "failure to calculate the probability of a catastrophic oil spill occurring within the OSRA run" was not unreasonable where BOEM substantively discussed that issue in the EIS).

Even if BOEM adequately analyzed the risk of a catastrophic oil spill, Plaintiffs insist, BOEM was still wrong to "discount[]" such a spill as "not reasonably foreseeable nor a part of the Proposed Action" when analyzing Lease Sale 259's impacts on various resources. Pls.' Reply at

29 (quoting J.A. Vol. II at 184).  As BOEM explained, however, "a catastrophic event like the Deepwater Horizon explosion, oil spill, and response . . . should not be overly emphasized in this Supplemental EIS to avoid confusion over whether it is or is not part of a Proposed Action."  J.A. Vol. II at 448–49.  "The key to managing the risk of such an event," BOEM continued, "is to implement a rigorous regulatory regime to ensure that post-lease drilling activities are conducted in a safe manner."  *Id.* at 449; *see also* J.A. Vol. I at 209 (discussing spill-response requirements).

　　　　Plaintiffs do not point to any flaws in BOEM's reasoning, and the court sees none.  Indeed, courts have expressly recognized that "[i]t is logical to discount the most horrible accidents by the fact that they are unlikely to occur; otherwise the worst accidents would dominate a risk assessment to an improper degree."  *Sierra Club v. Watkins*, 808 F. Supp. 852, 867–68 (D.D.C. 1991).  They have also "favorably viewed similar agency reliance on applicable regulatory standards when assessing impacts as part of a NEPA-required analysis."  *Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 126 (citing *EarthReports, Inc. v. FERC*, 828 F.3d 949, 957 (D.C. Cir. 2016)).  To the extent Plaintiffs disagree with BOEM's determination that catastrophic oil spills like Deepwater Horizon are "low probability" events, *see* Pls.' Reply at 28, such a disagreement is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise."  *Wisconsin Valley Improvement v. FERC*, 236 F.3d 738, 746 (D.C. Cir. 2001) (quoting *Marsh*, 490 U.S. at 376).  Plaintiffs do not contest that BOEM is the expert on oil spill risk analysis.  *See* Hr'g Tr. at 105:14-15.  Accordingly, the court must defer to "the informed discretion" of the agency.  *Wisconsin Valley Improvement*, 236 F.3d at 747; *accord Nat'l Comm. for the New River v. FERC*, 373 F.3d 1323, 1327 (D.C. Cir. 2004) ("When an agency 'is evaluating scientific data within its technical expertise,' an 'extreme degree of deference to the agency' is warranted." (citation omitted)).

Plaintiffs' second argument is of the flyspecking variety and therefore does not amount to a NEPA violation. Contrary to Plaintiffs' assertions, *see* Pls.' Mem. at 42, BOEM addressed the relationship between oil spills and risk factors such as severe hurricanes, aging infrastructure, and deepwater drilling. For example, it observed that hurricanes "have toppled, severely damaged, or destroyed the structures associated with oil and gas production," J.A. Vol. I at 182, such as pipelines, *id.* at 207. It further recognized that "hurricanes are the most common cause of spills from both platforms and pipelines," *id.* at 364; *accord id.* at 184, and that "[c]limate change has led to increased numbers and intensity of storms and hurricanes," J.A. Vol. II at 140. *See also* J.A. Vol. I at 229 (discussing hurricane landfalls in the Gulf of Mexico between 1995 through 2016); J.A. Vol. II at 235 (discussing major storms in the Gulf of Mexico between 2017 and 2022).

Aging infrastructure also poses a problem. As BOEM disclosed, "studies have shown that there is a direct relationship between older offshore production facilities and the potential for accidents and spills," J.A. Vol. I at 182, and that "structural failures (e.g., corrosion) account for a significant percentage of the total volume of spilled oil from offshore pipelines," *id.* at 365. Consequently, the Bureau concluded, "future spills would be greatly reduced" by "the placement of new infrastructure, combined with the continual updating of safety regulations." *Id.* at 182; *accord id.* at 184.

As for deepwater drilling, BOEM acknowledged the potential hazards that follow. It specifically pointed to the catastrophic Deepwater Horizon oil spill as evidence that "the loss of well control in deep water presents obstacles and challenges that differ from a loss of well control in shallow waters." *Id.* at 204. The well control techniques deployed during that event "were hindered by water depth," BOEM explained, and "the inability to quickly regain control of a well increases the size of a spill." *Id.* Still, BOEM noted that the "development and production drilling

activity" associated with the 2017–2022 Five-Year Leasing Program was expected to be "evenly spread" between shallower and deeper waters, up to depths of 1,600 meters (in the low-production scenario), or mostly concentrated in shallower waters, between depths of 0 and 200 meters (in the high-production scenario). *Id.* at 175.

Plaintiffs protest that deepwater drilling presents other risks, such as "increased reservoir pressure and temperature and unstable rock and sediment," Pls.' Mem at 42, but they do not explain how these factors materially undercut BOEM's assessment. In any event, more than one court has signaled that the risks associated with deepwater drilling are appropriately considered at a later stage in the leasing process, when site-specific information becomes available. *See Oceana*, 37 F. Supp. 3d at 167; *Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 150 (D.D.C. 2022), *vacated as moot*, No. 22-5036, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023); *see also Tribal Vill. of Akutan v. Hodel*, 869 F.2d 1185, 1192 (9th Cir. 1988) ("Prior to exploration, it is difficult to make so much as an educated guess as to the volume of oil likely to be produced or the probable location of oil wells."). The court thus finds that BOEM has provided a sufficient level of detail to satisfy NEPA.

### 5.     *Range of Alternatives*

Plaintiffs' fifth and final challenge is to BOEM's discussion of alternatives. "When evaluating environmental impacts, an agency must consider reasonable alternatives, including a no-action alternative." *Citizens Action Coal. of Indiana, Inc. v. FERC*, 125 F.4th 229, 239 (D.C. Cir. 2025). "An alternative is 'reasonable' if it is objectively feasible as well as reasonable in light of the agency's objectives." *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 72 (alteration, internal quotation marks, and citation omitted). "Because some alternatives will be impractical or fail to further the proposed action's purpose, agencies may reject unreasonable

alternatives after only brief discussion." *Ctr. for Biological Diversity*, 67 F.4th at 1182.  Courts

review an agency's selection and discussion of alternatives under the "rule of reason." *Citizens*

*Against Burlington, Inc. v. Busey*, 938 F.2d 190, 195 (D.C. Cir. 1991); *Theodore Roosevelt*

*Conservation P'ship*, 661 F.3d at 73.  Accordingly, an agency's analysis will be upheld "so long

as the alternatives are reasonable and the agency discusses them in reasonable detail." *Sierra Club*,

867 F.3d at 1376.

Plaintiffs fault BOEM for (1) failing to "adequately explain why each alternative would

result in similar impacts notwithstanding their differing locations, scope, and conditions";

(2) selecting "an unreasonably narrow range of alternatives"; and (3) declining to examine

Plaintiffs' suggested alternatives without "any valid basis."  Pls.' Mem. at 43–45.  None of these

charges are persuasive.

As to the first, the sole inadequacy Plaintiffs raise is BOEM's comparison of each

alternative's impacts on marine mammals.  Pls.' Mem. at 43–44 (citing J.A. Vol. II at 148).  In

Plaintiffs' view, BOEM illogically concluded that "[t]he effects associated with selection of any

of the alternatives would be equivalent" because BOEM unreasonably dismissed "conclusive data

on the density, general distribution[], and possible migratory behavior[]" of the Rice's whale.  *Id.*

(quoting J.A. Vol. II at 148).  But BOEM's conclusion was not based on a single species; it was

based on "the diversity and distribution of marine mammal species throughout the potential Area

of Interest."  J.A. Vol. II at 147.  "Therefore," BOEM explained, "a similar mix of species would

be exposed to the analyzed impact-producing factors, regardless of the specific action alternative

selected." *Id.* at 148.  The recent evidence of Rice's whale's distribution arguably reinforces that

conclusion, for it shows the whale's "persistent" occurrence throughout a wider area than

previously known.  In any event, BOEM's analysis "represent[ed] the *incremental* contribution of

a lease sale to the cumulative impacts from past, present, and future activities in the [Gulf of Mexico]," *id.* at 207, and evaluated "impacts to the resources/populations as a whole," *id.* at 209. Given the scale of existing oil and gas operations in the Gulf, *see* Pls.' Mem. at 5, it is hardly surprising that a single lease sale would generate "negligible" to "moderate" impacts on various resources and populations, *see* J.A. Vol. II at 208–09; *see also id.* at 197 ("[T]he cancellation of a single lease sale would not significantly change the environmental impacts of overall OCS oil- and gas-related activity over the short or long term."). On this record, BOEM's discussion of alternatives was reasonable.

Plaintiffs' second charge fares no better. Because the alternatives BOEM selected for evaluation "would result in largely the same 'negligible,' 'minor,' or 'moderate' impacts," Plaintiffs contend, BOEM's analysis "prevented the decisionmaker and the public from meaningfully evaluating the difference[s] between the alternatives." Pls.' Mem. at 44. But Plaintiffs have it backwards. The environmental impact of each alternative is the end product of the agency's analysis, not a variable to be manipulated as part of that analysis. *See Theodore Roosevelt Conservation P'ship*, 661 F.3d at 68 ("The EIS is a detailed analysis, prepared with expert assistance, of the projected environmental impact of a proposed major federal action."). Here, the four leasing alternatives "varied in location (different portions of the Gulf), in size (between a low of 26.74 million acres and a high of 80.51 million acres), and in the environmental stipulations that would be required." Fed. Defs.' Mem. at 35 (citing J.A. Vol. II at 190–96). Plaintiffs do not allege that BOEM's consideration of these variables was unreasonable.

That brings us to Plaintiffs' last charge—that BOEM should have expanded the range of alternatives considered. First, Plaintiffs claim that BOEM should have considered "an alternative that would exclude leasing in Rice's whale habitat." Pls.' Mem. at 44. But "[t]he goals of an

action delimit the universe of the action's reasonable alternatives," *Citizens Against Burlington*, 938 F.2d at 195, and here, the undisputed "purpose of and need for" Lease Sale 259 was "to offer for lease those areas that may contain economically recoverable oil and gas resources in order to further the orderly development of OCS oil and gas resources in accordance with the OCSLA," "as directed in the [IRA]." J.A. Vol. II at 179. Put another way, BOEM's overarching objective was to carry out Congress's explicit directive to "conduct" Lease Sale 259.

To be sure, BOEM retained significant discretion to choose which alternative to pursue. *See supra* Part III.B. It was, moreover, "required to balance development [of OCS oil and gas resources] with protection of the human, marine, and coastal environments." BOEM, *Gulf of Mexico OCS Oil and Gas Lease Sales 259 and 261: Final Supplemental Environmental Impact Statement* at C-41 (Jan. 2023).[18] But "given the decision the Bureau faced"—that is, the scope of the lease sale to be held—"it was reasonable to examine different ways in which that [sale] could be implemented compared against a baseline of no action." *Theodore Roosevelt Conservation P'ship*, 661 F.3d at 74 (original alterations and citation omitted) (concluding that the Bureau of Land Management "chose a reasonable range of alternatives" when deciding whether to "act upon" a proposal to expand natural gas development because it evaluated an alternative that "rejected the proposal," an alternative that "implemented the proposal in full," and three alternatives that "implemented modified versions of the proposal that differed primarily in the degree of mitigation required and the size of the core area available for year-round drilling"); *see also Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 372 (D.C. Cir. 1981) (explaining that "congressional action does not vitiate the need for . . . a discussion of alternatives," but "such action does have a bearing on what is considered a reasonable alternative" (citation omitted)). BOEM thus had no obligation

---

[18] Available at https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/GOM_LS259-261_SEIS_FINAL.pdf.

to include a Rice's whale-specific alternative. *Cf. Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 575–77 (D.C. Cir. 2016) (holding that an agency's failure to examine an alternative that would reduce the take of a particular species was unreasonable given the project's core purpose of ensuring the species' preservation).

Plaintiffs also assert that BOEM should have considered "reduced leasing alternatives which would have been more consistent with U.S. climate commitments and OCSLA's environmental mandates." Pls.' Mem. at 44–45. But BOEM *did* consider "a reduced lease sale area alternative" for Lease Sale 259 "based on sensitive biological habitat and reduced leasing activity." J.A. Vol. II at 198; *see id.* at 387. As BOEM explained, that alternative "was eliminated from further consideration" because it "had no additional environmental benefits over Alternative D" and "did not meet the IRA's 60-million-acre requirement for an offshore oil and gas lease sale necessary to issue an offshore wind lease within the following year." *Id.* at 199; *see id.* at 387.

Plaintiffs counter that "nothing in the IRA requires each offshore oil and gas lease sale to be greater than 60 million acres to allow for wind leasing," Pls.' Reply at 34, but that does not mean BOEM was barred from taking that threshold into account when formulating its range of alternatives. *Cf. Theodore Roosevelt Conservation P'ship*, 661 F.3d at 73 ("The agency should also 'always consider the views of Congress' to the extent they are discernible from the agency's statutory authorization and other directives." (quoting *Citizens Against Burlington*, 938 F.2d at 196)). On the contrary, BOEM ably explained why that threshold was relevant to its assessment: "[L]eases from the December 2022 California wind energy auction cannot be issued until a new OCS oil and gas lease sale of sufficient acreage is held." J.A. Vol. II at 180. And it expressly acknowledged that "[e]ither of [Gulf of Mexico] Lease Sales 259 or 261 could be configured to

include the acreage necessary to allow Interior to issue the California wind energy leases from the December auction in compliance with the IRA." *Id.* BOEM proceeded to analyze two leasing alternatives *below* that threshold. *Id.* at 192–94. Of course, it could have analyzed more. But given the time constraints BOEM faced and its aim of promoting oil, gas, and wind development in the Gulf of Mexico, BOEM's choice of alternatives was reasonable.

## IV.    CONCLUSION

For the reasons set forth above, the court grants in part and denies in part the parties' and the intervenors' cross-motions for summary judgment. Pursuant to the briefing schedule requested by the parties and entered by the court, *see* Order Granting Briefing Schedule, ECF No. 46, the court will also order additional briefing on remedy. The parties and the intervenors shall jointly submit a proposed briefing schedule by **April 3, 2025**.

Dated:  March 27, 2025

Amit P. Mehta
United States District Judge