**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEALTHY GULF, et al., | Case No. 1:23-cv-00604-APM |
| *Plaintiffs,* | |
| v. | |
| DOUGLAS BURGUM, et al., | |
| *Defendants,* | |
| and | |
| CHEVRON U.S.A. INC. and AMERICAN PETROLEUM INSTITUTE, | |
| *Intervenor-Defendants.* | |

**PLAINTIFFS' OPENING BRIEF ON REMEDY**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................................ iii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

ARGUMENT ............................................................................................................................ 3

    I.     Vacatur is the Standard Remedy for NEPA Violations. .......................................... 3

          A.    Vacatur is Required by the APA and is Consistent with the
               Purposes of NEPA. ................................................................................... 3

          B.    Courts Have Equitable Authority to Impose Partial Vacatur ...................... 4

          C.    Departure from the Default Remedy of Vacatur or Partial Vacatur
               is Rarely Warranted in NEPA Cases. ........................................................ 5

    II.    This Court Should Vacate the FSEIS and Partially Vacate the Leases
         Issued Pursuant to Lease Sale 259. ........................................................................ 7

          A.    Overview of Plaintiffs' Proposed Remedy. ................................................ 7

          B.    The Bureau's Failure to Properly Consider Climate and Rice's
               Whale Impacts Are Serious Errors. ........................................................... 11

          C.    Defendants Cannot Show that Disruptive Consequences Warrant
               Departure from the Standard Remedy. ....................................................... 12

          D.    The Court Should Retain Jurisdiction and Require the Bureau to
               Provide Periodic Reporting. ...................................................................... 14

CONCLUSION ....................................................................................................................... 15

## TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Alaska Ctr. for Env't v. Browner,*
    20 F.3d 981 (9th Cir. 1994) ................................................................................4

*\*Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n,*
    988 F.2d 146 (D.C. Cir. 1993) ....................................................................5, 12

*Bauer v. DeVos,*
    332 F.Supp.3d 181 (D.D.C. 2018) ......................................................................4

*City of Port Isabel v. FERC,*
    130 F.4th 1034 (D.C. Cir. 2025) .........................................................................6

*Cook Inletkeeper v. Raimondo,*
    541 F.Supp.3d 987 (D. Alaska 2021) ..................................................................5

*Cook Inletkeeper v. U.S. Dep't of the Interior,*
    740 F.Supp.3d 767 (D. Alaska 2024) ................................................................15

*Ctr. for Biological Diversity v. Bernhardt,*
    982 F.3d 723 (9th Cir. 2020) ............................................................................11

*Ctr. for Biological Diversity v. EPA,*
    861 F.3d 174 (D.C. Cir. 2017) ....................................................................6, 12

*Friends of the Earth v. Haaland,*
    583 F.Supp.3d 113 (D.D.C. 2022) ..............................................................6, 8, 11

*Friends of the Earth v. U.S. Army Corps of Eng'rs,*
    109 F.Supp.2d 30 (D.D.C. 2000) ........................................................................7

*Greater Yellowstone Coal. v. Bosworth,*
    209 F.Supp.2d 156 (D.D.C. 2002) ......................................................................7

*Greater Yellowstone Coal. v. Kempthorne,*
    577 F.Supp.2d 183 (D.D.C. 2008) ......................................................................7

*Hammond v. Kempthorne,*
    448 F.Supp.2d 114 (D.D.C. 2006) ......................................................................4

*Healthy Gulf v. Burgum,*
    No. 23-cv-02487 (D.D.C. Aug. 25, 2023) ..........................................................2

*\* Authorities upon which we chiefly rely are marked with an asterisk*

*Humane Soc'y of U.S. v. Dep't of Com.*,
  432 F.Supp.2d 4 (D.D.C. 2006)...................................................................................7

*Humane Soc'y of U.S. v. Johanns*,
  520 F.Supp.2d 8, 37 (D.D.C. 2007)............................................................................3

*Monsanto Co. v. Geertson Seed Farms*,
  561 U.S. 139 (2010)....................................................................................................4

*N. Plains Res. Council v. U.S. Army Corps of Eng'rs*,
  460 F.Supp.3d 1030 (D. Mont. 2020).........................................................................5

*Nat'l Parks Conserv. Ass'n v. Semonite*,
  422 F.Supp.3d 92 (D.D.C. 2019)................................................................................5

*Nat'l Wildlife Fed. v. Norton*,
  332 F.Supp.2d 170 (D.D.C. 2004)..............................................................................7

*Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*,
  896 F.3d 520 (D.C. Cir. 2018)...............................................................................6, 11

*Pub. Emps. for Env't Responsibility v. U.S. Fish & Wildlife Serv.*,
  189 F.Supp.3d 1 (D.D.C. 2016)..........................................................................3, 6, 13

*Reed v. Salazar*,
  744 F.Supp.2d 98 (D.D.C. 2010)................................................................................7

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)....................................................................................................4

*Sierra Club v. FERC*,
  827 F.3d 36 (D.C. Cir. 2016)......................................................................................4

*Sierra Club v. Van Antwerp*,
  719 F.Supp.2d 77 (D.D.C. 2010)............................................................................5, 7

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  280 F.Supp.3d 187 (D.D.C. 2017).............................................................................14

*\*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  282 F.Supp.3d 91 (D.D.C. 2017)................................................................4, 6, 13, 14

*\*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
  985 F.3d 1032 (D.C. Cir. 2021).......................................................................... *passim*

*Sugar Cane Growers Co-op. of Fla. v. Veneman*,
  289 F.3d 89 (D.C. Cir. 2002)...........................................................................6, 12, 13

*United Steel v. Mine Safety & Health Admin.*,
925 F.3d 1279 (D.C. Cir. 2019) ..................................................................................3

**Statutes**

5 U.S.C. § 706.............................................................................................................3

43 U.S.C. § 1351.........................................................................................................14

Pub. L. No. 117-169, 136 Stat. 1818 (2022)................................................................2

**Regulations**

30 C.F.R. § 550.105 .....................................................................................................8

30 C.F.R. § 550.207 .....................................................................................................8

30 C.F.R. § 550.211 .....................................................................................................8

30 C.F.R. § 550.241 .....................................................................................................8

30 C.F.R. § 550.269 .....................................................................................................8

43 C.F.R. § 46.160 .....................................................................................................15

**INTRODUCTION**

Pursuant to the Court's Order Granting Remedy Briefing Schedule, Dkt. 83, Plaintiffs respectfully submit this supplemental brief on remedy. In this Circuit, vacatur of agency actions taken in violation of the National Environmental Policy Act ("NEPA") and the Administrative Procedure Act ("APA") is the default remedy, with exceptions reserved for "rare cases." This is not such a rare case. To the contrary, the Bureau of Ocean Energy Management's ("Bureau") violations of NEPA are serious and go to the core of its duties to consider and disclose the full impacts of Lease Sale 259 before moving forward with the action. As this Court recognized, if the Bureau had properly assessed the lease sale's impacts on climate and risks to the critically endangered Rice's whale, it could have chosen a different course of action: a smaller lease sale, additional environmental conditions, or mitigation measures to reduce such impacts. Moreover, the economic consequences of pausing leasing activities while the Bureau complies with the law do not warrant departure from the standard remedy.

Plaintiffs acknowledge that the directives of the Inflation Reduction Act ("IRA") make vacatur of Lease Sale 259 potentially more complicated than in other cases. Accordingly, rather than seeking to vacate the Lease Sale or the resulting leases in their entirety, as would ordinarily be warranted, Plaintiffs seek more targeted relief. Specifically, Plaintiffs request that the Court: (1) vacate the Final Supplemental Environmental Impact Statement ("FSEIS") and remand it to the Bureau to complete an updated analysis consistent with this Court's Memorandum Opinion and Order, Dkt. 81 ("Mem. Op."); (2) partially vacate the leases granted under Lease Sale 259 such that any survey, exploration, development, drilling, and production activities may not proceed pending completion of a valid new FSEIS; and (3) maintain jurisdiction over this action and require the Bureau to provide regular updates regarding its new analysis and any activity on leases to ensure that harm does not occur in the interim.

**BACKGROUND**

Plaintiffs challenged the Bureau's decision to hold the 73.3 million acre Gulf of Mexico Lease Sale 259, one of the largest offshore oil and gas lease sales in U.S. history, without an adequate environmental review pursuant to NEPA. Lease Sale 259 was originally included in the 2017–2022 Outer Continental Shelf Oil and Gas Leasing Program but was not held prior to the Program's expiration in June 2022. *See* Dkt. 52-1, at 11–12. However, on August 16, 2022, the IRA was signed into law and directed the Secretary of the Interior to take certain steps regarding four lease sales——257, 258, 259, and 261—that had been proposed under the 2017–2022 Program. Pub. L. No. 117-169, § 50264, 136 Stat. 1818 (2022). As relevant here, the IRA required the Secretary to conduct Lease Sale 259 in accordance with the Record of Decision for the 2017–2022 Program no later than March 31, 2023. *Id*. § 50264(d). The IRA contained the same requirement for Lease Sale 261 with a September 30, 2023 sale date. *Id*. § 50264(e). As required by NEPA, the Bureau prepared a single FSEIS covering both lease sales. Dkt. 52-1, at 13–15. Plaintiffs challenged Lease Sale 259 on March 6, 2023, and filed a similar challenge to Lease Sale 261 on August 25, 2023, which has been related to this case. *See Healthy Gulf v. Burgum*, No. 23-cv-02487 (D.D.C. Aug. 25, 2023). The Bureau held Lease Sale 259 on March 29, 2023, and ultimately issued nearly 300 leases covering approximately 1.6 million acres. Declaration of Irene Gutierrez, Ex. 1, filed herewith.

On March 27, 2025, this Court issued its Memorandum Opinion and Order granting in part Plaintiffs' cross-motion for summary judgment with regard to the Bureau's failure to take a "hard look" at the impacts of Lease Sale 259 on climate and Rice's whale. Mem. Op. 25–33, 35–41. The Bureau's faulty climate analysis led it to arbitrarily conclude that although the estimated lifecycle domestic greenhouse gas emissions from Lease Sale 259 would be a staggering 360 million tons, BOEM20090 (tbl.4-1), such emissions were "negligible" because they were only

"slightly higher than, but largely similar" to, the no action alternative. BOEM20099, BOEM20104. The Court found that this analysis failed to examine laws and policies postdating its emissions modeling, which could have altered the Bureau's findings regarding greenhouse gas impacts. Mem. Op. 27. With regard to Rice's whale, the Bureau concluded that impacts from Lease Sale 259 would be "negligible," but considered only the species' habitat in the northeastern Gulf where oil and gas development is prohibited. *See* BOEM19597, BOEM19600, BOEM19602. The Court held that the Bureau ignored record evidence and failed to address a federal expert agency's determination that the species' habitat extends into the western and central Gulf, where the lease sale was held. Mem. Op. 35–41.

**ARGUMENT**

**I.    Vacatur is the Standard Remedy for NEPA Violations.**

**A.    Vacatur is Required by the APA and is Consistent with the Purposes of NEPA.**

"[D]istrict courts in this circuit routinely vacate agency actions taken in violation of NEPA." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 985 F.3d 1032, 1050 (D.C. Cir. 2021); *Humane Soc'y of U.S. v. Johanns*, 520 F.Supp.2d 8, 37 (D.D.C. 2007) ("vacating a rule or action promulgated in violation of NEPA is the standard remedy"); *Pub. Emps. for Env't Responsibility v. U.S. Fish & Wildlife Serv.* ("*PEER*"), 189 F.Supp.3d 1, 2 (D.D.C. 2016). Indeed, remand without vacatur is appropriate only in the "rare case." *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279, 1287 (D.C. Cir. 2019). Strict application of the vacatur standard, as applied in this Circuit, is consistent with the language of the APA itself, which commands that a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

3

"[B]ecause NEPA is a 'purely procedural statute,' where an agency's NEPA review suffers from 'a significant deficiency,' refusing to vacate the corresponding agency action would 'vitiate' the statute." *Standing Rock Sioux Tribe*, 985 F.3d at 1052 (citation omitted). This is consistent with the purpose of NEPA to ensure that "important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Consequently, vacatur is typically necessary to foster an objective analysis and ensure that all options are on the table for an agency to make a new decision based on what it learns. "[I]f the agency's eyes are open to the environmental consequences of its actions and if it considers options that entail less environmental damage, it may be persuaded to alter what it proposed." *Sierra Club v. FERC*, 827 F.3d 36, 45 (D.C. Cir. 2016) (citation omitted).

**B.      Courts Have Equitable Authority to Impose Partial Vacatur.**

While vacatur is the default remedy, courts can also consider whether "partial vacatur" is sufficient to address the harms resulting from an agency's failure to comply with NEPA. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010). This follows from the fact that district courts have "broad latitude in fashioning equitable relief when necessary to remedy an established wrong." *Alaska Ctr. for Env't v. Browner*, 20 F.3d 981, 986 (9th Cir. 1994); *see Bauer v. DeVos*, 332 F.Supp.3d 181, 184–85 (D.D.C. 2018) (discussing court's equitable authority to craft appropriate remedy under APA); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 282 F.Supp.3d 91, 108–09 (D.D.C. 2017) ("A reviewing court may craft relief as equity requires."); *Hammond v. Kempthorne*, 448 F.Supp.2d 114, 121 (D.D.C. 2006) ("Under NEPA, the Court retains its traditional equitable discretion to decide on an appropriate remedy based on a balance of the competing harms.").

Accordingly, district courts "may exercise that discretion where appropriate to order partial, rather than complete, vacatur." *N. Plains Res. Council v. U.S. Army Corps of Eng'rs*, 460 F.Supp.3d 1030, 1037, 1049 (D. Mont. 2020), *appeal dismissed and remanded*, No. 20-35412, 2021 WL 7368336 (9th Cir. Aug. 11, 2021) (granting partial vacatur of agency permit "as it relates to the construction of new oil and gas pipelines pending completion of the consultation process and compliance with all environmental statutes and regulations"). Courts in this Circuit and others regularly exercise their discretion in this manner. *See, e.g.*, *Sierra Club v. Van Antwerp,* 719 F.Supp.2d 77, 79–80 (D.D.C. 2010) (granting partial vacatur of federal agency permit found to violate NEPA and the Clean Water Act to allow defendant to complete the construction of road and manage storm water system "in order to prevent significant harm resulting from keeping the agency's decision in place"); *Cook Inletkeeper v. Raimondo*, 541 F.Supp.3d 987, 995–96 (D. Alaska 2021) (in challenge to oil and gas activities in Cook Inlet, ordering partial vacatur of federal approvals as to the use of tugs associated with drill rig).

### C.     Departure from the Default Remedy of Vacatur or Partial Vacatur is Rarely Warranted in NEPA Cases.

The D.C. Circuit has articulated a two-factor analysis governing a court's discretion to depart from the default rule of vacatur. *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993). A court should weigh "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Standing Rock Sioux Tribe*, 985 F.3d at 1051 (citation omitted). The burden is on defendants to establish an exception to the default rule. *Nat'l Parks Conserv. Ass'n v. Semonite*, 422 F.Supp.3d 92, 99 (D.D.C. 2019).

As to the first factor, the seriousness of a deficiency is determined in part by whether there is a "significant possibility that the agency may find an adequate explanation for its actions

on remand." *Standing Rock Sioux Tribe*, 985 F.3d at 1051 (cleaned up). NEPA reviews that suffer from "a significant deficiency" are definitionally "serious" in this analysis. *Id*. at 1052; *Oglala Sioux Tribe v. U.S. Nuclear Regul. Comm'n*, 896 F.3d 520, 536 (D.C. Cir. 2018) (because NEPA is a "purely procedural statute," where a NEPA review suffers from "a significant deficiency," refusing to vacate the underlying agency action would "vitiate" NEPA). While a specific deficiency in an EIS is less "serious" than, say, the failure to prepare one altogether, it is still the kind of error that "favors vacatur." *City of Port Isabel v. FERC*, 130 F.4th 1034, 1038 (D.C. Cir. 2025).

The second factor asks whether the disruptive consequences of vacatur are "unacceptable in light of the seriousness of the error." *Friends of the Earth v. Haaland*, 583 F.Supp.3d 113, 160 (D.D.C. 2022), *vacated as moot,* 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023). This factor is often invoked when vacatur would result in more environmental harm than would leaving the faulty action in place, as when an agency decision is invalid for being inadequately protective. *See, e.g.*, *Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 188–89 (D.C. Cir. 2017). In other cases, courts hesitate to block agency action that effectively cannot be undone, e.g., when the "egg has been scrambled." *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 97 (D.C. Cir. 2002); *City of Port Isabel*, 130 F.4th at 1038 (not vacating FERC license when it would throw global LNG supply chain "into disarray"). When it comes to the economic impact on third parties whose projects may be delayed, such impacts are not "determinative." *Standing Rock Sioux Tribe*, 282 F.Supp.3d at 104 ("Defendants' *cri de coeur* over lost profits and industrial inconvenience is not fully convincing. Such is the nature of doing business, especially in an area fraught with bureaucracy and litigation."); *PEER*, 189 F.Supp.3d at 3 (court is "reluctant to rely on economic disruption" as reason to remand without vacatur).

Applying these standards in NEPA cases almost always results in vacatur. *See, e.g.*, *Reed v. Salazar*, 744 F.Supp.2d 98, 118–20 (D.D.C. 2010) (vacating wildlife management agreement undertaken without EIS); *Sierra Club*, 719 F.Supp.2d at 80 ("Because intervenors intend on continuing development pursuant to the permit, vacatur is appropriate in order to prevent significant harm resulting from keeping the agency's decision in place."); *Greater Yellowstone Coal. v. Kempthorne*, 577 F.Supp.2d 183, 210 (D.D.C. 2008) (vacating plan allowing snowmobiles in national park); *Humane Soc'y of U.S. v. Dep't of Com.*, 432 F.Supp.2d 4, 25 (D.D.C. 2006) (vacating permits for sea lion research and ordering EIS); *Nat'l Wildlife Fed. v. Norton*, 332 F.Supp.2d 170, 188 (D.D.C. 2004) (declaring Corps permit for private mine "invalid" due to NEPA violation); *Greater Yellowstone Coal. v. Bosworth*, 209 F.Supp.2d 156, 163 (D.D.C. 2002) (vacating grazing leases issued in violation of NEPA); *Friends of the Earth v. U.S. Army Corps of Eng'rs*, 109 F.Supp.2d 30, 44 (D.D.C. 2000) (vacating Corps permit for riverboat casino that was unlawfully issued based on EA rather than EIS).

**II.    This Court Should Vacate the FSEIS and Partially Vacate the Leases Issued Pursuant to Lease Sale 259.**

**A.    Overview of Plaintiffs' Proposed Remedy.**

Here, Plaintiffs seek tailored relief—vacatur of the FSEIS, partial vacatur of leases issued pursuant to Lease Sale 259, and ongoing oversight of the Bureau's compliance. As this Court understands, the IRA mandated that a lease sale of some configuration occur. And Plaintiffs anticipate that Intervenors will present evidence of the difficulty of unwinding financial and other transactions if Lease Sale 259 itself is fully vacated. Accordingly, this Court should tailor relief to the circumstances of this case.

First, the Court should vacate the FSEIS and remand it to the Bureau to prepare a new one—including public comment and appropriate technical review—to comply with this Court's

Memorandum Opinion and Order. This will ensure that the Bureau takes a "hard look" at the impacts of Lease Sale 259 on climate and Rice's whale, and considers appropriate conditions or mitigation measures consistent with this analysis. It will also prevent the Bureau from authorizing any action pursuant to a categorical exclusion under its regulations.[1]

Second, and consistent with the first request for relief, the Court should partially vacate the leases issued pursuant to Lease Sale 259. Specifically, the Court should vacate any provision in the leases that allows survey or ground-disturbing activities, while leaving the leases themselves in place. Leases enable a host of activities – once they have obtained their leases and complied with applicable regulations, lessees may conduct "geological and geophysical explorations," "drill water wells within the leased area," and/or construct "artificial islands, installations, and other devices permanently or temporarily attached to the seabed and other works and structures necessary to the full enjoyment of the lease." *See, e.g.*, Gutierrez Decl., Ex. 2, sec. 2 (Lease OCS-G 37438); BOEM01671–72. Lessees may also conduct exploration and development activities in accordance with plans approved by the Bureau. Gutierrez Decl. Ex. 2, sec. 9; *see also* 30 C.F.R. §§ 550.105, .207, .211, .241 (authorizing ancillary, exploration, and development activities).

These kinds of activities have already taken place on leases sold in Lease Sale 259 and 261. For example, geophysical and geological explorations have already been conducted in the lease areas, and some lessees have obtained exploration plan or development-and-operations coordination document approvals. Gutierrez Decl. Exs. 4, 7. Geophysical and geological

---

[1] Interior's manual and implementing NEPA regulations provide categorical exclusions for exploration plans and development and production plans in the western and central Gulf. 516 Department Manual § 15.4(C)(10); 30 C.F.R. § 550.269(a). Thus, the lease sale stage is crucial in addressing NEPA's requirements. *See Friends of the Earth*, 583 F.Supp.3d at 133–34.

explorations use airguns and other equipment to assess oil and gas reserves and map underwater and coastal topography. BOEM00010. These surveys are conducted pre- and post-lease to evaluate hydrocarbon potential, assist with siting exploration and development wells, and monitor reservoir status. BOEM00010–11, BOEM01671–72. Some surveys will take place in the near future and some approvals for these surveys run through 2026. Gutierrez Decl. ¶¶ 6-7, Exs. 4, 5, 6.

This kind of activity can cause serious environmental harm. The airguns used for surveys deploy powerful acoustic energy pulses to map the underwater landscape. *See* BOEM00011–38. These sounds may be heard over hundreds or even thousands of kilometers underwater and can cause harm to marine life, including: hearing loss, acute and chronic stress, and changes in foraging and other behaviors. Declaration of Douglas P. Nowacek ¶¶ 7–20, 48, filed herewith; Declaration of Dr. Matthew Leslie ¶¶ 22, 31–33, filed herewith. Seismic surveys pose particular risks to Rice's whales, due to the overlap of their habitat with oil and gas development in the Western and Central Gulf (including leases from Lease Sale 259 and 261), and the adverse effects that surveys are likely to have on biologically essential behaviors (like vocalizing, communicating with other whales, including calves, mating, and foraging), and causing physical stress responses. *See* Gutierrez Decl. ¶ 11, Ex. 12 (Map of Lease Sale 259 and 261 Lease Blocks); Nowacek Decl. ¶¶ 21–47. These effects could devastate the critically endangered Rice's whale population. Nowacek Decl. ¶¶ 7, 49–50 (stating that surveys "would have both behavioral and physiological consequences in a population for which any decrement in fitness could jeopardize survival or prevent recovery"); Leslie Decl. ¶¶ 31–34 (stating development "highly likely to exacerbate the stressors on Rice's whales" and "degrade the whales' ability to recover.").

Additionally, some lessees have obtained exploration plan ("EP") or development-and-operations coordination document ("DOCD") approvals. Gutierrez Decl., Ex. 7. The exploration phase involves further surveys and drilling an exploration well to "determine if an oil and/or gas resource exists." BOEM01672, BOEM01980–81. If resources are discovered in economically favorable quantities, additional wells may be drilled to "define the amount of the resource or the extent of the reservoir," and an operator may also choose to seek approval for further development of the site, which could involve drilling development wells and installing a production facility. BOEM00205, BOEM01673, BOEM01982.

Exploration and development activities will also result in underwater noise from surveys and drilling, increased vessel traffic, disturbances to bottom habitat and waste discharges, increased air emissions, and the potential for accidental oil spills. BOEM02012–16. Increased industry activity and, in particular, increased vessel traffic, could pose serious risks to the Rice's whale population. Leslie Decl. ¶¶ 22–30. At lease one EP from Lease Sale 261 authorizes activity in the area NMFS considered inhabited by Rice's whale, and some operators have received DOCDs allowing them to start production of oil. Gutierrez Decl. ¶¶ 9-10, Exs. 8–11. And as the Court has acknowledged, oil and gas related activities may lead to "degradation of wetlands, coastal resources, benthic habitat, and pelagic habitat; behavioral changes to fish, sea turtles, marine mammals, and birds; mortality of individual organisms; and changes in air and water quality." Mem. Op. 11. Vacating the lease provisions that enable these activities would allow the FSEIS to be corrected while preventing the harms from ongoing lease development.

Third, this Court should exercise ongoing jurisdiction over the case and require the Bureau to provide periodic reporting to the Court and the parties regarding its progress and any activities that might take place. This proposed relief is discussed further in Section II.D below.

**B.    The Bureau's Failure to Properly Consider Climate and Rice's Whale Impacts Are Serious Errors.**

As Judge Contreras emphasized in a challenge to Lease Sale 257, "[v]acatur is the standard remedy for good reason" when agencies fail to faithfully fulfill their duties under NEPA. *Friends of the Earth*, 583 F.Supp.3d at 156 (vacating Gulf of Mexico Lease Sale 257 due to inadequate EIS). There, the agency's failure to include foreign emissions in its greenhouse gas estimate was a "serious" failing warranting vacatur, as it "was without a doubt highly relevant to the ultimate decision." *Id*. at 157–58. Similarly, in *Standing Rock Sioux Tribe*, the Army Corps' failure to prepare an EIS for a major pipeline was "serious" for purposes of the *Allied Signal* test. 985 F.3d at 1052–53; *see Oglala Sioux Tribe*, 896 F.3d at 536 ("The seriousness of the NEPA deficiency is particularly clear here because the point of NEPA is to require an adequate EIS before a project goes forward."); *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 740 (9th Cir. 2020) (vacating approval of offshore oil and gas project based on faulty greenhouse gas emissions analysis and finding that if the Bureau "later concludes that such emissions will be significant, it may well approve another alternative included in the EIS or deny the lease altogether").

Applying these principles here is not difficult. As Plaintiffs emphasized in their summary judgment brief, the Bureau's errors in its climate analysis were foundational to its decision. Dkt. 52-1, at 23–29. By using a misleading baseline against which to compare project lifecycle emissions, the FSEIS gravely understated total project emissions, which in turn, was a key component of the decision to move forward with the sale as proposed. *Id*. Under those circumstances, this Court concluded that the Bureau had failed to engage in "reasoned decisionmaking." Mem. Op. 28. The Bureau will be required, on remand, to conduct some level of "reasonable forecasting" to evaluate how current laws and policies impact the baseline that

11

underlies their greenhouse gas analysis. *Id*. at 29–30. Nor does it appear plausible that a "qualitative analysis" will suffice. *Id*. at 31. Conclusory information and "acknowledging the absence of information" will not replace a "reasoned analysis" of the issue in a revised SEIS. *Id*. at 32. Ultimately, the Bureau will have to make a new decision in light of revised findings. This is the kind of definitionally serious agency error that weighs in favor of vacatur.

The same is true for the Bureau's arbitrary and capricious failure to address evidence regarding impacts to the critically endangered Rice's whale. As this Court found, the FSEIS "arbitrarily limited" its analysis to avoid key areas of habitat identified by the National Marine Fisheries Service ("NMFS"). *Id*. at 38–41. This failure was "particularly glaring" in light of the Bureau's acknowledgement that NMFS's expertise warranted particular deference. *Id*. at 38. The use of updated and accurate information regarding the species and its habitat will likely show that Lease Sale 259's impacts are far greater than what is reflected in the agency's environmental review. *See* BOEM10959 (NMFS finding that the Rice's whale population is so precarious that the loss of just one individual could "drive the species to extinction."); *see also* Nowacek Decl. ¶¶ 7, 49–50; Leslie Decl. ¶¶ 16–20, 34. Thus, a corrected analysis for Lease Sale 259 will likely have a dramatic effect on the agency's assessment of the environmental costs and benefits of holding a sale, putting into doubt whether the agency "chose correctly." *Allied Signal*, 988 F.2d at 150. These serious failures weigh strongly in favor of vacatur.

## C.    Defendants Cannot Show that Disruptive Consequences Warrant Departure from the Standard Remedy.

This is not a case where the disruptive consequences of vacatur might outweigh the seriousness of the Bureau's NEPA violations. For example, vacatur would not result in reduced environmental protections as in *Center for Biological Diversity*, 861 F.3d at 188. Nor has the "egg" been so "scrambled" that there is no practical way to revert to the status quo. *Veneman*,

12

289 F.3d at 97. To the contrary, Plaintiffs seek a modified, partial vacatur that avoids the necessity to unwind settled transactions or unduly disrupt the leasing process.

As to Defendants' likely claims of economic disruptions, these are not ordinarily a basis for refusing to vacate an illegal action. *See Standing Rock Sioux Tribe*, 985 F.3d at 1051 (finding that economic disruption "is not commonly a basis, standing alone, for declining to vacate agency action"). To the extent that economic costs are cognizable, they do not warrant departure from the standard remedy in this case. *See, e.g.*, *PEER*, 189 F.Supp.3d at 3 ("[I]t is not clear that economic concerns are as relevant in an environmental case like this one."); *Standing Rock Sioux Tribe*, 985 F.3d at 1051, 1053 (upholding vacatur despite economic disruptions).

Moreover, to the extent there are any disruptive consequences for intervenors, they knowingly embraced that risk. Plaintiffs filed this lawsuit shortly after the Bureau issued the Record of Decision for Lease Sale 259, several weeks before the lease sale took place, and months before any leases became effective. *See* Dkts. 1, 29. Lessees entered their bids for Lease Sale 259 with full knowledge of this case and Plaintiffs' request for relief, and based on their own calculation of the risks and benefits. The Court should not reward companies for manufacturing "disruption" by knowingly engaging in a risky activity. As this Court has noted, the risk of disruption is inherent in the "nature of doing business, especially in an area fraught with bureaucracy and litigation." *Standing Rock Sioux Tribe*, 282 F.Supp.3d at 104.

Finally, this Court must also consider the disruptive consequences of *not* granting Plaintiffs' requested remedy. *Id.* at 105 (weighing "potentially disruptive effect" of oil spill that could occur in the absence of vacatur). As the record and the attached declarations reveal, authorizing lessees to conduct survey and ground-disturbing activities like seismic testing with airguns, exploration, and drilling activities, with all of the attendant vessel traffic and pollution,

13

creates the potential for significant irreversible harm to species already on the brink of extinction. Nowacek Decl. ¶¶ 7, 49-50; Leslie Decl. ¶¶ 7, 34. These concerns lie at the heart of this lawsuit, and they should not be sidelined by "economic myopia" focusing on the impact to lessees. *Standing Rock Sioux Tribe,* 282 F.Supp.3d at 105.

In sum, Defendants are unlikely to show that disruptive consequences warrant departure from Plaintiffs' tailored request for relief. Partial vacatur of the leases to prevent survey or ground-disturbing activities will prevent environmental harm from occurring until the new analysis is complete, without causing undue disruption to settled transactions. It will also maintain consistency with the IRA and allow the Bureau to exercise its discretion in future approvals consistent with this analysis. *See* 43 U.S.C. § 1351(h)(1).

> **D.    The Court Should Retain Jurisdiction and Require the Bureau to Provide Periodic Reporting.**

Finally, this Court should retain jurisdiction over this matter pending the Bureau's completion of a revised FSEIS and direct the agency to provide status updates every 60 days on both the revised environmental analysis and any activity on issued leases (surveys, exploration, development, drilling, and production activities). Interim relief of this nature is within this Court's equitable powers. For example, this Court in *Standing Rock Sioux Tribe* ordered defendants to comply with a number of interim conditions during a NEPA remand, including finalizing oil spill response plans, conducting a third-party audit of the pipeline's safety, and submitting bimonthly status reports to the court so that it would "receive[] up-to-date and necessary information about the operation of the pipeline and the facts on the ground." *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, 280 F.Supp.3d 187, 189 (D.D.C. 2017); *Standing Rock Sioux Tribe*, 282 F.Supp.3d at 109 ("A reviewing court may craft relief as equity requires.").

Such relief is commonplace in situations like this one. *See, e.g.*, *Cook Inletkeeper v. U.S. Dep't of the Interior*, 740 F.Supp.3d 767, 795–96 (D. Alaska 2024) (suspending offshore lease pending completion of supplemental EIS, retaining jurisdiction during the pendency of the supplemental EIS process, and directing the Bureau to file status reports every 6 months until supplemental NEPA review is complete). These reports will allow the Court to remain apprised of the Bureau's progress toward a revised FSEIS as well as any on-the-ground activities that could cause harm in the interim.[2]

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant its request for tailored relief. A proposed order is attached herewith.

Respectfully submitted this 9th day of May, 2025.

/s/ George Torgun
George Torgun (*pro hac vice*)
EARTHJUSTICE
50 California St., Suite 500
San Francisco, CA 94111
415-217-2000 Telephone
415-217-2040 Fax
gtorgun@earthjustice.org

Jan E. Hasselman (DC Bar No. WA0029)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-343-7340 Telephone

---

[2] Because the FSEIS at issue here was prepared by the Bureau for both Lease Sale 259 and Lease Sale 261, BOEM19440, the relief requested here should also apply to Lease Sale 261 and the leases issued pursuant to that action. *See* 43 C.F.R. § 46.160 (agency may undertake action during NEPA analysis process only where "there is adequate NEPA documentation to support the individual action").

415-217-2040 Fax
jhasselman@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Bayou City Waterkeeper, Friends of the Earth, and Center for Biological Diversity*


 /s/ Kristen Monsell
Kristen Monsell (DC Bar No. CA00060)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Ste. 800
Oakland, CA 94612
510-844-7137 Telephone
510-844-7150 Fax
kmonsell@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity*


 /s/ Thomas Zimpleman
Thomas Zimpleman (DC Bar No. 1049141)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St., Suite 300
Washington, DC 20005
202-513-6244 Telephone
tzimpleman@nrdc.org

Julia K. Forgie (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second St.
Santa Monica, CA 90401
310-434-2351 Telephone
jforgie@nrdc.org

Irene Gutierrez (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
111 Sutter St., 21st Floor
San Francisco, CA 94104
415-875-6187 Telephone
igutierrez@nrdc.org

Melanie D. Calero (*pro hac vice*)
NATURAL RESOURCES DEFENSE COUNCIL
40 W. 20 Street

16

New York, NY 10011
212-727-4546 Telephone
mcalero@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*


*/s/ Devorah Ancel*
Devorah Ancel (*pro hac vice*)
SIERRA CLUB
PO Box 4998
Austin, TX 78765
415-845-7847 Telephone
303-449-6520 Fax
devorah.ancel@sierraclub.org

*Attorney for Plaintiff Sierra Club*

17