**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEALTHY GULF, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) |
| DOUG BURGUM, et al., | ) |
| | ) **Case No. 23-cv-604 (APM)** |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| CHEVRON U.S.A. INC. and AMERICAN | ) |
| PETROLEUM INSTITUTE, | ) |
| | ) |
| Intervenors-Defendants. | ) |
| | ) |

<u>**MEMORANDUM OPINION**</u>

**I.**

In March 2023, Defendant Bureau of Ocean Energy Management (BOEM) conducted Lease Sale 259, encompassing millions of acres in the Gulf of Mexico for oil and gas production. Two years later, the court held that BOEM's sale ran afoul of the National Environmental Policy Act (NEPA) because the agency failed to take the requisite "hard look" at the sale's potential environmental consequences. The court thereafter asked for briefing on the appropriate remedy.

After the parties submitted their filings, BOEM prepared an additional environmental impact statement that it believed addressed the issues the court found the agency had overlooked. In its view, this development renders these proceedings moot. Intervenors-Defendants Chevron U.S.A., Inc. and American Petroleum Institute agree. Plaintiffs maintain that there is still a live controversy.

For the reasons that follow, the court concludes that the case is not moot. It accordingly proceeds to fashioning the appropriate remedy: remand without vacatur.

**II.**

The court detailed the full factual background of this case in its summary judgment opinion so reproduces here only the facts and procedural history necessary to its present decision. *See Healthy Gulf v. Burgum*, 775 F. Supp. 3d 455, 465–68 (D.D.C. 2025).

BOEM first proposed Lease Sale 259 as part of a series of offshore oil and gas lease sales in the Gulf of Mexico. *Id.* at 466. After the original program under which the sale was supposed to occur expired, Congress passed the Inflation Reduction Act (IRA), which ordered that Lease Sale 259 take place no later than March 31, 2023. *Id.* at 466–67. In advance of the sale, BOEM completed a supplemental environmental impact statement, or EIS, analyzing its possible environmental effects ("2023 EIS"). *Id.* at 467; *see also Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015) (explaining NEPA's EIS requirement (citing 42 U.S.C. § 4332(C))). BOEM ultimately authorized the lease of 13,600 blocks covering approximately 73.3 million acres. *Healthy Gulf*, 775 F. Supp. 3d at 467. The sale occurred on March 29, 2023. *Id.*

Plaintiffs challenged BOEM's approval of the sale, alleging that the 2023 EIS was deficient. *Id.* at 467–68. On cross-motions for summary judgment, the court agreed with Plaintiffs in part. The court concluded that BOEM had inadequately analyzed the sale's impact on both greenhouse gas emissions and the Rice's whale, an endangered species. As to the former, the court explained that BOEM had not sufficiently explained why it could not have used reasonable forecasting as a substitute for updated emissions modeling data that was not yet available. *Id.* at 481. Specifically, BOEM used outdated data that did not account for law and policy changes like the IRA that may "incentivize certain patterns of energy production and consumption" when

2

"establishing its baseline scenario." *Id.* at 480. This choice risked "underestimat[ing] or overestimat[ing] the resulting greenhouse gas emissions and, ultimately, [the] proposed action's environmental impacts." *Id.* As to the Rice's whale, the court noted that BOEM failed to respond to an updated report from the National Marine Fisheries Service (NMFS) that demonstrated the whale's habitat range in the Gulf extended more widely than initially believed. *Id.* at 485. Yet "the [habitat] distribution of Rice's whale bore directly on [BOEM's] evaluation of Lease Sale 259's impacts on Rice's whale," thus making BOEM's failure to consider the updated NMFS report arbitrary and capricious. *Id.* at 486–87. The court, however, found that BOEM's analysis was sufficient in other respects, such as its consideration of environmental justice, the risk of oil spills, and possible alternatives to the proposed plan. *See id.* at 488–95. Still, the court concluded that "had BOEM complied with its NEPA obligations" in full, "the scope of Lease Sale 259 may well have been different." *Id.* at 472.

At the parties' request, the court invited briefing on the question of proper remedy. *Id.* at 495. Rather than vacate Lease Sale 259 in its entirety, Plaintiffs asked for a narrower remedial package: (1) vacate the supplemental EIS and remand to the agency to prepare a new one; (2) partially vacate the leases to disallow lessees to conduct any "survey or ground-disturbing activities, while leaving the leases themselves in place"; and (3) retain jurisdiction over the case and require BOEM to file regular status reports. Pls.' Opening Br. on Remedy, ECF No. 85 [hereinafter Pls.' Br.], at 7–10. Both BOEM and Intervenors-Defendants, on the other hand, sought remand without vacatur. Fed. Defs.' Remedy Br., ECF No. 84 [hereinafter Fed. Defs.' Br.], at 1; Mem. on Remedy of Intervenors-Defs., ECF No. 86 [hereinafter Intervenors-Defs.' Br.], at 1.

3

Approximately two months after briefing concluded, BOEM advised that it planned to act on lessees' pending approval requests for exploration, development, and production plans. Fed. Defs.' Notice Regarding Pending Exploration Plans and Development Plans, ECF No. 94. It added that it had completed another EIS ("2025 EIS") regarding oil and gas lease sales in the Gulf and that a corresponding notice of availability would be published in the Federal Register shortly thereafter. *Id.* at 2. Several months later, BOEM "issued a new Record of Decision to Reaffirm Decisions for Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sales 259 and 261" ("2026 ROD"). Fed. Defs.' Notice Regarding the Issuance of a Record of Decision for Lease Sale 259, ECF No. 95 [hereinafter Fed. Defs.' Notice], at 2.[1] The agency's latest findings relied on the 2025 EIS, prior environmental analyses, the most recent emissions modeling data from the Energy Information Administration, and a new biological opinion from NMFS concerning the Rice's whale's habitats in the Gulf. *Id.* As BOEM sees it, its renewed analysis and decision both address the deficiencies in its original EIS and moot the remedies proceedings as to the original sale approval. *Id.* Intervenors-Defendants agree. *See* Intervenors-Defs.' Resp. to Fed. Def.'s Notice, ECF No. 97 [hereinafter Intervenors-Defs.' Resp.]. Plaintiffs responded to BOEM's notice to dispute both points. *See* Pls.' Resp. to Fed. Defs.' Notice, ECF No. 96.

The court issued an Order requiring Plaintiffs to show cause why this matter should not be dismissed as moot in light of the 2026 ROD. Order to Show Cause, ECF No. 98. Plaintiffs responded on May 3, 2026, contending that there is still a live controversy. Pls.' Resp. to Order to Show Cause, ECF No. 100 [hereinafter Pls.' Resp.].

---

[1] *See* Gulf of America, Outer Continental Shelf, Record of Decision To Reaffirm Decisions for Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sales 259 and 261 and Gulf of America Regional OCS Oil and Gase Lease Sales and Post-Lease Activities: Final Programmatic Environmental Impact Statement, 91 Fed. Reg. 9296, 9296 (Feb. 25, 2026) (directing to Record of Decision to Reaffirm Decisions for Gulf of Mexico Outer Continental Shelf Oil and Gas Lease Sales 259 and 261, https://perma.cc/T5ZM-TKT7 [hereinafter 2026 ROD]).

**III.**

The court "begin[s] with the question of mootness, as it is a 'threshold jurisdictional issue.'" *S. Co. Servs., Inc. v. FERC*, 416 F.3d 39, 43 (D.C. Cir. 2005) (quoting *Coal. of Airline Pilots Ass'ns v. FAA*, 370 F.3d 1184, 1189 (D.C. Cir. 2004)). A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 568 U.S. 165, 172 (2013) (citation omitted). This occurs "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* (internal quotation marks omitted). "As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (internal quotation marks omitted).

Defendants contend that the case is moot in light of the 2026 ROD. BOEM reasons that, because it has now addressed the deficiencies in the original EIS in reaching a new decision, there is no error left to remediate. *See* Fed. Defs.' Notice at 2. Intervenors-Defendants assert the same. They argue that the original sale approval has been rescinded and replaced by the 2026 ROD, so the court can no longer grant any relief as to the original approval. *See* Intervenors-Defs.' Resp. at 1–2. Any issue with the 2026 ROD, they continue, would need to be raised through a separate challenge. *Id.* at 3.

The court disagrees. There is still a live controversy because the court may still grant Plaintiffs effectual relief as to the 2023 EIS and original sale approval.[2] Defendants' reasoning rests on two faulty premises. First, to the extent Defendants argue that BOEM's updated explanations as to greenhouse gas emissions and the Rice's whale alone moot the case, that mischaracterizes the nature of the relief Plaintiffs seek. Plaintiffs ask for more than mere

---

[2] One reason Plaintiffs argue the case is not moot is that an improperly appointed agency official signed the 2026 ROD, so it has no legal force or effect and cannot moot the case. Pls.' Resp. at 2–4. The court concludes on other grounds that the case is not moot, so it assumes without deciding that BOEM validly executed the 2026 ROD.

reconsideration of these two issues.  Rather, from the outset of the case, Plaintiffs have asked the court to remand to the agency for further environmental analysis *and* vacate the sale in some form. *See* Compl., ECF No. 1, at 43; Pls.' Br. at 7–10.  That Defendants believe BOEM has addressed the deficiencies identified by the court does not moot the broader relief Plaintiffs seek.  *See Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 377 (2019) (emphasizing the "demanding standard" to demonstrate mootness).  In other words, there is still some form of relief—vacatur or, even without vacatur, a remand for yet further analysis—that the court may grant, even after BOEM has performed additional analysis in the interim.

Second, BOEM has not "rescinded and replaced" the 2023 sale approval or the underlying EIS.  *See* Intervenors-Defs.' Resp. at 1–2.  As BOEM itself notes, its 2026 ROD "[r]eaffirm[s]" its prior sale approval.  Fed. Defs.' Notice at 2.  And BOEM continues to rely on the 2023 EIS when deciding on post-leasing actions, such as whether to approve exploration plans.  *See* Pls.' Resp., Ex. 2, ECF No. 100-3, at 2 (CM/ECF pagination).  Where, as here, the new approval "makes clear on its face that it does not displace" the original and instead "incorporates" it, "the [new actions] preserve, rather than moot, the original controversy."  *Powder River Basin Res. Council v. U.S. Dep't of the Interior*, No. 22-cv-2696 (TSC), 2026 WL 555013, at *3–4 (D.D.C. Feb. 27, 2026) (quoting *Pickus v. U.S. Bd. of Parole*, 507 F.2d 1107, 1111 (D.C. Cir. 1974)), *appeal docketed*, No. 26-5119 (D.C. Cir. Apr. 15, 2026).

This critical detail renders Intervenors-Defendants' analogy to *Theodore Roosevelt Conservation Partnership v. Salazar*, 661 F.3d 66 (D.C. Cir. 2011), inapposite.  *See* Intervenors-Defs.' Resp. at 2.  There, the court deemed Plaintiffs' challenge to an ROD moot because a new ROD by its terms "superseded" the original one "in its entirety," and thus the initial ROD "no longer exist[ed]." *Salazar*, 661 F.3d at 79.  Accordingly, the court could "neither invalidate, nor

require the [agency] to adhere to, a Record of Decision that has 'disappeared into the regulatory netherworld.'" *Id.* (quoting *Nw. Pipeline Corp. v. FERC*, 863 F.2d 73, 77 (D.C. Cir. 1988)).  The terms of BOEM's 2026 ROD here are not comparable.  It does not "supersede," but rather "reaffirms," the 2023 EIS and approval, and that approval therefore remains of this world, not a "regulatory netherworld."  And, once again, BOEM continues to cite the 2023 EIS as support for post-leasing decisions.  The court therefore can still order remedies with respect to the 2023 EIS and original sale approval on which the 2026 ROD at least partially relies.  *See 350 Montana v. Haaland*, 50 F.4th 1254, 1264 (9th Cir. 2022).  As a result, this case is not moot.

**IV.**

The court now proceeds to determining the proper remedy.  Plaintiffs do not ask for full vacatur of Lease Sale 259.  Pls.' Br. at 8.  Nor could they, as Congress compelled the sale, and they do not challenge Congress's ability to do so.  *Healthy Gulf*, 775 F. Supp. 3d at 466–67.  Instead, Plaintiffs ask the court to vacate the 2023 EIS and remand for preparation of a new one, partially vacate the lease sale to prevent any further development of the leases while the agency prepares a new EIS, and retain jurisdiction to ensure compliance.  Pls.' Br. at 7–10.  Defendants ask for remand without vacatur.  Fed. Defs.' Br. at 1; Intervenors-Defs.' Br. at 1.

The court will remand without vacatur.  "Although vacatur is the typical remedy for an [Administrative Procedure Act] violation, it is not inevitable."  *Gulf Restoration Network v. Haaland*, 47 F.4th 795, 804 (D.C. Cir. 2022).  Whether to vacate an agency action depends on (1) "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly)" and (2) "the disruptive consequences of an interim change that may itself be changed."  *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993).  Both factors counsel against vacatur here.

*Seriousness.* A deficiency is not "serious" if "there is at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Id.* at 151. As the Supreme Court recently said, "[e]ven if an EIS falls short in some respects, that deficiency may not necessarily require a court to vacate the agency's ultimate approval of a project, at least absent reason to believe that the agency might disapprove the project if it added more to the EIS." *Seven Cnty. Infrastructure Coal. v. Eagle County*, 605 U.S. 168, 185 (2025).

Subsequent events have demonstrated a strong likelihood that BOEM can reach the same result after examining the latest information on greenhouse gas emissions and the Rice's whale's habitat. In the 2026 ROD, BOEM explained that it updated its emissions-analysis model to account for the effects of more recent policy changes, including the IRA. 2026 ROD at 6, 8. The agency "considered the updated analysis . . . in making [its] decision to reaffirm Lease Sales 259 and 261 in the manner they were held." *Id.* at 8. Similarly, the agency also updated its impacts analysis on the Rice's whale's habitat. *Id.* In 2025, NMFS released a new biological opinion (BiOp), which includes updated information on habitat range, detections in the western and central Gulf, and protective measures to avoid jeopardizing the species. *Id.* BOEM determined that the information contained therein "further confirmed the conclusions reached in" the 2023 EIS regarding the lease sales. *Id.* at 8–9. BOEM also noted that the leases issued pursuant to Lease Sale 259 require that any protective measures dictated by subsequent BiOps "be applied to post-lease actions." *Id.* at 9. So, BOEM concluded, "the lease sale and issued leases contain adequate mitigations at the lease sale stage, and later stages will be subject to additional mitigations and protections for species as appropriate." *Id.* at 11.[3]

---

[3] Plaintiffs contend that the BiOp should play no role in the court's analysis because "[a]n agency cannot rely upon compliance with a non-NEPA document to satisfy its environmental review obligations under NEPA." Pls.' Resp. Br. on Remedy, ECF No. 89, at 9–10. This contention misses the mark. BOEM does not argue that the BiOp relieves

The 2026 ROD thus demonstrates that there is "at least a serious possibility that the [agency] will be able to substantiate its decision on remand." *Allied-Signal*, 988 F.2d at 151. The "seriousness" factor accordingly weighs against vacatur.

In response, Plaintiffs emphasize that BOEM's errors were "foundational to its decision" to approve the sale. Pls.' Br. at 11. So, they continue, "updated and accurate information" on both greenhouse gas emissions and the distribution of the Rice's whale would "likely have a dramatic effect on the agency's assessment of the environmental costs and benefits of holding a sale." *See id.* at 11–12. The 2026 ROD, however, arguably reflects those updated analyses. The court thus has "no reason to doubt that BOEM itself can make the same case on remand." *Gulf Restoration Network*, 47 F.4th at 805.

Plaintiffs also challenge BOEM's processes for preparing the 2026 ROD and its underlying analyses, as well as the extent to which the documents actually address the deficiencies the court identified. *See* Pls.' Resp. at 6–8. But the adequacy of BOEM's updated analysis is not the question at this stage. The question is whether there is a strong possibility that BOEM could reach the same decision on remand such that vacatur is unnecessary. The 2026 ROD makes evident that there is. Any questions as to the propriety of the 2026 ROD or the analyses on which it relies are for another day.

*Disruptiveness.* Additionally, even partial vacatur would have disruptive consequences. True, the requested relief would not require BOEM to cancel leases or return bid money, as Plaintiffs do not ask the court to vacate the sales themselves. *See* Fed. Defs.' Resp. Br. Regarding Remedy, ECF No. 90, at 12–13. But lessees collectively paid almost $250 million for their leases

---

it of the obligation to perform its own review under NEPA. Instead, BOEM relied on the BiOp and other analyses as part of the environmental effects review that led to the 2026 ROD, *see* 91 Fed. Reg. at 9296, which demonstrates its ability to correct the deficiencies the court identified on remand.

and have "now acted for years in reliance" on them, investing even further since purchasing. *See* Intervenors-Defs.' Br. at 10.  Lessees have paid substantial sums of money in rent.  *See id*. at 10; Intervenors-Defs.' Br., Fourth Decl. of Trent Webre, ECF No. 86-1 [hereinafter Webre Decl.], ¶ 15 (noting that Chevron has paid nearly $13 million in rent).  They have performed site surveys, conducted facilities planning, and contracted with third parties to further exploration, development, and production plans.  Intervenors-Defs.' Br. at 10 (citing Intervenors-Defs.' Br., Decl. of Holly A. Hopkins in Supp. of Intervenors-Defs.' Br., ECF No. 86-2 [hereinafter Hopkins Decl.], ¶ 10); Webre Decl. ¶¶ 17–18 (describing investments of $110 million in new data licenses and $25 million for vendor work, as well as thousands of personnel hours).  And the governing statute prompts lessees to make swift progress, as "lessees risk forfeiting their leases if they cannot timely meet certain obligations."  Intervenors-Defs.' Br. at 10–11 (quoting *Gulf Restoration Network*, 47 F.4th at 805); *see also* Webre Decl. ¶ 21; Hopkins Decl. ¶ 10.

Just as in *Gulf Restoration Network*, these facts weigh against vacatur.  There, the D.C. Circuit noted that vacatur would be "highly disruptive for the lessees" because "[t]hey have paid millions of dollars to obtain their leases and have acted for some four years in reliance on them—including by investing substantial additional sums and by executing contracts with third parties."  47 F.4th at 805.  The same—albeit for a slightly shorter period of time—is true here.

Plaintiffs respond that "claims of economic disruptions . . . are not ordinarily a basis for refusing to vacate an illegal action."  Pls.' Br. at 13.  But courts in this Circuit have repeatedly weighed economic consequences to private parties when deciding whether to vacate agency action based on a NEPA violation.  *See, e.g.*, *Gulf Restoration Network*, 47 F.4th at 805; *Pub. Emps. for Env't Resp. v. Hopper*, 827 F.3d 1077, 1084 (D.C. Cir. 2016) (requiring consideration of "the social and economic costs of delay"); *Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,

10

282 F. Supp. 3d 91, 104 (D.D.C. 2017) ("[I]t is clear that courts in this Circuit have repeatedly considered the economic implications of vacatur—including in cases addressing environmental harms." (citing cases)).   This court accordingly does the same.

Plaintiffs next attempt to diminish the weight of the economic consequences, arguing that lessees "knowingly embraced [the] risk."  Pls.' Br. at 13.  To Plaintiffs, "the risk of disruption is inherent in the 'nature of doing business, especially in an area fraught with bureaucracy and litigation.'"  *Id.* (quoting *Standing Rock Sioux Tribe*, 282 F. Supp. 3d at 104).  And they note that they filed this lawsuit before any sales occurred, meaning "[l]essees entered their bids for Lease Sale 259 with full knowledge of this case and Plaintiffs' request for relief, and based on their own calculation of the risks and benefits."  *Id.*  Intervenors-Defendants do not contest that they assumed some risk of economic disruption.  *See* Reply Mem. on Remedy of Intervenors-Defs., ECF No. 91, at 14.  To be sure, that contextualizes the court's analysis of the economic impacts of vacatur.  But it does not render them irrelevant, particularly in light of the Supreme Court's recent directive to consider the impact of delays and costs that vacatur may impose on both the agency and developers.  *See Eagle County*, 605 U.S. at 183–84.  The potential delays and costs of even partial vacatur here counsel against it.

Plaintiffs lastly emphasize "the disruptive consequences of *not* granting Plaintiffs' requested remedy," like threats to endangered species from ongoing lease development.  Pls.' Br. at 13.  The court undoubtedly must and does consider them—after all, NEPA's purpose is to ensure that the environmental impacts of a project are adequately accounted for.  *See Sierra Club*, 803 F.3d at 36–37.  But, as described above, it appears likely that the agency can reach the same conclusion even after accounting for updated data on these risks.  Moreover, any post-lease development plans must be approved by the agency after "additional environmental review,"

2026 ROD at 10, which helps ensure that the environmental risks of ongoing development are considered, *see Gulf Restoration Network*, 47 F.4th at 805.  And as to endangered species, specifically, recall that, by the terms of the leases, any such approval must account for updated environmental analyses like BiOps, which prescribe mitigation measures to protect endangered species.  So the court does not believe that, absent vacatur, environmental risks will persist unchecked.

All in all, the court is wary of inviting the "disruptive consequences of an interim change that may itself be changed."  *Allied-Signal, Inc.*, 988 F.2d at 150–51.  Here, the court sees a substantial likelihood that such an interim change *would* itself be changed.  "[A]bsent reason to believe that the agency might disapprove the project if it added more to the EIS," the court will remand without vacatur.  *Eagle County*, 605 U.S. at 185.

## V.

For the foregoing reasons, the court remands this matter to BOEM without vacatur. A separate final order accompanies this Memorandum Opinion.

Dated:  May 21, 2026

Amit P. Mehta
United States District Judge